# Exhibit C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MIKE BLATZER, Derivatively on Behalf of Nominal Defendant ATKORE INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| WILLIAM E. WALTZ, JR., JOHN M. DEITZER, DAVID P. JOHNSON, MICHAEL V. SCHROCK, B. JOANNE EDWARDS, JERI L. ISBELL, WILBERT W. JAMES, JR., JUSTIN A. KERSHAW, SCOTT H. MUSE, BETTY R. WYNN, and A. MARK ZEFFIRO, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | **JURY TRIAL DEMANDED** |
| and | ) ) ) | |
| ATKORE INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Mike Blatzer ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Atkore Inc. ("Atkore" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants,

United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Atkore, legal filings, news reports, securities analysts' reports about the Company, filings in the related securities class action captioned *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Atkore Inc., et al.*, Case No. 1:25-cv-01851 (N.D. Ill.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Atkore against certain of its current and former officers and members of the Company's Board (collectively, the "Individual Defendants")[1] for breaches of their fiduciary duties between at least February 1, 2024 and February 3, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. According to the Company's public filings, Atkore is a leading manufacturer of electrical, safety, and infrastructure products in the construction, renovation, residential, and industrial markets.

3. The Company's product categories include metal electrical conduit fittings, plastic pipe conduit and fittings, mechanical tubing, and metal framing and fittings, among others. To manufacture its products, Atkore primarily uses steel, copper, polyvinyl chloride ("PVC") resin, and high density polyethylene ("HDPE"). PVC water pipes and electrical conduit pipes ("PVC Pipes") are among the Company's main offerings.

4. Shipping costs drastically increased when the COVID-19 pandemic began. As a

---

[1] The Individual Defendants are William E. Waltz, Jr. ("Waltz"), John M. Deitzer ("Deitzer"), David P. Johnson ("Johnson"), Michael V. Schrock ("Schrock"), B. Joanne Edwards ("Edwards"), Jeri L. Isbell ("Isbell"), Wilbert W. James, Jr. ("James"), Justin A. Kershaw ("Kershaw"), Scott H. Muse ("Muse"), Betty R. Wynn ("Wynn"), and A. Mark Zeffiro ("Zeffiro"). "Defendants" means Atkore and the Individual Defendnats.

result, foreign PVC Pipe manufacturers to struggled to sell PVC Pipes in the United States for a profit throughout the pandemic. Seeing an opportunity, Atkore and other U.S.-based PVC Pipe manufacturers exchanged confidential and competitively sensitive data to artificially inflate the price of PVC Pipes to benefit themselves.

5.      However, as the COVID-19 pandemic slowed, shipping prices returned to normal levels, allowing the foreign PVC Pipe manufacturers to re-enter the U.S. market. As a result, beginning in late 2022, the sales price of PVC Pipes began to decline.

6.      Despite this decline, throughout the Relevant Period, the Individual Defendants made numerous materially false and misleading statements related to the Company's success in the PVC Pipe market. The Individual Defendants repeatedly assured investors that Atkore was on a path of continued success post-pandemic and that the PVC Pipe price drops were based on normal supply and demand competition.

7.      In reality, as detailed herein, Atkore, along with other U.S.-based PVC Pipe manufacturers, engaged in a scheme to artificially inflate the price of PVC Pipes through the exchange of competitively sensitive business information regarding PVC Pipe pricing and sales in order to create the illusion of success. Accordingly, Atkore could not sustain its success in the market once foreign manufacturers re-entered and prices began to decline.

8.      On July 24, 2024, "ManBear Chicken's Coop," a short seller firm, published a short report titled "Pipe Price Fixing," wherein they accused Atkore and three other U.S.-based PVC Pipe manufacturers of fixing prices by using an industry newsletter called Oil Price Information Service, LLC ("OPIS") to coordinate pricing actions.[2] However, the Individual Defendants assured

---

[2] *Pipe Price Fixing*, MANBEARCHICKEN'S COOP (July 24, 2024), https://manbearchicken.substack.com/p/pipe-price-fixing.

investors that the allegations in the report were "unsubstantiated."

9. One month after the report was published, Atkore was named as a defendant in a number of civil antitrust lawsuits, including the consolidated class action captioned *In re PVC Pipe Antitrust Litig.*, Case No. 1:24-cv-07639 (N.D. Ill.) (the "Antitrust Class Action"). These actions allege that, from at least April 1, 2021, Atkore and other U.S.-based PVC Pipe manufacturers conspired to artificially inflate the price of PVC Pipes through the exchange of competitively sensitive business information regarding PVC Pipe pricing and sales through OPIS in violation of federal antitrust laws.

10. The truth was revealed months later, on February 4, 2025, when the Company issued a press release announcing its financial results for the first quarter of 2025 (the "1Q25 Earnings Release"). In the 1Q25 Earnings Release, Atkore revealed that its net sales for the first quarter were $661.6 million, which was nearly $20 million below analysts' estimates for the quarter. Atkore also revealed that it was significantly reducing its adjusted earnings per share ("EPS") and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") guidance for the rest of the fiscal year 2025.

11. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Deitzer revealed that the Company's "plastic pipe and conduit product category declined mid-single digits during the quarter" compared to "high single digits in the prior year." Defendant Deitzer also stated that the reduced financial guidance for 2025 was largely due to its PVC Pipe business, stating that "roughly $75 million or 3/4 of that is on the PVC side."

12. On this news, the Company's stock price fell $15.59 per share, or approximately

4

20%, to close at $64.13 per share on February 4, 2025.

13. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company engaged in an anticompetitive price-fixing scheme that caused the price of PVC Pipes in the United States to be artificially inflated; (ii) the financial benefits the Company experienced as a result of the scheme were artificially inflated and unsustainable; (iii) as the scheme was exposed, Atkore and the other U.S.-based PVC Pipe manufacturers involved in the scheme could no longer artificially inflate the price of PVC Pipes, resulting in a substantial decrease in the price of PVC Pipes in the United States; (iv) the decrease in PVC Pipes pricing negatively impacted the Company's business; (v) the Company did not have effective risk oversight mechanisms and controls in place; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

14. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Waltz, Deitzer, and Johnson on February 21, 2025, in the United States District Court for the Northern District of Illinois.

15. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action and the Antitrust Class Action and other related actions, as well as additional losses, including reputational harm and loss of goodwill.

16.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Atkore's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R.§240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.§240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))..

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     In connection with the acts, conduct and other wrongs complained of herein, the

Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Atkore maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action and Antitrust Class Action are pending in this District.

## PARTIES

### *Plaintiff*

23.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Atkore.

### *Nominal Defendant*

24.     Nominal Defendant Atkore is a Delaware corporation with its principal executive offices located at 16100 South Lathrop Avenue, Harvey, Illinois 60426.  Atkore's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ATKR."

### *Individual Defendants*

25.     Defendant Waltz has served as President, Chief Executive Officer ("CEO"), and a director of the Company since 2018. Waltz previously served in various other executive roles at the Company between 2013 and 2018. Waltz also serves as a member of the Company's Executive Committee. According to the Company's public filings, Defendant Waltz received $8,031,015 in compensation from the Company in 2024.

26.     Defendant Deitzer has served as Chief Financial Officer ("CFO") of the Company since August 2024. Deitzer previously served as Vice President of Investor Relations of the

Company from 2019 until August 2024. According to the Company's public filings, Defendant Deitzer received $763,864 in compensation from the Company in 2024.

27.     Defendant Johnson served as CFO of the Company from 2018 until August 2024 and as Chief Accounting Officer of the Company from 2019 until August 2024. According to the Company's public filings, Defendant Johnson received $2,164,647 in compensation from the Company in 2024.

28.     Defendant Schrock has served as a director of the Company since May 2018 and as Chairman of the Board since August 2018. Schrock also serves as Chair of the Company's Executive Committee. According to the Company's public filings, Defendant Schrock received $390,888 in compensation from the Company in 2024.

29.     Defendant Edwards has served as a director of the Company since 2023. Edwards also serves as a member of the Company's HR & Compensation Committee and Nominating & Governance Committee. According to the Company's public filings, Defendant Edwards received $250,888 in compensation from the Company in 2024.

30.     Defendant Isbell has served as a director of the Company since 2015. Isbell also serves as Chair of the Company's Nominating & Governance Committee and as a member of the Company's HR & Compensation Committee and Executive Committee. According to the Company's public filings, Defendant Isbell received $289,398 in compensation from the Company in 2024.

31.     Defendant James has served as a director of the Company since 2017. James also serves as a member of the Company's Audit Committee and Nominating & Governance Committee. According to the Company's public filings, Defendant James received $264,584 in compensation from the Company in 2024.

32. Defendant Kershaw has served as a director of the Company since 2017. Kershaw also serves as Chair of the Company's HR & Compensation Committee and as a member of the Company's Audit Committee and Executive Committee. According to the Company's public filings, Defendant Kershaw received $281,019 in compensation from the Company in 2024.

33. Defendant Muse has served as a director of the Company since 2015. Muse also serves as a member of the Company's Audit Committee and Nominating & Governance Committee. According to the Company's public filings, Defendant Muse received $271,906 in compensation from the Company in 2024.

34. Defendant Wynn has served as a director of the Company since 2018. Wynn also serves as Chair of the Company's Audit Committee and as a member of the Company's Nominating & Governance Committee and Executive Committee. According to the Company's public filings, Defendant Wynn received $285,420 in compensation from the Company in 2024.

35. Defendant Zeffiro has served as a director of the Company since 2015. Zeffiro also serves as a member of the Company's Audit Committee and HR & Compensation Committee. According to the Company's public filings, Defendant Zeffiro received $261,430 in compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36. By reason of their positions as officers and/or directors of Atkore, and because of their ability to control the business and corporate affairs of Atkore, the Individual Defendants owed Atkore and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Atkore in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Atkore and its shareholders.

37.     Each director and officer of the Company owes to Atkore and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Atkore, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of Atkore were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Atkore, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and

10

future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42. To discharge their duties, the officers and directors of Atkore were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Atkore were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Illinois and the United States, and pursuant to Atkore's own Code of Business Ethics and Conduct (the "Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Atkore conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Atkore and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

11

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Atkore's operations would comply with all applicable laws and Atkore's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)   Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43.     Each of the Individual Defendants further owed to Atkore and the shareholders the duty of loyalty requiring that each favor Atkore's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Atkore and were at all times acting within the course and scope of such agency.

45.     Because of their advisory, executive, managerial, and directorial positions with Atkore, each of the Individual Defendants had access to adverse, non-public information about the Company.

46.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Atkore.

## ATKORE'S CODE OF CONDUCT

47.     The Company's Code of Conduct applies to the Company's "Employees, including full-time, part-time, salaried, hourly, union and nonunion, officers and executives" and members of the Board.

48.     The Code of Conduct begins with a section titled "Code Highlights," which states, in relevant part:

- This Code is an expression of Atkore's commitment to the highest standards of ethics and business conduct. . . .

- All Employees and Directors are expected to comply with all applicable laws, rules and regulations; maintain the Company's propriety information in confidence; abide by all Company Policies; and exercise fair dealing in all aspects of the business.

- All Employees and Directors involved in preparing reports to the SEC or NYSE or who regularly communicates with the press, investors or analysts will ensure that such reports and communications are full, fair, timely, accurate and understandable.

49.     Under the section titled "Compliance with Laws, Rules & Regulations," the Code of Conduct states:

> Employees and Directors are required to comply fully with all laws, rules and regulations affecting the Company's business and its conduct in business matters. The Company conducts its business globally where applicable laws, rules, regulations, customs and social requirements may be different from those in the United States. It is the Company's policy to abide by the national and local laws of our host nations and communities. The fact that in some countries certain standards of conduct are legally prohibited, but these prohibitions are not enforced in practice, or their violation is not subject to public criticism or censure, will not excuse any illegal action by an employee. In the case of any conflict between foreign and United States law, or in any situation where an employee has a doubt as to the

13

proper course of conduct, it is incumbent upon an employee to immediately consult the Legal Department.

Beyond the strictly legal aspects involved, Employees and Directors are expected to act honestly and maintain the highest standards of ethics and business conduct at all times, consistent with the professional image of the Company.

50. Under a section titled "Conflicts of Interest," the Code of Conduct states:

Employees and Directors must base business decisions and actions on the best interest of the Company. Accordingly, the Atkore Conflicts of Interest Policy addresses conflicts of interest, including corporate opportunities, and all Employees and Directors are required to abide by the Atkore Conflicts of Interest Policy.

51. Under a section titled "Quality of Disclosures," the Code of Conducts states:

The federal and state securities laws impose continuing disclosure requirements on the Company, and require Atkore to regularly file certain reports with and make certain submissions to the U.S. Securities and Exchange Commission (the "SEC") and the New York Stock Exchange ("NYSE") and disseminate them to its stockholders. Such reports must comply with all applicable legal and exchange requirements and may not contain material misstatements or omit material facts.

All Employees and Directors directly or indirectly involved in preparing such reports, any Employees and Directors who regularly communicate with the press, investors or analysts concerning the Company, and all representatives who assist the Company in preparing such reports and communications, will ensure that such reports and communications are: (i) full, fair, timely, accurate and understandable; and (ii) meet all legal requirements. This Code applies to all public disclosure of material information about the Company, including written disclosures, oral statements, visual presentations, press conferences and media calls.

## ATKORE'S AUDIT COMMITTEE CHARTER

52. Atkore's Audit Committee Charter states that the primary purposes of the Audit Committee are:

(a) to assist the Board in overseeing (i) the quality and integrity of the financial statements of the Company; (ii) the Company's compliance with legal and regulatory requirements, including the effectiveness of the Company's internal control over financial reporting; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditors; (v) the accounting, financial and external reporting policies and practices of the Company; (vi) the performance of the other functions set forth in this Charter; and (b) to prepare the report of the Committee required to be

included in the Company's annual proxy statement under the rules of the U.S. Securities and Exchange Commission (the "SEC").

53. The Audit Committee Charter states that Atkore's Audit Committee has the following duties and responsibilities, among others:

*__Interaction with the Independent Auditor__*

1. *Appointment and Oversight*. The Committee shall have sole and direct responsibility and authority for the appointment or replacement (subject, if applicable, to shareholder ratification), compensation, retention, termination, evaluation and oversight of the work of each independent auditor (including resolution of any disagreement between the management of the Company and each such independent auditor regarding financial reporting and internal control related matters) or other consultants engaged by the Company for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attestation services for the Company, and each such independent auditor or consultant shall report directly to the Committee. Oversight of the independent auditors shall include discussions with the independent auditor about the independent auditor's responsibilities under generally accepted auditing standards, the scope and timing of the audit plan, including the independent auditors' review of internal control over financial reporting and the overall audit strategy. . . .

*__Annual Financial Statements, Quarterly Financial Statements and Annual Audit__*

1. *Meetings with Management, the Independent Auditor and the Internal Auditor.*

(a) The Committee shall review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's reviews of the quarterly financial statements, including any difficulties encountered or significant disagreements with management and management's responses to such matters. Additionally, the Committee shall receive and review any disclosure from the Company's CEO and CFO made in connection with the certification of the company's quarterly and annual reports filed with the SEC of any fraud, whether or not material, that involves management or other employees who have a significant role in the company's controls or significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting.

(b) The Committee shall meet with management, the independent auditor and the internal auditor prior to each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

15

(c) The Committee shall review and discuss with management and the independent auditor: (i) significant issues regarding accounting and auditing principles and practices and financial statement presentations, including all critical accounting policies and estimates, any significant changes in the Company's selection or application of accounting principles, and any significant issues as to the adequacy of the Company's internal controls over financial reporting and any special audit steps adopted in light of significant deficiencies or material weaknesses in the design and operation of internal controls over financial reporting; (ii) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (iv) any significant correspondence or communications from regulators or governmental agencies; (v) any significant changes to the Company's auditing and accounting principles and practices suggested by the independent auditor, internal audit personnel or management; (vi) management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act; and (vii) the independent auditors' selection of critical audit matters.

(d) The Committee shall periodically review and discuss with management the Company's guidelines and policies with respect to the process by which the Company undertakes risk assessment and risk management, including discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

(e) The Committee shall review and discuss with management the Company's practices regarding earnings press releases and the provision of financial information and earnings guidance by management to analysts and ratings agencies, including the use and presentation of non-GAAP financial metrics.

(f) The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Company's Form 10-K.

(g) The Committee shall prepare, review and approve the report of the Committee required by the SEC to be included in the Company's annual proxy statement.

(h) The Committee shall review and discuss with the Chief Executive Officer and Chief Financial Officer the procedures undertaken in connection with the Chief Executive Officer's and the Chief Financial Officer's certifications for reports on Form 10-K and Form 10-Q. The Committee shall review and discuss with the Chief Executive Officer and Chief Financial Officer their evaluation of the Company's disclosure controls, procedures and internal controls.

2.      *Separate Meetings with the Independent Auditor.* The Committee shall, at least annually, review with the independent auditor, out of the presence of management if deemed appropriate, the audit process, including, without limitation, any problems or difficulties the independent auditor may have encountered during the course of the performance of the audit, including any restrictions on the independent auditors' activities or access to requested information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee shall review with the independent auditor are: (a) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); (b) any significant communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement; (c) the Company's internal controls and the responsibilities, budget and staffing of internal control function, including any "management" or "internal control" letter issued, or proposed to be issued by the independent auditor to the Company; and (d) the matters required to be communicated to audit committees in accordance with the auditing standards of the PCAOB, as they may be modified or supplemented, relating to the conduct of the audit, including under Auditing Standard No. 1301 and Auditing Standard No. 1305 (as the same may be amended or superseded).

3.      *Assurances.* The Committee shall obtain annually assurance from the independent auditor that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

### ***Internal Audit and Compliance Matters***

1.      *Appointment.* The Committee shall review the appointment and termination of the senior internal audit personnel, all significant reports to management prepared by internal audit personnel, and management's responses.

2.      *Separate Meetings with the Internal Auditor.* The Committee shall meet periodically with the Company's internal auditor to discuss the responsibilities, budget and staffing of the Company's internal audit function and any issues that the internal auditor believes warrant the Committee's attention. The Committee shall discuss with the internal auditor any significant report to management prepared by the internal auditor and any responses from management.

3.      *Internal Control Reports.* The Committee shall cause management to prepare a report in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 and review such report of management's assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year.

4.      *Complaints.* The Committee shall establish and maintain procedures for (a)

the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. The Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

5.      *Legal Matters.* The Committee shall discuss with the Company's General Counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the financial statements or the compliance policies of the Company or any of its subsidiaries, and any material reports or inquiries received by the Company or any of its subsidiaries from regulators or government agencies.

### *Reports to the Board: Review of Committee Performance and Charter*

1.      *Reports to the Board.* The Committee shall report regularly to the Board and review with the Board any issues that arise with respect to (a) the quality or integrity of the Company's financial statements; (b) the performance and independence of the Company's independent auditor; (c) the performance of the Company's internal audit function; and (d) the Company's compliance with legal and regulatory requirements.

2.      *Review of Committee Performance and Charter.* The Committee shall undertake and review with the Board an annual performance evaluation of the Committee, which shall compare the performance of the Committee with the requirements of this Charter and set forth the goals and objectives of the Committee for the upcoming year. The performance evaluation by the Committee shall be conducted in such a manner as the Committee deems appropriate. The report to the Board may take the form of an oral report by the Chair of the Committee or any other member of the Committee designated by the Committee to make this report. The Committee shall review and reassess annually its performance and compliance with this Charter, the adequacy of this Charter and recommend any proposed changes to the Board for approval.

### *Other Powers and Responsibilities*

1.      *Related-Party Transactions.* The Committee shall discuss with management and the independent auditor any related-party transactions brought to the Committee's attention which could reasonably be expected to have a material impact on the financial statements of the Company and its subsidiaries. The Committee shall review and approve of all "related party transactions" as required to be disclosed under Item 404 of Regulation S-K.

18

2.      *Code of Ethics.* The Committee shall (i) regularly review the Company's code of ethics to ensure that the Company and its employees comply with the highest standards of integrity and ethical and moral business conduct; (ii) determine whether the code of ethics is in compliance with all applicable rules and regulations; (iii) recommend for Board approval any changes to be made to the code of ethics; and (iv) review management's monitoring of the Company's compliance with the code of ethics. In addition, the Committee shall evaluate whether management is setting the appropriate tone at the top by communicating the importance of ethical behavior and the guidelines for acceptable business practices. . . .

4.      *Risk Disclosure.* The Committee shall, prior to finalization and public disclosure thereof, review and discuss with the Company's counsel any proposed disclosures of risks which could have a material impact on the Company.

5.      *Other Powers.* The Committee shall exercise such other powers and perform such other duties and responsibilities as are incidental to the purposes, duties and responsibilities specified herein and as may from time to time be delegated to the Committee by the Board.

## SUBSTANTIVE ALLEGATIONS

*Background*

54.      Atkore is a manufacturer of electrical, safety, and infrastructure products in the construction, renovation, residential, and industrial markets.

55.      The Company's product categories include metal electrical conduit fittings, plastic pipe conduit and fittings, mechanical tubing, and metal framing and fittings, among others. To manufacture its products, Atkore primarily uses steel, copper, PVC resin, and HDPE. PVC Pipes are one of the Company's main products.

56.      During COVID-19, shipping costs drastically increased. As a result, foreign PVC Pipe manufacturers struggled to sell PVC Pipes in the United States for a profit. Seeing an opportunity, Atkore and other U.S.-based PVC Pipe manufacturers exchanged confidential and competitively sensitive data to artificially inflate the price of PVC Pipes. This pricing increase generated historic profits for Atkore, with Atkore reporting $913.4 million in net income in 2022, an increase of $325.6 million from its net income in 2021.

19

57.     However, as shipping prices returned to normal levels following the pandemic, foreign PVC Pipe manufacturers began to re-enter the U.S. market, resulting in a decline in PVC Pipe sales. Atkore informed investors of this, reporting that "part of the pricing outperformance that we've enjoyed over the past several years has started to normalize." However, throughout the Relevant Period, the Individual Defendants repeatedly assured investors that Atkore was on a path of continued success post-pandemic and that the PVC Pipe price drops were based on normal supply and demand competition.

***Individual Defendants' Materially False and Misleading Statements***

58.     On February 1, 2024, Atkore issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, Atkore reported net sales of $798.5 million, which constituted a 4.2% decrease year-over-year. The Company attributed this decrease, in part, to decreased average selling prices across the Company's products of $130.4 million as a result of expected pricing normalization."

59.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Johnson assured investors that the price decreases experienced by the Company were normal and expected, stating, in relevant part, "I'm pleased by our strong volume performance in the quarter with organic volumes up over 13%. These gains were offset by the continued pricing normalization, but this impact was within expectations and aligns with the pricing trends we have been discussing for the past several years."

60.     During the question and answer section of the 1Q24 Earnings Call, in response to a question regarding the "changes in competitive landscape," Defendant Waltz stated that there was "[n]othing of significance" and that "[t]here's always minor players that try to enter noise

level things, so somebody importing a product because of things." Also in response to this question, Defendant Johnson stated, "there are a lot of reasons why [] we do well and that the competitive landscape is fairly stable year-over-year."

61.     On May 7, 2024, Atkore issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). In the 2Q24 Earnings Release, the Company reported net sales of $792.9 million, a decrease of 11.5% year-over-year. The Company again assured investors that this decrease was normal, attributing this decrease, in part, to "decreased average selling prices across the Company's products of $85.5 million as a result of expected pricing normalization." Moreover, in the 2Q24 Earnings Release, Defendant Waltz was quoted as stating, in relevant part, that "Atkore achieved solid results in the second quarter" and "I am pleased with the results we've been able to achieve."

62.     On the same day, the Company hosted an earnings call with analysts and investors to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Johnson reported that the Company "continued to experience pricing normalization," but that the "second quarter results were in line with our expectations, both sequentially and from a year-over-year perspective." Waltz also assured investors that the Company was operating as normal during the 2Q24 Earnings Call, stating, in relevant part, "we are within our expectations of the pricing normalization topic." During the question and answer portion of the 2Q24 Earnings Call, in response to a question regarding "imports of conduit," Defendant Waltz assured investors that the Company had a "price premium" because of its "reputation," "quality," and "ability to ship."

63.     Then, on July 24, 2024, ManBearChicken's Coop published the report titled "Pipe Price Fixing." The report alleged that Atkore, along with three other PVC Pipe manufacturers, was

21

using the OPIS service to coordinate price actions to fix the PVC Pipe prices. The report stated, in relevant part:

> **We believe the apparent price fixing has resulted in massively inflated pipe prices and converter margins.** These prices appear to defy economic logic, remaining at extremely elevated levels despite normalized supply chains, normalized input costs (resin), and weak demand. Today, PVC municipal and conduit pipe prices remain 4.7x and 2.7x above pre-Covid levels, respectively, according to OPIS.
>
> **Price inflation has driven converter (ATKR, OTTR, WLK) and distributor (CNM) profits to never-before-seen levels. We believe these companies are materially over-earning**. . . .
>
> ATKR's core electrical segment EBITDA grew 3.4x from 2019 to 2023 (majority organic) as reported price increased +86% and margins expanded from 20% to 38%.

64. Shortly thereafter, on August 6, 2024, Atkore issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). In the 3Q24 Earnings Release, the Company announced net sales of $822.4 million for the quarter, a decrease of 10.5% year-over-year.

65. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results (the "3Q24 Earnings Release"). During the 3Q24 Earnings Release, when asked about the allegations in the July 24th report, Defendant Waltz stated, "I am going to claim that report is *unsubstantiated* from the conclusions it tries to make." (Emphasis added).

66. Then, that same month, Atkore was named as a defendant in a number of civil antitrust lawsuits, including the Antitrust Class Action. These actions allege that, from at least April 1, 2021, Atkore and other U.S.-based PVC Pipe manufacturers conspired to artificially inflate the price of PVC Pipes through the exchange of competitively sensitive business information regarding PVC Pipe pricing and sales through OPIS in violation of federal antitrust laws.

22

67.   Specifically, the Antitrust Class Action alleged that:

> OPIS receives from the Converter Defendants and certain other market participants a daily inflow of information, including prices, transactions, and projections. OPIS provides in turn the Converter Defendants with weekly reports that include prices, which the Converter Defendants rely on to set their PVCP prices. To create their weekly reports, OPIS personnel are in constant communication with PVCP marketplace players, including the Converter Defendants, to discover and report on prices (including bids and offers made by or to direct purchasers such as members of the class Plaintiff is seeking to represent) as well as pricing and market trends.

Antitrust Class Action, First Amended Class Action Complaint (ECF No. 184) ¶ 6.

68.   One such example of the wrongdoing in the Antitrust Class Action is alleged as follows:

> On June 21, 2024, the OPIS Report stated:

> Converters conceded they need to figure out how to push prices higher. The consensus this week was for a single price increase that would take prices up by about 5% over the current market level, with another percentage added to account for the discount. Then, if that works, do it again and again until it stops working. Conduit converters have been successful with this strategy in the past.

> On June 28, 2024, the OPIS Report stated, "Converters lost no time in starting a price increase effort," and detailed how six electrical conduit converters Atkore, Cantex, Prime, National and IPEX issued identical price sheets across the United States for PVC electrical pipe.

*Id.* ¶¶ 82-83.

69.   On November 21, 2024, Atkore filed its annual report for 2024 on a Form 10-K with the SEC (the "2024 10-K"). In the 2024 10-K, Atkore revealed the Antitrust Class Action and other related actions to shareholders and downplayed the significance of these actions, stating:

> In Q4, the Company has been named a defendant in several putative class action lawsuits, consolidated under the caption In re: PVC Pipe Antitrust Litigation (N.D. Ill. 24-cv-07639), seeking injunctive and monetary relief on behalf of both direct and indirect purchasers of PVC water pipe and PVC conduit. The suits generally allege anticompetitive conduct related the price of PVC pipes sold in the United States between approximately 2021 and the present. Specifically, the complaints allege that the defendant PVC pipe manufacturers improperly shared otherwise confidential information through their contribution of information to, and

readership of, a weekly report called "PVC & Pipe Weekly" published by defendant Oil Price Information Service, LLC ("OPIS"), as well as through direct communications with each other. The complaints claim that this conspiracy violated Section 1 of the Sherman Act and certain state laws. All cases are pending in federal court for the Northern District of Illinois. The Company believes there are defenses, both factual and legal, to the allegations in these various proceedings and the Company plans to vigorously defend itself. As these proceedings are in the early stages, it is not possible for the Company to predict any outcome or estimate the amount of loss, if any, which could be associated with any adverse decision. While the Company does not believe that any of these proceedings will have a material adverse effect on its financial condition, the Company cannot give assurance that the proceedings will not have a material effect on its results of operations.

70. The 2024 10-K was signed by Defendants Deitzer, Schrock, Waltz, Wynn, Isbell, James, Kershaw, Muse, Edwards, and Zeffiro. The 2024 10-K was also accompanied by certifications made by Defendants Deitzer and Waltz pursuant to Exchange Act Sections 13a-14(a) and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Deitzer and Waltz attested to the accuracy of the 2024 10-K.

71. On the same day, Atkore issued a press release announcing its financial results for the fourth quarter and full year of 2024 (the "4Q24 Earnings Release"). In the 4Q24 Earnings Release, Atkore reported net sales of $788.3 million for the fourth quarter, a decrease of $81.6 million from the same quarter in 2023. Atkore also reported that net sales guidance for the first quarter of 2025 was $655 million to $705 million, which was below analysts' estimates of $743.6 million.

72. Later that day, the Company hosted an earnings call to discuss its financial results for the fourth quarter of 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Waltz stated, "as we discussed earlier, our price versus cost assumptions reflect various competitive dynamics, including new domestic competition and continued impacts from imported products." Defendant Deitzer disclosed that the Company's EBITDA was affected by "pricing

24

normalization" and that "net sales in our Electrical segment were affected due to "pricing normalization." Specifically, Deitzer stated that "[n]et sales in our Electrical segment were $565 million, and our adjusted EBITDA margins compressed due to continued pricing normalization in our PVC products" and that the Company was experiencing "pressure from import competition in our steel conduit products."

73. On December 13, 2024, Atkore filed a proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). In the 2024 Proxy, the Company assured investors that the Company had effective risk oversight mechanisms in place, stating:

**Risk Oversight**

Our Board as a whole has responsibility for overseeing our risk management. The Board exercises this oversight responsibility directly and through its committees. The oversight responsibility of the Board and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the Board about the identification and assessment of key risks and our risk mitigation strategies. The full Board has primary responsibility for evaluating strategic and operational risk management, and succession planning. The independent members of the Board also receive an update from Company executives on cyber-related activities at each Board meeting and has not delegated responsibility for evaluating cyber security risks to any committee. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk, including oversight on compliance related to legal and regulatory exposure and meets regularly with our chief legal and compliance personnel. Our Human Resources & Compensation Committee evaluates risks arising from our compensation policies and practices, as more fully described below. The Audit Committee and Human Resources & Compensation Committee provide reports to the full Board regarding these and other matters. The Nominating & Governance Committee has oversight responsibility for many ESG matters.

74. The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company engaged in an anticompetitive price-fixing scheme that caused the price of PVC Pipes in the United States to

be artificially inflated; (ii) the financial benefits the Company experienced were artificially inflated and unsustainable due to the scheme; (iii) as the scheme was exposed, Atkore and its co-conspirators were no longer able to artificially inflate the price of PVC Pipes, which resulted in a substantial decrease in the price of PVC Pipes in the United States; (iv) the decrease in PVC Pipes pricing negatively impacted the Company's business; (v) the Company did not have effective risk oversight mechanisms and controls in place; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

75.     The truth was revealed on February 4, 2025, when the Company issued the 1Q25 Earnings Release. In the 1Q25 Earnings Release, Atkore revealed that its net sales for the first quarter were $661.6 million, which was nearly $20 million below analysts' estimates. Atkore also revealed that it was significantly reducing its adjusted EPS and adjusted EBITDA guidance for the rest of the fiscal year 2025. Specifically, the 1Q25 Earnings Release revealed that "[t]he Company is adjusting its estimate for fiscal year 2025 Adjusted EBITDA to be approximately $375 million to $425 million, and adjusting its estimate for Adjusted net income per diluted share to $5.75 - $6.85."

76.     In the 1Q25 Earnings Release, Atkore attributed the decrease in net sales to "decreased average selling prices across the Company's products," including PVC Pipes.

77.     On the same day, the Company hosted the 1Q25 Earnings Call.  During the 1Q25 Earnings Call, Defendant Waltz discussed the decreased guidance for 2025, stating, in relevant part that the "challenges we are navigating are *not what we anticipated* at the end of fiscal year 2022 when we signal normalization of our record profits." (Emphasis added).

78.     Also during the 1Q25 Earnings Call, Defendant Deitzer revealed that the Company's "plastic pipe and conduit product category declined mid-single digits during the quarter" compared to "high single digits in the prior year." Defendant Deitzer stated the reduced financial guidance for 2025 was largely due to its PVC Pipe business, stating that "roughly $75 million or 3/4 of that is on the PVC side."

79.     In response, analysts lowered the price targets for Atkore. For instance, RBC Capital lowered its price target to $73 from $91 and reported that the Company's 2025 guidance "implies more pricing cuts are needed to protect [Atkore's] market share" and that "essentially all pricing gains since COVID have been given back."

80.     On this news, the Company's stock price fell $15.59 per share, or approximately 20%, to close at $64.13 per share on February 4, 2025.

***Share Repurchases During the Relevant Period***

81.     According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase over 2.6 million shares of its own stock, for a total of approximately $313.6 million during the Relevant Period.

82.     According to the Company's public filings, Atkore made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| January 27, 2024 to March 1, 2024 | 185,000 | $147.98 | $27,376,300 |
| March 2, 2024 to March 29, 2024 | 67,000 | $166.85 | $11,178,950 |
| March 30, 2024 to April 26, 2024 | 184,000 | $175.49 | $32,290,160 |
| April 27, 2024 to May | 424,000 | $159.73 | $67,725,520 |

27

| | | | |
|---|---|---|---|
| 31, 2024 | | | |
| June 1, 2024 to June 28, 2024 | 180,000 | $139.20 | $25,056,000 |
| July 27, 2024 to August 30, 2024 | 1,047,000 | $95.49 | $99,978,030 |
| October 26, 2024 to November 29, 2024 | 97,000 | $93.96 | $9,114,120 |
| November 30, 2024 to December 27, 2024 | 463,000 | $88.35 | $40,906,050 |

83.     Given that the price of Atkore stock was $64.13 per share on February 4, 2025, after the corrective disclosures, the true value of the 2,647,000 repurchased shares was roughly $169,752,110. Accordingly, the Individual Defendants caused the Company to overpay by approximately $143,873,020 to repurchase these shares during the Relevant Period.

***Harm to the Company***

84.     As a direct and proximate result of the Individual Defendants' misconduct, Atkore has lost and expended, and will lose and expend, millions of dollars.

85.     Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Waltz, Deitzer, and Johnson, the legal fees associated with the Antitrust Class Action and other related actions, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

86.     Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

87.     Furthermore, the Securities Class Action and the Antitrust Class Action have exposed the Company to massive class-wide liability.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

88.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties by the Individual Defendants.

89.     Plaintiff will adequately and fairly represent the interests of Atkore and its shareholders in enforcing and prosecuting its rights.

90.     Atkore is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

91.     Plaintiff is a current shareholder of Atkore and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

92.     A pre-suit demand on the Board of Atkore is futile and, therefore, excused.  At the time this action was commenced, the nine-person Board consisted of Individual Defendants Schrock, Edwards, Isbell, James, Kershaw, Muse, Waltz, Wynn, and Zeffiro (the "Director Defendants"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

93.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

94.     Each of the Director Defendants approved and/or permitted the wrongs alleged

herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

95. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

96. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Atkore, the Director Defendants knew, or should have known, the material facts surrounding Atkore's financial condition and internal control mechanisms.

97. Defendant Waltz is not disinterested or independent. In addition to being a director, Defendant Waltz serves as President and CEO of the Company. Thus, as stated in the 2024 Proxy, the Company admits that Defendant Waltz is a non-independent director. Furthermore, Defendant Waltz is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

98. Moreover, Director Defendants Deitzer, Schrock, Waltz, Wynn, Isbell, James, Kershaw, Muse, Edwards, and Zeffiro signed the 2024 10-K, Additionally, Director Defendants Deitzer, Schrock, Waltz, Wynn, Isbell, James, Kershaw, Muse, Edwards, and Zeffiro solicited the

30

2024 Proxy. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

99. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

100. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

101. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

102. Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

103. Defendants James, Kershaw, Muse, Wynn, and Zeffiro (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board

31

of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

104.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

105.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I
### Against the Individual Defendants for Violations of Section 14(a)
### of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

108.    Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

109.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

110.     The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy, which was filed with the SEC. As alleged above, the 2024 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to the Company's manufacturing and sale of PVC Pipes.

111.     The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board.

112.     The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Edwards, Isbell, James, Kershaw, Muse, Schrock, Waltz, Wynn, and Zeffiro to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

113.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2024 Proxy.

33

114. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

115. Plaintiff, on behalf of Atkore, has no adequate remedy at law.

<u>**COUNT II**</u>
**Against the Individual Defendants for Violations of Section 10(b) of
the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)**

115. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116. The Individual Defendants participated in a scheme with the purpose and effect of defrauding Atkore. Not only is Atkore now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Atkore by the Individual Defendants.

117. During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $143.8 million to repurchase approximately 2.6 million shares of Atkore common stock.

118. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

119. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in

order to make the statements made about Atkore not misleading.

120. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Atkore.

121. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

122. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over $313.6 million in the repurchase of Atkore stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

123. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

124. Plaintiff, on behalf of Atkore, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for Violations**
**of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))**

125. Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

126. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Atkore stock at prices artificially inflated by those materially false and misleading statements.

127. Plaintiff, on behalf of Atkore, has no adequate remedy at law.

### COUNT IV
### Against the Individual Defendants
### For Breach of Fiduciary Duty

116. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

119. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and

36

deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company engaged in an anticompetitive price-fixing scheme that caused the price of PVC Pipes in the United States to be artificially inflated; (ii) the financial benefits the Company experienced were artificially inflated and unsustainable due to the scheme; (iii) as the scheme was exposed, Atkore and its co-conspirators were no longer able to artificially inflate the price of PVC Pipes, which resulted in a substantial decrease in the price of PVC Pipes in the United States; (iv) the decrease in PVC Pipes pricing negatively impacted the Company's business; (v) the Company did not have effective risk oversight mechanisms and controls in place; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

121. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

122. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

37

123.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

124.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action and the Antitrust Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action and the Antitrust Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

125.    Plaintiff, on behalf of Atkore, has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

128.    Plaintiff on behalf of Atkore has no adequate remedy at law.

## COUNT VI
### Against the Individual Defendants for Unjust Enrichment

129. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Atkore.

131. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Atkore that was tied to the performance or artificially inflated valuation of Atkore, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

132. Plaintiff, as a shareholder and a representative of Atkore, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

133. Plaintiff on behalf of Atkore has no adequate remedy at law.

## <u>COUNT VII</u>
### Against the Individual Defendants for Waste of Corporate Assets

134. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

136. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase over 2.6 million shares of its own common stock at artificially

inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action and Antitrust Class Action.

137.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

138.    Plaintiff, on behalf Atkore, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: March 18, 2025

*/s/ Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ALDER**
 **FREEMAN & HERZ LLC**
111 West Jackson, Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
malmstrom@whafh.com

Seth D. Rigrodsky
Vincent A. Licata
Leah B. Wihtelin
**RIGRODSKY LAW, P.A.**
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
vl@rl-legal.com
lw@rl-legal.com

*Attorneys for Plaintiff*