**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE ATKORE, INC. SECURITIES LITIGATION | Case No.: 1:25-cv-01851 |
| | Honorable John J. Tharp Jr. |
| | **JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Dated: August 22, 2025

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice* pending)
Adam Wierzbowski (admitted *pro hac vice*)
Alexander Noble (admitted *pro hac vice*)
Matthew S. Goldstein (admitted *pro hac vice*)
1251 Avenue of the Americas,
44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
Adam@blbglaw.com
Alexander.Noble@blbglaw.com
Matthew.Goldstein@blbglaw.com

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, IL 60601
Telephone: (312) 373-3800
Facsimile: (312) 794-7801
Avi@blbglaw.com

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ...................................................................... 12

III.    PARTIES ......................................................................................................... 13

      A.     Lead Plaintiff ....................................................................................... 13

      B.     Defendants ........................................................................................... 13

IV.    DEFENDANTS' PRICE-FIXING AND SECURITIES FRAUD SCHEME.................. 14

      A.     PVC Pipe Is Atkore's Core Business and Susceptible to Price-Fixing ............... 14

      B.     During and Immediately Following the Pandemic, Atkore Garnered Outsized Margins from Inflated Prices for PVC Pipe ........................................... 20

      C.     Post-Pandemic, Atkore Still Garnered High Margins, but Told Investors It Was Due to Atkore's Business Strengths, and that the Market Was Competitive.......................................................................................... 22

      D.     In Truth, Atkore and Its Competitors Were Engaged in an Undisclosed Scheme to Artificially Inflate the Price of PVC Pipe ............................................ 26

             1.     Atkore Based Its Pricing Decisions on Competitors' Prices, and Maintaining High PVC Prices Depended on Atkore and Its Competitors Acting Consistently ................................................. 28

             2.     OPIS Reported Detailed Weekly Pricing Information, and Other Market Intelligence, to Subscribers ......................................... 38

             3.     Atkore and Its Competitors Used OPIS to Agree on, and Enforce, Artificially Inflated Prices for PVC Electrical Conduit Pipe.................... 44

             4.     Atkore and Its Competitors Used OPIS to Agree on, and Enforce, Artificially Inflated Prices for Municipal Water Pipe.............................. 52

             5.     OPIS Recently Settled Private Civil Antitrust Claims Alleging PVC Pipe Price-Fixing............................................................ 60

      E.     Several "Plus Factors" Concerning the PVC Pipe Market Confirm the Conspiracy .......................................................................................... 66

             1.     Adhering to the Price-Fixing Scheme Was Contrary to Atkore's Self-Interest Unless Pursued as Part of a Collective Plan........................ 67

i

2.      Industry Performance Data, Including Extraordinary Profits, Support Successful Coordination ............................................. 68

3.      Certain Phenomena Can Be Explained Rationally Only as the Result of Concerted Action and There Was No Plausible, Legitimate Business Rationale for the Suspicious Conduct ................... 79

4.      Defendants Utilized and Created the Opportunity for Regular Communication ........................................................................... 80

F.      Defendants Were Motivated by Insider Stock Sales and Incentive Compensation to Fix Prices and Artificially Inflate Atkore's Stock Price ........... 84

V.      THE TRUTH IS GRADUALLY REVEALED TO INVESTORS ................................. 86

A.      May 7, 2024 Partial Disclosure ............................................................. 86

B.      July 24, 2024 Partial Disclosure ........................................................... 88

C.      August 6, 2024 Partial Disclosure ........................................................ 91

D.      November 2024 Partial Disclosures ...................................................... 94

E.      February 4, 2025 Partial Disclosure ..................................................... 95

F.      February 14, 2025 Partial Disclosure ................................................. 100

G.      August 5, 2025 Disclosure .................................................................. 101

VI.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ...... 104

A.      August 2, 2022 Misstatements (Q3 FY2022 Earnings) ...................................... 104

B.      November 9, 2022 Misstatements (Baird Global Industrial Conference) .......... 109

C.      November 18, 2022 Misstatements (Q4 and Full Year FY2022 Earnings) ........ 112

D.      November 30, 2022 Misstatements (Credit Suisse Industrials Conference) ...... 119

E.      February 1, 2023 Misstatements (Q1 FY2023 Earnings) ................................. 122

F.      February 21, 2023 Misstatements (Citi Global Industrial Tech and Mobility Conference) ........................................................................... 128

G.      May 9, 2023 Misstatements (Q2 FY2023 Earnings) .......................................... 131

H.      June 14, 2023 Misstatements (Wells Fargo Industrials Conference) ................. 135

I.      August 8, 2023 Misstatements (Q3 FY2023 Earnings) ...................................... 139

J.      November 17, 2023 Misstatements (Q4 and Full Year FY2023 Earnings)........ 142

K.      February 1, 2024 Misstatements (Q1 FY2024 Earnings) ................................... 147

L.      February 20, 2024 Misstatements (Citi Global Industrial Tech and Mobility Conference)........................................................................................ 151

M.      May 7, 2024 Misstatements (Q2 FY2024 Earnings) ......................................... 154

N.      May 8, 2024 Misstatements (Oppenheimer Industrial Growth Conference)...... 157

O.      August 6, 2024 Misstatements (Q3 FY2024 Earnings).................................... 158

P.      November 21, 2024 Misstatements (Q4 and Full Year FY2024 Earnings)........ 163

Q.      February 4, 2025 Misstatements (Q1 FY2025 Earnings) ................................... 167

R.      February 18, 2025 Misstatements (Citi Industrial Tech and Mobility Conference)........................................................................................................ 171

S.      May 6, 2025 Misstatements (Q2 FY2025 Earnings) ......................................... 173

T.      June 11, 2025 Misstatements (Wells Fargo Industrials Conference) ................ 176

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER........................................................ 178

A.      The Individual Defendants Attended Internal Atkore Meeting to Discuss PVC Pricing and Were Directly Involved in Atkore's Pricing Decisions .......... 179

B.      Defendant Pregenzer Was Responsible for PVC Pricing, Which He Reported Monthly to Defendants Waltz, Johnson, and Deitzer........................ 181

C.      Defendants Waltz, Johnson and Pregenzer Sold Their Personally Held Atkore Stock at Artificially Inflated Prices During the Class Period ................ 183

D.      The Departures of Defendants Johnson and Waltz, and Significant PVC Pipe Personnel, Were Suspiciously Timed ........................................................ 197

E.      Defendants Waltz, Johnson, and Deitzer Reaped Significant Incentive Compensation from Artificially Inflated PVC Prices and Atkore's Artificially Inflated Stock Price ........................................................................ 198

F.      Defendants Were Confronted with Direct Evidence of Price-Fixing Via OPIS No Later Than the July 24, 2024 ManBear Report ................................... 201

G.      Atkore Is Currently Facing a Department of Justice Investigation and Multiple Civil Antitrust Lawsuits ..................................................................... 202

H.     OPIS Abruptly Ceased Publication of the *PetroChem Wire* Report After It Received a DOJ Subpoena, and OPIS Has Settled with Antitrust Plaintiffs ...... 203

I.     Atkore's Core Operations Were the Subject of Defendants' Material Misrepresentations and Omissions ...................................................................... 204

J.     The Speaking Defendants Spoke Frequently and with Familiarity on the Topics of Defendants' Misrepresentations and Omissions................................ 206

VIII.    ADDITIONAL LOSS CAUSATION ALLEGATIONS ................................................ 208

IX.    CLASS ACTION ALLEGATIONS ................................................................................. 210

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 212

XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE ................................... 213

XII.    COUNTS AGAINST DEFENDANTS ........................................................................... 215

COUNT I ............................................................................................................................... 215

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants .................................................................................................... 215

COUNT II .............................................................................................................................. 220

For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants .................................................................................................... 220

XIII.    PRAYER FOR RELIEF ................................................................................................ 221

XIV.    JURY DEMAND .......................................................................................................... 222

Lead Plaintiff Nykredit Portefølje Administration A/S ("Nykredit" or "Lead Plaintiff" or "Plaintiff"), by and through its undersigned counsel, alleges the following upon information and belief, except as to allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Atkore Inc. ("Atkore" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; (d) review of other publicly-available information concerning the Company and the Individual Defendants (defined below); and (e) discussions with former employees of Atkore and others in the PVC pipe industry.

## I.    INTRODUCTION[1]

1.    Lead Plaintiff brings this federal securities class action on behalf of itself and a class comprised of all persons and entities that purchased or otherwise acquired Atkore common stock between August 2, 2022 and August 4, 2025, inclusive (the "Class Period"; the "Class"). Lead Plaintiff asserts claims against Atkore and certain of its officers, executives and senior leaders (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants artificially inflated the trading price of Atkore common stock by making materially false and misleading public statements that misstated and failed to disclose that Atkore's reported financials and claimed historic financial success resulted from the Company's

---

[1] Unless otherwise indicated, all emphasis in quotations throughout the Complaint is added.

undisclosed scheme to manipulate the price of its main product—pipe made from the synthetic plastic polymer PolyVinyl Chloride ("PVC").

2.      Atkore manufactures PVC pipe products, including municipal pipe, plumbing pipe, and electrical conduit pipe (together, "PVC Pipe" or "PVC Pipe Products") and describes itself as a leading manufacturer of electrical, safety, and infrastructure products. Atkore's business includes its role as a PVC "converter" or "processor," which refers to a company that processes PVC resin into usable products or components for other businesses such as PVC Pipe.

3.      The PVC Pipe industry has historically involved a race-to-the-bottom, competition approach to pricing. PVC Pipes are commodities, meaning these products are essentially interchangeable and have little, if any, difference in PVC Pipe Products manufactured by one competitor or another. As a result, Atkore and other PVC Pipe manufacturers have historically needed to compete primarily on the price of their products.

4.      Before and during the Class Period, however, Atkore and its competitors engaged in a coordinated effort to collectively abandon their historical competition-driven approach to pricing PVC Pipe, and instead agreed to, and actually did, set PVC Pipe prices at specific levels, to reap supra-competitive profits by increasing and stabilizing the price of PVC Pipe. Atkore manipulated the price of PVC Pipe by setting prices with competitors through the non-public *PetroChem Wire*, issued to only limited subscribers by the private industry information service Oil Price Information Service, LLC ("OPIS"). As one of Atkore's competitors explained, this service created "a good old boys club" that enabled Atkore and other PVC Pipe manufacturers to engage in ***"price gouging."***

5.      Leading up to the COVID-19 pandemic, Atkore and its competitors began to lay the groundwork for their price-fixing agreement. As documents produced in connection with a

2

DOJ investigation and civil antitrust suits reveal, Atkore and its competitors established a practice of using OPIS as an intermediary to exchange confidential, competitively-sensitive pricing information with its competitors.

6.     Before and during the Class Period, Atkore and its competitors used OPIS to implement coordinated price increases for PVC Pipe, including through OPIS's *PetroChem Wire*, which "provide[d] daily petrochemical prices"[2] for products that included PVC Pipe. The *PetroChem Wire*, authored by OPIS employee Donna Todd, was the only aggregate source for weekly, real-time PVC Pipe prices. It required a paid subscription, all of the major U.S. pipe manufacturers, including Atkore, subscribed and contributed pricing information to it, and could not be accessed unless OPIS approved a subscriber's application.

7.     Atkore communicated to OPIS, specifically through Ms. Todd, in considerable detail its anticipated pricing moves—including the specific sales regions and timelines for such moves—as well as Atkore's reactions to its competitors' pricing moves. OPIS communicated these signals to Atkore's competitors, and Atkore's competitors communicated similar pricing signals in return through their OPIS contributions, as OPIS published its weekly reports to subscribers. Since the *PetroChem Wire* was only available to a small cadre of industry players, and not to market participants more broadly, Atkore and its co-conspirators conducted their coordinated price-setting without the market's knowledge. Atkore and its competitors specifically used Ms. Todd, senior editor of the *PetroChem Wire*, as an intermediary to coordinate their price-fixing activity.

8.     Atkore and its competitors continued to use OPIS to carry out their price-fixing of PVC Pipe prices throughout 2020 when the COVID-19 pandemic occurred. The COVID-19

---

[2] *See* https://www.opis.com/product/pricing/spot/petrochem-wire-reports/.

pandemic caused major market disruptions in the PVC Pipe industry, which caused the price of the raw materials and other input costs related to the manufacture PVC Pipe to skyrocket. In response, Atkore and other PVC Pipe manufacturers raised their prices for PVC Pipe to unprecedented levels, which led to record profits for Atkore and its competitors. However, the global economy recovered from the pandemic, and the market disruptions that initially drove these price increases ended. But after reaping staggering profits, Atkore and its competitors were determined to maintain them by using OPIS to set and maintain PVC Pipe prices at specific levels, which enabled them to reap supra-competitive profits by increasing and stabilizing the price of PVC Pipe.

9. From at least August 2022, Atkore and its primary competitors in the PVC market (Otter Tail and Westlake), and Atkore's principal distributor (Core & Main) coordinated on PVC Pipe pricing levels, including simultaneous price increases. This resulted in PVC Pipe prices that were not correlated with input costs or demand. Atkore's profits were boosted by this supra-competitive pricing, yet Defendants claimed its profits were the result of Atkore's competitive advantages, and thus "sustainable" (when they were not). As a highly-placed executive at one of Atkore's competitors explained, ***"[i]t's not sustainable to operate and be price g[o]uging for that long."***

10. Unbeknownst to investors: (1) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (2) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (3) Atkore's pricing practices were unsustainable because its coordinated pricing

4

actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (4) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (5) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance. As a result, Defendants' statements attributing the Company's business, operations, and prospects to factors other than Atkore's coordinated price increases artificially inflated Atkore's stock price, were materially false and misleading, and lacked a reasonable basis at all relevant times.

11.     However, throughout the Class Period, Defendants repeatedly assured the market that Atkore would continue to be successful in a competitive post-COVID market due to factors completely unrelated to its price-fixing. For instance, on November 11, 2022, after Atkore reported staggering profit margins, Defendant Waltz touted ***"the sustainability of [Atkore's] profit"*** that he falsely attributed to Atkore's ability to ***"get a pricing premium"*** because of ***"truly unique, sustainable, competitive advantages on pricing that no one else has."***

12.     Defendants also repeatedly assured investors they were leveraging Atkore's supposed advantages to compete with other PVC converters for business and market share. For example, on August 2, 2022, when securities analysts asked Waltz about "other players" in the PVC Pipe market, Waltz unequivocally and falsely told investors and analysts that, ***"my competitors and I don't talk."*** Then, on February 1, 2024, when Atkore reported increased sales for the first quarter of fiscal year 2024, CFO Johnson falsely maintained that the Company enjoyed a "price premium" due to its "reputation," "quality," and "ability to ship." Such statements

misstated and failed to disclose that Atkore's "price premium" resulted from its undisclosed, anti-competitive pricing activity that rendered its pricing practices unsustainable and subjected it to regulatory scrutiny for price-fixing.

13. Defendants reaped massive financial gains from the artificial inflation in Atkore's stock price that resulted from their material misstatements and omissions to investors. During the Class Period, Defendants Waltz, Johnson and Pregenzer collectively sold over 360,000 shares of their personally-held Atkore common stock for proceeds of over $49 million, and avoided losses of more than $28.8 million. Their sales came at suspicious times—including on the very dates they made false statements that artificially increased Atkore's stock price, near the Class Period highs for Atkore's stock price, and right before partial corrective disclosures of Atkore's true financial state and involvement in price-fixing, which drove the price of Atkore stock down. Their Class Period sales were also far larger than their Atkore stock sales in the period directly preceding the Class Period.

14. The truth about Defendants' undisclosed PVC Pipe price manipulation scheme entered the market through a series of partial corrective disclosures. By late 2023 and early 2024, the cracks in Atkore's price-fixing agreement with its competitors had begun to emerge. For example, OPIS reports privately shared among OPIS members on February 23, 2024 show that, after years of successful price-fixing, Atkore and its competitors grew concerned that some participants in their price-fixing arrangement were breaking ranks. As OPIS privately reported: "[PVC Pipe] converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, ***they won't be able to raise prices at all***."

15. Immediately after OPIS's non-public report to its subscribers on February 23, 2024, Defendants Waltz, Johnson and Pregenzer began a series of sales to unload their Atkore stock.

They made these sales while the Company's share price remained artificially high (and approached its all-time high of approximately $190 per share), but before the market learned what Defendants had long privately known—that the true source of the Company's blockbuster financial performance was unsustainable price-fixing, which was rapidly deteriorating.

16.     On the very next trading day (February 26, 2024), Defendant Waltz sold over *43,000* shares of his Atkore common stock in an open market sale, reaping nearly ***$7,000,000*** in proceeds, while the stock price was at a near Class Period-high of $160.48 per share. That same day, Defendant Pregenzer also sold over *6,500* of his shares in a single transaction, reaping over ***$1,000,000*** in proceeds. Defendants continued to unload their shares over the following week, as they privately learned the risks to the price-fixing agreement driving Atkore's financial performance when they failed to impose a price increase for the month of March 2024. As OPIS later privately confirmed in a March 2024 report, "There was ***plenty of finger pointing going on***, with a couple of smaller regional players getting blamed ***for prices not going up***. However, they said ***they were only meeting the prices of larger converters***."

17.     Indeed, on March 4, 2024, Defendant Waltz sold *50,000* of his Atkore shares at a near-record high price of around $174 per share, reaping nearly ***$8.7 million*** in proceeds. The same day, Defendant Johnson sold over *12,700* of his shares in an open market sale, reaping nearly ***$2.2 million*** in proceeds. Defendant Pregenzer also sold over *4,000* of his shares that day, reaping over ***$700,000*** in proceeds. Defendants made these sales as Atkore's fiscal second quarter 2024 wound to a close on March 29, 2024 while in possession of material non-public information about Atkore's true financial state, yet Atkore's second-quarter financials would not be publicly reported to investors until May 7, 2024.

18.      Indeed, in April 2024, shortly after these sales, OPIS reported to its subscribers that participants in the price-fixing conspiracy were "upset" because one of their members, "a market leader," had broken ranks by filling "orders *at low prices that keep prices static* through May [2024] . . . through June [2024]." Then, on May 7, 2024, Atkore shocked analysts by unexpectedly *cutting* the Company's 2024 guidance—after the Company had repeatedly raised its guidance over multiple consecutive quarters. The Company specifically reported that the cut was due to issues affecting its Electrical segment (which contained the Company's electrical conduit PVC Pipe business), but pointed the finger at purported problems with the Electrical segment's HPDE (High-Density Polyethylene pipe and conduit products) and solar initiatives. Despite misleadingly pointing to problems purportedly unrelated to PVC Pipe as the reason for its guidance cut, the Company revealed that, for the *entire* Electrical segment containing the Company's PVC Pipe business, "the pricing environment could be challenged in the second half of 2024." Atkore's earnings release issued that day also revealed to investors that "Atkore-specific pricing initiatives" that had "recently" given the Company "pricing power" were not sustainable and generated an "expectation that margins will normalize." In response to this news, the price of Atkore stock fell by 12.51%, or $22.06.

19.      Yet Defendants did not reveal the full truth at that time and continued to mislead investors throughout the Class Period. For example, Defendant Waltz continued to assure investors that it was the unique competitive advantages of Atkore's model that enabled it to maintain a "price premium" for its PVC products in the face of changing market conditions.

20.      Then, on July 24, 2024, market research firm ManBear published a report entitled "Pipe Price Fixing" (the "ManBear Report"). The ManBear Report disclosed to investors new facts concerning Atkore and three other PVC Pipe manufacturers that had used the commodity pricing

service OPIS to coordinate pricing actions and thereby fix PVC Pipe prices. Such new information included screenshots and quotes from several OPIS reports showing concerted pricing actions and the sharing of forward pricing moves (several of which are quoted below). The ManBear Report asserted that the price-fixing scheme "resulted in massively inflated" PVC Pipe prices that "defy economic logic." ManBear further stated that PVC Pipe prices "remain at extremely elevated levels despite normalized supply chains, normalized input costs (resin), and weak demand," with "PVC municipal [water pipe] and conduit pipe prices" holding "4.7x and 2.7x above pre-Covid levels, respectively." As ManBear summarized, "The North American pipe and fittings market is estimated at $36 billion by WLK [Westlake], a leading pipe manufacturer." However, "[t]he severe inflation impacts contractors, municipalities, and ultimately consumers [] pay for it in the form of higher construction costs and utility bills." In response to this news, the price of Atkore stock fell by $12.37, a decline of 8.53%.

21.     Just two weeks later, during an August 6, 2024 Atkore earnings call reporting the Company's unfavorable financial results for the third quarter of fiscal year 2024, CEO Waltz publicly addressed and dismissed the allegations in the ManBear Report, when he stated that, "I'm going to claim that report is unsubstantiated from the conclusions it tries to make." But, in response to the Company's negative financial news that day, the price of Atkore stock fell again, this time by 14.7%, or $17.41.

22.     Between November 7 and 8, 2024, additional disclosures further revealed the true picture of events. On November 7, 2024, Atkore competitor Otter Tail—named in the ManBear report as a price-fixing co-conspirator—disclosed that on August 27, 2024, it had received a DOJ grand jury subpoena issued by the U.S. District Court for the Northern District of California "call[ing] for production of documents regarding the manufacturing, selling, and pricing of PVC

pipe." The next day, RBC held an investor call with price-fixing expert Professor Salil Mehra, who explained the significance of the Otter Tail subpoena. Mehra outlined in detail the possible risks to Atkore stemming from the ManBear Report and subsequent events, including the likelihood that Atkore would ultimately need to settle antitrust class actions that had been filed against it. In response to this news, including the tying of the DOJ's Otter Tail subpoena to Atkore, the price of Atkore stock fell by a further $7.39, a decline of 7.2%.

23.     The truth was further revealed to investors before markets opened on February 4, 2025, when Atkore announced its financial results for the first quarter of fiscal year 2025, reporting net sales of $661.6 million—below analysts' estimates of $680.7 million. Atkore also significantly reduced its guidance for its adjusted earnings per share ("EPS") and adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") for the rest of fiscal 2025, which also missed analysts' estimates. During Atkore's earnings call that same day, CFO Deitzer disclosed that Atkore's "plastic pipe and conduit product category declined mid-single digits during the quarter[,]" compared to "high single digits in the prior year." During that same call, CFO Deitzer attributed the guidance reduction to the forthcoming poor performance of Atkore's PVC business, stating, "I'd say roughly $75 million or three-quarters of that is on the PVC side." Securities analysts immediately reacted negatively to this news. For example, RBC Capital reported that Atkore's newly-issued guidance "marks the fourth consecutive quarter of a guidance cut . . . and implies more pricing cuts are needed to protect [Atkore's] market share," adding that "[e]ssentially all pricing gains since COVID have been given back." Similarly, Roth Capital analysts lowered estimates for fiscal years 2025 and 2026, citing "acceleration in pricing pressure for PVC" and "margin compression." On this news, the price of Atkore common stock fell $15.59 per share, or

nearly 20%, from a closing price of $79.72 per share on February 3, 2025, to a closing price of $64.13 per share on February 4, 2025.

24.     In addition, after market close on February 14, 2025, Atkore announced that it had itself received a DOJ grand jury subpoena issued by the U.S. District Court for the Northern District of California "call[ing] for production of documents relating to the pricing of the Company's PVC pipe and conduit products." On the next trading day, February 18, 2025, Atkore's stock price dropped $2.32, or 3.2%, from its February 14, 2025 closing price, and closed at $70.19 per share.

25.     Finally, on August 5, 2025, Atkore reported its earnings for the fiscal third quarter of 2025 and announced that Defendant Waltz was stepping down as CEO. Atkore also announced (i) compression of adjusted EBITDA margins in its Electrical segment, "primarily due to *pricing declines* related to [Atkore's] PVC and steel conduit products," and (ii) a $50 million reduction in earnings guidance for fiscal year 2026. On the August 5 investor call, an analyst asked CEO Waltz about the "underlying assumptions" supporting the $50 million guidance cut, and he responded that Atkore "expect[s] *year over year headwinds* for things like PVC purely because as *pricing dropped this year,* it's a much lower starting off point even if PVC pricing held for all of next year."

26.     Analysts covering Atkore reacted negatively to the news. Even though Atkore had announced higher-than-expected earnings per share on August 5, Keybanc downgraded its outlook for the Company, and RBC substantially cut its price target for Atkore stock from $83 to $60. On August 5, 2025, the price of Atkore stock plummeted on the news of Waltz's resignation and the revelations contained in Atkore's Q3 earnings report. The price fell by $20.16—*over 26%*—from $76.55 at market close on August 4, 2025, to $56.39 at market close on August 5, 2025. In

percentage terms, this was the ***largest single-day drop*** in Atkore's stock price during the Class Period.

27.     As a result of Defendants' materially false and misleading statements, the price of Atkore common stock was artificially inflated during the Class Period, and the precipitous decline in market value of the Company's common stock when the truth was disclosed caused Lead Plaintiff and other Class members to suffer significant damages.

28.     The criminal and civil antitrust investigations into Atkore's price-fixing conduct have revealed significant evidence corroborating the price-fixing allegations described herein, yet much of this evidence has been sealed from public filings and is not yet publicly accessible. These investigations remain ongoing and Lead Plaintiff anticipates that significant additional evidence will be revealed further corroborating the allegations herein.

## II.     JURISDICTION AND VENUE

29.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud and effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Atkore is headquartered in this Judicial District.

32. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

33. Lead Plaintiff Nykredit Portefølje Administration A/S is a regulated investment management company based in Denmark. As of March 31, 2025, Nykredit's assets under administration totaled approximately $161 billion, with assets under management of approximately $71 billion. As set forth herein, and in the Certification previously filed with the Court (ECF No. 19-1) and incorporated by reference herein, Nykredit purchased Atkore common stock at artificially inflated prices during the Class Period and suffered financial harm as a result of the materially false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

34. Defendant Atkore is incorporated under the laws of Delaware with its principal executive offices in Harvey, Illinois. Atkore's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "ATKR."

35. Defendant William E. Waltz ("Waltz") served as Atkore's President and Chief Executive Officer ("CEO"), and as a Director since September 2018, until his recently-announced resignation in August 2025.

36. Defendant John M. Deitzer ("Deitzer") has served as Atkore's Vice President ("VP") and Chief Financial Officer ("CFO") since August 9, 2024. Prior to his promotion to CFO, Deitzer served as VP of Finance in the Company's electrical business unit.

37. Defendant David P. Johnson ("Johnson") served as Atkore's VP, CFO and Chief Accounting Officer ("CAO") from August 2018 to August 9, 2024.

38.     Defendant John W. Pregenzer ("Pregenzer") has served as President of Atkore's Electrical segment since 2020, and, in addition, as the Company's Chief Operating Officer ("COO") since January 2025.

39.     Atkore and the Individual Defendants are collectively referred to herein as the "Defendants." Defendants Waltz, Deitzer, Johnson, and Pregenzer are referred to collectively herein as the "Individual Defendants," and Defendants Atkore, Waltz, Deitzer, and Johnson are collectively referred to herein as the "Speaking Defendants."

40.     The Speaking Defendants, because of their positions with Atkore, possessed the power and authority to control, and did control, the contents of, among other things, Atkore's SEC filings, including its quarterly and annual reports, as well as Atkore's press releases and presentations to investors, securities analysts, money and portfolio managers, and institutional investors. The Speaking Defendants received copies of Atkore's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with Atkore, and their access to material non-public information available to them but not to the public, the Speaking Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the contrary representations and omissions were materially false and misleading. The Speaking Defendants are liable for the false and misleading statements and omissions alleged herein.

## IV.     DEFENDANTS' PRICE-FIXING AND SECURITIES FRAUD SCHEME

### A.     PVC Pipe Is Atkore's Core Business and Susceptible to Price-Fixing

41.     Atkore manufactures electrical and infrastructure products used to construct electrical power systems, including metal electrical conduit and fittings, plastic pipe conduit and fittings, electrical cable and flexible conduit, and plastic pipes for water systems.

14

42.     PVC Pipe is comprised of tubular sections made from PVC—known as "long form pipe." PVC Pipe Products also include pipe fittings, which are detachable PVC pieces used to join together several pieces of PVC Pipe. Atkore and certain of its competitors produced and sold most of PVC Pipe and PVC Pipe fitting in the United States.

43.     PVC Pipe Products consist of three main types: (1) PVC municipal pipe, used in municipal, commercial and industrial water and sewer systems to transport drinking water or wastewater; (2) PVC plumbing pipe, used for potable water, irrigation, and drainage systems in residential and commercial building projects; and (3) PVC conduit, used in electrical installations as protective housing for electrical wiring.

44.     PVC municipal pipe is the largest segment in the PVC Pipe market in the United States. It is used in roughly two-thirds of public water distribution systems and accounts for almost two-thirds of PVC Pipe sales in the U.S. PVC Municipal pipe follows an industry-standard coloring system to differentiate between potable water lines and pipes carrying non-potable water and other utilities. PVC Pipe for potable water uses the blue color, as depicted in the following Figure:



45.     PVC municipal pipe used to carry non-potable water in public sewage systems uses the green color, as depicted in the following Figure:



46.     PVC plumbing pipe, also known as drain, waste and vent ("DWV") pipe, is commonly used in residential and commercial plumbing. PVC plumbing pipe is commonly used in industrial plumbing, such as to carry fluids and other materials throughout chemical processing plants, factories, and manufacturing facilities. It is typically lightweight and colored white, as depicted in the following Figure:



47.     PVC conduit is often used in residential wiring applications, such as to route electrical wires through houses and apartment buildings. It is also used extensively in commercial buildings as conduit for wiring throughout offices, retail spaces, factories, warehouses, and any

other spaces with electrical systems. PVC conduit it typically grey or white, as depicted in the following Figure:



48.     Atkore reports results in two segments: (1) Electrical; and (2) Safety & Infrastructure. The Electrical segment is the Company's most important segment and it includes PVC electrical conduits that are an essential product in the PVC Pipe market.

49.     A PVC electrical conduit is a type of rigid or flexible plastic pipe used to protect and route electrical wiring in buildings. It provides a pathway for electrical cables, shielding them from physical damage, moisture, and corrosive elements. Atkore holds an approximately 35% market share of PVC electrical conduits, the largest among its competitors.

50.     Atkore's Electrical segment comprises the vast majority of Atkore's total business. For example, in fiscal year 2023, the Electrical segment accounted for 76% of Atkore's sales and 91% of its EBITDA. Similarly, in fiscal year 2024, the Electrical segment comprised over 73% of Atkore's net sales and over 89% of its EBITDA.

51.     PVC Pipe is among Atkore's most important products. Sales of plastic pipe, conduit and fittings alone accounted for a significant portion of the Company's sales, representing nearly 40% of total sales for fiscal year 2023.

17

52.     The PVC Pipe industry is highly concentrated due to consolidation among only a handful of major players, including Atkore. Atkore and its main competitors control approximately 95% of the PVC electrical conduit application category and approximately 90% of the PVC Pipe municipal water application category and in the United States. As Defendant Waltz stated at an investor conference on February 20, 2024, "the industry has gotten more consolidated," and a decade ago there was "around a dozen PVC competitors" but "we are now down to . . . two to three." Atkore was an active driver of this consolidation. Prior to the Class Period, Atkore engaged in a concerted effort to purchase the assets of other PVC Pipe manufacturers, including Heritage Plastics (2013), Ridgeline Pipe Manufacturing (2013), Rocky Mountain Colby Pipe Company (2019), and Queen City Plastics, Inc. (2020). In addition, in August 2022, Atkore announced its acquisition of Cascade Poly Pipe & Conduit and Northwest Polymers. As a result, Atkore produces between 35-40% of the PVC electrical conduit pipe in the United States.

53.     The July 24, 2024 ManBear Report estimated the following top five companies' market shares in the PVC Electrical Conduit market:

| PVC Electrical Conduit Market Share* | |
|---|---|
| Atkore (ATKR) | 35% |
| Prime (owned by Mitsubishi) | 15% |
| Cantex(owned by Mitsubishi) | 15% |
| National Pipe (CRH) | 15% |
| JM Eagle | 10% |

54.     PVC Pipe is susceptible to price-fixing because demand for PVC Pipe products is inelastic, meaning that demand is relatively resistant to price increases which result in limited declines of sales volumes. Atkore and its competitors took advantage of this demand inelasticity for their products by raising prices above competitive levels.

55.     The PVC Pipe industry is also susceptible to price-fixing due to its significant barriers to entry. These high barriers to entry hindered other entrants or would-be competitors who

18

were not participants in the price-fixing conspiracy from entering the PVC Pipe market. New entrants into the PVC Pipe market face a three-to-four-year process to bring a brand-new PVC Pipe facility online, and costly and lengthy start-up costs, including multi-million-dollar costs associated with building production facilities and obtaining the licensing and engineering of products needed to ensure PVC Pipe meets applicable regulatory codes and requirements.

56.     For example, in October of 2023, Atkore's smaller competitor IPEX (which ManBear estimated held a 5% electrical conduit market share) announced that it would build a new PVC Pipe production facility in Pineville, NC, and reported the initial cost to open the plant was $200 million.

57.     As Defendant Waltz stated during an earnings call on February 1, 2024, "[t]here's always minor players that try to enter [the market]" or "somebody importing your product," but they amounted to "[n]othing of significance" for established PVC Pipe manufacturers like Atkore and its competitors.

58.     PVC Pipes are commodity products, meaning that Atkore and its supposed competitors produce similar and interchangeable PVC Pipes and, as a result, Atkore and other PVC Pipe manufacturers compete primarily based on price. Atkore's own former employees confirmed this. For example, FE-1,[3] a former President at Cable Solutions at Atkore from September 2014 through January 2021, stated that price was the critical factor to Atkore's customers because there was nothing different in the product between manufacturers.

59.     Where competition occurs principally on the basis of price, it is easier to implement and monitor collusive agreements, including because price is more often objectively measurable

---

[3] Former employees are referred to herein as "FEs" and are all referenced using masculine pronouns regardless of their actual gender.

than non-price factors. As a Federal Trade Commission Administrative Law Judge previously determined, "pipes made from materials other than PVC are not close substitutes for PVC pipes," including because these products have "distinct properties" as compared to possible replacements, such as pipes made from concrete, clay, and corrugated iron, and have cost advantages over conduit made from other types of materials, such as steel. As such, commodities like PVC Pipe are potentially susceptible to price-fixing.

60.     As the ManBear Report also summarized regarding the municipal pipe industry, that "industry is consolidated and has a history of FTC [Federal Trade Commission] enforcement action for collusion." Specifically, "[i]n 2016, Fortiline, the 3rd largest distributor of municipal water pipe in the US today, settled FTC charges for inviting a competitor to raise and fix prices" and "[i]n 2012, three pipe companies settled FTC charges of collusion."

**B.     During and Immediately Following the Pandemic, Atkore Garnered Outsized Margins from Inflated Prices for PVC Pipe**

61.     Historically, the price of PVC Pipe was driven by competition among manufacturers and marginal-cost-based production that is typical of competitive markets for commodity products. But in 2020, as Atkore and its competitors had laid the groundwork for a price-fixing agreement using OPIS, the COVID-19 pandemic occurred. This caused the market for PVC Pipe to come under unprecedented supply stress that temporarily drove up PVC Pipe prices. Atkore and its competitors used these temporary supply stresses as a pretext to drastically increase PVC Pipe prices and maintain them as supra-competitive levels long after these supply constraints ended.

62.     Leading up to the COVID-19 pandemic, PVC Pipe prices were relatively constant. For example, the Figure below shows the prices of PVC Pipe between March 2017 and December 2018, with the price per foot remaining relatively flat and constant throughout this time period:



63.     However, the onset of the COVID-19 pandemic caused major disruptions of global markets that significantly impacted the PVC pipe industry. These market disruptions reduced production capacities and limited the global supply of PVC resin—the primary raw material ingredient in PVC Pipe that accounts for roughly 70% of its production cost. Starting in July 2020, demand for PVC Pipe products surged due to construction increases, which were driven by low interest rates and increased home remodeling, causing the price of PVC resin to rise drastically. PVC resin prices approximately doubled from $0.43/lb. in late 2019 to $.89/lb. in early 2022.

64.     During the pandemic, Atkore and its competitors drastically increased PVC Pipe prices. These drastic price increases impacted all PVC Pipe application categories because Atkore and its competitors have high market concentration in each application category. The Figure below shows the increase in prices of PVC Pipe from roughly early 2021 to September 2022.



65.     The macro-economic conditions that caused the pricing effects during the pandemic disappeared as the pandemic ended, but, as detailed below, Atkore and its competitors preserved and increased the artificial inflation in PVC Pipe prices post-pandemic through a coordinated price-fixing scheme carried out through the OPIS information-sharing service.

### C.     Post-Pandemic, Atkore Still Garnered High Margins, but Told Investors It Was Due to Atkore's Business Strengths, and that the Market Was Competitive

66.     After the pandemic ended, supply shocks subsided and input prices normalized. For example, by January 2023, PVC resin prices normalized back to $0.51/lb and remained relatively stable (with the price at $0.53 at the time of the ManBear Report in July 2024).

67.     Despite this, post-pandemic, Atkore still reported staggering growth in earnings and profit margins. Atkore's former employees, such as FE-2, confirmed that these staggering profits were widely discussed within the Company. FE-2 was a Plant Manager at Atkore from October 2021 to April 2024. He was primarily responsible for managing a plant that produced Atkore's Electrical segment products. FE-2 reported that there was price gouging during COVID across all industries, but pricing did not seem to come down after that, including in PVC pipe manufactured and sold by Atkore.

68.    FE-2 stated that he attended annual plant manager meetings that the Company held for all the plant managers, and one corporate event annually. These meetings were personally attended by Defendants Waltz and Pregenzer, former Atkore Vice President/General Manager of Plastic Pipe and Conduit Jeff Sherman, and Sherman's direct report Keith Dinkheller, who was Atkore's Director of Operations PPC-West. FE-2 reported that Dinkheller was very close with Sherman and had previously worked at Sherman's company before Atkore acquired it.

69.    In August 2022, FE-2 attended a plant manager meeting where Dinkheller boasted that Atkore's PVC unit had increased PVC profits by between 200-300%, which was a staggering increase. When FE-2 asked Dinkheller how they were able to increase PVC pipe profits so greatly when Atkore's other business units were barely making margins, Dinkheller told him it was just in pricing. Based on his conversation with Dinkheller, FE-2 acknowledged that there was price gouging within the PVC division at Atkore.

70.    FE-2 also stated that Atkore held meetings attended by the Company's executive leadership to discuss pricing, including for PVC Pipe. For example, in or around August 2023, FE-2 attended an all-hands meeting where Waltz gave a presentation that specifically addressed the Company's pricing strategy. During the presentation, Waltz told the Company's employees that Atkore should be maximizing pricing by charging whatever they could get.

71.    From 2019 to 2023, Atkore's Electrical segment EBITDA grew more than threefold and its profit margins grew from less than 20% for the time period from 2016 through 2019, to 38% in 2023. Atkore achieved a record net income of $913.4 million for its fiscal year 2022— representing an increase of $325.6 million year-over-year. Similarly, Atkore's earnings per share ("EPS") skyrocketed from just $3 to $4 prior to the pandemic to $19 in 2023, reflecting

extraordinary and unprecedented EPS growth. Atkore publicly attributed these results to its supposed competitive strengths and claimed that it did not speak to its competitors.

72. Throughout the Class Period, Defendants made a host of false statements to investors attributing the Company's record margins from higher PVC pipe pricing to the unique competitive advantages Atkore's distinctive business system. For instance:

- At a November 30, 2022 investor conference, Waltz told investors that "We get a pricing premium" because "with Atkore, it literally is an Amazon experience of one order, one delivery, one invoice. . . . there's a lot of things that we do that are ***truly unique, sustainable, competitive advantages on pricing that no one else has***."

- On the Company's November 17, 2023 earnings call, Defendant Waltz touted the Company's ***"sustainable pricing increases*** that we discussed are still holding" and stated that "the diversity and strength of our product portfolio is a ***true competitive advantage."***

- On the February 1, 2024 earnings call, Defendant Waltz stated, "we're a price leader because we have that one order, one delivery, one invoice and ***we have the ability to bring more value than many of our competitors to the industry***."

73. Defendants also repeatedly assured investors falsely that they were fiercely competing with other PVC pipe manufacturers for sales and market share and denied any communication between them:

- On the Company's August 2, 2022 earnings call, Defendant Waltz stated ***"my competitors and I don't talk . . . I'm not aware of anything."*** He also assured investors that Atkore and its competitors were each ***"effective[ly] pricing their products, trying to maximize their own profit."***

- On Atkore's February 1, 2023 earnings call, Waltz claimed that "***maybe one of our competitors is out there thinking, well, my costs went down, I can lower my price . . . but that's just not a major contributor to how we price.***"

- During an investor conference on June 14, 2023, Defendant Johnson stated that Atkore faced pricing pressure because ***"we have great competitors."***

- During an investor conference on February 20, 2024, Defendant Waltz stated, "the industry has gotten more consolidated, great competitors out there. . . . ***We're all competing really now, which I think is effectively on value***." Defendant Waltz also stated, ***"we do have good competitors*** . . . even within our highest margin, ***our competitors are out leading price increases."***

- On the August 6, 2024 earnings call, Defendant Waltz stated that the price-fixing allegations against Atkore in the ManBear Report were **"unsubstantiated."**

74. Defendants also falsely told investors that Atkore resisted "pricing normalization" trends due to its unique competitive advantages that enabled it to maintain elevated PVC pipe prices:

- During a November 9, 2022 investor conference, Defendant Waltz stated **"we absolutely can hold on to [elevated PVC pipe pricing]** . . . before COVID ever hit in 2020 . . . we were compounding growth . . . and making price over cost virtually every year. *So that's going to continue."*

- At a November 30, 2022 investor conference, Waltz stated, "**Price fluctuation is good for us** . . . [with pricing] on the way down, when there's a little bit more art of why [we] hold pricing, [we] don't give it up."

- On the Company's February 1, 2023 earnings call, Waltz stated that **"we are seeing more price that we're holding,"** so **"there's enough comfort in year to raise the guidance by the $100 million."**

- On the Company's November 17, 2023 earnings call, Waltz stated that "prices still remains good, better than what we forecasted. . . . *because of our service, our Regional Service Centers, the ability for one order, one delivery, one invoice*."

- On the February 1, 2024 earnings call, Defendant Waltz stated **"we're doing really well on pricing with . . . it's a good environment for Atkore"** and that "pricing [was] basically on track and we've put in one or two price increases . . . we're still optimistic going forward on these attempting to push the prices in the industry up."

- On the August 6, 2024 earnings call, Defendant Waltz stated, **"[pricing normalization] will become de minimis enough that the other things will drive ahead and we get back on track of growing earnings . . . a strong reflection point for our stock that goes with every other fundamental of our company."**

75. Defendants thereby claimed Atkore could hold on to elevated PVC Pipe pricing supposedly due to its service, Regional Service Centers, and "the ability for one order, one delivery, one invoice." Atkore further claimed that, in the market, fluctuations in pricing were good for Atkore. But, contrary to such public claims, and unbeknownst to investors, Atkore was engaged in a price-fixing conspiracy with its competitors, which held steady and artificially inflated the price of PVC Pipe.

### D. In Truth, Atkore and Its Competitors Were Engaged in an Undisclosed Scheme to Artificially Inflate the Price of PVC Pipe

76.     Unbeknownst to investors, Defendants misstated and failed to disclose that: (1) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (2) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (3) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (4) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (5) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance. As a result, Defendants' statements attributing the Company's business, operations, and prospects to factors other than Atkore's coordinated price increases artificially inflated Atkore's stock price, were materially false and misleading, and lacked a reasonable basis at all relevant times.

77.     The historically high profit margins of 2020 incentivized Atkore and its competitors to stop chasing increases in their own market share through lower prices, and instead prioritize profitability through collusion on the price of PVC Pipe. Prior to 2020, Atkore and its competitors wanted to grow their own market shares through lower, competitive prices, even in times when PVC Pipe prices were falling or rising. But by 2021, to become more profitable, Atkore and its

supposed competitors chose collusion (versus competing against each other). Beginning in late 2022, even as PVC resin prices began falling due to "price normalization" as the favorable market dynamics of the COVID pandemic ended, Atkore's price-fixing scheme prevented PVC Pipe prices from falling more or faster than they otherwise would have. Atkore and its competitors thereby held onto their record COVID-era profit margins and reaped supra-competitive profits, and accomplished this using OPIS and other means to facilitate their conspiracy.

78.     Defendants took measures to minimize public disclosure of their agreements and hide their direct exchanges of information, including through the use of OPIS and its employee Donna Todd as an intermediary to exchange competitively sensitive pricing information. As set forth in more detail below (*infra* at ¶¶191-94, 200-203), Ms. Todd was used to exchange these communications amongst Atkore and its competitors via telephone, text, and e-mail, gather competitive intelligence, distribute price increase letters, engage in signaling through OPIS's industry publication, PVC & Pipe Weekly, and take other actions to carry out the price-fixing agreement.

79.     It is illegal for companies to coordinate prices. It is also illegal to use an intermediary to share future plans and pricing intentions. As the ManBear Report disclosed, "It appears PVC pipe manufacturers are doing both."

80.     As the FTC Guide to Antitrust Laws states:

Price fixing is an agreement (written, verbal, or inferred from conduct) among competitors to raise, lower, maintain, or stabilize prices or price levels. Generally, the antitrust laws require that each company establish prices and other competitive terms on its own, without agreeing with a competitor. When purchasers make choices about what products and services to buy, they expect that the price has been determined on the basis of supply and demand, not by an agreement among competitors. When competitors agree to restrict competition, the result is often higher prices.

81.     And, as the FTC Spotlight on Intermediaries states:

27

Dealings among competitors that violate the law would still violate the law even if they were done through a trade association. For instance, *it is illegal to use a trade association to control or suggest prices of members. It is illegal to use information-sharing programs*, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, *as a disguised means of fixing prices.* One area for concern is exchanging price or other sensitive business data among competitors, whether within a trade or professional association or other industry group. Any data exchange or statistical reporting that includes current prices, or information that identifies data from individual competitors, can raise antitrust concerns if it encourages more uniform prices than otherwise would exist.

82.     The FTC Spotlight on Intermediaries also included the hypothetical question, "I am a regional sales manager and I regularly get calls from an industry consultant. If I share with him our company's plan to raise product prices, does this create a problem for my company?" The FTC provided the following response:

A: Information about future plans should be closely guarded; *disclosing future plans outside the company could alter competitors' decisions and raise antitrust concerns.* In addition, employees should be careful when sharing information they could not otherwise share with competitors through intermediaries such as a financial analyst or even a supplier. If the consultant were to share that specific information with the company's competitors, resulting in a change in their pricing strategy, *such indirect communications could be seen as facilitating an agreement if other evidence points to a coordinated strategy.*

### 1.     Atkore Based Its Pricing Decisions on Competitors' Prices, and Maintaining High PVC Prices Depended on Atkore and Its Competitors Acting Consistently

83.     Multiple former Atkore employees reported that Atkore based its pricing decisions on pricing information provided by its competitors. For example, FE-1 was President at Cable Solutions at Atkore from September 2014 through January 2021. In this role, he was primarily responsible for overseeing the Company's cable solutions and flexible conduit business units. He reported to Defendant Waltz and interacted with Defendants Waltz and Johnson on a daily basis.

84.     Starting in around 2018, FE-1 became Atkore's executive sponsor for pricing for all products at Atkore, including for PVC Pipe. FE-1 stated that each year, Atkore, under the direction of the CEO, decided on a set of key strategic initiatives to pursue by implementing

Company-wide processes to drive those specific objectives. Pricing of Atkore's products, including PVC, was one of those strategic objectives and FE-1 was assigned to oversee it. As the executive sponsor for pricing, FE-1 was focused on the Company's pricing strategy and metrics for PVC. He stated that pricing was very important to Atkore and one of its top strategic initiatives.

85.     FE-1 stated that to sustain high margins in the PVC Pipe market, competitors needed to be in lock and step, or else price increases will not hold. FE-1 explained that, in an ordinary market, there was tight competition between Atkore and other manufacturers on price. He stated that the sales channel process for pricing starts with the end user, a contractor, who buys PVC from a distributor and this distributor interacts with an independent sales agent that represents Atkore. The sales agent will take the request and bring it to Atkore and ask it for its price and then will pass back to the distributor the amount. The distributor will relay to the sales agent whether the distributor has obtained a better price from a competitor and this information is then relayed back to Atkore, forcing Atkore to offer more competitive pricing to achieve the sale. FE-1 stated that price was the critical factor in making sales because there was nothing different in the product between manufacturers; most contractors will buy a product based on price.

86.     FE-1 stated that Atkore's PVC pricing, however, was set through sharing "price sheets" that were specifically based on the pricing of its competitors. He explained that all domestic PVC Pipe manufacturers, including Atkore, shared price sheet guidelines on all PVC Pipe Products for the agents. That price sheet is a framework or guideline for the sales agent to the distributor. FE-1 explained that Atkore's PVC Pipe price sheets were generated by the Company's inside sales personnel working with General Manager of PVC Jeff Sherman, who reported to John Pregenzer, President of the Electrical segment. FE-1 stated that Sherman generally had latitude to set pricing, but needed to discuss and align on price increases with Pregenzer before they could go out.

87.     FE-1 stated that pricing of Atkore's products was "tightly controlled." He stated that for each commodity, including PVC, Atkore had an "inside sales" team of 4-6 employees who monitored all price feeds, competitive analysis, and trade publications to generate the Company's pricing. FE-1 stated that the Company ran these processes to monitor pricing on a daily and even hourly basis. He stated that unlike OPIS, the trade publications Atkore used for its products other than PVC Pipe did not provide real-time pricing data from other companies.

88.     FE-1 stated that a key metric used to track and set Atkore's PVC prices was the "spread," i.e., the difference between the cost to manufacture PVC pipe versus the price at which it was sold. Because the spread corresponded directly to the Company's profits from selling PVC pipe, it was also a key measure of the Company's financial performance.

89.     FE-1 stated that the Company regularly tracked and reported on spreads for each product category, including PVC Pipe, all the way up to the CEO, Defendant Waltz, and CFO, Defendant Johnson. He stated that Defendants Waltz and Johnson received reports on spreads on at least a monthly basis.

90.     FE-1 stated that, every month, the Company would hold an in-person meeting with Defendants Waltz and Johnson at the Company's offices in Chicago to discuss pricing and financials for each business unit, including PVC Pipe. He explained that, at the monthly meeting, the President of each segment presented on their segment's financial performance, including the spreads for each product. FE-1 stated that spreads were a significant discussion topic during the meetings because they were "a primary driver for financial performance." The monthly meetings would typically last three to four days. FE-1 personally attended all of these meetings.

91.     According to FE-1, in connection with each monthly meeting on pricing, Atkore's business units would each generate a financial package to present to Defendants Waltz and

Johnson. The financial package specifically included each business unit's spreads and pricing sheets. He stated that for PVC Pipe, Sherman would assemble this information and report it to Defendant Pregenzer for the presentation to Defendants Waltz and Johnson. FE-1 confirmed that the information that Atkore's inside sales personnel obtained about competitors' prices was reported up to Defendants Waltz and Johnson.

92.     In advance of Defendant Pregenzer's presentation on PVC pricing at the monthly meeting, Sherman would present to Pregenzer in a preliminary business review prior to the meeting, using information gathered by the Company's inside sales personnel who monitored the pricing of Atkore's competitors for PVC. Pregenzer closely monitored the spreads of PVC prices and received this information from Jeff Sherman on a daily, weekly, monthly and quarterly basis.

93.     FE-1 stated that, at the monthly meeting with Company executives, each business unit spent up to four hours presenting its financials and pricing information to Defendants Waltz and Johnson. He reported that Defendants Waltz and Johnson would have a separate meeting to do a "deep dive" on PVC spreads. If spreads were not performing up to their expectations, there would be a discussion with the General Manager of the business unit about how to quickly take corrective action to increase the spreads. FE-1 stated that the President of each product category, General Manager and inside sales manager's performance was measured on the spreads. Spreads were directly tied to profitability, which was tied to compensation in the form of bonuses. If Defendants Waltz and Johnson assessed that spreads were down, they would give significant negative feedback.

94.     As set forth below, FE-3 confirmed that these monthly meetings between Defendant Pregenzer and Atkore's executive leadership, including Defendants Waltz, Johnson and Deitzer, continued to be held during the Class Period. Jeff Sherman's monthly preparation sessions

with Defendant Pregenzer in advance of the monthly meetings similarly continued during the Class Period.

95.     FE-1 stated that Defendants Waltz and Johnson also followed the latest on all the commodities, i.e., the costs of underlying materials used to manufacture PVC Pipe and other products. FE-1 stated that Defendants Waltz and Johnson received regular reporting for each product that tracked input costs and how commodities were performing. FE-1 also reported that, in advance of the monthly meeting, each business unit would need to generate financial forecasts, including on pricing, that were sent to Defendants Waltz and Johnson to show they were on track for the month.

96.     Importantly, FE-1 stated that Atkore depended on monitoring competitor pricing to make its own pricing decisions. He stated that if Atkore and its competitors could not all follow the same pricing, raising prices would be an exercise in futility. FE-1 stated that ultimately, Atkore and the other manufacturers did not want a race to the bottom, and they needed everyone to be aligned to sustain their price increases. According to FE-1, this was why Atkore's inside sales group obtained information about competitors' prices that was reported up to the Company's executive leadership. It was critical to obtain this information because Atkore and its competitors had to be aligned on pricing.

97.     FE-1 stated that to effectively sustain high prices across the PVC Pipe market, Atkore and the other manufacturers needed to act immediately to institute their price increases. He explained that there was a difference if a competitor followed Atkore's pricing within one to days of raising it versus not following or waiting for a few weeks, in which case the price increase would not hold.

98.     FE-3 was HR Director for PVC Pipe & Conduit at Atkore from June 2022 to June 2024. FE-3 was an HR Site lead at the Company from January 2018 to April 2019 and returned back to the Company to work in the PVC Pipe & Conduit division in 2022. As the HR Director of PVC Pipe & Conduit, FE-3 was the HR partner for Jeff Sherman and his direct reports, including former Director of Operations for PPC-West, Keith Dinkheller. The HR site teams at the Company's thirteen PVC plants reported to two regional HR managers—one each for the East and West coast segments—who in turn reported to FE-3.

99.     FE-3 stated that Jeff Sherman was the GM for the Company's PVC Pipe and Conduit business unit. He stated that Sherman reported to Defendant Pregenzer, who in turn reported to Defendant Waltz. FE-3 reported that Sherman oversaw all of the Company's facilities where PVC Pipe was manufactured, including all plants in both the East and West coast segments. FE-3 reported that after Atkore acquired Sherman's PVC Pipe company over a decade ago, Sherman became an integral part of the Company until Sherman left Atkore in or about August 2024. FE-3 stated that when it came to PVC Pipe, Sherman was in the middle of everything.

100.    Specifically, according to FE-3, Sherman was involved in pricing PVC Pipe. He stated that Atkore's "SIOP" group, which stood for Sales, Inventory & Operations Planning, was responsible for researching the pricing information, but Sherman approved the price lists. The SIOP group members who worked on pricing PVC Pipe reported to an Atkore corporate finance director. FE-3 also reported that Kristie Acree, an Atkore corporate finance representative, worked directly with Sherman. Acree and the SIOP group both operated under the leadership of the CFO and ultimately reported up to Defendant Johnson.

101.    FE-3 stated that Sherman held monthly PVC Pipe meetings in which PVC Pipe pricing was a recurring topic. At these meetings, Acree's financial team presented reporting on

PVC Pipe production costs, projected incomes, sales and inventory numbers, spreads, and other metrics, and attendees including SIOP and Sherman would discuss these numbers. FE-3 reported that he attended over three-quarters of these monthly meetings each year. FE-3 confirmed that Sherman met with Defendant Pregenzer each month to present him with the material the PVC team had put together in the monthly PVC business meeting. During these meetings, Sherman would prepare Pregenzer to speak about PVC performance during the multi-day meeting that Atkore executives including Defendants Waltz, Johnson and Deitzer held each month in Chicago. At those meetings, Pregenzer relayed to the executives what he had learned from Sherman.

102.     FE-3 stated that the Company also held similar PVC meetings on an annual basis, in or around early February, at which time Sherman and his direct reports, as well SIOP and Acree's finance team, would discuss projections for the coming year. FE-3 reported that he attended these annual meetings, and that PVC Pipe pricing was a recurring topic. FE-3 recounted that, at an annual PVC meeting in late 2023, Sherman stated that Atkore was not selling enough PVC Pipe and that inventory was consequently accumulating to the point that one of the Company's PVC plants had to cease production for approximately a week around Christmas 2023. FE-3 stated that Acree and the SIOP personnel who provided pricing support for PVC Pipe also attended this meeting. FE-3 further reported that Atkore also had an annual business meeting, held by executives including Defendant Waltz, to which the VPs of each business, VPs of operations and plant managers were invited.

103.     On at least two occasions, FE-3 heard Sherman "ranting" about imports of PVC Pipe from foreign producers who were underbidding Atkore. During one of Sherman's regular direct report meetings in approximately November 2023, and again during one of his regular PVC business meetings in approximately February 2024, Sherman expressed his displeasure that the

imported competition was pricing PVC Pipe significantly lower than Atkore and his desire that Atkore put out articles stating that the foreign pipe was of substandard quality. FE-3 reported that he was sure Sherman would have spoken about this with Defendants Waltz and Pregenzer.

104.    FE-3 stated that the Company maintained a program called "AIP" (Atkore Incentive Plan), under which managers received bonuses based on the Company's performance, and in FE-3's case, the performance of the PVC business. FE-3 reported that because of this program, employees in the PVC Pipe business unit got less than 100% of their bonuses in 2023 and 2024, when the PVC business had started to fare poorly.

105.    FE-4 worked at Atkore from August 2017 to January 2023. From 2017 to 2021, FE-4 was a production manager at an Atkore plant in Texas that produced PVC Pipe, where he reported to a plant manager who in turn reported to the PVC GM, Jeff Sherman. In 2021, FE-4 became the plant manager for Atkore's South Carolina PVC plant, where he reported to VP Greg Purtle and then to Director of Operations Scott Johns. At all times during his tenure at Atkore, FE-4 had a dotted line reporting relationship to Sherman. FE-4 explained that all PVC plants reported to Defendant Pregenzer through Sherman and Purtle.

106.    FE-4 stated that he has worked in the PVC Pipe business for nearly 40 years. He explained that there are ordinarily low margins in commodity plastics businesses like PVC. However, starting with the COVID-19 pandemic, the prices Atkore and other PVC Pipe manufacturers charged for PVC Pipe products went through the roof. For example, he stated that prices for PVC Pipe were measured by the pounds, and the price went from approximately $0.70 per pound in 2017 to upwards of $3.00 per pound in 2023. FE-4 stated that Atkore's competitors had the same kind of price increases.

35

107.     According to FE-4, Atkore tracked and monitored the PVC Pipe pricing of its competitors, in part through monitoring industry publications. FE-4 heard Sherman and others including PVC engineer Jim Gilchrist repeatedly discussing numbers they had seen in such publications.

108.     From a financial standpoint, FE-4 stated that bonuses for Atkore PVC personnel around FE-4's level and higher were tied to PVC pricing. For example, FE-4 stated that he received emails informing him that he would receive a 20% bonus if PVC pricing hit 100% of the set target. FE-4 reported that bonuses were extremely high in 2021 and 2022 because of very high PVC prices. Prices hit 250% of the target level in one of those years and nearly 250% in the other. FE-4 explained that bonuses maxed out at that 250% level, meaning that bonuses would not continue to increase even with higher pricing, and that in 2021 and 2022 his bonuses increased his total annual compensation by nearly half.

109.     FE-5 was an outside sales representative for PVC Pipe manufacturers, including Atkore, from 2018 to early 2025. He acted as a middleman between the manufacturers and distributors and contractors by selling PVC Pipe Products, including Atkore's, to the distributors and contractors.

110.     According to FE-5, Atkore cornered the PVC Pipe market. FE-5 stated that he believes Atkore and other PVC Pipe manufacturers are in collusion with each other and that this was widespread with many industries.

111.     FE-5 stated that every week, Atkore required the agents to speak to their distributors and report back competitor pricing. For instance, FE-5 would call the distributor and ask where any particular competitor was on 4-inch PVC Pipe on a given day. This information was fed back to Atkore on a weekly basis. They had four outside sales agents, and they all obtained information

for each product group which was reported back to Atkore on Wednesday each week. The inside salesperson at FE-5's outside sales agency would compile the information and would forward it to Atkore's regional sales manager, Rebecca Hertzog.[4]

112.  FE-5 stated that Hertzog's predecessor was Mike Eggert, Atkore's Regional Sales Manager 2015 to April 2020. FE-5 stated that during Eggert's time, they never submitted competitor pricing feedback reports to Atkore. He explained that practice was introduced when Hertzog took over.

113.  FE-5 stated that, in his role in outside sales for Atkore, Atkore would send them price sheets since PVC was a commodity product, and would send a new price sheet every time prices were raised. He stated that, during COVID, price increases happened so frequently they could only be good for one day. He recounted that, in one year, they had 5 to 10 price increases. At the end of that year, they made a lot of money without having to hire or pay people or increase production of the products.

114.  However, FE-5 stated that, after COVID, Atkore stopped being competitive. For example, in 2024, they struggled to get orders and Atkore would not compete in their territory which was the Bay area that included San Francisco, San Jose and the Silicon Valley. He also stated that, in mid-2024, foreign PVC was taking a chunk of Atkore's market for PVC Pipe in the U.S. He explained that because all PVC Pipe is a commodity product, people preferred to buy imported PVC Pipe based on lower price. There were discussions where Atkore wanted the agents to find out who was importing PVC Pipe and get the scoop on it. He also recounted that Atkore wanted to publicize to PVC Pipe buyers that foreign companies did not have the right quality

---

[4] Rebecca Hertzog has served as Atkore's Regional Sales Manager, Northwest, from November 2020 to the present.

approvals for their products like Atkore did as a way to stop buyers from choosing imported PVC Pipe.

  **2. OPIS Reported Detailed Weekly Pricing Information, and Other Market Intelligence, to Subscribers**

  115. OPIS is a commodity pricing service that publishes industry reports including the *PetroChem Wire* report, the only source for PVC Pipe prices. OPIS played a key role in Atkore's PVC Pipe price-fixing scheme by facilitating the clandestine exchange of competitively-sensitive information between and among Atkore and its competitors. This ensured that they remained coordinated in increasing and stabilizing the price of PVC Pipe.

  116. OPIS provided Atkore and its competitors the ability to communicate their intentions and confirmed their commitment to a proposed course of action. This created a pattern of extensive communication among Atkore and its competitors that preceded complex, parallel adjustments in behavior that could not readily be explained as the product of Atkore and its competitors' independent efforts.

  117. OPIS markets itself as the world-leading provider of news, data, and analysis for the energy, chemical, and environmental commodity markets. Before and during the Class Period, OPIS provided pricing and market intelligence in various industries, including the PVC Pipe industry. OPIS describes itself as offering the ability to "uniquely price[] commodities throughout the supply chain—from the spot market to the wholesale rack or terminal market and ultimately to more than 400,000 retail locations across North America and Europe."

  118. During the Class Period, OPIS disclosed to subscribers daily prices and market trends via *PetroChem Wire*, including the PVC & Pipe Weekly reports. The *PetroChem Wire* report is published weekly and includes pipe price data and manufacturer commentary, which often includes forward-pricing intentions and apparent invitations to coordinate pricing.

38



119.    OPIS described *PetroChem Wire*'s reporting methodology on pricing as rigorous and consistent. For example, OPIS has stated that *PetroChem Wire* performs "due diligence on every number and explain[s] each price movement."[5] OPIS also stated that it "established **unique two-way relationships** with players at the heart of the action" and it obtains "a daily inflow of prices and transactions from active traders every day, **who in turn, benchmark off our numbers**. Many major players don't report to anyone but [OPIS]."

120.    OPIS marketed its *PetroChem Wire* service to PVC manufacturers like Atkore and its competitors by claiming that "[w]ith a more exact picture of transactional prices in the supply chain, **you can make more profitable decisions**, whether you are converting olefins [hydrocarbon

---

[5] Our Methodology, *PetroChem Wire*, https://www.petrochemwire.com/our-methodology/ (last accessed Aug. 22, 2025).

compounds used in the petrochemical industry] or manufacturing consumer products. Build inventory before prices go up, or delay if prices are falling."[6]

121.    The PVC & Pipe Weekly reports specifically enabled Atkore and its competitors to coordinate their future pricing activities in the PVC Pipe market with the purpose of elevating and maintaining artificially-inflated PVC Pipe prices and generating artificially high profit margins.

122.    The PVC & Pipe Weekly report offered subscribers access to timely information on pricing and supply/demand in the PVC pipe market. Each weekly issue of PVC & Pipe Weekly contained (1) a narrative summary of the PVC Pipe market for the past week, including statements by Atkore and its competitors on market conditions and events; (2) a "Midpoint" price for PVC municipal water pipe, PVC plumbing pipe, and PVC electrical conduit pipe; and (3) PVC resin prices. The PVC & Pipe Weekly report provided similar pricing and market information for PVC Pipe fittings. Atkore's price-fixing conduct detailed herein included fixing prices of PVC Pipe fittings.

123.    OPIS's *PetroChem Wire* website describes PVC & Pipe Weekly as ***the only source for pricing on finished PVC pipe: municipal, conduit, and plumbing.***

124.    OPIS's pricing and market intelligence for the PVC Pipe market was not available to the public. Not only was a subscription necessary to access the data, OPIS required that prospective customers *apply* for a subscription, and OPIS did not list its subscription fees publicly. Potential subscribers needed to contact OPIS for pricing information that they could obtain only if and when OPIS approved their application.

---

[6] https://www.petrochemwire.com/wp-content/uploads/2019/03/Petrochem-8p-ebroch-IOSCO.pdf (last accessed Aug. 22, 2025). Olefins are widely-used as raw materials in the manufacture of chemical and polymer products and consist of a group of chemicals: ethylene, propylene, and butadiene. PVC is made from ethylene (which is derived from oil or natural gas).

125. OPIS does not publicly provide the names of the subscribers or contributors to PVC & Pipe Weekly. However, as revealed through the ManBear Report, for example, Atkore and its competitors subscribed to, and contributed information to, the PVC & Pipe Weekly publication, which is made clear by the detailed information regarding Atkore and its competitors that appeared in the publication and the pricing data covering the PVC Pipe market.

126. To create the PVC & Pipe Weekly report each week, OPIS was in constant communication with active marketplace participants to discover deals, bids, offers, and trends, including through employees such as Donna Todd, the senior editor and author of the PVC & Pipe Weekly reports.

127. Ms. Todd was the Associate Director of PVC & Pipe at OPIS during the Class Period. Ms. Todd has described herself as "a market analyst following the PVC market and its derivatives, particularly the PVC pipe market." She claims to be "the only analyst to write about the pipe market supply/demand and pipe prices every week, including charts and graphs of pipe prices."

128. As detailed further below (*see* infra at ¶¶185-88), OPIS was a named defendant in the civil antitrust cases filed against Atkore and its competitors for OPIS's role in facilitating the price-fixing conspiracy. In connection with OPIS's settlement of the claims against it in the civil antitrust cases, OPIS was required to produce substantial volumes of documents, including its communications with Atkore and its competitors concerning the PVC & Pipe Weekly reports.

129. These documents and communications produced by OPIS allegedly show that Ms. Todd served as a primary and knowing facilitator of Atkore's price-fixing conduct. They demonstrate that Atkore and other manufacturers provided Ms. Todd competitively sensitive pricing information through text message, email and telephone, on a daily and often hourly basis,

including PVC Pipe prices, discounting information, transactions, projected prices, and forward-looking price increases. In turn, OPIS provided Atkore and its competitors with the above-described weekly reports that included PVC Pipe prices, which they relied on to monitor the prices of PVC Pipe Products, including fittings. Through Ms. Todd, Atkore and its competitors shared competitively sensitive information, made offers to collude, monitored and policed their price-fixing agreement, and raised PVC Pipe prices.

130.    Although the content Ms. Todd's communications with Atkore and its competitors is largely redacted from the public versions of the civil antitrust complaints, these communications allegedly show [the PVC Pipe competitors] trusted [Todd], and were comfortable giving her competitively sensitive, forward-looking pricing information." The civil antitrust complaints contain hundreds of paragraphs detailing examples of these communications, which are summarized below, including communications with Atkore. *See infra* at ¶¶194-96.

131.    News publications confirm that Ms. Todd was in constant communication with PVC Pipe manufacturers like Atkore both before and throughout the Class Period. For example, Plastics Technology Magazine published a standing article, typically on an at least weekly basis, which provided news and market commentary on PVC and PVC Pipe pricing. Since at least January 2020, every one of these articles featured commentary from Todd about PVC pricing, at least until the final article featuring Todd's commentary was published on September 23, 2024, shortly before it was publicly revealed that Otter Tail had received a subpoena from the DOJ indicating that DOJ was investigating the price-fixing conspiracy that OPIS allegedly facilitated. Not a single one of these articles quoted or featured any commentary from Todd after the DOJ's investigation was revealed.

42

132.    The purpose of OPIS's price data collection was to facilitate the sharing of Atkore's and its competitors' PVC Pipe market prices. Market assessors also receive deal sheets from market participants that detail their daily market activity. Analysis by OPIS market assessors is frequently reviewed by OPIS supervisors throughout the trading day and before publication of the PVC & Pipe Weekly report.

133.    OPIS's PVC & Pipe Weekly report published net transaction prices based on the data and information that OPIS collected from market-makers. OPIS's *PetroChem Wire* website claimed that "[t]he valuations published in this report reflect each week's current market realities." The knowledge of competitors' current prices enabled Atkore and its competitors to collectively increase, stabilize, and maintain artificially inflated PVC Pipe prices rather than pursue their own separate economic interests.

134.    The information exchanged by Atkore and its competitors through OPIS, which included "current price information," is the type of information exchange that the U.S. Supreme Court has recognized is likely to have "the greatest potential for generating anticompetitive effects."[7] On February 23, 2023, the Principal Deputy Assistant Attorney General for the DOJ's Antitrust Division stated that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchanges among competitors."[8]

135.    Not only was the information Atkore and its competitors exchanged through OPIS current and future-looking (e.g., telling competitors current plans for future pricing strategies), the information was specific to PVC converters. Because OPIS is a subscription service, and OPIS

---

[7] *Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[8] Doha Mekki, Principal Deputy Assistant Attorney Gen., Dep't. of Justice, Antitrust Div., Remarks as Prepared for Delivery at GCR Live: Law Leaders Global 2023 (Feb. 2, 2023).

reviews all subscription applications before granting a potential subscriber access to its PVC Pipe reporting, this information was not publicly available and could not be used by others, such as everyday purchasers of PVC Pipe to negotiate lower prices. Instead, Atkore and its competitors used it as a way to fix, raise, maintain, and stabilize the price of PVC Pipe.

136.    OPIS's Anti-Trust policy states that it "recognizes that suppliers cannot afford even the slightest perception of pricing sharing or price signaling."[9] Despite this recognition, OPIS provided Atkore and its competitors with the means to unlawfully exchange information with the purpose and effect of fixing and stabilizing PVC Pipe prices and harming competition.

### 3.    Atkore and Its Competitors Used OPIS to Agree on, and Enforce, Artificially Inflated Prices for PVC Electrical Conduit Pipe

137.    Atkore and its competitors used PVC & Pipe Weekly to agree on, coordinate and maintain collective price increases on PVC electrical conduit pipe. In *In re Text Messaging Antitrust Litigation*, 630 F.3d 622, 629 (7th Cir. 2010), Judge Richard Posner observed that "Direct evidence of conspiracy is not a *sine qua non*. . . . Circumstantial evidence can establish an antitrust conspiracy." However, as set forth below, there is direct evidence of agreement between Atkore and its supposed competitors to inflate or maintain prices on PVC Pipe.

138.    As revealed through the ManBear Report, Atkore and its competitors exchanged information through OPIS's PVC & Pipe Weekly report as part of their anticompetitive scheme. Since the PVC & Pipe Weekly reports are non-public, and OPIS maintains tightly controlled access, the full scope of information contained within OPIS's PVC & Pipe Weekly reports was not publicly available to investors during the Class Period. The full scope of the information contained within OPIS's PVC & Pipe Weekly reports is also currently unknown to Lead Plaintiff,

---

[9] https://www.opis.com/about/methodology/ (last accessed Aug. 22, 2025).

but fully known to Atkore, including the precise scope and timing of its involvement in the price-fixing.

139.     Participants in the PVC Pipe industry report the existence of a scheme to coordinate pricing and specifically detailed Atkore's role. For example, prior to COVID, 4-inch PVC industry standard was $150-$180 per 100 ft', and shot up to $300 per 100 feet. An executive from one of Atkore's competitors, the CEO of Maverick Pipe, stated that, "So now as we go through COVID and then the supply chain starts to reconnect, during that time through COVID . . . resin prices nearly double or 2.5x. Well, the price of [PVC Pipe] 4x or 5x through the roof, which is why Atkore earnings reports were still fantastic during that time line. As things start to stabilize, supply [chains] reconnect, resin starts to come down, the pipe price did not come down at the same rate . . . as the resin prices." Specifically discussing Atkore's use of OPIS, the CEO stated: "it's a good old boys club. So the first person, every manufacturer releases their pricing every two weeks, some release pricing every week, and it's a full price list, which shows all the size pipes, the price per hundred . . . [a]nd here's your freight allowed amount. . . . *Atkore is always the first one to issue their price list.* Literally within hours, Cantex and Prime issue theirs and then everybody else issues theirs. *It's amazing because everybody's price is usually within 1% of each other*." He further stated, "that's just how it goes. *They've done this for years. Every time pricing comes out, everybody seems to match the other competitors*."

140.     On May 26, 2023, Atkore and/or its competitors used OPIS to signal what action needed to be taken to prevent PVC electrical conduit pipe pricing from sliding in the face of decreasing costs and softening demand. OPIS wrote, *"Some market participants viewed the new sheets more as an effort to stem the price erosion that has gripped the market* rather than a true effort to push prices higher. With resin prices predicted to drop in May and Jun[e] and demand

still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that *as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the higher price levels.*"

141. As ManBear later commented in the July 24, 2024 ManBear Report regarding the above May 26, 2023 OPIS report, "Here we have converters acknowledging that there is no economic reason for a price increase (noting weak demand and declining resin prices), while calling on ATKR as the market leader to hold the line so that others can follow." Indeed, there is no pro-competitive reason to call on market leader Atkore to "take a hard stand" and hold the line on higher price levels, while acknowledging that there is no economic reason for a price increase because costs and demand are decreasing.

142. By November 2023, the elevation of the price of PVC Pipe and the disconnect between the price of PVC resin and PVC Pipe prices was well established. The barriers to entry into the PVC Pipe market are significant, and no new PVC converter could or did enter the market.

143. On November 17, 2023, during Atkore's fourth quarter earnings call, President & CEO Bill Waltz stated that "2023 was a great year for Atkore. We delivered financial results well ahead of our expectations." During the same earnings call, Atkore CFO David Johnson noted that with respect to its PVC Pipe business, "profitability on both an adjusted EBITDA and EPS basis was much stronger than originally anticipated."

144. The elevated prices for PVC Pipe did not correlate to strong demand for the products throughout the Class Period. Instead, such elevated prices occurred during a period of falling demand for PVC Pipe. For example, Atkore competitor Otter Tail reported in its Form 10-K filings with the SEC that the revenue from its PVC Pipe business increased by 155% between 2019 and 2023, but the total volume of PVC Pipe that Otter Tail sold decreased by 19% and 14%

in 2022 and 2023 respectively. Similarly, Atkore reported that, from 2019-2023, its prices for PVC Pipe increased by 86% but the volume of those pipes sold decreased by 9%. In short, despite weak demand, prices went up significantly. This is inconsistent with the laws of supply and demand—i.e., when demand decreases, price should decrease as well, absent coordination among commodity manufacturers.

145.    On February 16, 2024, OPIS wrote in its non-public report to Atkore and its other subscribers: "Converters will know by the end of next week if Jan resin prices will be flat, and if their cost for resin is still predicted to increase by 2 cpp [cents per pound] for Feb. This may give them the backbone to stop the slide in prices, competitors said, and try to recoup this impending loss of margin. Some converters expect that new price sheets will be issued for Mar[ch]."

146.    On February 23, 2024, OPIS issued a non-public report to Atkore and its supposed competitors that warned them that chasing volume would negatively impact the price of PVC electrical conduit pipe. As OPIS reported on February 23: "There was talk in the market this week that new pipe sheets for Mar[ch] might be coming out next week. But, some converters said, *if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all.* Converters found out this week that their resin costs could possibly rise by a total of 5-6 [cents per pound] for Feb and Mar purchases. They concluded that *they not only need to stop the slide in their pipe prices, but they must push them higher* if they don't want to lose more margin due to the higher resin prices." As ManBear later asked in the July 24, 2024 ManBear Report regarding this specific language from the February 23, 2024 OPIS report, "Why are converters signaling the next price increase to each other with specific future timing ('next week'), while calling for everyone to maintain disciplined bidding activity ahead of that?"

147.    On March 15, 2024, OPIS issued a report only to its subscribers that conveyed to Atkore and its supposed competitors the need for collective action on PVC electrical conduit pipe pricing. OPIS wrote that "***There was plenty of finger pointing going on***, with a couple of smaller regional players getting ***blamed for prices not going up***. However, they said ***they were only meeting the prices of larger converters***. ***Competitors said everyone needs to start moving prices up on business written from now on***, or distributors will continue to buy hand to mouth." This was a clear exhortation for a collective price increase through the sharing of future plans for pricing, and it had its intended effect. Shortly thereafter, as ManBear later reported in the July 24, 2024 ManBear Report, on April 24, 2024 OPIS reported that PVC electrical conduit pipe prices had increased from $3.78/ft on March 15, 2024 to $3.90/ft. on April 12, 2024.

148.    Atkore and its competitors continued to use OPIS to monitor and enforce the conspiracy. On April 5, 2024, OPIS addressed concerns about potential price competition on PVC electrical conduit pipe pricing. OPIS wrote that "The hope is that prices will ***continue to move up next week***. Some competitors were still upset because ***a market leader took hold for release orders at low prices that keep prices static*** through May for 10-truck orders and through Jun[e] for 20-truck orders. The converter in question reported that none of the hold for release trucks were left in the Northeast, so ***that shouldn't be affecting prices anymore***." (A "hold for release" order can mean an order in which inventory has been allocated to a future ship date.) This back-and-forth discussion through a trade publication among purported competitors about being "upset" about a possibility of price competition was an example of cartel enforcement. Several of the competitors used OPIS to seek and receive assurances that "[t]he converter in question" was not abandoning the rest of the cartel. And, in response, the "market leader" in question reassured the other members

48

of the conspiracy—through OPIS—that since none of the trucks carrying the low-priced inventory "were left," it "shouldn't be affecting prices anymore."

149.    There is no pro-competitive reason for Atkore or its competitors to share company-specific information about pricing, including future plans about pricing, and to reassure competitors they were in fact *not* competing on price. As ManBear asked rhetorically in the July 24, 2024 ManBear Report about the above April 5, 2024 report from OPIS, "Why are converters sharing company specific pricing? Are converters restricting competition by inviting each other to work together?" The clear answer to the latter question is "yes."

150.    On May 3, 2024, OPIS reported to its non-public subscribers that, "Converters said the price hikes won't work ***unless everyone is working together to implement them***." This was a plain urging to Atkore and its competitors to work together to implement price hikes. As ManBear later posed the rhetorical question in the July 24, 2024 ManBear Report regarding this May 3, 2024 report from OPIS, "Why is 'working together' the only way to push prices higher? Is that because there is no economic justification (demand, supply) otherwise?" Indeed, when there is no economic justification for unilaterally raising prices, anti-competitive collective action is required.

151.    On May 6, 2024, Cantex instituted a price increase of 7.5% that it said was "in response to conduit price increases announcements in the market."

152.    On May 10, 2024, OPIS reported to its non-public subscribers that "Converters complained that one regional converter was not making any attempt to raise its prices, and had actually dropped its price in the East to $360/100ft [$3.60/ft.]. The converter in question said that ***until the larger competitors proved they were moving prices up it would not do so*** . . . Converters hope to push prices higher next week but ***concede it will have to be a unanimous effort*** to have any chance of success." As ManBear later posed the rhetorical question in the July 24, 2024

49

ManBear Report regarding this May 10, 2024 report from OPIS, "Is pushing prices higher via a 'unanimous effort' considered to be legal competitive behavior?" Under the FTC provisions discussed above, it is not.

153.    On May 17, 2024, OPIS reported to its subscribers that "Larger converters [*N.B.* Atkore is the largest in the industry] were still complaining about a smaller regional competitor, saying it was holding its pricing at $360/100 ft in the East while they were trying to get prices up to a minimum of $370-375/100 ft. The converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that the market leader in question was quoting higher prices and the fact that the price ranges rose in regions outside of the East proved it."

154.    As ManBear revealed in the ManBear Report, "The 'unanimous' price increase effort in early May [2024] succeeded in driving Conduit prices up from $3.70 / ft [i.e., $370/100 ft.] on 5/3/24 to $3.80 / ft [$380/100 ft.] on 5/24/24 (per OPIS)." As ManBear asked rhetorically, "Why are converters sharing their specific individual pricing strategies with each other?"

155.    The back-and-forth conversation among competitors, facilitated directly by OPIS through its subscriber-only service, shows that OPIS created the proverbial smoke-filled room for Atkore and its competitors to coordinate and monitor pricing and enforce cartel discipline. Indeed, as discussed below, by June 28, 2024 at the latest, Atkore and its competitors had raised or set their East rates at $396.75/100 ft. (a further 4.4% increase from the $380.00 set in May of 2024).

156.    On May 20, 2024, Cantex implemented its second 7.5% price increase in under a month that it said was "in response to conduit price increase announcements in the market."

157.    On June 21, 2024, Atkore and its competitors used OPIS to signal a price increase on PVC electrical conduit pipe. OPIS wrote that "[PVC] converters conceded they need to figure

50

out how to push prices higher. ***The consensus this week was for a single price increase that would take prices up by about 5% over the current market level,*** with another percentage added to account for the discount. Then, if that works, do it again and again until it stops working. ***Conduit converters have been successful with this strategy in the past***." OPIS was thereby acting as a conduit for Atkore and its competitors to coordinate on future pricing activities.

158.     A screenshot of the June 21, 2024 *PetroChem Wire* PVC & Pipe Weekly report (sourced from the July 24, 2024 ManBear Report) is pasted below:



159.     ***Within a week***, Atkore and its competitors acted on the signaling in the OPIS reports. On June 28, 2024, one week after reporting on the consensus of converters to seek a single price increase of 5% over the current market level for PVC electrical conduit pipes, OPIS reported that ***"[c]onverters lost no time in starting a price increase effort."*** All major converters raised prices with almost identical pricing in every region they served. Cantex issued price sheets at

$396.75/100 ft. in the East region, $396.75/100 ft. in the South Central region, $431.25/100 ft. in the North Central region, $402.50/100 ft. in the Southwest region, and $425.50/100 ft. in the Northwest region. Prime, National Pipe, Southern Pipe, and IPEX followed with similar price sheets for the regions they serve. Defendant Atkore issued price sheets at $396.75/100 ft. in the East and South Central regions, $431.25/100 ft. in the North, and $402.50/100 ft. in the Southwest.

160.    A screenshot of the June 28, 2024 *PetroChem Wire* PVC & Pipe Weekly report (sourced from the ManBear Report) is pasted below:



161.    For clarity, below is a table summarizing the price changes by June 28, 2024 that were the same between Cantex and Atkore (down to the penny), and "Prime, National, Southern and IPEX followed [Cantex] with similar sheets for the regions they serve":

| Company | East Region | South Central Region | North Regions | Southwest Region |
|---------|-------------|----------------------|---------------|------------------|
| Cantex | $396.75/100 ft. | $396.75/100 ft. | $431.25/100 ft. | $402.50/100 ft. |
| Atkore | $396.75/100 ft. | $396.75/100 ft. | $431.25/100 ft. | $402.50/100 ft. |

### 4.    Atkore and Its Competitors Used OPIS to Agree on, and Enforce, Artificially Inflated Prices for Municipal Water Pipe

162.    Atkore and its competitors used PVC & Pipe Weekly to coordinate and maintain collective price increases on municipal water pipe.

163.    Atkore and its competitors priced municipal water pipe through a tiered pricing strategy known as "blocking pricing." This pricing strategy set prices in "Blocks," where each "Block" presents a cost of ½ cent-per-foot of PVC Pipe, such that "Block 78" means $0.39/foot (78 x $0.005) and a price increase of 10 "Blocks" equates to a price increase of $0.05/foot. Atkore and its competitors used "block books" to set different price points for various ranges or "blocks" of pipe quantities. This strategy benefits sellers because the customer pays the list price associated with higher-quantity blocks regardless of whether the customer actually needs to buy the number of units at the upper limit of the block. For example, as explained in the civil antitrust complaints, a PVC manufacturer might set prices at $10 for 1 unit but only $80 for a block of 10 units, and $150 for a block of 20 units. Even if the customer only needs 15 units, they will still pay the $150 price for the larger block. As a result, PVC manufacturers can take advantage of block pricing changes to impose price increases on their customers, as Atkore and its competitors did here.

164.    For instance, on January 22, 2021, Atkore and/or its competitors conveyed through OPIS an invitation to collective action on PVC municipal water pipe price, with the OPIS PVC & Pipe Weekly report stating that "[W]hile some market participants believed that the market needed to be reset with a new price letter closer to the current price level, others said that there is no reason converters can't push prices higher without a new price letter. ***The only requirement would be discipline***." In the parlance of Atkore and its competitors, "discipline" meant not to compete for market share but to instead focus on collectively increasing the price of their PVC Pipe.

165.    In response, Atkore and its competitors, acting in parallel, started raising the price of PVC Pipe, as illustrated through the examples below.

166.    For example:

- On February 19, 2021, JM Eagle informed its customers that it was implementing a minimum 15% price hike on "all PVC products."

53

- On February 22, 2021, Diamond Plastics informed its PVC municipal water pipe customers that, effective immediately, it was raising its standard block book prices for Immediate Ship and Standard Quotations.

- On February 22, 2021, IPEX informed its customers that it would raise prices on its PVC Pipe starting in March 2021.

- On March 2, 2021, National Pipe informed its customers that, effective immediately, it was implementing price increases on its PVC municipal water pipe products.

- On March 2, 2021, NAPCO Pipe and Fittings (now called Westlake Pipe & Fittings) informed its municipal customers that it was implementing block price increases effective immediately.

167.    On March 21, 2022, National Pipe announced a price increase on its PVC municipal pipes effective immediately. The same day, Diamond Plastics and NAPCO Pipe & Fittings (now called Westlake Pipe & Fittings) announced PVC municipal water pipe price increases. Both companies moved immediate shipments to Block 420 and quoted 30/30 to Block 440 for all municipal customers. In other words, shifting pricing from Block 420 to Block 440 equated a significant price increase of $0.10/foot.

168.    On October 28, 2022, OPIS highlighted the success of the collective action by Atkore and its competitors on PVC municipal water pipe pricing, including with respect to the "remarkable" fact that, despite that "demand has diminished significantly" and a "steep drop in pipe demand," there was "no change in municipal pipe pricing" and "prices have remained rock solid." OPIS wrote on October 28, 2022 that:

> There was no change in municipal pipe pricing this week. The market was still firmly at Block 440. Converters conceded that **demand has diminished significantly** from the heady days when backlogs were 12 weeks or more out and customers were on allocation. The **steep drop in pipe demand makes it all the more remarkable that prices have remained rock solid** at Block 440. Pipe makers give credit to distributors as they have been partners in the determination not let prices slip. Admittedly, it's in distributors' own interest that prices hold steady as long as they have yards full of pipe. Market watchers expect their support to wane as their inventory levels sink. At the same time, converters see no reason for prices to drop

rapidly once they do start to retreat, as ***they have shown discipline thus far and see no reason why that should change.***

169.    As ManBear wrote in the July 24, 2024 ManBear Report concerning the above OPIS report from October 28, 2022, "Converters appear to be coordinating with distributors and encouraging 'discipline' amongst competitors in order to maintain prices at record high levels even despite a 'steep drop' in demand." The fact that the PVC Pipe market was not responding to normal supply and demand market dynamics in October 2022 supports that Atkore and its competitors were coordinating pricing actions to stabilize PVC Pipe prices at their historically high levels.

170.    As the ManBear Report revealed, Atkore and its competitors coordinated their pricing activities through direct communications. For example, on November 4, 2022, OPIS wrote that:

> Municipal pipe prices were still holding on at Block 440. Converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, ***but a phone call or two proved that this was not the case. So far, nobody has blinked***. . . converters said they have resigned themselves to the fact that ***demand will be very low*** in Nov, Dec, Jan and Feb and that dropping their price won't get them more volume.

Such instances demonstrate that Atkore, its competitors, and/or OPIS were using direct communications to contact one another and ensure that converters were each remaining disciplined on PVC pricing and that "nobody has blinked."

171.    On January 20, 2023, Atkore and/or its competitors used OPIS to signal a commitment to collective action regarding PVC municipal water pipe pricing. OPIS wrote that "Northern Pipe and IPEX indicated that they would follow whatever the market does." There is no pro-competitive reason for Northern Pipe or IPEX to signal to their competitors that they would "follow . . . the market." This behavior is consistent with the "discipline" needed to push prices higher and keep them elevated and Atkore and its competitors' need to monitor fellow conspirators. As ManBear asked rhetorically in the July 24, 2024 ManBear Report concerning this

55

January 20, 2023 OPIS report, "Why does Northern Pipe (owned by OTTR [Otter Tail]) repeatedly use OPIS to tell competitors they would 'follow whatever the market does'?"

172.    On January 27, 2023, Atkore and/or its competitors used OPIS to signal the need to work with large distributors on stabilizing PVC municipal water pipe pricing. On January 27, 2023, OPIS wrote that:

> Diamond, National, Sanderson and Pipeline by Jet Stream had previously issued price increase letters at Block 445 for immediate sales and Block 450 for quotes, effective Feb 1. Neither Northern Pipe nor IPEX had issued a price hike, but both indicated **they would follow whatever the market does.** Westlawk Pipe & Fittings issued its price increase letter at Blocks 445/450 on Friday, effective Jan 30.

> Distributors said they had worked off some of their inventories, but not enough that they were prepared to see municipal pipe prices drop. **They still don't want to see their inventory devalued.** Despite the recent price increase announcements, some distributors were concerned that converters were starting to build pipe inventories while still **facing five or six weeks of low demand** before construction seasons starts. This, they worried, could make converters more likely to try cutting prices in an effort to stimulate some demand. Converters, on the other hand, said **they know demand will not kick in for weeks but were confident that they could hold prices firm as long as distributors were on the same page.**

This was an invitation in January 2023 to distributors to coordinate future PVC Pipe pricing, which would insulate Atkore and its competitors from the normal supply and demand dynamics of a competitive market.

173.    The July 24, 2024 ManBear Report later asked rhetorically, regarding the above January 27, 2023 report from OPIS, "How would municipalities and contractors feel if they knew their distributors are coordinating with suppliers to maintain high prices, instead of working to get the best prices?"

174.    On February 3, 2023, Atkore and/or its competitors used OPIS to identify specific block price increases to collectively implement on PVC municipal water pipe, with OPIS writing that, "**Converters had rallied around a price increase for Feb 1** which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes. **Some competitors had only**

56

*grudgingly joined the effort, as they felt a price hike was not warranted*, as they felt a price hike was not warranted due to the fact that municipal pipe prices have been stable at Block 440 for 40 weeks in a row while PVC prices had fallen by 42 cpp in 2H 2022." In other words, this coordinated price increase occurred at a time when PVC municipal water pipe prices had been stabilized for approximately 40 weeks in a row, while PVC resin prices had fallen.

175.     On February 10, 2023, OPIS further confirmed that Atkore and its competitors had unanimously joined in the PVC municipal water pipe price increase, despite some reservations. As OPIS wrote to its subscribers on February 10, 2023, "While *the increase announcements had been unanimous*, not all converters were particularly enthusiastic about the idea of trying to push for higher prices in early Feb. They said that *demand was still too low to support raising prices*." This unanimous, parallel, and disciplined increase in the price of PVC municipal water pipe in the face of weak demand is coordinated pricing action unsupported by market conditions. There is no pro-competitive justification for such an action.

176.     The July 24, 2024 ManBear Report commented on the February 3 and 10, 2023 OPIS reports that, "This looks like 'unanimous' coordination of price increases among competitors, even while admitting economics (weak demand, declining input costs) do not support it. These coordinated efforts kept muni[cipal] pipe prices at record levels for 40 straight weeks (a commodity product with flat pricing for that duration is very unusual)."

177.     Atkore and its competitors sold the vast majority of PVC Pipe to end customers in the United States through distributors. PVC municipal water pipes are sold through a relatively consolidated group of distributors, with at least 40-50% of the market controlled by Core & Main, Ferguson, and Fortiline. Distributors have a strong economic interest, shared with Atkore and its competitors, to keep prices high. A key component of that shared interest relates to the valuation

of the large inventories of PVC Pipe that distributors carry, and the devastating impact that a write-down of the value of those inventories would have had if the price of PVC Pipe suddenly fell after years of remaining high beginning in 2020.

178.    On February 24, 2023, OPIS reported to its subscribers that "Converters spoke about ***working in concert with large distributors for months to keep pricing from sliding*** below Block 440 to prevent devaluing distributor inventories." OPIS added that PVC converters also "expressed some concern about whether distributors would ***return the favor and help keep prices from dropping****. . . .*"

179.    As ManBear reported in the July 24, 2024 ManBear Report regarding this February 24, 2023 OPIS report, "Prices for muni[cipal] pipe have held at extremely elevated levels through July 2024, so apparently distributors have 'returned the favor' by 'working in concert' with converters to hold prices." Similarly, during Core & Main's fourth quarter 2022 earnings call, CEO Steve LeClair emphasized that, "We have seen pricing stabilize and remain elevated for several months across our municipal pipe products." Later during the same call, Mr. LeClair also stated that Core & Main would "continue to monitor the cost of our municipal pipe products closely, but we have been pleased to see ***the cost of these products remain firm at higher levels over the past few quarters***." In Core & Main's 2024 First Quarter earnings call, CEO Steve LeClair stated that municipal PVC pricing was "off of I'd say the record highs we saw in 2022. But overall, ***it's been pretty stable here in the last several months***."

180.    On May 2, 2023, during Otter Tail's first quarter earnings call, Chuck MacFarlane (Otter Tail President and CEO) stated, "We continue to benefit from elevated PVC pipe pricing despite resin costs receding from historic heights. PVC pipe prices remained higher than estimated for the first quarter of the year and into the second quarter."

181. On March 22, 2024, OPIS commented on the collective action taken by Atkore and its competitors on PVC municipal water pipe pricing. OPIS wrote, "Last Friday, ***Westlake issued a price increase letter*** taking municipal pipe prices to Block 390 for immediate shipment (for all diameters) and block 400 for standard quotes, effective March 18. National, Jet Stream, IPEX, ***Atkore***, Diamond, Sanderson, and JM Eagle ***followed suit with similar letters***, effective Mar 18 or 19. As usual, Northern and Vinyl Tech did not issue price increase letters, but said they would be raising their prices to the same level." There is no pro-competitive reason that Northern Pipe Products and Vinyl Tech (both wholly owned manufacturing subsidiaries of Otter Tail) would permit OPIS to reveal to their competitors their pricing intentions, especially when they were not even issuing price increase letters to their own customers regarding that fact. The only rational explanation for these Otter Tail converters to allow OPIS to publish that information is to signal to Atkore and the rest of its competitors that the Otter Tail converters intended to continue to participate in the scheme.

182. On June 21, 2024, Atkore and/or its competitors used OPIS to coordinate the size and implementation date for a price increase on PVC municipal water pipes. Specifically, OPIS wrote that "With a total of 4 cpp in resin price increases on the table, converters acknowledged ***they will need to try again to raise prices.*** This time, some said, they need to put out price letters with an increase of no more than 10 Blocks above the current market and all aim for the same implementation date. Then, if that increase is successful, to do it again."

183. Then, on July 12, 2024, OPIS further signaled Atkore and its competitors' collective action to increase the price of PVC municipal water pipe. OPIS wrote, "With six cents in resin price increases staring converters in the face for Jun, Jul, and Aug, the consensus was that they need to get serious about pushing prices up. . . . Some converters said they need to return to

the tactics they had employed a few years ago of going up by only 5 Blocks at a time but doing it repeatedly until their desired price level was achieved." This is a direct admission by OPIS that its participants had coordinated price increases in the past and an unambiguous signal that Atkore and its competitors intended to coordinate price increases going forward.

184.    Still in mid-July 2024, the price-fixing conspiracy appeared to be in effect. On July 19 2024, OPIS reported that, "Most converters were concerned about the constant erosion of their margins, but were *waiting for a market leader to announce a price hike for them to follow*." As the July 24, 2024 ManBear Report asked rhetorically regarding this July 19, 2024 OPIS report, "Is it legal to invite your competitors to raise prices, and tell them that you will 'follow'?"

### 5.    OPIS Recently Settled Private Civil Antitrust Claims Alleging PVC Pipe Price-Fixing

185.    OPIS was a named defendant in the civil antitrust cases filed against Atkore for its role in facilitating the price-fixing conspiracy, also pending in this federal district court. *See In re PVC Pipe Antitrust Litig.*, No. 1:24-cv-07639 (N.D. Ill. Aug. 23, 2024). The actions allege that Atkore and other U.S.-based PVC Pipe manufacturers conspired to artificially inflate the price of PVC Pipes by exchanging competitively-sensitive business information, including information regarding future PVC Pipe pricing and sales through OPIS.

186.    OPIS received a grand jury subpoena in August 2024 from the DOJ as part of the federal criminal antitrust investigation, and has also disclosed receipt of investigative demands from the state of Florida, with respect to the price-fixing conduct alleged in this case and under investigation by DOJ.

187.    On May 5, 2025, the plaintiffs in the civil antitrust case announced that OPIS had agreed to settle their antitrust claims against OPIS. Pursuant to the terms of the settlement, OPIS

is required to pay $6 million to the plaintiffs, and provide extensive cooperation in the prosecution of the claims against Atkore and its competitors.

188.     Such cooperation includes that OPIS will provide: (a) an attorney proffer regarding material facts known to OPIS's counsel relating to the claims; (b) three depositions; (c) three live trial witnesses; (d) documents that OPIS had produced to the DOJ in connection with the DOJ's own antitrust investigation into PVC Pipe price-fixing (as well as documents that OPIS provided to any other governmental entity investigating the PVC Pipe market), including structured data, PVC & Pipe Weekly reports, all messages or communications between Donna Todd[10] and employees of Atkore and its competitors and their distributors, other documents to be provided pursuant to search terms to be negotiated by the Parties, and other materials responsive to the DOJ's subpoena, such as interrogatory responses and privilege logs; and (e) declarations to establish the authenticity and admissibility of OPIS's documents.

189.     In a statement on or about June 9, 2025, OPIS said that the civil antitrust allegations against it supposedly "involved an isolated situation impacting *one product*, which we have since discontinued." As *Reuters* stated on June 9, 2025, when reporting on the settlement, OPIS last year discontinued the PVC & Pipe Weekly report: "OPIS had produced *until late last year* a weekly PVC pipe market condition report."

190.     On August 18, 2025, the plaintiffs in the civil antitrust suit filed a series of Amended Complaints in this Court under seal, which name Atkore and other PVC pipe companies as Defendants, and incorporate information learned from OPIS through OPIS's cooperation with

---

[10] Donna Todd is OPIS's senior PVC editor. OPIS (via Ms. Todd) served as the primary facilitator of the alleged conspiracy by directly contacting PVC pipe buyers and sellers to collect confidential pricing information, which enabled Atkore and its competitors to coordinate their pricing strategies and monitor the conspiracy.

those plaintiffs. Dozens of pages and hundreds of paragraphs of allegations are redacted. Accordingly, Lead Plaintiff believes that substantial additional evidence of Atkore's price-fixing conspiracy, including through OPIS, will be available through discovery.

191.    These amended complaints contain numerous examples showing that Atkore and its competitors used OPIS—specifically Ms. Todd, the author of the PVC Pipe & Weekly reports—to carry out the price-fixing agreement.

192.    For example, certain text and email communications detailed in the civil antitrust complaints show that ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

193.    ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████ █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

---

[11] The redacted content herein consists of communications with OPIS which are incorporated from the Second Consolidated Amended Class Action Complaint (ECF No. 391-2), publicly filed by the civil antitrust plaintiffs in *In re PVC Pipe Antitrust Litigation*, 1:24-cv-07639 (N.D. Ill.) on August 18, 2025. On August 19, 2025, the civil antitrust plaintiffs requested to provisionally seal that filing (ECF No. 425), and were permitted to re-file it with the above-referenced OPIS communications redacted from public view (ECF No. 444). Lead Plaintiff intends to move to unseal all of the content redacted from the civil antitrust plaintiffs' complaints. However, in an abundance of caution, Lead Plaintiff has redacted certain OPIS communications pending its motion to unseal and rulings by the Court.

████████████████████████████████████████████████████████

████████████████████████████

194.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

195.    The complaints filed in the antitrust action contain dozens of redacted paragraphs

detailing more communications from 2020 through 2024. For example:

- From the year 2020, the direct purchaser plaintiff's complaint contains over 20 paragraphs detailing such communications—all of which are redacted pursuant to OPIS's settlement agreement with the antitrust plaintiffs;

- From the year 2021, the complaint contains nearly 20 paragraphs of such text and email communications with Ms. Todd, which allegedly "are representative examples of [the PVC Pipe manufacturers'] adherence to their price-fixing agreement during 2021";

- From the year 2022, the antitrust complaints also contain nearly 20 paragraphs of additional text and other communications with Ms. Todd, which provide further "representative examples of [the PVC Pipe manufacturers'] adherence to their price-fixing agreement during 2022," and that such manufacturers "used Todd to monitor the conspiracy, any cheating by cartel members, and used her to reinforce adherence to the conspiracy";

- From the year 2023, the antitrust complaints also contain nearly 50 paragraphs of additional text and other communications with Ms. Todd, which provide further "representative examples of [the PVC Pipe manufacturers'] adherence to their price-fixing agreement during 2023." These communications allegedly evidence that Atkore and its competitors "continued to use Todd to police the conspiracy, and to try to prevent or correct cheating"; and

- From the year 2024, the antitrust complaints also contain nearly 40 paragraphs of additional text and communications with Ms. Todd, which provide further "representative examples of [the PVC Pipe manufacturers'] adherence to their price-fixing agreement during 2023."

196. These communications are redacted from the public versions of the civil antitrust complaints, but it is reasonable to infer they include communications with Atkore employees. The antitrust complaints specify that Defendants Waltz, Deitzer and Pregenzer are among the Atkore executives who "were responsible for setting and determining the prices of PVC Products for each Atkore subsidiary and implemented uniform pricing of PVC Products for all of the Atkore-related entities."

197. Ms. Todd also facilitated the price-fixing agreement by Atkore and its competitors through a "BCC List," an email distribution list that included PVC Pipe manufacturers' employees. Ms. Todd regularly (at least weekly, often daily, and sometimes several times per day) ensured that the price sheets and price increase letters obtained directly from Atkore and its supposed

competitors were continually circulated to her BCC List, along with a request to the recipients to send Todd any additional pricing letters or pricing sheets. The specific names and companies of the PVC Pipe manufacturers on Ms. Todd's BCC List are redacted from the public versions of the civil antitrust complaints, but it is reasonable to infer the list includes Atkore employees.

198. This is not the first instance of OPIS allegedly facilitating an antitrust conspiracy. In 2020, the California Attorney General initiated a case against two gasoline companies for using OPIS to manipulate gasoline prices and raise price for consumers in California.[12] These allegations were resolved through a $50 million settlement between the California Attorney General and the gasoline companies.

199. Additional Witness 1 ("AW-1")[13] was the director of sales and business development at *PetroChem Wire* until his departure in 2023. AW-1 joined *PetroChem Wire* in 2008 after it was founded by Kathy Hall, the current *PetroChem Wire* executive director.

200. AW-1 stated that Donna Todd, former senior editor of the *PetroChem Wire*'s PVC & Pipe Weekly publication, had founded that publication when she joined *PetroChem Wire* about two or three years after AW-1 joined *PetroChem Wire*. Ms. Todd served as PVC & Pipe Weekly senior editor until 2023, when she became Associate Director of the publication.

201. AW-1 stated that he was familiar with the reporting process on the PVC side, and that *PetroChem Wire* subscribers, including Atkore and other PVC Pipe sellers and distributors regularly spoke to the publication's editors, including by phone. AW-1 stated, for example, that subscribers had the ability to call the editor directly and ask questions, and that the publication

---

[12] Press Release, "Attorney General Becerra Announces Lawsuit Against Two Multinational Companies for Manipulating Gas Market, Costing Californians More at the Pump" (May 4, 2020), https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-lawsuit-against-two-multinational-companies (last accessed Aug. 22, 2025).

[13] Witnesses are all referenced herein using masculine pronouns regardless of their actual gender.

generally had a primary contact at each subscriber's company. AW-1 stated that Donna Todd, as PVC & Pipe Weekly's editor, spoke with companies, including Atkore and its competitors, in order to give them weekly updates on what was happening in the PVC market. AW-1 stated that these companies reported PVC Pipe price ranges to the publication's editors that they needed to stay within.

202.    AW-1 stated that Todd would generally speak about pricing with the person at each company who managed its PVC division, usually the General Manager of the company's PVC business unit. AW-1 stated that beyond phone calls, there were also text messages exchanged between subscribers and the publication's editors.

203.    AW-1 reported that he was familiar with Jeff Sherman, Atkore's GM of PVC. AW-1 stated that he attended a trade show with Donna Todd, and that AW-1 met Sherman when Sherman came up to speak with Todd.

**E.      Several "Plus Factors" Concerning the PVC Pipe Market Confirm the Conspiracy**

204.    "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."[14] "Courts have relied on operational criteria known as plus factors to determine whether a pattern of parallel conduct results from an agreement."[15]

205.    The chief plus factors have included:

- Actions contrary to each defendant's self-interest unless pursued as part of a collective plan.

---

[14] William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, Plus Factors and Agreement in Antitrust Law, 110 MICH. L. REV. 393, 393 (2011). Available at: https://repository.law.umich.edu/mlr/vol110/iss3/1.

[15] *Id*. at 405.

- Phenomena that can be explained rationally only as the result of concerted action.

- Evidence that the defendants created the opportunity for regular communication.

- Industry performance data, such as extraordinary profits, that suggest successful coordination.

- The absence of a plausible, legitimate business rationale for suspicious conduct (such as certain communications with rivals) or the presentation of contrived rationale for certain conduct.[16]

206.    The plus factors discussed below support that Atkore and its competitors engaged in an agreement to fix the prices of PVC Pipe.

### 1.    Adhering to the Price-Fixing Scheme Was Contrary to Atkore's Self-Interest Unless Pursued as Part of a Collective Plan

207.    Atkore raising and/or maintaining prices at supra-competitive levels was contrary to Atkore's self-interest, unless Atkore pursued it as part of a collective plan. For example, by not lowering the prices of its own PVC Pipe, Atkore did not sell the volume of PVC Pipe that it otherwise could have. Lowering prices would have resulted in Atkore selling more PVC Pipe volume and potentially increasing its market share vis-à-vis its competitors. Instead, maintaining prices at supra-competitive levels caused Atkore to accumulate unsold PVC Pipe inventory.

208.    Indeed, PVC Pipe is largely homogeneous, and the behavior of Atkore and its competitors during the Class Period involved a discrete change that shifted from a pursuit of market share to maintenance of elevated prices (which included shift to "price before volume").

---

[16] *Id.* at 405-06. Atkore publicly claimed that it was not harmed by a reduction in volume because of the high PVC Pipe prices in the market. As Defendant Waltz stated on November 18, 2022, Atkore's "strategic decisions" to "reduce and drive price increases in select categories," as well as "market declines," have "resulted in [a] $100 million our retail exposure decline in volumes over the past five years," but "What's notable, however, is that ***the loss of earnings resulting from that decline has been negligible***" and created "significant benefit . . . in regards to our pricing and profitability.".

209.     Atkore publicly claimed that it was not harmed by a reduction in volume because of the high PVC Pipe prices in the market. As Defendant Waltz stated on November 18, 2022, Atkore's "strategic decisions" to "reduce our retail exposure and drive price increases in select categories" (as well as "market declines") had "resulted in [a] $100 million decline in volumes over the past five years," but "What's notable, however, is that *the loss of earnings resulting from that decline has been negligible*" and created "significant benefit . . . in regards to our pricing and profitability."

210.     However, FE-2 stated that, at the end of 2023, as Atkore's PVC Pipe sales volumes started to decrease, the Company held an annual meeting outside of Dallas, Texas, which he attended. FE-2 reported that Defendants Waltz and Pregenzer, Jeff Sherman, and Keith Dinkheller also attended the meeting. In connection with the meeting, the attendees, including FE-2, took a tour of Atkore's PVC Pipe manufacturing facility. FE-2 stated that, during the tour, they noticed that there was excess PVC piping inventory everywhere. During the tour, the plant manager stated that they had nowhere to put this excess PVC Pipe inventory, and it stretched out to the manufacturing facility's parking lot. FE-2 stated that Defendants Waltz and Pregenzer, Sherman, and Dinkheller were also at the plant and would have seen this. FE-2 thought the overabundance of PVC pipe at the plant was due to the Company's elevated prices reducing Atkore's sales volumes.

### 2.     Industry Performance Data, Including Extraordinary Profits, Support Successful Coordination

#### a.     There Was an Uncoupling of the Historic Relationship Between PVC Pipe Prices and Input Costs

211.     Historically, there has been a close relationship between the prices for PVC resin and PVC Pipe, which logically follows from the fact that PVC resin is the primary raw material used in making PVC Pipe and constitutes approximately 70% of the total input costs associated

with making PVC Pipe. The markup from PVC resin to finished PVC Pipe is known as a PVC Pipe manufacturer's "spread." Before 2020, when PVC resin prices changed, the pricing for PVC Pipe moved in lockstep, causing the spread of finished PVC Pipe over raw PVC resin to be a consistent ratio. This meant that profit margins for PVC converters were fairly consistent, rarely if ever exceeding a rate in the low teens. However, in 2021, this historical relationship between the price of PVC resin and PVC Pipe ended, and the price of PVC Pipe remained consistently high as a result of the scheme to increase and stabilize the price of all PVC Pipe, even as the price of PVC resin dropped.

212. With respect to PVC electrical conduit pipe, OPIS pricing data shows that Atkore and its competitors raised the price of PVC electrical conduit pipe approximately 500% between late 2019 and late 2021, moving from $0.63/ft. to $3.77/ft. OPIS reported that PVC electrical conduit pipe, as of July 2024, sat at $1.68, which is approximately three times its price pre-March 2020. By comparison, OPIS pricing data showed that PVC resin prices increased from $0.34/lb. in late 2019 to $0.89/lb. in early 2022 to $0.51/lb. in January 2023 and $0.53 in July 2024.

213. The July 24, 2024 ManBear report represented this through the below graphic, with the green shaded area representing the converters' Gross Profit divided by the Spread:



214.    As the ManBear Report stated, "Conduit prices and converter margins remain extremely elevated, with spreads (ie gross margins) still >4x the 2017-2019 average, even though the primary cost input to make conduit (PVC resin) fully normalized in 2022." As ManBear summarized, "the improper communication via OPIS has allowed converters to maintain massively inflated margins."

215.    Similarly, data available to Lead Plaintiff without the benefit of discovery (including into OPIS's complete PVC Pipe price datasets) includes a data series from the Federal Reserve Bank concerning plastic conduit pipe, which is primarily composed of PVC electrical conduit pipe. As shown below, this data set demonstrates the decoupling of the price of PVC resin and PVC electrical conduit:



216.    With respect to PVC municipal water pipe, OPIS reported in PVC & Pipe Weekly that Atkore and its competitors raised the price of PVC municipal water pipe approximately 500% between late 2019 and mid-2022. In July 2024, OPIS reported that prices for PVC municipal water

pipe remained 4.7 times what they were pre-December 2019. By comparison, OPIS pricing data showed that PVC resin prices increased from $0.43/lb. in late 2019 to $0.89/lb. in early 2022, before falling back to a more normal level of $0.51/lb. in January 2023.

217. The July 24, 2024 ManBear Report represented this through the below graphic, with the light blue shaded area representing the converters' Spread:



218. As the ManBear Report stated, "Muni pipe prices and converter margins remain extremely elevated, even though the primary cost input (PVC resin) fully normalized in 2022. We believe the improper communication of pricing intentions via OPIS has allowed converters to maintain massively inflated margins."

219. The full data set of OPIS's PVC municipal water pipe is not available to Lead Plaintiff without discovery. However, an analysis of data from the Federal Reserve Bank concerning the "Plastic Water Pipe" data series, which is primarily composed of municipal water pipe (blue/green PVC), is shown below and demonstrates the uncoupling of the historic relationship between the price of PVC resin and PVC municipal water pipe:

71



220. With respect to PVC plumbing pipe (also referred to as DWV pipe), OPIS's reported trends for pricing are not currently available to Lead Plaintiff without discovery. However, a comparison between data from the Federal Reserve Bank concerning DWV pipe and PVC resin data demonstrates the same pattern of a break with the historic relationship between PVC resin and PVC Pipe prices in 2021:



Comparison of PVC Plumbing Pipe ("Drain, Waste, Vent") Prices and Resins Prices

221.    PVC Pipe prices rose far faster than PVC resin prices after the onset of the COVID-19 pandemic, leading to historic margins for Atkore and its competitors. For example, from 2019 to 2023, Atkore's Electrical segment EBITDA grew more than threefold and its profit margins grew from less than 20% for the time period from 2016 through 2019, to 38% in 2023. Atkore achieved a record net income of $913.4 million for its fiscal year 2022—representing an increase of $325.6 million year-over-year. Similarly, Atkore's earnings per share ("EPS") skyrocketed from just $3 to $4 prior to the pandemic to $19 in 2023, reflecting extraordinary and unprecedented EPS growth.

222.    Similarly, Atkore's competitor Otter Tail reported for its PVC line of business—namely Northern Pipe and Vinyltech—in its Q4 2021 Earnings Call Presentation that "[t]he average price per pound of PVC pipe sold in 2021 increased by 82.1% compared to 2020, which exceeded the increase in the cost of PVC resin and other input materials." And in its 2021 Annual Report, Otter Tail stated that "unique supply and demand conditions during the year in the PVC

pipe industry led to earnings levels not previously experienced." Profit margins for Otter Tail's Northern Pipe and Vinyltech exploded to 61% in 2023 from its 14% long-term average (2013-2019) due in large part to profit from its PVC municipal pipe business.

### b. Lead Plaintiff's Regression Analysis Confirms the Supra-Competitive Prices of PVC Pipe Caused by the Scheme

223.   To analyze the impact of Defendants' price-fixing scheme, Lead Plaintiff constructed a regression model (without the benefit of discovery or Defendants' internal transactional data) based on the relationship between the price of three different PVC Pipe applications (i.e., PVC municipal water pipe, PVC electrical conduit pipe, and PVC plumbing pipe) and the input costs and other factors affecting prices that are unrelated to collusion (e.g., cost and demand factors) in order to isolate the price effects, if any, of the alleged conspiracy. This provides a reliable predictive econometric model that accounts for material non-collusive effects on price, estimated using benchmark data where conduct was presumed non-collusive, and produces a prediction of prices that does not explain the path of actual prices in the period of potential collusion, at a high confidence level.

224.   The determination of a price effect, if any, and the estimation of the impact attributable to collusive behavior, if any, typically involves the comparison of prices during the period affected by the alleged unlawful conduct (referred to as the "damages" period) to competitive prices during a "benchmark" period, i.e., prices in a market or during a time period likely unaffected by the alleged unlawful conduct. The benchmark prices provide information that can be used to estimate counterfactual, "but-for" prices that would have prevailed during the damages period in the absence of the alleged unlawful conduct. The Figures below compare actual PVC Pipe prices to the prices that buyers **would have paid** in a free market absent collusion (the

"but-for prices"). The but-for prices are based on the actual costs of inputs to manufacture the given commodity, PVC Pipes.



Comparison of Actual and But-For PVC Pipe Prices ("Plastic Pipe Data Series")

225.     The Figure above reflects that the actual prices for PVC Pipe in the Plastic Pipe Data Series far exceeded the predicted, but-for prices in Lead Plaintiff's regression analysis.

226.     The same regression analysis holds when three different application categories of PVC Pipe are broken out separately by PVC municipal water pipe, PVC electrical conduit pipe, and PVC plumbing pipe, as shown below:







227. Established econometric methods account for factors that affect prices but that are unrelated to collusion (e.g., cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy. Here, Lead Plaintiff applied the widely-accepted "dummy variable" multiple regression methodology to estimate the price effects of the alleged conspiracy.[17] The dummy variable multiple regression methodology implements the comparison described above, in that it relies on comparing "prices in the impact period to available prices before and/or after the alleged period of impact,"[18] while controlling for other factors that affect prices.

---

[17] *See, e.g.,* ABA Section of Antitrust Law (2017), *Proving Antitrust Damages: Legal and Economic Issues,* 3rd ed. Ch. 6, Section F; McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods,* vol. 3, pp. 63-74; and ABA Section of Antitrust Law (2014), *Econometrics: Legal, Practical, and Technical Issues,* 2nd ed., Ch. 12.

[18] McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods,* vol. 3, pp. 63-74, at 63. (The control period is also known as the "benchmark period.")

228.     Specifically, the multiple regression analysis illustrated in the Figures above controls for supply and demand by including variables for (1) resins producer price index ("PPI"), (2) production and nonsupervisory employees labor cost index, (3) freight trucking PPI, (4) total construction spending, (5) inflation, (6) the onset of the COVID-19 pandemic on relevant economic factors, and (7) calendar month fixed effects, which accounts for seasonality in prices.

229.     As shown in the Figures above, relevant economic factors predicted price increases in 2021 and later (*see* predicted but-for prices in the Figures above), but they do not explain all of the substantial price increases. Actual prices were significantly higher than the but-for prices in the period from January 2021 to the present, even after accounting for all major demand and cost factors. Specifically, the ***average estimated overcharges*** for PVC Pipes, shown in the Figures above, are:

- Plastic Pipes: 22.8%

- Plastic Water Pipes: 30.1%

- Plastic Conduit: 33.2%

- Drain, Vent, Waste Pipes: 23.3%

230.     These regression results showing overcharges are highly statistically significant. They demonstrate that the prices of PVC Pipe were maintained at an inflated level above competitive levels throughout the Class Period, accounting for major non-conspiracy factors that affect PVC Pipe product prices.

231.     For instance, the chart below demonstrates that labor costs do not explain the divergence of PVC Pipe prices from the calculated but-for prices:



### 3. Certain Phenomena Can Be Explained Rationally Only as the Result of Concerted Action and There Was No Plausible, Legitimate Business Rationale for the Suspicious Conduct

232.    As set forth above, Atkore and its competitors' communications and actions in the OPIS reports reflect phenomena that can be explained only as the result of concerted action, and there is no plausible, legitimate explanation for the suspicious conduct.

233.    For example:

a.    On May 26, 2023, OPIS explained that resin prices would drop and pipe demand would be "moribund," but cited to converters believing that ***"as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the higher price levels."*** Competitors thus called on market leader Atkore to "take a hard stand" and hold the line on higher price levels, while acknowledging that there was no valid economic reason for a price increase because costs and demand were decreasing;

b.    On February 23, 2024, converters signaled to each other through OPIS the next price increase with specific future timing ("next week"), while calling for everyone to maintain disciplined bidding activity ahead of that;

c.    The March 15, 2024 OPIS report that "Competitors said everyone needs to start moving prices up on business written from now on" was a clear

invocation of collective future action contrary to competition, and converters did raise their prices from $3.78/ft on March 15, 2024 to a price of $3.90/ft. on April 12, 2024;

d.     On April 5, 2024, competitors shared company-specific information about pricing, including future plans about pricing, and reassured competitors they were in fact ***not*** competing on price (because, although the company in question "took hold for release orders at low prices that keep prices static," none of the orders were now left);

e.     On May 3, 2024, OPIS reported to its non-public subscribers that, "Converters said the price hikes won't work ***unless everyone is working together to implement them***";

f.     On May 10, 2024, OPIS reported that "Converters hope to push prices higher but ***concede*** that it will have to be a ***unanimous effort*** to have any chance of success."

g.     On June 21, 2024, OPIS wrote that "[PVC] converters conceded they need to figure out how to push prices higher. ***The consensus this week was for a single price increase that would take prices up by about 5% over the current market level***, with another percent added to account the discount. Then, if that works, do it again and again until it stops working. ***Conduit converters have been successful with this strategy in the past***." Within a week, the converters all published the same, increased prices.

234.     It is axiomatic that, in a competitive market, one seller knowing information about a rival gives that seller a competitive advantage. A competitor thus has no unilateral interest in disadvantaging itself relative to its rivals. But the numerous examples from the OPIS reports where competitors divulged competitively sensitive information about themselves to one another reflect firms having knowledge of the details of other firms' transactions, sales, and/or prices where the latter firms would normally be competitively disadvantaged by conveying that information unilaterally.

### 4.     Defendants Utilized and Created the Opportunity for Regular Communication

235.     As discussed in detail above, Atkore and its competitors used OPIS as a forum through which to regularly communicate with each other about PVC Pipe prices.

80

236.    In addition, Atkore and its competitors had numerous opportunities to collude through overlapping membership in trade associates and industry groups. These provided executives from Atkore and its competitors with opportunities to meet directly with one another to facilitate the conspiracy.

237.    For example, the Uni-Bell PVC Pipe Association ("PVCPA") is one of the most prominent PVC Pipe trade associations in the United States. Atkore and its competitors (including Mitsubishi/Shin-Etsu entities (including Diamond Plastics and Sanderson Pipe), IPEX, JM Eagle, National Pipe, Otter Tail entities (including Vinyltech and Northern Pipe), PipeLife, and Westlake are members of PVCPA. PVCPA hosts multiple events each year, including an annual meeting. Numerous executives from Atkore and its competitors have sat on the PVCPA Board of Directors, including Jeff Sherman (Atkore), Chuck Clark (JM Eagle), Andre Battistin (Westlake), John Britton (Diamond Plastics), Matt Siegel (National Pipe), Travis Lutes (IPEX), Wayne Voorhees (PipeLife), and Eric Howard (Sanderson Pipe).

238.    While Jeff Sherman was on the PVCPA Board of Directors, he served as General Manager of Atkore's PVC Pipe business. As FE-1, FE-3 and FE-4 confirmed, Sherman and his team were directly involved in gathering information about competitor PVC Pipe pricing that was regularly reported and discussed with Defendants Waltz, Johnson and Pregenzer.

239.    Atkore and its competitors regularly attended each PVCPA meeting. In 2022, the PVCPA annual meeting was held on April 4-6, 2022, at the Ponte Vedra Inn & Club in Ponte Vedra Beach, Florida. In 2023, the annual meeting was held March 20-22, 2023, at the Curio Collection by Hilton in Key West, Florida.

240.    High-level executives from Atkore and its competitors regularly attend the PVCPA's Annual Conferences. For example, the following high-level executives attended the

February 2024 PVCPA Annual Meeting in Costa Rica: Jeff Sherman and Michael Deneen (Atkore VP of Sales for PVC and HDPE products) attended for Atkore; Skip Yents (VP of Sales and Marketing) and John Britton (CEO) attended for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) attended for IPEX; Chuck Clark (Vice President of Operations) attended for JM Eagle; Matt Siegel (President) and Josh Funderburk (Head of Strategic Sourcing) attended for National Pipe; Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President) attended for Otter Tail; Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing) attended for PipeLife; Eric Howard (President) attended for Sanderson Pipe; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), and Veso Sobot (Director of Corporate Affairs) attended for Westlake. In addition, Greg Nahrgang attended on behalf of Charlotte Pipe and Foundry Company (Vice President, Technical Services and Product Development).

241.    The Plastic Pipe and Fittings Association ("PPFA") is a trade association for the PVC Pipe industry focused on plumbing and piping applications for buildings. Membership includes Atkore and its competitors (including Cantex, IPEX, PipeLife, Westlake, Prime Conduit, National Pipe, and Sanderson Pipe). Charlotte Pipe & Foundry Company and Cresline Plastic Pipe Co. are also members of the PPFA. Shintech, Formosa, Oxy Chemical, and Westlake also have a resin supplier membership in PPFA.

242.    The PPFA holds two meetings per year. In 2021, the spring meeting was held from March 7-9, 2021, at the Loews Ventana Canyon Resort in Tucson, Arizona, and the 2021 fall meeting was held from October 3-5, 2021, at the Ritz Carlton on Amelia Island, Florida. In 2022, the spring meeting was held from March 6-8, 2022, at the Hyatt Regency in Indian Wells,

California, and the fall 2022 meeting was held from October 2-4, 2022, at The Broadmoor in Colorado Springs, Colorado. In 2023, the spring meeting was held from March 5-7, 2023, at the Loews Ventana Canyon Resort in Tucson, Arizona, and the fall 2023 meeting was held from October 1-3, 2023, at the Ritz Carlton in Naples, Florida. In 2024, the spring meeting was held from March 3-5, 2024, at Rancho Mirage, California, and the fall 2024 meeting was held from October 6-8, 2024, in Monterrey, California.

243. The Plastics Pipe Institute ("PP Institute") is the major North American manufacturers trade association for advocacy and education regarding plastics use in pipe, conduit, and infrastructure. Atkore, JM Eagle, and IPEX are members, as well as Core & Main and Ferguson. PP Institute holds two meetings per year—a "semi-annual" meeting in the fall, and an "annual" meeting in the spring. The PP Institute members listed above attend each meeting. In 2021, the annual meeting was held from September 26-29, 2021, in Plano Texas. In 2022, the annual meeting was held from May 15-18, 2022, in Scottsdale, Arizona, and the semi-annual meeting was held from October 16-19, 2022, in Louisville, Kentucky. In 2023, the annual meeting was held from May 9-12, 2023, in Maui, Hawaii, and the semi-annual meeting was held from October 15-18, 2023, in Nashville, Tennessee. In 2024, the annual meeting was held from May 13-16 in Manalapan, Florida, and the semi-annual meeting was held from October 21-24 in Irving, Texas.

244. The Irrigation Association was established in 1949 and is the leading membership organization for irrigation equipment and system manufacturers, dealers, distributors, designers, consultants and contractors in the United States. Atkore, Westlake Pipe & Fittings, JM Eagle, and IPEX USA are members. The Irrigation Association hosts regular conferences and seminars for its members, including the Irrigation Show and Education Week, which "brings the brightest minds

and latest innovations in irrigation to one place." In 2023, Atkore, JM Eagle, IPEX USA, and Westlake Pipe & Fittings all attended and were exhibitors at the trade show which took place from November 27 to December 30 in San Antonio, Texas.

245.    The National Electrical Manufacturers Association ("NEMA") was founded in 1926 and is a trade association of electrical equipment manufacturers in the United States that advocates for the industry and publishes standards for electrical products, including PVC pipe. Atkore, Cantex, IPEX USA, and Southern Pipe are members. NEMA hosts over 100 in-person and virtual events every year, including its members-only on-site annual conference.

246.    The National Association of Electrical Distributors ("NAED") was founded in 1969 and is a trade association of companies involved in the distribution of electrical equipment in the United States. Atkore, Cantex, IPEX USA, Prime, and Southern Pipe are members. According to NEAD, their association is the "dominant source of networking for the nation's distributors and their affiliates," and it provides these networking opportunities through approximately 20 meetings and conferences a year, including an on-site annual conference.

**F.    Defendants Were Motivated by Insider Stock Sales and Incentive Compensation to Fix Prices and Artificially Inflate Atkore's Stock Price**

247.    As alleged in more detail in the "Additional Allegations of Scienter" section below, Defendants took advantage of Atkore's inflated share price to reap tens of millions of dollars in proceeds from insider stock sales. For example, on February 1, 2023—while Atkore was privately colluding with other manufacturers to boost the Company's PVC pipe pricing—Defendant Waltz publicly announced that the Company was raising its fiscal year guidance by $100 million due to Atkore continuing to sustain elevated pricing in defiance of pricing normalization trends. In response to this news, Atkore stock price increased by over 14%. On the same day, Defendant

Waltz sold 30,000 shares of his Atkore stock in a single pre-planned transaction, reaping $4.2 million dollars in proceeds (and over $3.9 million in profits).

248.    In addition, after Atkore realized internally—including during the internal Atkore annual meeting at the end of 2023—that it was experiencing significant financial difficulties despite the price-fixing, Defendants sold a significant number of Atkore shares to benefit from Atkore's artificially-inflated stock price while failing to disclose the truth. For example, in February 2024, Defendant Waltz sold over *43,000* of his shares in a single unplanned transaction on February 26, 2024, reaping nearly *$7 million* in proceeds. As the conspiracy faced challenges and Atkore and its competitors failed to achieve a price increase for March 2024, Waltz sold another *50,000* of his shares on March 4, 2024 in another unplanned transaction, reaping over *$8.6 million* in proceeds. As this was happening, Defendant Johnson seized on the opportunity to unload over *12,700* of his shares in an unplanned open market sale on March 4, 2024, reaping nearly *$2.2 million* in proceeds. Likewise, Defendant Pregenzer sold over *6,500* of his shares in a single unplanned transaction on February 26, 2024, reaping over *$1 million* in proceeds, and sold over *4,000* of his shares in another unplanned transaction on March 4, 2024, reaping over *$700,000* in proceeds. These February 26 and March 4, 2024 sales by Defendants came soon before the Class Period high price for Atkore stock—$194.98, reached on April 1, 2024—which also represents the *highest-ever* Atkore stock price to date. These sales also came just over two months before the truth about Atkore's artificially inflated financials was partially revealed via the May 7, 2024 corrective disclosure that drove Atkore's stock price down over 12.5%

249.    Similarly, on November 21, 2024, Defendant Waltz told investors that Atkore's competitive advantages provided a bulwark protecting the Company from worsening pricing pressure due to PVC pipe imports. In response to this news, Atkore's stock price increased a

cumulative 12%. In response, Defendant Waltz sold over 120,000 of his Atkore shares in a pair of unplanned open-market transactions on November 26, 2024 and November 27, 2024, reaping over $11 million in proceeds.

## V.    THE TRUTH IS GRADUALLY REVEALED TO INVESTORS

250.    The truth about Atkore's scheme to artificially inflate the price of PVC Pipe, its scheme to hide from investors Atkore's actual financial state as it would exist in a truly competitive market, and to hide the risk of regulatory scrutiny and thereby artificially inflate Atkore's stock price, was revealed through a series of partial corrective disclosures.

### A.    May 7, 2024 Partial Disclosure

251.    On May 7, 2024, in connection with the release of Atkore's fiscal second quarter 2024 financial results, Atkore announced that it was lowering its full year fiscal 2024 projections "due to several factors impacting our [High-Density Polyethylene ("HDPE")] and solar-related initiatives." Specifically, the Company lowered its fiscal full year 2024 adjusted EBITDA from a range of $900 million to $950 million to a range of $850 million to $900 million. As the Company acknowledged in its SEC filings (including its February 1, 2023 earnings release), adjusted EBITDA was a critical metric in its earnings reports because it served as Atkore's "primary measure of profit and loss."

252.    This guidance cut was especially significant, as it followed years of consistently positive quarterly earnings reports and rosy projections from the Company. Notwithstanding the negative news, Atkore still reaffirmed its fiscal full year 2025 adjusted net income per diluted share target of "greater than $18.00" on the Company's earnings call that day.

253.    Atkore attributed its guidance cut to "impacting our HDPE and solar-related initiatives," but the Company also disclosed that the "pricing environment could be challenged in the second half of 2024," a fact that did not go unnoticed by investors. An RBC report published

prior to the Company's May 7, 2024 earnings call listed the following as some "[k]ey questions" on which analysts were focused: "What drove the weakness in volume in both segments? Was pricing achieved at the expense of any volume in the quarter? . . . Expectations for the impacts and cadence of pricing for the full year. Can you take us through the puts and takes on pricing? Does this change your thoughts on [pricing] normalization?"

254.     On that day's earnings call, a Citigroup analyst asked whether, as Atkore had "suggested," "price versus cost pressure" was "solely because of HDPE." The same analyst, digging deeper, specifically asked Defendants to "elaborate on what you're seeing in your core PVC products," to explain what Defendants had meant when they "mentioned strength from non-Electrical PVC products," and whether they were "seeing something on the volume or pricing side" in Electrical by which "pricing could be impacted." Defendants Waltz and Johnson gave roundabout answers to these questions and notably did not at any point elaborate on "what [they] were] seeing in [Atkore's] core PVC products markets."

255.     Analysts were surprised by what a May 7 RBC Capital report called the "unexpected F2024 guidance cut." Some explanation, however, was forthcoming the next day, May 8, 2024, when Defendant Johnson participated in the Oppenheimer Industrial Growth Conference. Asked to explain why Atkore "ha[d] to revise your guidance," Johnson's first answer concerned the Company's PVC business: "[I]f I back up and look at our performance over the last several years, I think there's a reason why we had the reaction we did yesterday. So, we, during the COVID period of time, experienced a really robust market for one of our product lines. It's called PVC conduit . . . So, going into COVID, markets were pretty strong, and then we had a pretty significant disruption in the supply of resin, which in turn led to some very large pricing

gains for us and for our competitors"—which was beginning to evaporate absent Atkore's ability to maintain non-competitively high prices.

256.    On this news, the price of Atkore common stock fell $22.06 per share, or 12.5%, from a closing price of $176.40 per share on May 6, 2024, to a closing price of $154.34 per share on May 7, 2024. This drop in Atkore's stock price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market. However, as discussed further below, the full truth had yet to be revealed.

**B.    July 24, 2024 Partial Disclosure**

257.    After the market closed on July 23, 2024, Atkore announced that Defendant Johnson had abruptly "submitted his resignation as Vice President, Chief Financial Officer and Chief Accounting Officer ("CAO"), effective close of business on August 9, 2024." Atkore also announced that upon Johnson's departure, Defendant Deitzer would take over as the Company's CFO and James Alvey would assume the role of CAO.

258.    The next day, July 24, 2024, market analyst firm ManBear published a report titled "Pipe Price Fixing" (the "ManBear Report"). As stated in the ManBear Report, ManBear "emerged in 2016 to expose price fixing in the chicken industry" and described itself as "a long-biased investor who publishes research infrequently when unique situations arise, such as a need to alert regulators of improper behavior/disclosures." The ManBear Report stated that this was "ManBear's 4th investigation in 8 years; the previous 3 investigations were followed by meaningful market changes, fines, executive indictments, and/or meaningful stock price underperformance." For example, a ManBear report exposing price fixing activity in the chicken industry preceded Pilgrims Pride Corp. pleading guilty to price-fixing and paying a $107 million fine, as well as the DOJ indicting numerous chicken company executives.

259.    As summarized by the ManBear Report:

"We believe PVC pipe manufacturers and distributors are fixing prices by coordinating pricing actions via an industry newsletter"

"PVC pipe manufacturers ('converters') in the electrical conduit and municipal water pipe markets appear to be coordinating pricing actions via an industry newsletter called OPIS – a paid resources [sic] that we believe few, if any, end customers have access to."

"For example, on 6/21/24, OPIS reported 'converters conceded they need to figure out how to push prices higher. ***The consensus this week was for a single price increase that would take prices up by about 5% over the current market level, with another percentage added to account for the discount. Then, if that works, do it again and again until it stops working. Conduit converters have been successful with this strategy in the past.'*** Then the following week on 6/28/24 OPIS reported 'converters lost no time in starting a price increase effort' and detailed how ***6 electrical conduit converters issued effectively identical price sheets in every region.***"

"We believe the apparent price fixing has resulted in massively inflated pipe prices and converter margins. These prices appear to defy economic logic, remaining at extremely elevated levels despite normalized supply chains, normalized input costs (resin), and weak demand. Today, PVC municipal [water pipe] and conduit pipe prices remain 4.7x and 2.7x above pre-Covid levels, respectively, according to OPIS."

"Price inflation has driven converter (ATKR, OTTR, WLK) and distributor (CNM) profits to never-before-seen levels. We believe these companies are materially over-earning. . . ATKR's core electrical segment EBITDA grew 3.4x from 2019 to 2023 (majority organic) as reported price increased +86% and margins expanded from 20% to 38%."

"Regulators are focused on this type of price fixing. The DOJ is actively looking for post-Covid collusive pricing behavior. The FTC is focused on the use of intermediaries, similar to OPIS, to facilitate price fixing. The CA Attorney General is focused on price fixing via OPIS itself."

"ATKR, OTTR, WLK and CNM have material downside if pipe prices normalize, before any impact from fines or damages."

260.    The ManBear Report documented numerous, specific instances of Atkore and other leading PVC Pipe manufacturers using the *PetroChem Wire* PVC & Pipe Weekly report, a publication put out by the commodity pricing service OPIS, to coordinate pricing actions, thereby fixing PVC Pipe prices.

261.     The ManBear report provided considerable evidence of the price-fixing scheme it alleged, including "[d]irect [q]uotes from OPIS [*PetroChem Wire*] reports" describing PVC producers' collusion on the timing and level of pricing increases. For example, the report included quotes from a *PetroChem Wire* report of March 15, 2024 that "[c]ompetitors said everyone need to start moving prices up on business written from now on, or distributors will continue to buy hand to mouth," and tied that quote to subsequent pricing movement, noting that "shortly after" this report, "conduit prices moved up – from $3.78 / ft on 3/15/24 to $3.90 / ft on 4/12/24." Per another quoted *PetroChem Wire* report, from May 26, 2023, "there doesn't seem to be either a demand pull or a cost push to move prices higher," and "some converters believed that as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the higher price levels." Additional specific quotes from the ManBear Report appear throughout this Complaint.

262.     The ManBear report also quoted *PetroChem Wire* reports regarding municipal water PVC pipe. For example, it highlighted a February 3, 2023 *PetroChem Wire* report that said "[c]onverters had rallied around a price increase for Feb 1," even though "[s]ome competitors had only grudgingly joined the effort, as they felt a price hike was not warranted." Another quoted *PetroChem Wire* report, from November 4, 2022, referred to "a phone call or two" between municipal pipe converters, and the ManBear Report asked, "Are competitors calling each other?"

263.     In addition to these and other *PetroChem Wire* report quotes, the ManBear Report included graphs showing "extremely elevated" gross margins for converters during the period of alleged price fixing. The Report also showed that these elevated margins did not comport with ordinary economic rules of supply and demand, noting that "while [s]upply chain issues [had] normalized in 2022" and "PVC resin prices [had] normalized by early 2023"—and despite "weak"

PVC pipe demand—"price remains massively inflated." To support its assertions that this inflation was the result of collusion via *PetroChem Wire* reports, the ManBear Report highlighted, for example, a *PetroChem Wire* report published on June 10, 2022 (as PVC resin prices were beginning to decrease from abnormally inflated levels), which stated that: "Pipe converters were also looking for resin pricing to hold steady over the next few months. They have pushed their pipe prices to record highs during the past two years and the last thing they want is for PVC prices to start falling and pull pipe prices down."

264. Identifying Atkore as one of the "[s]tocks at [r]isk," the ManBear report noted Atkore management's prior "claims [that] elevated margins are sustainable," as well as the fact that Atkore was "[c]alled out consistently in OPIS as the market leader and the leader of various price increase efforts."

265. On this news, the price of Atkore common stock fell $12.37 per share, or 8.5%, from a closing price of $145.00 per share on July 23, 2024, to a closing price of $132.63 per share on July 24, 2024. This drop in Atkore's stock price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market. However, as discussed further below, the full truth had yet to be revealed.

### C. August 6, 2024 Partial Disclosure

266. On August 6, 2024, Atkore reported its fiscal third quarter 2024 financial results and revised its full year fiscal 2024 guidance. Specifically, Atkore reported adjusted EPS that missed the average analyst estimate. In addition, the Company adjusted downward its estimate for fiscal full year 2024 adjusted EBITDA to a range of $772 million to $782 million, and adjusted net income per diluted share to a range of $14.30 to $14.52. The Company also cut its projected fiscal year 2025 EBITDA to account for a projected $200 million to $250 million headwind from continuing price/cost normalization.

267.    The financial numbers in the August 6 earnings release demonstrated the outsized impact of decreased sales in the Electrical business. The total 10.5% decrease in the Company's net sales (compared to the prior quarter) comprised a 1.6% increase in net sales in Safety & Infrastructure and a ***14.1% decrease in Electrical net sales***.

268.    In the earnings release issued that day, Defendant Waltz admitted that, "[t]he third quarter proved to be more challenging than we initially anticipated due to a limited increase in demand from the summer construction season and an ***overall soft pricing environment across most of our Electrical business***." Waltz specified that "***[p]ricing was softer than expected due to the slower end markets, particularly for our PVC conduit business*** and higher concentration of large projects where pricing tends to be more competitive." He added, "[w]e anticipate these trends to continue into the fourth quarter and next year, and we've updated our expectations and outlooks accordingly," clarifying that the Company's "fourth quarter outlook reflects a continuation of or an acceleration of several factors that have impacted us, ***most notably the pricing dynamics in PVC***."

269.    Prior to the earnings call, RBC analysts had published a report wondering "[w]hat drove the margin contraction at Electrical." Accordingly, during the earnings call, analysts focused on PVC pricing. But Defendants again provided vague and elusive answers. For example, a Citigroup analyst asked whether it was "really the steel stuff"—i.e., increased amounts of foreign steel conduit in the market—"that hit you more this quarter," given that "you are seeing increased competition within core PVC." Defendant Waltz responded that "it's in the top two of challenges," and did not mention PVC in his response. Another analyst, from KeyBanc Capital Markets, asked about the "breakdown" of headwinds into "import headwinds versus incremental PVC side and

the HDPE pressures." Defendant Waltz did not provide specifics in his response, stating only that import headwinds were "probably first. Then it's probably PVC and HDPE."

270.    During the call, Defendant Waltz also called the ManBear report "unsubstantiated," but then faced more analyst questions about PVC pricing. A CJS Securities analyst asked whether "PVC pricing still represents . . . the biggest pricing risk moving forward," and Defendant Waltz answered, "yes, I do think it's PVC and then we'll see how metal conduit plays out." Defendant Johnson added that "the reason why we would say PVC for the next year" represents the greatest pricing risk to the Company was "probably just more uncertainty around [demand in] the PVC market for next year."

271.    Analysts once again reacted negatively to the Company's guidance cut. KeyBanc analysts, for example, were *"surprised"* and *"disappointed by the degree of volume headwinds in PVC."* They further noted the pushout of Atkore management's projected price/cost normalization, which "was previously expected to be largely complete exiting FY24," but for which "management now sees another $200M-$250M of pricing headwinds in FY25." Loop Capital analysts reported that the new fiscal year 2025 guidance was "substantially lower than pre-call expectations," specifying that the new guidance was roughly *thirty percent* below market consensus estimates.

272.    In an August 6, 2024 report, RBC Capital Markets analysts downgraded their rating of Atkore stock, emphasizing the "[u]nderwhelming . . . F3Q24 operating miss" (including that sales in the Company's Electrical segment were down 14.1% year over year against RBC's prior -11.5% estimate), as well as the "[s]everity of the F2025 preliminary guidance cut" and the "confluence of new negatives that together push out" the expected timing of the "continued PVC/HDPE pricing normalization." The RBC report also noted Defendants' explanation, on that

day's earnings call, that "the bulk of the ongoing pricing pressures reflect the PVC and HDPE market dynamics where softer demand is leading to enhanced competition."

273. On this news, the price of Atkore common stock fell $17.41 per share, or nearly 15%, from a closing price of $118.46 per share on August 5, 2024, to a closing price of $101.05 per share on August 6, 2024. This drop in Atkore's stock price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market. However, as discussed further below, the full truth had yet to be revealed.

**D.    November 2024 Partial Disclosures**

274. On November 7, 2024, Otter Tail—a competitor of Atkore that the ManBear Report identified as a conspirator in the PVC pipe price-fixing scheme—disclosed in its Form 10-Q filed with the SEC that, on August 27, 2024, it had received a grand jury subpoena from the U.S. Department of Justice.

275. The next day, November 8, 2024, RBC hosted an "investor call" featuring Temple University Beasley School of Law Professor Salil Mehra, an attorney with "25 years of experience in antitrust price fixing/collusion litigation." On that call, as described in an RBC report dated November 10, 2024, Mehra discussed Otter Tail's announcement that it had received a DOJ subpoena, which RBC called "a [n]otable [d]evelopment." Mehra also discussed in detail the emergent antitrust class action suits against Atkore, the "potential involvement of DOJ/FTC," and "the potential size of Atkore's liability." These antitrust class actions allege that Atkore and other U.S.-based PVC Pipe manufacturers conspired to artificially inflate the price of PVC Pipes by exchanging competitively sensitive business information, including information regarding future PVC Pipe pricing and sales through OPIS. *See, e.g.*, *In re PVC Pipe Antitrust Litig.*, No. 1:24-cv-07639 (N.D. Ill. Aug. 23, 2024). On the November 8 call, Mehra told investors that "cases like this are typically settled."

276. Underscoring to the market the potential for Atkore's financial liability, a November 8, 2024 *Financial Times* article reporting the Otter Tail subpoena noted the ManBear Report's relationship to the "DoJ investigation" and pointed out ManBear's record of accurate antitrust allegations. The article stated that, following ManBear's 2016 antitrust report regarding "price fixing in the chicken industry," a chicken producer had "agreed to a $110.5mn settlement with the DoJ."

277. On this news, the price of Atkore common stock fell $7.39 per share, or approximately 7.2%, from a closing price of $102.70 per share on November 7, 2024, to a closing price of $95.31 per share on November 8, 2024. This drop in Atkore's stock price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market. However, as discussed further below, the full truth had yet to be revealed.

### E. February 4, 2025 Partial Disclosure

278. Before markets opened on February 4, 2025, Atkore announced its financial results for the fiscal first quarter of 2025, reporting net sales of $661.6 million, down 17% year-over-year and below analysts' estimates of $680.7 million. Additionally, Atkore provided guidance for the rest of fiscal year 2025, including adjusted EPS of $5.75 to $6.85 and adjusted EBITDA of $375 million to $425 million—representing a significant reduction from its previously-issued guidance of $7.80 to $8.90 and $475 million to $525 million, respectively.

279. During the corresponding earnings call held later that day, CEO Waltz expressed disappointment regarding Atkore's fiscal 2025 EBITDA guidance, as the Company "continue[s] to operate in these conditions[,]" and that the "challenges we are navigating are not what we anticipated at the end of fiscal year 2022 when we signaled normalization of our record profits."

280. During that same call, CFO Deitzer disclosed that Atkore's "plastic pipe and conduit product category declined mid-single digits during the quarter[,]" compared to "high single

digits in the prior year." CFO Deitzer also reiterated that the EBITDA guidance reduction was attributed to the poor performance of Atkore's PVC business, stating, "I'd say roughly $75 million or three-quarters of that is on the PVC side." In the earnings presentation attached to the release and presented during the earnings call that day, Defendants stated they were "Modifying FY 2025 Adjusted EBITDA Outlook to $375M - $425M," and the Company's PVC pipe business was no longer its largest operating segment, due to "Import competition gaining momentum in PVC market." The presentation also stated that Net Sales would be "Down $395M - $435M and Adjusted EBITDA would be "Down $395M - $435M" with the "Impact driven primarily from PVC Conduit and Steel Conduit."

281.    On the conference call, Defendant Waltz stated, "When we met in November, we planned our year with an expectation that we would continue to face challenges impacting both our volume and price due to increased foreign and domestic competition. Most notably, these challenges impact our PVC conduit and steel conduit businesses. Having completed our first quarter, we now believe the challenges we outlined in November will have a larger impact on our 2025 performance than previously anticipated. We saw year-over-year volume increases in imported PVC conduit, which is impacting the market environment. The imports for both PVC conduit and steel conduit originated from countries where quantity limitations are either non-existent or poorly enforced." Defendant Waltz continued, "I am disappointed that we continue to operate in these conditions. The challenges we are navigating are not what we anticipated at the end of fiscal year 2022 when we signaled normalization of our record profits. We now expect full year 2025 adjusted EBITDA to be approximately $400 million at the midpoint of our range. Our outlook reflects what we believe is most probable. . . . We are currently forecasting the headwinds impacting PVC pricing may continue."

282.     On the earnings call, Defendant Deitzer stated, "In the first quarter, we achieved net sales of $662 million and adjusted EBITDA of $99 million. . . . Organic volumes were down 5% compared to double-digit growth in the first quarter of fiscal 2024 when volume was up over 13%. Our average selling prices declined 12% during the quarter, most of which came from our PVC conduit and steel conduit products. . . . Our plastic pipe and conduit product category declined mid-single-digits during the quarter. This category grew high-single-digits in the prior year as the channel was adding back inventory after a period of destocking in 2023." Defendant Deitzer continued, "we are also seeing an increase in imported products coming from multiple locations, including Central and South America. The combination of imports remains below 10% of the overall market, but we are continuing to monitor the situation closely. In addition, we are examining the product quality characteristics of these imported materials versus the standards and specifications. . . . As we look beyond Q1, we continue to expect growth across much of the portfolio, including contributions from our plastic pipe category, driven by growth in our water-related products. Overall, we continue to expect volume growth between low to mid-single-digits for the full year."

283.     Defendant Deizter further stated, "Adjusted EBITDA margins compressed in our electrical segment due to previously mentioned pricing and volume declines. . . . We expect our Q2 net sales in the range of $685 million and $715 million. Our adjusted EBITDA is expected to be in the range of $85 million to $95 million. Our adjusted EPS is expected to be in the range of $1.30 and $1.50. Historically, we are accustomed to anticipating some amount of seasonality. We generally build in an expectation that the back half of the year will be stronger than the first half. We believe this will be the case this year for two main reasons. First, our overall business is generally stronger in the spring and summer construction seasons versus the fall and winter.

Second, as we continue to ramp up our initiatives, our volume should steadily increase throughout the year. Therefore, we expect adjusted EBITDA to improve sequentially from Q2 into the second half of the year. As Bill shared, we are also updating our full year 2025 outlook. We now expect full year adjusted EBITDA in the range of $375 million to $425 million and adjusted EPS in the range of $5.75 to $6.85."

284.    Analysts immediately focused on Defendants' disclosures about increased import pressure negatively impacting the Company's financial performance. An analyst from Citi asked, "can you elaborate on the commentary that import competition is gaining momentum in PVC? Maybe what has changed with PVC imports versus the past that you've seen a pretty big move from this Latin American competition?" In response, Defendant Waltz disclosed, "Imports have grown . . . over 20% year-over-year . . . driving down price, and our competition with slower markets matching price."

285.    On the call, Defendants also pinpointed that increased competition was the cause of the pricing declines in PVC. An analyst asked Defendants, "on PVC, is the revision entirely from the imports or is there also additional capacity domestically? And then could you maybe give us an updated view on the degree of incremental capacity being added from the market as a whole?" In response, Defendant Waltz revealed: "people trying to enter the market, trying to grow will leverage price . . . now that somebody dropped their price . . . *[e]ven a well-known, recognized competitor of ours, call it a Tier 1 person who's been around for a century or something that PVC hasn't been along but you get it. They go, hey, now they're matching or now they think that's the market price*."

286.    Defendants were asked how much of their guidance cut was because of PVC price reductions. In response, Defendant Deitzer stated, "from a price versus cost standpoint, we roughly

had an outlook of down $300 million previously. Now, we're at the midpoint roughly down $400 million. So it's $100 million delta from a price versus cost standpoint versus where we were at back in November. I'd say roughly $75 million or three quarters of that is on the PVC side, so **overwhelmingly driven by the changes in expectations from a PVC conduit**." Atkore executive John Pregenzer added, "So when we look at the PVC market . . . the most disruptive period we've ever seen in regards to number of new entrants and that's just creating a lot of pressure on price and spread that we're experiencing. And there's been a significant acceleration here. As we've been tracking this price normalization over the past couple of years, the last quarter to two quarters has really accelerated."

287. Analysts were stunned by the revelations. KeyBanc analysts were "disappointed by **another painful reset on pricing**." RBC Capital analysts reported that Atkore's newly-issued guidance "marks the fourth consecutive quarter of a guidance cut . . . and **implies more pricing cuts are needed** to protect [Atkore's] market share," adding that "[e]ssentially all pricing gains since COVID have been given back." Similarly, Roth Capital analysts lowered estimates for fiscal years 2025 and 2026, citing "acceleration in pricing pressure for PVC" and "margin compression." In a report published on February 9, 2025, Loop Capital analysts told the market, "[w]e are throwing in the towel," and that despite the latest guidance cut, they were "concerned that a durable pricing floor has not yet been reached." Further, as a Citi analyst stated during a February 18, 2025 investor conference with Defendants Waltz and Deizter, "I definitely thought that one order, one delivery, one invoice [Atkore business model] was going to protect you . . . from some of these lower-cost competitors."

288. Analyst reports also focused on the contribution of Atkore's PVC business to the disappointing results. For example, RBC attributed "the stock's ~20% selloff [to] the 25%

guidance cut to F2025," noting that "pricing pressure from import conduit surges in PVC" accounted for "75% of the cut." In the same RBC report, analysts reiterated the "potential 1-2 year legal overhang for Atkore," mentioning the DOJ subpoena to Otter Tail and noting that "[m]onetary damages/settlement account potentially could be 3x the determined overcharge amount plus attorney fees." KeyBanc explained that it significantly lowered its EPS estimate for fiscal year 2025 "to reflect incremental PVC pricing pressures." Similarly, Roth Capital lowered its financial estimates for fiscal year 2025 "expect[ing] an acceleration in pricing pressure for PVC."

289.    On this news, the price of Atkore common stock fell $15.59 per share, or nearly 20%, from a closing price of $79.72 per share on February 3, 2025, to a closing price of $64.13 per share on February 4, 2025. This drop in Atkore's stock price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market. However, as discussed further below, the full truth had yet to be revealed.

### F.    February 14, 2025 Partial Disclosure

290.    The truth was further revealed on February 14, 2025, when Atkore issued a press release announcing that, on February 13, 2025, the Company had received a grand jury subpoena from the DOJ's Antitrust Division. Atkore disclosed that the subpoena called for the "production of documents relating to the pricing of the Company's PVC pipe and conduit products."

291.    Analysts took note of the development. An RBC Capital report dated February 17, 2025 mentioned that the PVC pipe and conduit products at issue represented "about 21% of [Atkore] revenues."

292.    On this news, the price of Atkore common stock fell $2.32 per share, or approximately 3.2%, from a closing price of $72.51 per share on February 14, 2025, to a closing price of $70.19 per share on the next trading day, February 18, 2025. This drop in Atkore's stock

price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market. However, as discussed further below, the full truth had yet to be revealed.

### G. August 5, 2025 Disclosure

293. The truth was further revealed on August 5, 2025, when Atkore reported earnings for the third quarter of 2025 and announced Defendant Waltz's resignation as CEO. In the earnings release issued that day, the Company revealed that its margins in the Electrical segment had worsened "primarily due to *pricing declines related to our PVC* . . . products." Additionally, the Company cut its earnings guidance for fiscal year 2026 by $50 million.

294. On the Company's earnings call that day, an analyst asked Defendants to provide the "underlying assumptions" behind the $50 million guidance cut. Defendant Waltz responded that Atkore cut its guidance because of *"year-over-year headwinds for things like PVC purely because as pricing dropped this year."* Analysts also asked Waltz about other potential reasons for the Company's worsening financial performance, such as changes in demand. For example, in response to an analyst asking Waltz to "take us through and update us on your demand visibility as it stands today," Waltz responded that demand "really hasn't changed much," and reiterated that *"PVC pricing has dropped."* Similarly, Defendant Pregenzer stated, "there are approximately $50 million of unmitigated headwinds in FY 2026," including "*due to the rate of change in our average selling prices for our PVC conduit products in FY 2025*, we expect to experience a year over year headwind into FY 2026."

295. On the earnings call, Defendant Waltz also disclosed information contrary to Defendants' earlier statements downplaying the return of competition to domestic PVC Pipe markets. For example, Defendant Waltz revealed that, "*with domestic competition and so forth, PVC pricing . . . will continue to go down* here at least through the end of the year and probably some into next year." Similarly, contrary to their earlier statements, Defendants revealed that, *PVC*

*imports were not decreasing, but in fact had gone* "*up 2%*," even with the benefit of recently-imposed tariffs on "PVC at 10% for most countries."

296.     Analysts reacted swiftly to this news. In an August 5, 2025 report, Loop Capital analysts called the timing of Defendant Waltz's departure announcement "unsettling for investors," highlighted the Company's disclosure of the "roughly $50M net drag on FY26 earnings," and cut their target price for Atkore stock. Expanding on the guidance cut, the Loop Capital report stated that "Atkore cited roughly $70-75M of unfavorable pricing led by ongoing PVC headwinds *(est. ~$90M drag partially offset by improving steel conduit pricing)*" (emphasis in original).

297.     In reports dated August 5, 2025, RBC analysts pointedly attributed "the sharp selloff" of Atkore stock to both Defendant Waltz's departure and the "cautious F2026 commentary" regarding the "$50 mil EBITDA headwind." Per these analysts, "[t]he most notable developments" in the Company's earnings release and call were "(1) *unexpected CEO retirement announcement that injects an element of uncertainty* and (2) cautious prelim *F2026 comments [on] continuing PVC conduit price normalization*," and the "Y/Y pricing decline, mostly due to PVC conduit," was the "[b]iggest [s]urprise." In line with these comments, RBC substantially cut its price target for Atkore stock from $83 to $60.

298.     In these reports, the RBC analysts reiterated that "PVC pipe price fixing class action litigation presents a potential 1-2 year legal overhang for Atkore," and added that Atkore's receipt of "a grand jury subpoena from the DOJ" was a "meaningful development for the case." They also pointed out "the most recent development" in the case: "the data analytics platform OPIS settl[ing] with a group of plaintiffs for $6 million" on June 9, 2025. The RBC analysts also touched on Atkore's PVC competitors, noting the "[r]isks" of "[p]ricing competition from the PVC conduit

import surge" and a "new domestic PVC competitor," and elaborating that "[f]or PVC, imports now represent MSD%-HSD% [mid-single digits to high single digits] of total market vs. 3% historically."

299. Keybanc Capital Markets also released two reports on August 5, 2025, in which analysts downgraded their outlook for the Company in what they called a "[p]ainful, but the [r]ight [m]ove." These analysts stated that they were "disappointed by the degree of price/cost headwinds carrying over into FY26," which were driven by "mostly PVC." They also worried that "continued evidence of domestic capacity additions" from the Company's PVC competitors indicated that "there is now more risk that PVC Conduit pricing drops below pre-COVID levels and remains a pressure beyond current expectations." The pre-earnings call Keybanc report also highlighted that Defendant Waltz had "decided to retire."

300. A Roth Capital Partners report released the next day, August 6, 2025, further underscores the reasons for the market's reaction to the August 5 disclosure. The report emphasized that the announced "~$50mn headwind to FY'26 gross profit . . . implies adj. EBITDA could decline by ~12% YoY in FY'26 to $350mn, *10% below prior consensus*," and noted that this "outlook reset, combined with CEO Bill Waltz's announced retirement, contributed to a ~26% drop in [Atkore] shares." Roth analysts accordingly cut their price target for Atkore stock from $78 to $67.

301. On this news, the price of Atkore common stock fell $20.16 per share, or over 26%, from a closing price of $76.55 per share on August 4, 2025, to a closing price of $56.39 per share on August 5, 2025. This drop in Atkore's stock price was statistically significant, occurring against a backdrop of little to no movement in the wider stock market.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    August 2, 2022 Misstatements (Q3 FY2022 Earnings)

302.    The Class Period begins on August 2, 2022, the day Defendants announced Atkore's financial results for the fiscal third quarter of 2022 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on August 2, 2022, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported its third quarter results in a Form 10-Q filed with the SEC on August 2, 2022, signed by Defendant Johnson, and accompanied by Certifications pursuant to the Exchange Act and Sarbanes-Oxley Act of 2002 ("SOX") (the "SOX Certifications") signed by Defendants Johnson and Waltz.

303.    In the release and Form 10-Q, Atkore reported its third quarter 2022 earnings as follows:

(a)    Net sales of $1,061.6 million, up 24.4% versus prior year;

(b)    Net income per diluted share increased by $2.10 versus prior year to $5.74;

(c)    Adjusted net income per diluted share increased by $2.11 versus prior year to $6.07;

(d)    Net income increased by $79.0 million versus prior year to $254.3 million;

(e)    Adjusted EBITDA increased by $103.3 million versus prior year to $377.5 million.

304.    On August 2, 2022, Defendants made multiple false and misleading statements, set forth below.

305.    Speaking about the Company's performance in the release, Defendant Waltz stated that "Atkore delivered year-over-year earnings growth and margin expansion in both Electrical and Safety & Infrastructure. ***Our performance demonstrates the strength of the Atkore Business***

*System and our industry-leading solutions, as well as our team's continued dedication to supporting our customers*."

306.     In the release and Form 10-Q, Defendants stated that "[t]he increase in net sales is *primarily attributed to increased average selling prices* across the Company's products of $244.0 million which were mostly driven by the PVC pipe and conduit product category within the Electrical segment." This statement was materially false and misleading because Defendants' claim that Atkore's financial success was merely attributable to "increased average selling prices" misstated and failed to disclose that the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

307.     In announcing the Company's third quarter earnings, Defendants also raised Atkore's financial guidance for fiscal year 2022. In the release, Defendants stated: "The Company is updating its outlook for Adjusted EBITDA and Adjusted net income per diluted share for fiscal year 2022. The Company expects Net Sales to be up approximately 32 percent versus fiscal year 2021. The Company expects Adjusted EBITDA to be in the range of $1,322 million to $1,342 million, and Adjusted net income per diluted share to be in the range of $20.89 – $21.24."

308.     In the earnings presentation attached to the release and presented during the earnings call, Defendants stated that they were "[i]ncreasing FY2022 expectations given results and performance year to date in FY2022." Defendants added that they "[c]ontinue to expect FY2023 Adjusted EBITDA in the range of $800 to $900 million dollars."

309.     On the earnings call that day, analysts were focused on the Company's PVC pricing and repeatedly questioned Defendants on that topic. For example, an analyst from CJS Securities stated that Atkore's "dynamic pricing is kind of one of the obviously key strengths of the company

and volume decisions are often impacted by pricing" and asked Waltz, Johnson and Deitzer, "As volume declines, how price is tied to that and is it different for PVC than it is kind of in other areas?" Waltz falsely responded that, "It all depends on what the demand that is out there, because obviously *we want to maximize both price and volume*." This statement was materially false and misleading when made because it misstated and failed to disclose that Atkore was engaged in anti-competitive increases and maintenance of prices on PVC Pipe to the detriment of selling volume.

310.     On the August 2, 2022 earnings call, the CJS Securities analyst also asked Defendants Waltz, Johnson and Deitzer, "are you seeing any meaningful changes on the PVC supply side? And any reason to think Mitsubishi is ramping production or any other players are entering the market at this stage?" Defendant Waltz responded, ***"No, I'm not aware of [any] in the [PVC] electrical conduit market. Again, <u>my competitors and I don't talk</u>. But no I'm not aware of anything."*** He continued, ***"I'll say, the $800 million to $900 million, . . . we're still very comfortable with our model and [to] deliver on numbers that we said."*** This statement was materially false and misleading when made because it misstated and failed to disclose that Atkore was communicating with its competitors, including through OPIS, on issues related to PVC Pipe supply and pricing, and thereby working anti-competitively to set prices on PVC Pipe.

311.     In the SOX Certifications (signed by Defendants Johnson and Waltz), Defendants stated the following, which was materially false and misleading because Defendants failed to disclose Defendants' anti-competitive PVC Pipe pricing fraud:

    1.     I have reviewed this Quarterly Report on Form 10-Q of Atkore Inc.;

    2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> > (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

312.    In a separate SOX certification signed by Defendants Waltz and Johnson, Defendants certified that:

> > (i)     the Quarterly Report on Form 10-Q for the quarter ended June 24, 2022, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

> > (ii)    the information contained in such Quarterly Report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Atkore Inc.

313.    The statements set forth in ¶¶305 through 312 above were further materially false and misleading when made because they misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

**B.     November 9, 2022 Misstatements (Baird Global Industrial Conference)**

314.     On November 9, 2022, Defendants Waltz and Johnson spoke at the Baird Global Industrial Conference as representatives of Atkore, and Defendant Deitzer also attended).

315.     At the conference, Defendant Waltz told investors that Atkore's "success" was due to the competitive advantages of "the Atkore business system" and the Company's "one order, one delivery, one invoice" sales model. He stated, *"we have virtually every product there is and that is a difference from most of our competition."* He stated that Atkore's sales model was akin to that of e-commerce giant Amazon: "Just like none of you would want to go in or go to seven different grocery stores, that's what a contractor distributor does today, because *they have to go seven different places other than Atkore to literally get all their product. . . . Do not underestimate that just like you may have underestimated Amazon 30 years ago, one place to go buy all your products*."

316.     When asked specifically about the Company's "competitive advantages" in the Electrical segment responsible for selling PVC pipe, Defendant Waltz stated that Atkore's advantages were *"huge"* because of *"the [delivery] speed of having that one order, one delivery, one invoice" sales model*. He continued, "for us to be able to put a quarter load, a metal conduit on with a quarter load of PVC conduit on, with a quarter load of cable and then other products, *that is a huge saving logistically for the distributors*. And again, *they trust us because we are one voice*." Waltz claimed that Atkore's blockbuster financial performance tied directly back to these, stating: *"the sustainability of our profit, it's because of the ability to add more things . . . I made the analogy [to Amazon] . . . Every one of you as consumer gets this with like Amazon. . . . It's the same logistical thing."* Doubling down on Defendant Waltz's claims, Defendant Johnson touted the strength of Atkore's brand and products as the reason for its supposedly sustainable profits: "some of our brands are almost a 100 years old so we've been in the industry a long time.

*. . . when you have a product breadth like us where you can adhere yourself to with some of the best agents . . . It just puts us at advantage versus some of our competition*."

317.    The statements in the preceding two paragraphs were materially false and misleading when made because Defendants' claims that Atkore's financial success (including the reference to it having supposed "sustainability") was attributable to Atkore's unique product offerings or logistical competitive advantages (such as "the [delivery] speed of [Atkore's] one order, one delivery, one invoice" sales model, "hav[ing] virtually every product there is . . . that is a difference from most of our competition," and that Atkore's "product breadth . . . puts us at advantage versus some of our competition") misstated and failed to disclose that the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

318.    At the conference, Defendants were also asked specifically about Atkore's competition in the PVC Pipe market. When asked about companies like Atkore's competitor Westlake, which had supplied Atkore with raw materials but launched its own line of PVC pipe products to compete with Atkore directly, Waltz claimed that Westlake's emergence as a competitor was a *"neutral non-event"* for Atkore. Waltz assured investors that *"where [Westlake] stop[s] and where Atkore starts is they're single dimensional. . . . you want to come to one place where no matter what type of product it is, one stop service."* He also implicitly dispelled any notion that Westlake and Atkore were engaged in anti-competitive conduct with one another, stating that: *"with Westlake . . . they're effective pricing their products, trying to maximize their own profit."* These statements were materially false and misleading when made because they attributed Atkore's financial success to its "one stop service" and misstated and failed to disclose that Atkore was engaged in undisclosed anti-competitive PVC Pipe pricing behavior with its

supposed competitors, and that Atkore's supposed competitors (including Westlake) were not in fact "trying to maximize their own profit."

319.    In follow-up questions, Defendants were asked, "you've seen a lot of inflation and you've been ahead of that to effectively price for that. . . . [B]etween you and your primary competitor or two, how does pricing work if you see more deflation? . . . [I]s there a chance you can hold on to some of it?" In response, Defendant Waltz stated, the *"short answer is [Atkore] absolutely can hold on to it*. . . . if you look back where the previous five years before COVID ever hit in 2020 . . . we were compounding growth around 10-plus percent a year in EBITDA and making price over cost virtually every year. *So that's going to continue."* He added, *"we will hold on to a lot of the profit we will get back some*. And then *Atkore does a great job . . . if there was different factors on pricing, the biggest thing is supply, demand and service."*

320.    The statements set forth in ¶¶315 through 319 above were materially false and misleading when made. Defendants' statements above, including that Atkore and its competitors were "effective pricing their products, trying to maximize their own profit," that of the "different factors on pricing, the biggest thing is supply, demand and service" and that Atkore could "absolutely" hold onto its pricing and that its ability to compound growth was "going to continue" even given broader market deflation, were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its

coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

### C. November 18, 2022 Misstatements (Q4 and Full Year FY2022 Earnings)

321.    On November 18, 2022, Defendants announced Atkore's financial results for the fiscal fourth quarter and full year 2022 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on November 18, 2022, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported the results in a Form 10-K filed with the SEC on November 18, 2022, signed by Defendants Johnson and Waltz, among others, and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

322.    In the press release, Defendants reported the "highlights" of Atkore's fourth quarter 2022 earnings as follows:

(a)    Net income per diluted share increased to $5.18 from $4.26 in prior year period;

(b)    Adjusted net income per diluted share increased to $5.52 from $4.39 in prior year period;

(c)    Net income increased by $18.2 million versus prior year period to $220.8 million;

      (d)     Adjusted EBITDA increased by $32.2 million versus prior year period to $325.1 million.

323.    In the press release, Defendants reported the "highlights" of Atkore's full year 2022 earnings as follows:

      (a)     Record full year net sales and net income;

      (b)     Net income per diluted share increased to $20.30 from $12.19 in prior year;

      (c)     Adjusted net income per diluted share increased to $21.55 from $12.98 in prior year;

      (d)     Net income increased by $325.6 million versus prior year to $913.4 million;

      (e)     Adjusted EBITDA increased to $1,341.8 million from $897.5 million in prior year;

      (f)     Net cash provided by operating activities of $786.8 million; Free Cash Flow of $651.1 million.

324.    On November 18, 2022, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

325.    In the press release, Defendants provided the following guidance for fiscal year 2023:

      (a)     Full-year 2023 Net sales expected to be flat to down approximately 10 percent compared to fiscal 2022;

      (b)     Full-year 2023 Adjusted EBITDA outlook of $850 - $950 million;

      (c)     Full-year Adjusted net income per diluted share outlook of $13.10 – $14.90;

      (d)     Introduced long-term Full-Year Adjusted net income per diluted share goal of greater than $18.00 in fiscal year 2025.

326.     Speaking regarding the Company's fourth quarter and full year 2022 performance, Defendant Waltz stated in the release, "Atkore delivered record results for fiscal 2022, as we continue to successfully execute on our strategic initiatives to expand our portfolio and deliver differentiated value to our customers." Waltz further stated, "Our performance was driven by ***the resilience of our business model***."

327.     In the release, Defendants reported the Company's fourth quarter results as follows: "Net sales for the fourth quarter of 2022 increased to $1,029.0 million, an increase of 11.4% compared to $923.7 million for the prior-year period, ***primarily due to higher average selling prices of $45.4 million and higher sales volume of $8.4 million***." For the Electrical segment containing Atkore's PVC pipe business, Defendants stated in the release: "Electrical net sales increased $97.7 million, or 14.0%, to $795.2 million for the fourth quarter of 2022 . . . ***The increase in net sales is primarily attributed to increased average selling prices of $59.3 million which were mostly driven by the plastic pipe and conduit category***."

328.     In the Form 10-K, Defendants reported Atkore's full year 2022 results as follows: "Net sales for fiscal 2022 increased $985.9 million to $3,913.9 million, an increase of 33.7%. . . . ***The increase in net sales is primarily attributed to increased average selling prices of $996.2 million which were mostly driven by the plastic pipe and conduit category within the Electrical segment***." For the Electrical segment containing Atkore's PVC pipe business, Defendants reported in the Form 10-K: "Net sales increased by $780.5 million, or 34.9%, to $3,013.8 million for fiscal 2022 compared to $2,233.3 million for fiscal 2021. ***The increase in net sales is primarily attributed to increased average selling prices of $788.8 million which were mostly driven by the plastic pipe and conduit category***."

114

329.    In the earnings presentation attached to the release and presented during the earnings call that day, Defendants stated they "[d]elivered record financial results," and that the Company's recent performance was "driven by the execution of our Atkore business system."

330.    Defendants also issued full year fiscal 2023 guidance and a full year fiscal 2025 "goal" that day. In the release, Defendants stated:

> **Fiscal 2023 Full Year** - The Company expects fiscal year 2023 Adjusted EBITDA to be in the range of $850-$950 million and Adjusted net income per diluted share to be in the range of $13.10 - $14.90.
>
> **Fiscal 2025 Full Year Goal** - The Company is providing a long-term fiscal 2025 Adjusted net income per diluted share target of greater than $18.00.

331.    Analysts immediately noted that the full year fiscal 2023 guidance came in above consensus estimates and that the full year fiscal 2025 goal "implies an impressive 13% earnings CAGR." Indeed, analysts were impressed at the Company's long-term "visibility."

332.    On the earnings call, Defendant Waltz stated in his prepared remarks: "we recognized that we've benefitted significantly from the outperformance driven by elevated prices of our plastic pipe and conduit products. However, at the same time, ***we've evolved our business by leveraging our foundational Atkore Business System***. This process-driven approach has informed ***many of the strategic decisions over the past several years, especially in the area[] of pricing***."

333.    Waltz added that "As we look at the significant benefit we've driven in regards to our pricing and profitability, ***we estimate that approximately 40% of that benefit is sustainable going forward***." Waltz was referring to the following slide from the accompanying earnings presentation, which stated that Defendants "[e]stimate ***~40% of pricing improvements are sustainable***":



334.    In other words, Defendants told investors that **$400 million** of the Company's elevated prices from fiscal year 2022 were "sustainable."

335.    During the question-and-answer portion of the earnings call, analysts were keenly focused on Defendants' claims that Atkore's pricing performance was "sustainable" and the 40% sustainability figure that Defendant Waltz presented above. When asked for the basis behind these claims, Defendant Waltz stated: "we have triangulated by looking at every product line what we've sustained in the past because some of our product lines, by the way, are still increasing in profit margins, so even as commodity costs are going down, that ties back to supply demand, and also us factoring in things that *we are working our own self-help, like our one order, one delivery, one invoice, and the price extra that we can get for the market for that*." Waltz continued, **"$400 million of that, we think we're actually going to hold on to** . . . we've already given anchor points, let's say, of $18 a share. But *if we can hold on to more of this $585 million, that even means the $18 goes up*. So I think **it's a realistic number that we've triangulated from a couple of perspectives."**

116

336.     Defendant Johnson doubled down on Waltz's claims, stating that "we're still moving forward with our projections for FY 2023 and beyond given the strength of contractor backlogs *in a market demand environment*." He continued that, "Turning to our outlook for fiscal year 2023 on page 26 [of the accompanying slide presentation], we expect net sales to be flat to down in 2023 and we expected adjusted EBITDA to be in the range of $850 million to $950 million. This is $50 million higher than our preliminary perspective we provided previously." He added that in fiscal year 2023, *"we do expect solid mid-single digit volume growth this year with strong incremental margins."* Johnson thus told investors that the Company's record margin performance would continue to improve "incrementally" in fiscal year 2023.

337.     Analysts questioned how Atkore could achieve its high earnings "goal" for fiscal year 2025 given the "pricing normalization" in the PVC Pipe market. An analyst from Citi asked Defendants, "you look like you're baking in something close to mid-teens EPS growth with little continued pricing normalization after 2023 . . . why wouldn't you continue to see more price normalization if commodities do continue to come down?" Defendant Waltz responded, "on the pricing, *you're correct in saying we have a low red line there perhaps between 2023 and 2025*, but we do think the *normalization will, by and large, be behind us this year*. But also remember *it's more a supply, demand than it really is the underlying commodities*. And then as we continue to progress our initiatives around our RDC [Regional Distribution Centers], our one invoice [model] for shipping . . . *we feel our pricing power will even be that more robust. So, that's what we have built in*."

338.     On the call, an analyst noted that Defendants raised Atkore's earnings guidance for fiscal year 2023, and asked Defendants, "What's giving you confidence there? . . . Is it pricing?" Defendant Waltz responded, "we're halfway through the quarter, but pricing is holding in there. .

. . I'll be quite candid here on moving the guide up by $50 million was through both obviously $50 million, so a 5%, 6% increase in EBITDA for the year, but also a confidence we have in the year." Defendant Waltz continued, boasting that Atkore's $50 million guidance raise was overly *conservative*, as he claimed there was ample basis for a ***$100 million*** increase: ***"We could have just went to $800 million to $900 million and we use one to signal, guys. . . . [S]ince David and I have been CEO and CFO, we have not missed a single earnings and we don't expect to hear [it] going forward."***[19]

339.    On this news, the price of Atkore's common stock increased by $15.38 per share, or 15%, to close at $116 per share. An analyst at Royal Bank of Canada ("RBC") commented, "[w]e believe that this upside guidance sparked the +15% rally in the stock, as it once again quelled 'peak earnings' fears. Management also sounded ***exceptionally confident*** in the company's ability to hit these guidance targets."

340.    The statements set forth in ¶¶324 through 338 above were materially false and misleading when made. Defendants' statements above, such as that at least "40% of pricing improvements are sustainable," Atkore's "projections for FY 2023" were based on "a market demand environment," "pricing power will even be that more robust," and "normalization will, by and large, be behind us this year," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases

---

[19] Indeed, as set forth below, the very next quarter, Defendants increased Atkore's projected earnings for fiscal year 2023 by an additional ***$100 million*** (on top of the $50 million increase).

with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

341.    In addition, Defendants' foregoing claims that Atkore's financial success was attributable to merely "increased average selling prices" and Atkore's supposed competitive advantages, such as the "foundational Atkore Business System," and Atkore's "strategic decisions over the past several years . . . in the area[] of pricing," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**D.    November 30, 2022 Misstatements (Credit Suisse Industrials Conference)**

342.    On November 30, 2022, Defendants Waltz and Johnson spoke at the Credit Suisse Industrials Conference as representatives of Atkore. At the conference, Defendants were asked to explain the "pricing dynamic in the industry as well, kind of where are we now within the industry around pricing?" Defendant Waltz responded that Atkore's pricing was something that "I don't

think investors fully understand," and explained that Atkore enjoyed a "price premium" for three specific reasons.

343.     First, Waltz said the "biggest factor" behind Atkore's pricing was its ability to manage "supply-demand imbalance." He stated, "[w]hen there's more demand than there is supply . . . **Atkore goes a really good job of shipping quickly**. . . . Atkore manages our backlog, our orders and our capabilities with our manufacturer that we still typically ship in a week or two to now back to less than a week. That **if there is a supply-demand imbalance, we can get our pricing premium because of the confidence with our distributors to . . . pass that [cost] through [to end purchasers]**."

344.     Second, Waltz touted the "convenience" of the Company's "one order, one delivery, one invoice" sales model. He stated, **"We get a pricing premium" from being able "to bundle products together**. . . . you go to Amazon and you buy everything you need and it all gets delivered and its convenient. . . . **with Atkore, it literally is an Amazon experience of one order, one delivery, one invoice."** Waltz continued, "We actually measure the price premium even within Atkore that we get when we ship a truckload of one product. . . . And **we're getting 5%, 7% premium to be able to place everything together even against our higher standard of pricing**." He added, **"[this] is the value premium that Atkore gets that our distributors fully recognize. . . . there's a lot of things that we do that are truly unique, sustainable, competitive advantages on pricing that no one else has."**

345.     Third, Waltz touted Atkore's ability to manage "input costs" to "get more price than cost." Waltz stated, "if an investor wants to think, well, what [is] the commodity [price] doing? **Price fluctuation is good for us**. . . . Soon as we see a price increase, we're announcing literally that day or within two days to the market our costs are going up. So, **we're going to**

120

*capture price premium a lot quicker than what it hits our COGS*." Continuing, Waltz touted Atkore's ability to maintain this "price premium" even when input costs decreased: *"it's the same on the way down, where there's a little bit more art of why hold pricing, [we] don't give it up. . . . any type of [input price] variability, is also good to us."* Waltz concluded by touting Atkore's dominance as a market leader, claiming that, as a "national supplier, all of the products, relationships as big as we are, relative to our competitors with every major distributor out there, the associations, where we're on the leadership councils of and so forth. *So, all that value-add, brands have been around for 100 years, top brand in the industry, and then it is that fluctuation we just walked about on material costs, but they're all working in our favor*."

346. The statements set forth in ¶¶342 through 345 above were materially false and misleading when made. Defendants' statements above, such as that the "biggest factor" driving Atkore's pricing was "supply-demand imbalance," "if there is a supply-demand imbalance, we can get our pricing premium because of the confidence with our distributors to . . . pass that [cost] through [to end purchasers]," there was an "art" to Atkore "hold[ing] pricing" high even when input costs decreased, and "that fluctuation . . . on material costs [was] working in our favor," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from

regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

347. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as Atkore's "truly unique, sustainable, competitive advantages on pricing that no one else has, that "[w]e get a pricing premium" from being able "to bundle products together" and "with Atkore, it literally is an Amazon experience of one order, one delivery, one invoice," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### E. February 1, 2023 Misstatements (Q1 FY2023 Earnings)

348. On February 1, 2023, Defendants announced Atkore's financial results for the fiscal first quarter of 2023 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on February 1, 2023, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported these results in a Form 10-Q filed with the SEC on February 1, 2023, which was signed by Defendant Johnson and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

349.     In the release and Form 10-Q, Defendants reported their second quarter 2023 earnings as follows:

(a)     Net sales of $833.8 million, down 0.8% versus prior year;

(b)     Net income per diluted share decreased by $0.12 versus prior year to $4.20;

(c)     Adjusted net income per diluted share increased by $0.03 versus prior year to $4.61;

(d)     Net income decreased by $31.4 million versus prior year to $173.5 million.

350.     On February 1, 2023, Defendants made multiple false and misleading statements, set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

351.     Speaking on the Company's performance in the release, Defendant Waltz claimed that *"Atkore is off to a solid start in 2023 as we leverage our diversified approach and broad portfolio of leading solutions to capture opportunities for growth."*

352.     Defendants also primed investors for Atkore to continue experiencing outstanding profits driven by its high prices of PVC Pipe. For example, in the release, Defendant Waltz stated, *"Given our first quarter performance and current market dynamics, we are raising our fiscal 2023 outlook for Adjusted EBITDA and Adjusted EPS."* Defendants stated: "The Company is increasing its estimate for fiscal year 2023 Adjusted EBITDA and Adjusted net income per diluted share. The Company estimates Adjusted EBITDA to be approximately $950 million to $1,050 million. Additionally, the Company estimates fiscal year 2023 Adjusted net income per diluted share to be in the range of $15.85 – $17.75."

353.   In the earnings presentation attached to the release and presented during the earnings call, Defendants also stated that Atkore had a "solid start to FY23 with organic volume up over 5% in the quarter," and was "increasing Full Year 2023 Outlook for Adjusted EBITDA and Adjusted EPS."

354.   On the call, Defendant Waltz repeated his statements from the earnings release, stating: ***"Atkore is off to a solid start for 2023. . . . With our solid start to the year, we are increasing our full-year outlook for adjusted EBITDA and adjusted EPS."***

355.   On the call, Defendant Johnson stated, "***with the strong performance in the quarter and the resiliency of our Atkore Business System model, we are increasing our outlook for adjusted EBITDA and adjusted EPS***. For FY 2023, we expect adjusted EBITDA of $1 billion at the midpoint, with a range of plus or minus $50 million. This is an increase of $100 million versus our prior outlook."

356.   On the call, analysts were keenly focused on how "pricing normalization" would impact Atkore's financial performance, and Atkore's ability to meet the increased earnings targets in its new financial guidance. For example, a Citi analyst noted, "you recorded just over the high end of your guidance for the quarter . . . but you raised your 2023 guidance by $100 million . . . what is it about the price versus cost equation that has changed to allow you to adjust your guidance pretty early in the year, pretty significantly?" The analyst also referred back to the "waterfall chart" from Atkore's November 2022 earnings call in which Defendant Waltz claimed that Atkore would retain at least $400 million from the price increases in the prior fiscal year 2022. The analyst then asked Defendants, "Are you retaining more price so far than that waterfall chart that you gave us last quarter? And does that potentially change the trajectory of the $600 million or so on price give back you gave us in that waterfall?" Waltz responded that, ***"we are seeing more price that we're***

*holding on to and/or just commodity costs dropping faster or different things like that in our value equations that we are able to raise as you mentioned, our whole year forecast for EBITDA around $100 million."* Defendant Waltz continued, *"we're still comfortable as we can be on the $18-plus [EPS target] for long term.* But for this year . . . *there's enough comfort in year to raise the guidance by the $100 million."*

357.    In a follow-up question about "PVC markets," the Citi analyst noted that "pricing there still looks like maybe it's been dropping a little, but stabilizing . . . how do you define demand in PVC?" Defendant Waltz responded that, "I think *there is enough opportunities* . . . *we're still cautiously optimistic for growth, both for the industry and Atkore going forward*."

358.    On the call, analysts also were reassured by Atkore's decision to increase its earnings guidance in the face of pricing normalization. For example, an RBC analyst noted that "investors have been looking at [Atkore's] fiscal 2022 and your prior guide on EBITDA, it was . . . looking at a 33% decline and there was this worry it would be falling off a cliff in January. And obviously, that's not happening. You've boosted, it's now a 25% decline using the [earnings guidance] midpoint. . . . it's also a $1 billion which I think is interesting in terms of that midpoint. You and I talked about how that's an important milestone. Where does that normalization trend line go from here in for fiscal 2023 on an EBITDA basis?" Defendant Waltz responded: "we're comfortable with the midpoint of the guide. I think there will be some pressure continuing on some of our pricing, but *I think there's enough other things that we're doing well . . . Our value equation for customers that are driving in some place, again, margin even more as we go forward that we're comfortable raising our guide for the year, [we're] also very comfortable still on the FY 2025 guide [of $18 EPS].*" He added, *"pricing is holding better or your whole the beginning up 33% drop and 25% drop, that $1 billion like you mentioned sounds good to me."*

359.     Analysts also questioned Defendants about how Atkore maintained its high prices despite declines in input costs, such as raw materials for PVC Pipe. For example, the RBC analyst noted that the decreases seen in Atkore's input costs were "bigger than . . . the decline we've seen in pricing." The analyst then asked Defendants to "take us through . . . the key input costs, how much they've gone down and how that factors into your pricing." Defendant Waltz responded that Atkore's pricing was driven by market dynamics and Atkore's competitive advantages: ***"the things that drive our ability to price are supply/demand competition . . . [i.e.] what are our competitors doing compared to how much demand is in the industry.*** And then, ***Atkore's value prop[osition], which I think is, bar none, the best in the industry with our ability to co-load in one order, one delivery, one invoice, our electronics, our customer service."*** These statements were materially false and misleading because, rather than Atkore's pricing being driven by "supply/demand competition," or "what are our competitors doing compared to how much demand is in the industry," Atkore was in fact driving its pricing through anti-competitive PVC Pipe pricing.

360.     Analysts credited Defendants' statements touting the foregoing statements, particularly those touting the sustainability of Atkore's profits from elevated pricing in the face of pricing normalization. For example, after the February 1, 2023 earnings call, RBC reported that the "biggest surprise" from Atkore's first quarter 2023 results was that ***"[the] pricing decline [was] contained"*** compared to analysts' estimates, and that Atkore's overall financial performance was buoyed ***"by a lower than expected decline in Electrical."*** Analysts also emphasized that they were reassured by Atkore's decision to raise its fiscal year 2023 guidance by an additional $100 million, having already increased that guidance by $50 million the prior quarter. For example, RBC reported that, based on Atkore's fiscal full-year 2023 adjusted EBITDA guidance was also

increased by $100 million, or 11%, from $950 to $1,050 million, "we expect that Atkore will need to boost its +$18 2025 EPS target later this year."

361. The statements set forth in ¶¶350 through 360 above were materially false and misleading when made. Defendants' statements above, such as "we are seeing more price that we're holding on to and/or just commodity costs dropping faster" that "there's enough comfort in year to raise the guidance by the $100 million," "pricing is holding better," and "the things that drive our ability to price are supply/demand competition," were also materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

362. Defendants' foregoing claims that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as "the resiliency of our Atkore Business System

model," and "Atkore's value prop[osition] . . . with our ability to co-load in one order, one delivery, one invoice, our electronics, our customer service," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### F. February 21, 2023 Misstatements (Citi Global Industrial Tech and Mobility Conference)

363. On February 21, 2023, Defendants Waltz and Johnson spoke at the Citi Global Industrial Tech and Mobility Conference as representatives of Atkore. At the conference, Defendants were asked about "PVC markets," noting that it "look[s] like [demand] is dropping still, but how would you define demand from PVC?" Defendant Johnson responded that, ***"PVC is very much in balance supply and demand in the marketplace. . . . I think we're well positioned***. And if you look at the way our year is kind of playing out so far, Q1 actuals and our Q2 guide were pretty similar in nature. So I think ***embedded in that is a stabilization of pricing over that period of time."***

364. When asked "how Atkore is able to record $1 billion of price versus cost and related EBITDA," Defendant Waltz stated, ***"underlying Atkore is what we call the Atkore Business System***. I think a lot of companies talk about having a business system or a process. ***We truly have a system from how we recruit people to how we price . . . that's [what is] paying fruition."*** Defendant Waltz continued, ***"Atkore has the competitive, sustainable advantage of one order, one delivery, one invoice as we continue to do that. . . . we could get you pay a premium for that . . . those things are the primary drivers."*** He added, ***"We did well before pre-COVID, but***

*especially with the nuances of different things that happened during COVID and now it's how do we maintain it and how do we grow and continue to drive more value as we go forward."*

365.    Analysts again asked Defendants about the "waterfall chart" from their November 2022 earnings call claiming Atkore would retain at least 40% or $400 million of its heightened pricing into fiscal year 2023. An analyst, referring to the chart, asked, "you said 40% of price versus cost improvements that you've had is sustainable . . . how did you come up with that particular number and what gives you the confidence in that number?" Defendant Johnson responded that, "We actually did kind of product-by-product, customer-by-customer, kind of a bottoms up versus trends that we were seeing before COVID and then *the dynamics around, our competition* . . . So, that's when we came up that estimate." He continued, "at the large piece of our raise so far this year was I think *we were actually a little too conservative* in that . . . we feel like *pricing is a little stronger than what we had thought going into the year*."

366.    In response to the analyst's follow up questions, Defendant Johnson added that, in the PVC pipe business, *"our pricing is very dynamic . . . we can be very . . . agile when it comes to any changes in input costs."*

367.    At the conference, an analyst noted that Defendants "raised your guidance after just one quarter," and asked whether "the reason" was "because pricing was a little bit more resilient." Defendant Johnson responded, *"it was definitely pricing . . . holding a little bit firm."* The analyst also referred back to the Company's fiscal year 2025 target of $18 EPS and asked Defendants, "what [does] the raise this year tell you about what you might do in 2025?" Defendant Johnson responded, *"we're on track or favorable to where we thought we would be."*

368.    When asked if Atkore's earnings would be impacted by a decline in sales volumes, Defendant Johnson stated, "we just don't see [sales volume declines]. . . . *In most cases we have*

*two or three competitors by price. So how would they react . . . it's a little hard to predict, but . . . we're in really good industries at this point*."

369.    The statements set forth in ¶¶363 through 368 above were materially false and misleading when made. Defendants' statements above that "PVC is very much in balance supply and demand in the marketplace," "embedded in [Atkore's fiscal year 2023 guidance] is a stabilization of pricing," Atkore's claimed 40% pricing improvement retention rate was "actually a little too conservative" as "pricing is a little stronger than what we had thought going into the year," "we're on track or favorable to where we thought we would be" toward reaching its 2025 fiscal year guidance, "In most cases we have two or three competitors by price," and its competitors' pricing actions were "a little hard to predict," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to

actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

370.    Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as that "Atkore has the competitive, sustainable advantage of one order, one delivery, one invoice" and "we could get you pay a premium for that," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### G.    May 9, 2023 Misstatements (Q2 FY2023 Earnings)

371.    On May 9, 2023, Defendants announced Atkore's financial results for the fiscal second quarter of 2023 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on May 9, 2022, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported these results in a Form 10-Q filed with the SEC on May 9, 2023, signed by Defendant Johnson and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

372.    In the release and Form 10-Q, Defendants reported their second quarter 2023 earnings as follows:

      (a)    Net sales of $895.9 million, down 8.8% versus prior year;

      (b)    Net income per diluted share decreased by $0.77 versus prior year to $4.31;

      (c)    Adjusted net income per diluted share decreased by $0.52 versus prior year to $4.87;

(d)     Net income decreased by $59.3 million versus prior year to $174.2 million;

(e)     Adjusted EBITDA decreased by $70.1 million versus prior year to $276.0 million.

373.     On May 9, 2023 Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

374.     In the release, Defendant Waltz stated, "Atkore delivered solid results in the second quarter." In the release, Defendant Waltz further stated, "[w]ith the performance we've achieved in the first half of the year and the positive trends we are experiencing, we are increasing and narrowing our outlook for Adjusted EBITDA and Adjusted EPS for Fiscal Year 2023."

375.     Defendants again raised Atkore's financial guidance for the third consecutive quarter, stating in the release: "The Company is increasing its estimate for fiscal year 2023 Adjusted EBITDA and Adjusted net income per diluted share. The Company estimates Adjusted EBITDA to be approximately $1,015 million to $1,065 million, and Adjusted net income per diluted share to be in the range of $17.45 – $18.35."

376.     In the earnings presentation attached to the release and presented during the earnings call, Defendants stated that "Pricing continues to normalize; *margin impact slightly better than expectations*," and that the Company was "Increasing Full Year 2023 Outlook for Adjusted EBITDA and Adjusted EPS; *outlook supported by our resilient business model and the transformational business actions that we've completed since becoming public*."

377.     On the conference call, Defendant Waltz stated that Atkore's second quarter performance *"was slightly better than our expectations and reflects the strength of our business*

*model. . . . Net sales, adjusted EBITDA and adjusted EPS, all increased sequentially from the first quarter. Overall, the team delivered solid results. . . . We are encouraged by the positive trends we are seeing so far in 2023 and we've updated our outlook for adjusted EBITDA and adjusted EPS for the fiscal year."*

378.    On the call, Defendant Johnson stated, "In the second quarter, net sales were $896 million, adjusted EBITDA was $276 million and adjusted EPS was $4.87. We expect further normalization of our business in 2023 as compared to last year's outperformance and are pleased with our margin performance in the quarter with adjusted EBITDA margins of 31%. *While this is down year-over-year versus previous record highs, is still a very strong and healthy level*."

379.    On the call, analysts were keenly focused on Atkore's pricing. For example, an analyst asked Defendants to provide "specifics on the pricing dynamic this quarter" and whether the Company's pricing levels were "all part of the normalization process." Defendant Waltz responded, *"we're basically right on track, if anything, slightly better . . .* because again *we exceeded anybody's expectations for the quarter. We're raising guidance."* Defendant Waltz, addressing the Company's profits from PVC pricing specifically: *"the biggest thing that controls our profit is just supply/demand in the market. Second thing is Atkore[] shipping on time, coloading, all the value we bring. Third thing is the input costs and us keeping up."*

380.    Analysts were also focused on how Atkore planned to maintain high PVC prices given declining input costs. For example, an analyst asked, "how much of the price do you expect to hold on to, because we hear PVC down 50% on the input cost, but certainly your pricing is much better than that." Defendant Waltz responded, *"our pricing is not down 50% . . . we are doing better than expected."* Defendant Waltz referred back to the "waterfall chart" he presented on the November 2022 earnings call, stating: *"we're as comfortable today as we were in November*

*[2022] when we put the plan together . . . we are on track, which is the Atkore business team and our amazing set of leaders."*

381.    On the call, analyst also asked whether Atkore's distributors reported any pushback from customers about Atkore's high PVC Pipe prices. For example, an analyst asked, "distributors like higher prices . . . how much conversation are they having with customers regarding the margin that Atkore makes on its products especially, PVC conduits? Do you even hear much on that front?" Defendant Waltz responded, ***"I don't think there's any concern there. . . . [O]ur co-load strategy through our distribution . . . is much more important than whatever the . . . price of . . . . our products would be."***

382.    The statements set forth in ¶¶373 through 381 above were materially false and misleading when made. Defendants' statements above, such as "the biggest thing that controls our profit is just supply/demand in the market. Second thing is Atkore[] shipping on time, coloading, all the value we bring. Third thing is the input costs and us keeping up," that pricing was "right on track, if anything, slightly better," that Defendants were "as comfortable today as we were in November [2022] when we put the [fiscal 2023] plan together . . . we are on track" to preserving pricing improvements, and "I don't think there's any concern there" with customers complaining about pricing to distributors, were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with

competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

383. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as "Atkore[] shipping on time, coloading, all the value we bring," and that "our co-load strategy through our distribution . . . is much more important than whatever the . . . price of . . . our products would be," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**H.** **June 14, 2023 Misstatements (Wells Fargo Industrials Conference)**

384. On June 14, 2023, Defendant Johnson spoke at the Wells Fargo Industrials Conference as a representative of Atkore.

385. At the conference, Defendant Johnson was asked about the "competitive landscape" and "where Atkore is best positioned" in the industry, and Johnson responded that "when you look at our PVC conduit business . . . *we find that as an advantage where we have a really nice . . . overall product portfolio of infrastructure products, where our competitors have typically one*." He continued, "what that means for a distributor, if you're able to support them across like the United States, multiple product lines, we also use agents as a means to sell to

135

distributors. You tend to get really nice quality in the manufacturing reps because we have the better product portfolio with the better brands. I guess *that just adds to kind of Atkore performing I think very well vis-à-vis our competitors*."

386.     When Defendant Johnson was asked "about how dynamic the pricing is and how [Atkore's] pricing approach has changed maybe over the last . . . three or five years," he stated, "In our industry, most of our product lines, it's dynamic pricing. So we literally price on a day-to-day basis by product line, by region, by customer. I think that's changed over time. *As part of the Atkore business system, we really standardize the way that we get market feedback on what pricing is doing, how we react to it, the tools that we use*, *the weekly meeting that we have with myself and our CEO talking about the dynamics of pricing and what we're going to do the next week*." Defendant Johnson continued, "we have like zero commodity exposure in most of our business because we price every day. *So we pretty much know ahead of time if prices are going up or down, are able to react to that*. And the only time where you might get upside down there is if it's a supply-demand situation. But if you look at every quarter up until COVID, *we were positive price cost every single quarter for three-plus years just because of the way we're able to dynamically price. And I think our competition does very similar things*."

387.     The conference host noted, "you talk about sustainable pricing improvements," and asked Defendants "how we should be thinking about that price outperformance?" Defendant Johnson responded, "I very much like answering this question, because I think I answer it all the time. Before COVID, we had this business model that's dynamic pricing, looking at the input supply and demand and we had a really great track record of every quarter showing a positive price/cost irregardless of commodities going up or down or what have you. So, that was kind of pre-COVID." Defendant Johnson continued, *"Going into COVID against supply-demand with a*

136

*really big imbalance in PVC. . . . And so, pricing went way up*, okay. And this is when our EBITDA started going up to $900 million, $1.3 billion and so on. So, we knew that *there's an element of that, over time, that we would end up giving back. I mean we have great competitors and what have you."* This statement was materially false and misleading because it communicated to investors that Atkore was operating in a competitive environment whereby pricing actions by competitors would lead to Atkore "giving back" profits when, in fact, Atkore was engaged in anti-competitive PVC Pipe pricing.

388.    During the conference, Defendant Johnson also referred back to the "waterfall chart" presented during the fourth quarter 2022 earnings call, which claimed that Atkore would sustain 40% or $400 million of its heightened pricing during fiscal year 2023. Defendant Johnson stated: "when we put out our guide this year, we started at $1.3 billion of actual last year, down to $900 million was our – *so that $400 million we said mostly was this pricing normalization* plus some positive to volume. And where we sit today is at $1.040 billion. So, *we're $140 million better than the $900 million . . . that's probably a little bit better pricing environment than what we thought . . . we're giving back less than we had intended or less than we thought going into the year."*

389.    The statements set forth in ¶¶385 through 388 above were materially false and misleading when made. Defendants' statements above that "As part of the Atkore business system, we really standardize the way that we get market feedback on what pricing is doing," "we were positive price cost every single quarter for three-plus years just because of the way we're able to dynamically price. And I think our competition does very similar things," Atkore's faced price competition because "we have great competitors," and "that's probably a little bit better pricing environment than what we thought . . . we're giving back less than we had intended or less than

we thought going into the year," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

390. Defendants' foregoing claims that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as that "we find that as an advantage where we have a really nice . . . overall product portfolio of infrastructure products, where our competitors have typically one," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### I.        August 8, 2023 Misstatements (Q3 FY2023 Earnings)

391.    On August 8, 2023, Defendants announced Atkore's financial results for the fiscal third quarter of 2023 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on August 8, 2023, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported these results in a Form 10-Q filed with the SEC on August 8, 2023, signed by Defendant Johnson and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

392.    In the release and Form 10-Q, Defendants reported their third quarter 2023 earnings and updated guidance as follows:

(a)     Net sales of $919.1 million, down 13.4% versus prior year;

(b)     Net income per diluted share decreased by $0.61 versus prior year to $5.13;

(c)     Adjusted net income per diluted share decreased by $0.35 versus prior year to $5.72;

(d)     Net income decreased by $53.0 million versus prior year to $201.3 million;

(e)      Adjusted EBITDA decreased by $107.3 million versus prior year to $270.3 million;

(f)     Solar tax credit accounting correction resulted in an $11.5 million decrease in net sales, a $17.5 million decrease in Adjusted EBITDA and a $39.8 million benefit to income tax expense versus prior year.

393.    On August 8, 2023, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

394.     Speaking on the Company's performance in the release, Defendant Waltz stated,
***"Atkore delivered solid results in the third quarter that surpassed our expectations. . . . the third
quarter results demonstrate the strength and stability of our business model."*** Defendant Waltz
continued, "We enter the last quarter of the fiscal year in a position that is ***well-ahead of our initial
projections*** . . . . [W]e are increasing our full year outlook for Adjusted Diluted EPS for Fiscal Year
2023."

395.     In announcing the Company's third quarter earnings, Defendants again raised
Atkore's financial guidance. In the release, Defendants stated, "The Company is updating and
narrowing its estimate for fiscal year 2023 Adjusted EBITDA to be approximately $1,020 million
to $1,040 million primarily due to the change in accounting methodology related to solar credits,
and increasing its estimate for Adjusted net income per diluted share to be in the range of $18.90
– $19.30."

396.     During the conference call, analysts were keenly focused on Atkore's pricing. For
example, an RBC analyst, noting that Atkore's pricing "ended up being better than what we
thought it would," asked for "more specifics around pricing normalization because that's probably
been the biggest area of inbound calls that we get," including "[a]ny changes on the competition
side." In response, Defendant Waltz stated that ***"[pricing] was better than we anticipated*** . . . .
[W]e predicted exactly how this is going to play out for the last year or two, ***we're on track***, still
probably some price normalization with products like PVC over the next year, but ***well within
everything we've anticipated."***

397.     Analysts also questioned why Atkore's margin performance "hasn't degraded
really at all in the last couple of quarters despite increasing pricing pressure." In response, Waltz
stated, ***"we are driving productivity in different ways. . . . the teams doing good, their commodity***

*costs have dropped and not as much as pricing. . . . it's going to be a good year here. We just raised our guidance for the year and we're still comfortable with the 2025 outlook . . . we're in a good spot."*

398.    The statements set forth in ¶¶393 through 397 above were materially false and misleading when made. Defendants' statements above, such as that "[pricing] was better than we anticipated. . . . we're on track . . . well within everything we've anticipated," Atkore was "well-ahead of our initial projections," "commodity costs have dropped and not as much as pricing. . . . it's going to be a good year here," and "[w]e just raised our guidance for the year and we're still comfortable with the 2025 outlook . . . we're in a good spot," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

399.     Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as "the strength and stability of our business model," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**J.     November 17, 2023 Misstatements (Q4 and Full Year FY2023 Earnings)**

400.     On November 17, 2023, Defendants announced Atkore's financial results for the fiscal fourth quarter and full year of 2023 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on November 17, 2023, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported these results in a Form 10-K filed with the SEC on November 17, 2023, signed by Defendant Johnson and Waltz, among others, and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

401.     The Company's full year fiscal 2023 adjusted EBITDA and adjusted net income per diluted share both came in above the top end of its guidance range, respectively.

402.     In the press release, Defendants reported the "highlights" of Atkore's fourth quarter 2023 earnings as follows:

(a)     Net income per diluted share decreased to $3.63 from $5.18 in prior year period;

(b)     Adjusted net income per diluted share decreased to $4.21 from $5.52 in prior year period;

(c)     Net income decreased by $79.9 million versus prior year period to $140.9 million;

(d)     Adjusted EBITDA decreased by $93.1 million versus prior year period to $232.0 million

403.    In the press release, Defendants reported the "highlights" of Atkore's full year 2023 earnings as follows:

(a)     Net income per diluted share decreased to $17.27 from $20.30 in prior year;

(b)     Adjusted net income per diluted share decreased to $19.40 from $21.55 in prior year;

(c)     Net income decreased by $223.5 million versus prior year to $689.9 million;

(d)     Adjusted EBITDA decreased to $1,042.1 million from $1,341.8 million in prior year;

(e)     Net cash provided by operating activities of $807.6 million;

(f)     Free Cash Flow of $588.7 million.

404.    In reporting these results and Atkore's fiscal guidance, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

405.    Speaking on the Company's fourth quarter and full year 2023 performance, Defendant Waltz stated in the release, "Atkore achieved solid results for fiscal 2023, as we continued to successfully execute on our strategic initiatives and deliver differentiated value to our customers." He continued, *"we have transformed, diversified and elevated the profitability of this business since our initial public offering."*

406.    In the release, Defendants updated Atkore's guidance as follows:

(a)     Fiscal 2024 First Quarter - The Company expects the first quarter of fiscal 2024 Adjusted EBITDA to be in the range of $200 - $210 million and Adjusted net income per diluted share to be in the range of $3.50 - $3.70.

(b)     Fiscal 2024 Full Year - The Company expects fiscal year 2024 Adjusted EBITDA to be in the range of $900-$950 million and Adjusted net income per diluted share to be in the range of $16.00 - $17.00.

(c)     Fiscal 2025 Full Year Goal - The Company is maintaining its fiscal 2025 Adjusted net income per diluted share target of greater than $18.00.

407.    On the call, Defendant Johnson stated, **"stable profitability was stronger than expected** . . . price normalization, primarily in our PVC business started at the end of FY 2022 and has continued through FY 2023. However, **our profitability on both an adjusted EBITDA and EPS basis was much stronger than originally anticipated."**

408.    Defendant Johnston stated that, in the Electrical segment, **"margins were better-than-expected** and we were encouraged to see volumes in our PVC-related products were flat on both a year-over-year and sequential basis."

409.    Describing the impact of "price normalization" in the coming year, Defendant Johnston stated, "Despite these anticipated declines into FY 2024, **we're extremely pleased with the structural transformation and improvements that we have achieved** in the business since our IPO . . . **when you layer the sustainable pricing increases that we discussed are still holding and our estimates regarding pricing outperformance are in-line with our expectations. The diversity and strength of our product portfolio is a true competitive advantage."** He added, **"we expect our long-term adjusted EBITDA margins will land in the range of 25% . . . these margins would be equal or slightly better than best-in-class companies in the electrical industry."**

410.    Analysts were keenly focused on Defendants' comments concerning the impact of pricing normalization on Atkore. For example, an RBC analyst noted, "So for the quarter, pricing ended up being not down as much as we thought it would be, so better on pricing," asking "how

144

does that factor in . . . what you're seeing in terms of competition[?]" Defendant Waltz responded that, **"Q4 was slightly better as we expected and the whole year was slightly better**. . . . we started the year with around the $850 million EBITDA. So again, this was a strong year that beat our expectations and guide, analyst expectations and guide this quarter that we just wrapped up, analyst guide for EPS and EBITDA and so forth. And **prices still remains good, better than what we forecasted."** He added, **"we continue to see PVC slowly go down**. So that's the part of the estimate as we go forward." Defendant Waltz again referred back to the "waterfall chart" he presented during the fourth quarter 2022 earnings call: **"really the stuff that we presented in November a year ago is playing out other than slightly better . . . because of our service, our Regional Service Centers, the ability for one order, one delivery, one invoice."**

411.    When asked "what the expectation is on 2024 and kind of some of that lingering impact [of price normalization] on 2025," Defendant Johnson stated pricing was solely the result of market forces: "there's really no action. **It's just the amount of the way that the market, over time, goes between volume and price and opportunities** . . . and we've seen a general decline down." He added that the pricing decrease was **"a lot slower than we probably would have said three years ago."** Waltz further responded, "we'll be able to look out three years, plug in $18 EPS, explain pricing going down, explain what we're driving and basically been on every forecast and/or exceed most things. So right now, everything looks to be playing out as we expect it to be but there will be a little bit of price discussion even in next fiscal year."

412.    The statements set forth in ¶¶404 through 411 above were materially false and misleading when made. Defendants' statements above, such as that they "elevated the profitability of this business," "stable profitability was stronger than expected," "margins were better-than-expected, "the sustainable pricing increases that we discussed are still holding and our estimates

145

regarding pricing outperformance are in-line with our expectations," "we expect our long-term adjusted EBITDA margins will land in the range of 25%, "the stuff that we presented in November a year ago is playing out other than slightly better," and that Atkore's pricing reflected "the way that the market, over time, goes between volume and price and opportunities," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

413. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as "our service, our Regional Service Centers, the ability for one order, one delivery, one invoice," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins

and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### K.     February 1, 2024 Misstatements (Q1 FY2024 Earnings)

414.    On February 1, 2024, Defendants announced Atkore's financial results for the fiscal first quarter of 2024 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on February 1, 2024, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call and Defendant Deitzer attended. The Company also reported these results in a Form 10-Q filed with the SEC on February 1, 2024, signed by Defendant Johnson and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

415.    In the release, Defendants reported the Company's first quarter results as follows:

(a)     Net sales of $798.5 million, down 4.2% versus prior year;

(b)     Net income per diluted share decreased by $0.59 versus prior year to $3.61; Adjusted net income per diluted share decreased by $0.49 versus prior year to $4.12;

(c)     Net income decreased by $35.1 million versus prior year to $138.4 million; Adjusted EBITDA decreased by $50.3 million versus prior year to $213.5 million.

416.    On February 1, 2024, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

417.    Speaking on the first quarter results, Defendant Waltz stated, ***"Atkore is off to a great start for fiscal 2024***, with double digit organic volume growth in the first quarter driven by

147

contributions across all key product areas. . . . ***Given our performance in the first quarter, we are raising our fiscal 2024 outlook for Adjusted EPS."***

418.    In reporting its first quarter results, Defendants raised Atkore's guidance, stating in the release: "The Company is maintaining its estimate for fiscal year 2024 Adjusted EBITDA to be approximately $900 million to $950 million, and increasing its estimate for Adjusted net income per diluted share to be in the range of $16.50 - $17.50."

419.    In the earnings presentation attached to the release and presented during the earnings call that day, Defendants stated that Atkore was "Increasing FY 2024 Outlook for Adjusted Diluted EPS. Continue to expect low double digit percentage volume growth for FY 2024 driven by growth across all key product areas."

420.    On the conference call, Defendant Johnson stated, "In the first quarter, net sales were $798 million and adjusted EBITDA was $214 million. ***We are pleased with our margin performance in the quarter with adjusted EBITDA margins over 26%***."

421.    When asked by an RBC analyst about the performance of the Company's product portfolio, Defendant Waltz stated, "PVC and HD is important. It's 31% of our sales. . . . ***we're doing really well on pricing . . . it's a good environment for Atkore***." Turning "to the heart of the question" for investors, the analyst asked about "the pricing dynamics this quarter," including "input costs, competitive positioning, [and] where the demand was." In response, Defendant Waltz stated, ***"we're a price leader because we have that one order, one delivery, one invoice and we have the ability to bring more value than many of our competitors to the industry***, but we're not the only one out there thinking about how you give good returns to their shareholders, so right on track overall." Defendant Johnson added to Waltz's answer, ***"we're definitely on track from our expectations for the year***."

422.    When asked by a CJS Securities analyst specifically "on PVC pricing for January, was there a much change?," Defendant Waltz responded that *"pricing [was] basically on track and we've put in one or two price increases . . . we're still optimistic going forward on these attempting to push the prices in the industry up."*

423.    An analyst asked "what does your guidance imply for price and volume? . . . [H]ave we seen the correction in raw materials . . . reflected in either the first quarter or the second quarter guide?" Defendant Waltz responded "for you or other shareholders out there, the way we think about our profit and pricing, *first thing it's just general industry volume*. . . . Second thing where I think where *we are absolutely the industry leader is our capability and we're really doubling down on this, the one order, one delivery, one invoice that just is a competitive, sustainable advantage."*

424.    On the call, Defendants were asked "how [do] you see the inventory landscape" for Atkore's products? Defendant Waltz responded, "God bless we're [back] to normal pre-COVID . . . commodity prices are pretty stable. . . . PVC may be going up a little bit . . . even *our pricing, while we always aspire to increase our pricing,* so there's no dramatic swings or supplier shortages, so *business is back to normal."* In a follow-up question, Defendants were asked "what's going on or what might be changing" with "the competitive landscape"? Defendant Waltz responded: *"Nothing of significance.* There's always minor players that try to enter [the market] as somebody importing your product. *At the end of the day . . . [i]t's our self-help things . . . those are really the drivers of the business."* Doubling down on Waltz's comments, Defendant Johnson added, "You still have to have [sales] agents, you have to have distribution, you have to have a brand that people know . . . so *there are a lot of reasons why like we do well and that the competitive landscape is fairly stable year-over-year."*

425.    The statements set forth in ¶¶416 through 424 above were materially false and misleading when made. Defendants' statements above, such as that "pricing [was] basically on track and we've put in one or two price increases . . . we're still optimistic going forward on these attempting to push the prices in the industry up," "we're doing really well on pricing . . . it's a good environment for Atkore," there was "nothing of significance" going on in "the competitive landscape, "the competitive landscape is fairly stable year-over-year," and that "the way we think about our profit and pricing, first thing it's just general industry volume. . . . Second thing where I think where we are absolutely the industry leader is our capability and we're really doubling down on this, the one order, one delivery, one invoice that just is a competitive, sustainable advantage," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

426.    Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as that "we're a price leader because we have that one order, one delivery, one invoice and we have the ability to bring more value than many of our competitors to the industry," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

## L.    February 20, 2024 Misstatements (Citi Global Industrial Tech and Mobility Conference)

427.    On February 20, 2024, Defendants Waltz and Johnson spoke at the Citi Global Industrial Tech and Mobility Conference as representatives of Atkore. At the conference, Defendants were asked why the Company "was achieving mid-teen's EBITDA margin before the pandemic, now seems to be achieving sustainable mid-20% EBITDA margins post-pandemic." Waltz responded, "the industry has gotten more consolidated, great competitors out there. . . [A] decade ago . . . there was . . . around a dozen PVC competitors. . . . [W]e are now down to . . . two to three . . . *We're all competing really now, which I think is effectively on value.* How do you bring better, more innovative products around, delivery, service, relationships. *But I'm sure that has helped both our margin and our competitor's margins*."

428.    In reaction to follow-up questions asking, "You obviously have some relatively significant electrical competitors. Why can't they replicate sort of what you do?," Waltz stated, *"it is that one order, one delivery, one invoice"* sales model.

429.    Defendants were also asked about their "waterfall chart" from the November 2022 earnings call, which claimed that the Company would retain 40% of its heightened pricing after

fiscal year 2022. The Citi analyst asked, "you've had such precision in your pricing . . . it's been a little bit longer than expected to give back . . . how do you get so precise?" Defendant Johnson responded that, "we knew investors would want to know when we had the $1.3 billion, we knew that we had a situation where we had more pricing than we thought would stick long term. And so we spent quite a bit of time going product line by product line. . . . So we went through all that and that's when we came up with, we think that $585 million of the $985 million was temporary. Now we always said that the longer the better it takes to get there because we're generating more cash and I think we deploy cash pretty rationally. . . . Q1 was slightly better than what we thought. And I think the most important thing is sequentially our pricing is firming. . . . *[W]e're in the ballpark of what our original expectations were*."

430.     Defendant Waltz added, ***"we do have good competitors*** . . . even within our highest margin, ***our competitors are out leading price increases*** . . . we lead more, [Atkore] is an industry leader, ***but we're not the only ones . . . like we are holding and/or increasing price in that product line as the underlying commodities dropping . . . even if we did have some product on, oh, we didn't expect a competitor to drop price, we had to match. There's enough other products here that are year-over-year continue to increase in price. So we're as comfortable as anybody can be with two weeks backlog."***

431.     Defendants were also asked, given their positive projections, "Why wouldn't you change your guidance other than maybe you're worried about more price normalization." Defendant Johnson responded, ***"I don't think we're worried about that."***

432.     The statements set forth in ¶¶427 through 431 above were materially false and misleading when made. Defendants' statements above, such as that "We're all competing really now, which I think is effectively on value," "we do have good competitors . . . even within our

highest margin, our competitors are out leading price increases," "we are holding and/or increasing price," "Q1 [pricing] was slightly better than what we thought . . . we're in the ballpark of what our original expectations were," and "I don't think we're worried about [more PVC Pipe price decreases]," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

433. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as its "one order, one delivery, one invoice" sales model, were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed

anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### M.    May 7, 2024 Misstatements (Q2 FY2024 Earnings)

434.    On May 7, 2024, Defendants announced Atkore's financial results for the fiscal second quarter of 2024 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on May 7, 2024, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call. The Company also reported these results in a Form 10-Q filed with the SEC on May 7, 2024, signed by Defendant Johnson and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

435.    In the release and Form 10-Q, Defendants reported their second quarter 2023 earnings as follows:

> (a)    Net sales of $792.9 million, down 11.5% versus prior year;
>
> (b)    Net income per diluted share decreased by $0.64 versus prior year to $3.67;
>
> (c)    Adjusted net income per diluted share decreased by $0.79 versus prior year to $4.08;
>
> (d)    Net income decreased by $36.2 million versus prior year to $138.0 million;
>
> (e)    Adjusted EBITDA decreased by $64.1 million versus prior year to $211.9 million.

436.    On May 7, 2024, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

437.    Defendant Waltz stated that, "At the halfway point of our fiscal 2024, I'm pleased with the results we've been able to achieve. As we look forward to the second half of the year, we are amending the midpoint of our adjusted EBITDA outlook by $50 million to $875 million."

438.    Despite lowering its guidance, Defendant Waltz continued to assure investors that "pricing normalization" remained in line with its assurance from the "waterfall chart" from Atkore's November 2022 earnings call claiming that the Company would retain at least 40% of its heightened pricing. Waltz, referring to the chart, stated: ***"We have not adjusted our FY 2024 assumptions versus the overall expectation we presented in November of 2022."***

439.    Analysts were intensely focused on PVC Pipe pricing during the Q&A portion of the conference call. A Citi analyst asked Defendants to "elaborate on what you're seeing in your core PVC products markets." Defendant Waltz responded that, "***we're growing faster than the market back to the 6% year-to-date . . . a lot of this is our self-help.*** For example, on PVC . . . our growth initiatives like the global mega projects that David referenced and also with PVC expanding beyond our core markets are definitely helping us grow faster than the market."

440.    Analysts also focused on Atkore's disclosure that "the pricing environment could be challenged in the second half of 2024." An analyst from Citi asked Defendants, "I just want to go back to your comment that if you talked about spring and summer activities in Electrical space, if it doesn't pan out, pricing could be impacted. I guess why did you say that? Are you seeing something on the volume or pricing side, that concern at this point?" Waltz cryptically responded that, "right now ***things are playing out as expected . . . there's no foreshadowing***."

441.    An RBC analyst asked Defendants, "[w]as there any bias this quarter to hold on price at the expense of volume?" In response, Defendant Waltz stated, "We're always conscious of that as a market leader . . . ***we go out with almost any customer that would probably prefer us***

*for lots of reasons and gain volume, and we don't want to do that*." Waltz continued, referencing his repeated prior representations that the Company was on track to achieve $18 EPS in 2025: *"the business plans work, and we're still locked on the $18 EPS."*

442.    Analysts also asked how import pressure in PVC markets was impacting the Company's profits. When asked about "the significance of any imports of conduit," Defendant Waltz stated, "Without getting product-by-product . . . it goes from 0% to 3% to the highest I'm aware was around 20%." But Waltz assured investors that*, "[we] have a price premium both for our reputation, our quality, our ability to ship. . . . we keep back to our earnings guide, what we expected. We're running our game plan . . . it's going well."*

443.    The statements set forth in ¶¶436 through 442 above were materially false and misleading when made. Defendants' statements above, such as that "right now things are playing out as expected . . . there's no foreshadowing," "we go out with almost any customer that would probably prefer us for lots of reasons and gain volume, and we don't want to do that," "the business plans work, and we're still locked on the $18 EPS," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market

could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

444. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as that "[we] have a price premium both for our reputation, our quality, our ability to ship. . . . we keep back to our earnings guide, what we expected. We're running our game plan . . . it's going well," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### N. May 8, 2024 Misstatements (Oppenheimer Industrial Growth Conference)

445. On May 8, 2024, Defendant Johnson and Matthew Kline (Atkore's Vice President-Treasury & Investor Relations), spoke at the Oppenheimer Industrial Growth Conference as representatives of Atkore.

446. Defendant Johnson was asked whether the Company would reach its "fiscal 2025, $18-plus EPS target." In response, Defendant Johnson stated, "we're halfway through this year and we have a midpoint of $16.50. So, to get to $18, that's another $1.50. And at our current level of shares, that's about $75 million of EBITDA, okay? We still will have some remaining . . . price cost into next year, because if we said $585 million a couple years ago, we're roughly, say, $500 million at the end of this fiscal year, that reasonably would make you expecting *pricing has stabilized quarter-over-quarter*."

447.    The statements set forth in ¶446 above was materially false and misleading when made. Defendant Johnson's statement above that "pricing has stabilized quarter-over-quarter" was materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

### O.    August 6, 2024 Misstatements (Q3 FY2024 Earnings)

448.    On August 6, 2024, Defendants announced Atkore's financial results for the fiscal third quarter of 2024 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on August 6, 2024, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Johnson led the conference call. The Company also reported these results in a Form 10-Q filed with the SEC on August 6, 2024, signed by Defendant Johnson and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Johnson and Waltz.

449. In the release and Form 10-Q, Defendants reported their second quarter 2023 earnings and revised guidance as follows:

(a) Net sales of $822.4 million, down 10.5% versus prior year;

(b) Net income per diluted share decreased by $1.80 versus prior year to $3.33;

(c) Adjusted net income per diluted share decreased by $1.92 versus prior year to $3.80;

(d) Net income decreased by $77.9 million versus prior year to $123.4 million;

(e) Adjusted EBITDA decreased by $64.1 million versus prior year to $206.1 million.

450. On August 6, 2024, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Johnson and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

451. Speaking about the Company's second quarter performance in the release, Defendant Waltz stated, "Atkore delivered Adjusted EBITDA margins over 25% on essentially flat volume compared to the prior year."

452. In announcing the Company's second quarter earnings, Defendants also revised Atkore's guidance. In the release, Defendants stated: "The Company is adjusting its estimate for fiscal year 2024 Adjusted EBITDA to be approximately $772 million to $782 million, and adjusting its estimate for Adjusted net income per diluted share to $14.30 - $14.52."

453. On the conference call, Defendant Waltz concluded his prepared remarks by stating, "*we remain confident in the long-term opportunities for our diversified product portfolio. . . . The breadth of our product portfolio enables Atkore to be resilient to changing end market demand while remaining a supplier of choice across our channel partners*."

159

454. On the conference call, Defendant Waltz stated, "The larger question that remains is what the pricing environment will be as we progress through FY 2025. . . . our initial EBITDA estimate for FY 2025 would be around $650 million, given the market environment. However, ***this estimate could go higher if construction activity in the areas such as residential and utilities starts to improve***."

455. A Citi analyst asked Defendants, "what changed in the environment between last quarter and this quarter. . . . you do have pretty severe decrementals in Q4 versus Q3, is that just all price, is there something else going on?" Defendant Waltz responded, "if you're a PVC [pipe buyer] . . . it's utility and residential and [there are] just not sub-developments being built at this stage and obviously multifamily home is down. So the specific markets that drive us most are much quieter. I do think there's job delays." Defendant Waltz continued, ***"I can't control obviously what our competitors do . . . or listen to somebody else saying here's the price you need and reacting to that."*** Yet Defendant Waltz continued to reassure investors that the Company would outperform in upcoming quarters: "as we go into next quarter, ***I'd rather get out in front of it now and pick numbers that obviously it's a forecast, but we expect to hit or exceed probably like every quarter . . . which I'm absolutely so convinced of our . . . long-term strategies***."

456. When asked by a Keybanc Capital Markets analyst to provide "some color on kind of the incremental $50 million of headwind in the outlook," including "how much is kind of the import headwind versus incremental PVC side," Defendant Waltz stated, ***"we actually could get price [increases]."***

457. An analyst from RBC asked Defendants when the "pricing normalization"—i.e., reduction of elevated pricing in the PVC pipe market—would be complete: "The previous expectation was price normalization might be reached towards the end of calendar 2024. That now

feels like that's being pushed out. Based upon what you know today, where do you see the best case price normalization that would happen?" Defendant Waltz responded that pricing normalization *"will become de minimis enough that the other things will drive ahead and we get back on track of growing earnings, which obviously will be a strong reflection point for our stock that goes with every other fundamental of our company*."

458.    Analysts were also keenly focused on the allegations of Atkore's anti-competitive behavior documented in the ManBear Report. The RBC analyst asked, "do you have any comments on some of the noise we're hearing about pricing and PVC? I hate to use that word, collusion . . . can this be substantiated?" Defendant Waltz stated, "it's from a short seller . . . I am so proud of our internal pricing mechanisms, weekly calls, scatter diagrams, apps that tell us pricing that we drive our business and *I'm going to claim that report is unsubstantiated from the conclusions it tries to make*." That statement was materially false and misleading because the ManBear Report contained reference to numerous claims of alleged price-fixing that were substantiated by the OPIS reports cited herein, and Defendants were in possession of additional information supporting the veracity of the ManBear Report.

459.    Analysts also intensely questioned Defendants about the risk of Atkore's PVC Pipe prices falling. For example, an analyst from CJS Securities asked whether "PVC pricing still represents kind of the biggest pricing risk moving forward." Defendant Waltz responded by assuring investors that these trends were purely a function of market dynamics and Atkore's fiscal guidance already accounted for them: "if you go back to COVID time, *with supply demand constraints, which drives our business*, this has been a constant theme . . . *all of our products that I can think of all went up in margin. So did both our competitors and other industries, maybe not as much*." Waltz continued, pointing to several other causes he claimed were behind PVC Pipe

price increases: "with PVC, if you go back around COVID, *you also had a hurricane hit. . . .
[F]our, six months later you had the freeze in Texas. So . . . there isn't as much opportunity for
somebody to try to drop their price. . . . [T]hat's the dramatic thing that's happened in PVC. . . .
in this quarter, I think we've appropriately scoped that*."

460.    In follow-up responses to that analyst's question, Defendant Johnson doubled down
on Defendant Waltz's claims as the drivers of PVC Pipe pricing: "during the COVID times, *not
only was a supply chain disruption, but there was very strong demand* . . . we don't talk enough
about the demand aspect of pricing. *If we had that type of demand right now, I don't think we'd
be talking about pricing like we're talking about today. . . . [T]he reason why we would say PVC
for next year is probably just more uncertainty around the PVC market for next year as it goes
in and affects pricing.*"

461.    The statements set forth in ¶¶450 through 460 above were materially false and
misleading when made. Defendants' statements above, such as "I can't control obviously what our
competitors do or listen to somebody else saying here's the price you need and reacting to that,"
"we actually could get price [increases]," "[pricing normalization] will become de minimis," "I'm
going to claim that [the ManBear] report is unsubstantiated from the conclusions it tries to make,"
and "supply demand constraints . . . drive[] our business," were materially false and misleading
when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an
anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe
and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of
reflecting actual supply and demand dynamics, were the product of coordinated price increases
with Atkore's competitors that did not reflect what the Company could charge in a truly
competitive market environment; (iii) Atkore's pricing practices were unsustainable because its

coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

462.    Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as "[t]he breadth of our product portfolio," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**P.    November 21, 2024 Misstatements (Q4 and Full Year FY2024 Earnings)**

463.    On November 21, 2024, Defendants announced Atkore's financial results for the fiscal fourth quarter and full year of 2024 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on November 21, 2024, and attached a slide presentation referenced during the earnings call. Defendants Waltz and Deitzer led the conference call. The Company also reported these results in a Form 10-K filed with the SEC on November 21, 2024, signed by Defendants Deitzer and Waltz, among others, and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Deitzer and Waltz.

464. In the press release, Defendants reported the "highlights" of Atkore's fourth quarter 2024 earnings as follows:

    (a)    Net sales decreased by $81.6 million versus prior year period to $788.3 million;

    (b)    Net income decreased by $67.8 million versus prior year period to $73.1 million;

    (c)    Adjusted EBITDA decreased by $91.8 million versus prior year period to $140.2 million;

    (d)    Net income per diluted share decreased to $2.02 from $3.63 in prior year period;

    (e)    Adjusted net income per diluted share decreased to $2.43 from $4.21 in prior year period.

465. In the press release, Defendants reported the "highlights" of Atkore's full year 2022 earnings as follows:

    (a)    Net sales decreased $316.7 million versus prior year period to $3,202.1 million;

    (b)    Net income decreased by $217.0 million versus prior year to $472.9 million;

    (c)    Adjusted EBITDA decreased to $771.7 million from $1,042.1 million in prior year;

    (d)    Net income per diluted share decreased to $12.69 from $17.27 in prior year;

    (e)    Adjusted net income per diluted share decreased to $14.48 from $19.40 in prior year;

    (f)    Net cash provided by operating activities of $549.0 million;

    (g)    Free Cash Flow of $399.2 million.

466. In reporting these results and Atkore's financial guidance, Defendants made multiple false and misleading statements set forth below. This includes that the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Deitzer and Waltz, were false

and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

467.    In the press release, Defendants provided the following concerning Atkore's guidance for fiscal year 2025:

(a)    Full-year 2025 Net sales expected to be in the range of $2.9 - $3.2 billion;

(b)    Full-year 2025 Adjusted EBITDA outlook of $475 - $525 million;

(c)    Full-year Adjusted net income per diluted share outlook of $7.80 - $8.90.

468.    On the conference call, Defendant Waltz reassured investors that, despite "evolving dynamics impacting the competitive landscape," ***Atkore's "price versus cost assumptions reflect [these] various competitive dynamics***, including new domestic competition and continued impacts from imported products. . . . ***pricing could stabilize and potentially improve with the clarity on the allowable import population."***

469.    Analysts were also keenly focused on the Company's statements about increasing competition in the PVC pipe market. An RBC analyst asked, "what are you expecting in terms of percent new capacity from this competition?" Defendant Waltz responded that, ***"my competition doesn't tell me about where they're starting factories up and so forth."***

470.    During the call, the RBC analyst also asked Defendants whether their new financial guidance "give[s] you some cushion for other kind of dynamics that could come up during the course of fiscal 2025?" Defendant Deitzer responded, ***"I think our guide is balanced."***

471.    In response to an analyst question concerning the impact of the increasing PVC pipe imports, Defendant Waltz stated, "there is PVC imports . . . ***Atkore has this advantage where we have like nine facilities across the country. We can serve and deliver in two days***."

472.     When asked about "the puts and takes as to why fiscal 2025 could be the bottom from a revenue and adjusted EBITDA standpoint," Defendant Waltz responded, ***"as pricing goes down . . . for importers, it just doesn't become as feasible as the price declines."***

473.     In the 2024 10-K, Atkore responded to the filing of the PVC Antitrust Actions, stating:

> The Company believes there are defenses, both factual and legal, to the allegations in these various proceedings and the Company plans to vigorously defend itself. As these proceedings are in the early stages, it is not possible for the Company to predict any outcome or estimate the amount of loss, if any, which could be associated with any adverse decision. While the Company does not believe that any of these proceedings will have a material adverse effect on its financial condition, the Company cannot give assurance that the proceedings will not have a material effect on its results of operations.

474.     The statements set forth in ¶¶466 through 473 above were materially false and misleading when made. Defendants' statements above, such as that "pricing could stabilize and potentially improve," "my competition doesn't tell me about where they're starting factories up and so forth," "I think our guide is balanced," and "as pricing goes down, . . . for importers, it just doesn't become as feasible as the price declines," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market

could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

475.     Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as that "Atkore has this advantage where we have like nine facilities across the country. We can serve and deliver in two days," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

### Q.     February 4, 2025 Misstatements (Q1 FY2025 Earnings)

476.     On February 4, 2025, Defendants announced Atkore's financial results for the fiscal first quarter of 2025 in a press release and held a conference call to discuss those results. Atkore filed the press release in a Form 8-K with the SEC on February 4, 2025, and attached a slide presentation referenced during the earnings call. Defendants Waltz, Deitzer and Pregenzer led the conference call. The Company also reported these results in a Form 10-Q filed with the SEC on February 5, 2025, signed by Defendant Deitzer and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Deitzer and Waltz.

477.     In the release, Defendants reported the Company's fourth quarter results as follows:

(a)     Net sales of $661.6 million, down 17.1% versus prior year;

(b)     Net income per diluted share decreased by $2.30 versus prior year to $1.31;

(c)    Adjusted net income per diluted share decreased by $2.49 versus prior year to $1.63;

(d)    Net income decreased by $92.0 million versus prior year to $46.3 million;

(e)    Adjusted EBITDA decreased by $114.4 million versus prior year to $99.2 million.

478.    On February 4, 2025, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Deitzer and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

479.    During the conference call that day, analysts were highly focused on Defendants' disclosures that increased competition was harming Atkore's financial performance. On the call, Defendant Waltz was asked to "elaborate on the commentary that import competition is gaining momentum in PVC . . . what has changed with PVC imports?" In response, Waltz assured investors that import pressure was priced into the Company's guidance: "let's go through PVC . . . *we've taken a very aggressive view quite frankly, a view for price declines . . . [in] our forecast*." He continued, downplaying the risk of increasing import pressure: "this [was] the worst year for year-over-year declines in PVC. So [we] both answered kind of the imports. . . *I don't think they can make money with the additional freight even if they have lower [cost] level.* From our analysis, the resin costs in these countries are the same as ours. . . literally imports have grown like 4%. . . . *I think it's moderating with that*."

480.    On the conference call, an analyst from Keybanc asked Defendants "to put a finer point on PVC, is the [guidance] revision entirely from the imports or is there also additional capacity domestically? And then could you maybe give us an updated view on the degree of incremental capacity being added from the market as a whole?" In response, Defendant Waltz

stated, *"we don't know because again, we don't talk to our competition."* This statement was materially false and misleading because Atkore did "talk" to its competitors through the medium of the OPIS reports, which allowed Atkore to engage in anti-competitive PVC Pipe pricing. He continued by reassuring investors that Atkore's competitive advantages would protect its position in the market in the face of price declines: *"I still think we're the market leader out there. We have the full breadth of products. . . . Because of our span, we have relationships with all these companies . . . we're kind of the first choice and last look."*

481. During the call, Defendant Waltz doubled-down on his comments that Atkore had accounted for decreases in PVC prices and assured investors they had hit a trough that was priced into Atkore's financial guidance. For example, a Loop Capital analyst asked Defendants, "forgive me if I'm misunderstanding, but the expectation around profitability is now that we're kind of reset to pre-COVID levels on the PVC side. However, we've seen more imports come in. We've seen more domestic production. So how do we get confidence that, that is actually the right level and not something lower than pre-COVID?" In response, Defendant Waltz stated, "what we have in here is our pricing down to that level. . . . at some point . . . *[importing PVC] is just no longer effective because of the freight. . . . imports coming from across the globe no longer, in our opinion, from our analysis at the moment, make economic sense.*" He added, "from that standpoint, *I feel good with Atkore* because we are one of the largest resin buyers. . . . *this year alone, including PVC should be our best year for productivity that I'm aware of pre or post IPO*."

482. The statements set forth in ¶¶478 through 481 above were materially false and misleading when made. Defendants' statements above, such as that "we've taken a very aggressive view quite frankly, a view for price declines . . . [in] our forecast," that imports pressures in the

PVC Pipe market were "moderating" because "I don't think they can make money with the additional freight even if they have lower [cost] level," "we don't talk to our competition," and "this year alone, including PVC should be our best year for productivity," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

483. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as that "I still think we're the market leader out there" and "we're kind of the first choice and last look" for PVC Pipe purchasers, were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source

of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**R.     February 18, 2025 Misstatements (Citi Industrial Tech and Mobility Conference)**

484.     On February 18, 2025, Defendants Waltz and Deitzer spoke at the Citi Industrial Tech and Mobility Conference as representatives of Atkore. After disclosing the Company's negative earnings performance for Q1 2025 two weeks earlier on February 4, 2025, Defendants claimed they were pivoting to an "edge-out strategy" to repair the Company's ailing financial performance.

485.     During the conference, in response to an analyst asking "what differentiates Atkore," Defendant Waltz stated, "there is absolutely a sustainable competitive advantage with Atkore." While Waltz conceded "our products themselves are not that differentiated," he stated that "what we provide is . . . the service and because of that service . . . ***our customers [] have a preference for us. . . . our customers will pay a premium for our products***."

486.     The analyst, noting that Defendant Waltz "highlighted a couple of important growth areas for Atkore, namely PVC," asked Defendants to "update us on the progress of these initiatives and how you think about their impact in 2025 and beyond." In response, Waltz stated, "these large . . . customers we've already been selling to those markets, selling to [agricultural business] markets . . . we have a cost base here. We had 10 PVC facilities across the country. We know how to make PVC pipe really well. We buy resin really well. We have a good cost base. ***We're already in the market. So, let's edge out . . . sell on the value or bring in PVC . . . to these customers***."

487.     Defendant Deitzer echoed Defendant Waltz's comments, stating "it was a decade to build [Atkore's PVC] business . . . to build that network of facilities, integrate them, and ***[we]***

171

*have the operational footprint to then start to move into an edge-out strategy, as [Defendant Waltz] mentioned*."

488.    The analyst asked Defendants, "do you see the potential for the business to inflect?" In response, Defendant Waltz stated, "the utility market and so forth is where our PVC goes at, *after a tough year, we have easy comps*. *The orders we're starting to get now . . . and so forth [are] growing*."

489.    On the call, an analyst asked Defendants about Atkore's "US competitor who's come into PVC from steel," Defendant Waltz stated, "We tell the shareholders, we believe our customers know this, that *we have a unique value prop[osition] of having the best agents in the industry because we have a whole suite of product you can go [to]*."

490.    Given Defendants' repeated statements touting Atkore's Amazon-like business model, an analyst noted with surprise about the Company's poor first-quarter 2025 results only two weeks earlier, "I definitely thought that [the] one order, one delivery, one invoice [Atkore business model] was going to protect you . . . from some of these lower-cost competitors." In response to the analyst asking, "what have your distribution customers said when invariably they just kind of move [on] from you guys," Defendant Waltz stated, "*some of our . . . largest customers out there have never bought a single imported product, and they're loyal to us . . . [they are the] same as Atkore, they don't have to be the same price, nor do they want to be at the same price as the person with three shops and so forth*."

491.    The statements set forth in ¶¶484 through 490 above were materially false and misleading when made. Defendants' statements above, such as that Atkore was employing an "edge out strategy" to "sell on the value or bring in PVC . . . to these customers" and that Atkore's "largest customers . . . have never bought a single imported product, and they're loyal to us," were

materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

492.    Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as Atkore's "unique value prop[osition] of having the best agents in the industry because we have a whole suite of product you can go [to]," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**S.    May 6, 2025 Misstatements (Q2 FY2025 Earnings)**

493.    On May 6, 2025, Defendants announced Atkore's financial results for the fiscal second quarter of 2025 in a press release and held a conference call to discuss those results. Atkore

filed the press release in a Form 8-K with the SEC on May 6, 2025, and attached a slide presentation referenced during the earnings call. Defendants Waltz, Deitzer and Pregenzer led the conference call. The Company also reported these results in a Form 10-Q filed with the SEC on May 6, 2025, signed by Defendant Deitzer and accompanied by SOX Certifications with the language set forth in ¶¶311-12 above, which were signed by Defendants Deitzer and Waltz.

494.    In the release, Defendants reported the Company's fourth quarter results as follows:

(a)    Net sales of $701.7 million, down 11.5% versus prior year;

(b)    Net income per diluted share decreased by $5.13 versus prior year to a diluted loss per share of $1.46;

(c)    Adjusted net income per diluted share decreased by $2.04 versus prior year to $2.04;

(d)    Net income decreased by $188.0 million versus prior year to a net loss of $50.1 million;

(e)    Adjusted EBITDA decreased by $95.5 million versus prior year to $116.4 million;

(f)    The company recognized a non-cash asset impairment charge of $127.7 million.

495.    In reporting these results and Atkore's fiscal guidance, Defendants made multiple false and misleading statements set forth below. This includes the SOX Certifications with the language set forth in ¶¶311-12 above, signed by Defendants Deitzer and Waltz, which were false and misleading because Atkore was engaged in a PVC Pipe anti-competitive pricing fraud that Defendants failed to disclose to investors.

496.    In the release, Defendants stated, "The Company is maintaining its estimate for fiscal year 2025 Adjusted EBITDA to be approximately $375 million to $425 million, and maintaining its estimate for Adjusted net income per diluted share to $5.75 - $6.85."

497. On the call, Defendants were asked to "start with PVC conduits and . . . what you're expecting for the balance of the year. . . . after Q1, kind of the idea was – would be pre-pandemic pricing perhaps by the end of fiscal 2025. Just wanted to see if that's still in line with the way you're looking at it." In response, Defendant Waltz stated, "it's kind of on track back to our earnings and everything we said with what we expect." When asked a follow-up question, "what would be from a market share standpoint on PVC conduit . . . where Atkore is at this point in time," Defendant Waltz responded *"we're absolutely still a leader, no question about that, and give or take probably around keeping our same market share."*

498. An analyst asked Defendants, "I'm just trying to understand your view of PVC conduits in terms of your overall offering. There's more competition and more imports. Just from big picture, how important is it to kind of overall business in the longer term?" In response, Defendant Waltz stated, *"it's a key part of our business . . . it totally fits into Atkore's one order, one delivery, one invoice [business model]*, which, as we've explained over the years, we think *is a competitive advantage for us. . . . we're driving productivity here to continue to be competitive."*

499. The statements set forth in ¶¶495 through 497 above were materially false and misleading when made. Defendants' statements above, such as that Atkore was "absolutely still a leader, no question about that, and give or take probably around keeping our same market share," that increased competition in PVC Pipe markets was "a key part of our business . . . it totally fits into Atkore's one order, one delivery, one invoice [business model]," and "we're driving productivity here to continue to be competitive," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and

unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) if Atkore's anti-competitive pricing practices were exposed, PVC Pipe prices would necessarily fall from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

500. Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as "Atkore's one order, one delivery, one invoice [business model]," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

**T.     June 11, 2025 Misstatements (Wells Fargo Industrials Conference)**

501. On June 11, 2025, Defendant Deitzer spoke at the Wells Fargo Industrials Conference as a representative of Atkore.

502. During the conference, Defendant Deitzer stated, "a differentiating factor for Atkore versus some of our other competitors is the breadth of our portfolio. Some people can do

some of the products or maybe one or two, but *we don't have a competitor that quite does the full suite of products that we do here in the US*."

503.     Defendant Deitzer also stated, "*we're seeing some opportunities to grow our PVC water products* . . . we feel not just this year, but the long-term benefits there, where *we get a real advantage operationally by leveraging the investments we've made at our existing footprint of facilities that manufacture our PVC conduit products*."

504.     In response to an analyst question "how the management team is thinking more broadly about incorporating higher level of service across the business and how you scale that?", Defendant Deitzer stated, "[Atkore's] service centers are what enable that model to scale and where that comes through is hopefully potentially getting a premium versus ourselves on a bulk basis or other single line product competitors by *being able to co-load multiple product lines under a single order, one order, one delivery, one invoice is that. So, I think it's having that footprint enables that to scale*."

505.     The statements set forth in ¶¶502 through 504 above were materially false and misleading when made. Defendants' statements above, such as that Atkore had "opportunities to grow our PVC water products" based on "the investments we've made at our existing footprint of facilities that manufacture our PVC conduit products," were materially false and misleading when made because Defendants misstated and failed to disclose that: (i) Atkore participated in an anti-competitive pricing scheme with its competitors that artificially inflated the price of PVC Pipe and unsustainably boosted Atkore's revenue and profits; (ii) Atkore's PVC Pipe prices, instead of reflecting actual supply and demand dynamics, were the product of coordinated price increases with Atkore's competitors that did not reflect what the Company could charge in a truly competitive market environment; (iii) Atkore's pricing practices were unsustainable because its

coordinated pricing actions with competitors could not be maintained under non-manipulated market conditions, including when under scrutiny from regulators; (iv) Atkore's pricing practices were unsustainable because Atkore's coordinated pricing with competitors in the U.S. market could not be maintained in the face of growing PVC Pipe imports from foreign manufacturers not involved in Atkore's coordinated pricing actions; and (v) as Atkore's coordinated pricing practices were exposed, PVC Pipe prices would necessarily decrease from the anti-competitive rates to actual market prices, resulting in a substantial decrease in Atkore's profits and financial performance.

506.    Defendants' statements above that Atkore's financial success was attributable to Atkore's supposed competitive advantages, such as its "being able to co-load multiple product lines under a single order, one order, one delivery, one invoice is that. So, I think it's having that footprint enables that to scale," and "we don't have a competitor that quite does the full suite of products that we do here in the US," were also materially false and misleading when made because they falsely attributed Atkore's financial success to such supposed advantages and misstated and failed to disclose that, in fact, the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior, which artificially inflated the price of Atkore's PVC Pipe.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

507.    Each of the Defendants named herein acted with scienter. When the Defendants made the statements alleged herein, engaged in activity to inflate the price of PVC Pipe and artificially inflate Atkore's stock price, and/or personally sell millions of dollars worth of Atkore common stock, they acted with scienter and either knew that their statements were materially false and misleading when made or were recklessly indifferent to the risk that those statements were materially false and misleading.

508.    The ample evidence presented below, when considered together, supports a strong inference of each Defendant's scienter that is at least as compelling as a non-culpable explanation of their behavior. Indeed, it been said that, "prices don't fix themselves." The coordinated PVC Pipe price-setting across supposed competitors here required concerted strategic decision-making from the top levels of Atkore. Any given week, Atkore had to determine if it was maintaining, increasing or lowering its PVC Pipe prices. The senior-most executives at Atkore—CEO Waltz, CFOs Johnson and Deitzer, and President of the Electrical segment and COO Pregenzer—were all involved in setting Atkore's PVC Pipe prices. OPIS reported numerous instances of supposed competitors (i) instilling "discipline" to conform to price increases; (ii) reaching "consensus" on price increases; and (iii) looking to the market leaders (Atkore was the largest) to impose price increases or price maintenance that all others would follow.

509.    It is not plausible that Atkore was engaged in this concerted price-setting behavior with its supposed competitors without the knowledge, or at least, reckless disregard, of such conduct by its most senior executives, who have admitted that they participated in the very weekly meetings that Atkore used to set its PVC Pipe prices.

### A.    The Individual Defendants Attended Internal Atkore Meeting to Discuss PVC Pricing and Were Directly Involved in Atkore's Pricing Decisions

510.    The Individual Defendants—Waltz, Johnson, Deitzer and Pregenzer—participated in regular internal Atkore meetings about pricing and regularly discussed and tracked pricing and sales information concerning PVC Pipe. PVC Pipe pricing was a critical financial metric for Atkore and the Individual Defendants repeatedly admitted that they were personally familiar, on a weekly basis, with the granular details of how Atkore priced its PVC Pipe and the prices the Company (and its supposed competitors) disseminated. This direct personal involvement in, and consequent knowledge of, the Company's PVC pricing, as the Individual Defendants admitted in

numerous different public admissions during the Class Period, supports an inference of scienter on the part of each Individual Defendant.

511. For example, on June 14, 2023, Defendant Johnson admitted at the Wells Fargo Industrials Conference that he and Waltz have a weekly meeting to discuss pricing. Johnson described that, "As part of the Atkore business system, we really standardize the way that we get market feedback on what pricing is doing, how we react to it, the tools that we use, *the weekly meeting that we have with myself and our CEO talking about the dynamics of pricing and what we're going to do the next week*." The weekly recurrence of Defendants' meetings aligns with OPIS's weekly dissemination of its reports, which OPIS disseminated to its subscribers every Friday.

512. Similarly, on November 17, 2023, during Atkore's fourth quarter 2023 earnings call, a securities analyst asked Waltz and Johnson to identify "the conduits of growth ... helping ... your forecasts on revenue or EBITDA." Waltz responded that, "we give weekly—our leadership, our pricing and so forth, daily metrics. *But David [Johnson] and I [receive] weekly metrics*."

513. Likewise, on February 1, 2024, during the Company's first quarter 2024 earnings call, a securities analyst asked Defendants Johnson and Waltz, "on PVC pricing for January, was there much change?" Waltz evidenced his personal awareness of a lack of PVC Pipe demand, and Atkore's attempts to increase prices. Specifically, Waltz responded that, "we've put in one or two price increases. *It's harder when the demand isn't there* to get them to realize. But *we're still optimistic going forward* on these *attempting to push the prices in the industry up*." Defendant Johnson added, "we do kind of *every week* look at where [sales] volumes are."

514. On August 6, 2024, during the Company's third quarter 2024 earnings call, a securities analyst asked Waltz and Johnson about the price-fixing allegations in the ManBear

Report. Defendant Waltz called the allegations "unsubstantiated" and stated he was "so proud of our internal pricing mechanisms," which included "**weekly calls**, scatter diagrams, [and] apps that tell us pricing."

515. During his tenure as CFO, Defendant Deitzer also demonstrated his pricing knowledge during Atkore's November 21, 2024 earnings call, when he spoke in detail about Atkore's pricing dynamics, including "on the PVC electrical conduit side." And, as discussed in detail below, Defendant Pregenzer regularly attended internal Atkore meetings concerning pricing.

### B. Defendant Pregenzer Was Responsible for PVC Pricing, Which He Reported Monthly to Defendants Waltz, Johnson, and Deitzer

516. Defendant Pregenzer was the President of Atkore's Electrical segment that contained its PVC Pipe business for the majority of the Class Period. He joined the Company in July 2015 and served as President of the Conduit & Fittings business unit and Vice President and General Manager of the Plastic Pipe and Conduit strategic business unit. Pregenzer became the President of Electrical in 2020. On January 10, 2025, Atkore announced that Pregenzer was named Chief Operating Officer ("COO") in addition to his role as President of Electrical. As Atkore stated in the January 10, 2025 press release announcing his promotion to COO, Pregenzer "report[ed] directly to [Defendant] Waltz" both before and after he was named COO.

517. Pregenzer was directly involved in the pricing of Atkore's PVC products. He served as a critical intermediary between Jeff Sherman, GM of the Company's PVC Pipe business, and Defendants Waltz, Johnson, and Deitzer, who received reports from Pregenzer on at least a monthly basis about the Company's PVC pricing efforts and "spreads"—i.e., the difference between manufacturing cost and sales price—for all of the Company's products. Defendants closely monitored these spreads, as they were crucial to Atkore's business.

518.    According to FE-1, a former Atkore President of Cable Solutions who also served as executive sponsor for Atkore's internal strategic pricing initiative, the pricing process followed a clear and defined path, and spreads were how Atkore measured the performance of its Presidents, General Managers, and inside sales teams. Sherman formulated PVC price changes and generated price sheets with the PVC inside sales team, which constantly (i) monitored trade publications and (ii) consulted with independent sales agents, who would in turn communicate with PVC distributors and report back the distributors' view of pricing in the market, on a daily or even hourly basis.

519.    FE-3, who served as Atkore's HR director for PVC Pipe & Conduit from June 2022 to June 2024, and was the HR business partner for Sherman specifically, attended regular monthly and annual PVC business meetings, held by Sherman, at which representatives from the PVC plants and Atkore's finance team, including Kristie Acree, the Company's Director of Finance for PVC, would discuss PVC prices and finances. FE-4, who served as plant manager for Atkore's South Carolian PVC plant from 2021 to January 2023, also attended these meetings and confirmed that PVC prices were a topic of discussion.

520.    Sherman communicated his PVC pricing decisions to Defendant Pregenzer. He also regularly communicated PVC unit financials to Pregenzer, sometimes on a daily basis, and each month provided Pregenzer with a monthly preliminary business update for the Company's PVC business.

521.    As President of Electrical, Pregenzer would then travel each month to Chicago to relay Electrical segment updates to Atkore executives, including Waltz, Johnson, and Deitzer. During these meetings, Pregenzer and other Company Presidents would present updates on their

business segments that sometimes ran for hours. Pregenzer's Electrical segment update included information about PVC pricing and spreads, which was of keen interest to the executives present.

522.    Defendant Pregenzer also made multiple statements to investors about the Company's PVC Pipe business and specifically about pricing. For example, during the Company's earnings call on February 4, 2025—the first earnings call Pregenzer attended as COO—Defendant Deitzer referred a question about Atkore's PVC pricing to Pregenzer. In response, Pregenzer gave detailed statements about PVC Pricing trends indicating that he had been involved in the Company's PVC pricing efforts for *years*. In Pregenzer's words, "when we look at the PVC market, there's been a number of new entrants from all different sources, whether it's imports from Latin America, from China. . . . there's new entrants that are coming in out of nowhere. . . . ***In my career, probably the most disruptive period we've ever seen*** . . . that's just creating a lot of pressure ***on price and spread that we're experiencing. . . . As we've been tracking this price normalization over the past couple of years***, ***the last quarter to two quarters has really accelerated***. . . . [W]hat we're trying to do is to capture that going out for the rest of the year."

### C.    Defendants Waltz, Johnson and Pregenzer Sold Their Personally Held Atkore Stock at Artificially Inflated Prices During the Class Period

523.    During the Class Period, Defendants Waltz, Johnson and Pregenzer sold over 360,000 shares of their personally held Atkore common stock for total proceeds of over $49.2 million and total profits of at least $23 million. These sales were suspiciously timed and comprised a material departure from the three Defendants' trading behavior over the 927-day period preceding the Class Period (the "Control Period").

524.    By selling when they did, Waltz, Johnson and Pregenzer took full advantage of the inflation in Atkore's stock price caused by their false and misleading statements, and avoided significant losses. The collective proceeds of these sales were approximately ***$28.9 million more***

than they would have been if they had sold their shares after the artificial inflation had been

removed by the corrective disclosures alleged herein.

525.    Each of these Defendants' Class Period sales represented a significant percentage

of the saleable Atkore common stock held by the respective Defendants at the time of the sale.[20]

Despite receiving additional Atkore stock through the Class Period via grants and the vesting of

certain restricted shares, Defendants Waltz, Johnson and Pregenzer each beneficially owned fewer

shares of Atkore common stock at the end of the Class Period than they did at its beginning.

526.    Atkore's stock ownership requirements for its executives underscore the fact that

these Defendants each sold an outsized portion of their shares during the Class Period. As CEO,

Defendant Waltz was required to own shares of Atkore valued at five times his annual salary, and

as executives, Defendants Johnson and Pregenzer were required to own shares of Atkore valued

at three times their annual salaries. These Defendants' salaries through the Class Period, and the

value in Atkore stock they were required to retain, are detailed in the chart below:

| Defendant | 2022 | | 2023 | | 2024 | |
|---|---|---|---|---|---|---|
| | Salary | Required Stock Value | Salary | Required Stock Value | Salary | Required Stock Value |
| **Waltz** | $919,231 | $4,596,155 | $1,023,077 | $5,115,385 | $1,073,077 | $5,365,385 |
| **Johnson** | $516,923 | $1,550,769 | $549,462 | $1,648,386 | $577,769* | $1,733,307 |
| **Pregenzer** | $417,462 | $1,252,386 | $469,462 | $1,408,386 | $523,462 | $1,570,386 |
| * Sum total of base salary through termination day of August 9, 2024. | | | | | | |

527.    During their tenures as executive officers throughout the Class Period, Defendants

Waltz, Johnson, and Pregenzer met their respective five- and three-time salary stock retention

requirements.[21] Because of these minimum share ownership requirements, none of these

---

[20] As used herein, "saleable shares" and "saleable Atkore stock" means shares of Atkore that the
Defendants were able to sell, i.e., not including restricted or unvested options or grants.

[21] Defendant Deitzer, who became an executive officer in August 2024, had not met his three-

Defendants could have sold their full holdings of Atkore stock. Their sales detailed below, already significant, thus represent an even more significant part of their Atkore stock ownership in proportion to what, under Atkore's compensation guidelines, these executives could realistically sell.

528.     Waltz, Johnson and Pregenzer made these insider sales while they were aware of material nonpublic information, including that Atkore was engaged in anti-competitive PVC Pipe pricing, and about the effects of Atkore's price-fixing conspiracy on the Company's revenues and other financial metrics. Through their insider sales, Waltz, Johnson and Pregenzer personally profited from the artificial inflation of Atkore's stock price caused by the materially false and misleading statements and omissions t investors and Defendants' PVC Pipe price-fixing scheme. They unloaded tens of millions of dollars of their own shares as the stock price soared as they privately knew Atkore's anti-competitive pricing and the price-fixing conspiracy were driving the Company's profits, prior to Atkore's stock price crashing when the rest of the market learned the truth.

529.     These stock sales were suspiciously timed in light of the challenges Defendants faced when trying to live up to their repeated false claims that Atkore's margins and profits were "sustainable," as it proved increasingly difficult to maintain and raise PVC Pipe prices. For example, on February 23, 2024, OPIS reported that "some converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all. . . . they must push them higher if they don't want to lose more margin." Then, just days later, as set forth in detail below, Defendants Waltz, Johnson and

---

times-salary threshold as of December 1, 2024, but was nevertheless bound by the requirement to retain 50% of his net profit shares.

Pregenzer all made sizable sales of stock between February 26 and March 4, 2024. And, on March 15, 2024, OPIS reported that PVC Pipe prices did not increase, and that "there was plenty of finger pointing going on . . . competitors said everyone needs to start moving prices up on business written from now on."

530.     These facts, and additional details alleged below, support a strong inference of scienter on the part of these three Defendants.

531.     **Defendant Waltz.** During the Class Period, Defendant Waltz sold over 322,000 shares of Atkore common stock for proceeds of over $43 million. Through these sales, which were unusual in both timing and amount (including their difference from Waltz's stock sales during the Control Period), Waltz profited by at least $22,775,710 and avoided losses of $24,893,401.[22] Each of these sales comprised a significant percentage of the Atkore common stock Waltz held at the time of each sale. Waltz beneficially owned approximately 390,819 shares of Atkore common stock at the beginning of the Class Period and approximately 322,235 shares at its end—a roughly 18% decrease—even though he received additional Atkore stock, including through grants and the vesting of restricted shares, throughout the Class Period.

532.     Defendant Waltz's insider sales during the Class Period are set forth in the chart below:

---

[22] The "losses avoided" number is the amount by which the actual proceeds of these sales exceeded the hypothetical proceeds from sales of the same amount of Atkore stock at the August 5, 2025 closing price of $56.39, after the corrective disclosures alleged herein removed artificial inflation from the stock price.

| Defendant Waltz's Class Period Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| Date | Shares Sold | Price | Proceeds | Profits | Losses Avoided | Percent of Holdings** |
| 2/1/2023[23] | 30,000 | $140.26 | $4,207,875 | $3,934,275 | $2,516,175 | 30.0% |
| 12/14/2023[24] | 79,600 | $150.75 | $11,999,342 | $11,273,389 | $7,510,698 | 38.6% |
| 2/26/2024 | 43,072 | $160.48 | $6,912,048 | N/A* | $4,483,218 | 34.0% |
| 3/4/2024 | 50,000 | $173.85 | $8,692,350 | $7,568,046 | $5,872,850 | 37.4% |
| 11/26/2024 | 61,079 | $95.21 | $5,815,130 | N/A* | $2,370,885 | 46.0% |
| 11/27/2024 | 59,019 | $92.64 | $5,467,656 | N/A* | $2,139,575 | 82.4% |
| Totals | 322,770 | | $43,094,401 | ≥$22,775,710 | $24,893,401 | |

*The purchase prices for shares sold in this transaction are not listed in the corresponding Form 4.
**Shares sold as a percentage of holdings of Atkore common stock at time of sale.

533. By comparison, during the Control Period preceding the Class Period, Defendant Waltz sold only 213,059 shares of Atkore stock, for proceeds of $15,252,314. Thus, via his Class Period stock sales, Defendant Waltz sold over 51% more shares, and received *over three times* as much in proceeds, as he did through his Control Period sales.

534. Further, in both the Class Period and Control Period, Defendant Waltz made three option-related sales, i.e., sales for which the corresponding Form 4 allows calculation of net profits. Through his three Class Period option-related sales, Waltz reaped profits of approximately $22.8

[23] Defendant Waltz made his February 1, 2023 stock sale pursuant to a Rule 10b5-1 trading plan adopted on November 12, 2022, by which time he was already privy to material non-public information about Atkore's non-competitive pricing behavior, and price-fixing conspiracy, and their impact on the Company's revenues and stock price.

[24] Defendant Waltz made his December 14, 2023 stock sale pursuant to a Rule 10b5-1 trading plan adopted on August 23, 2023, by which time he was already privy to material non-public information about Atkore's non-competitive pricing behavior, and price-fixing conspiracy, and their impact on the Company's revenues and stock price.

million—about *six times* as much as the approximately $3.8 million he made in profits through his three Control Period option-related sales.

535. Waltz's Class Period stock sales were suspiciously timed to take advantage of the market's ignorance of Atkore's anti-competitive PVC Pipe pricing and PVC Pipe price-fixing conspiracy, which artificially inflated Atkore's financial performance and securities prices. For example, on February 1, 2023, the day Waltz made multiple false and misleading statements to investors, and publicly announced that Atkore was raising its fiscal year guidance by ***$100 million*** due to Atkore continuing to sustain elevated pricing in defiance of pricing normalization trends (which contributed to a 14.33% increase in Atkore's stock price), Waltz sold 30,000 shares of his Atkore stock at an artificially-inflated price in a single transaction, reaping $4.2 million dollars in insider proceeds.

536. Similarly, on December 14, 2023, the same day Atkore experienced a 10% increase in its stock price, Waltz sold 79,600 of his Atkore stock at artificially inflated prices, reaping nearly $12 million in illegal insider proceeds.

537. As indicated by the two footnotes to Defendant Waltz's chart above, Waltz executed his first two Class Period sales (on February 1, 2023 and December 14, 2023) via Rule 10b5-1 trading plans. However, Waltz then suspiciously changed his stock-selling approach—all of his remaining Class Period sales of Atkore stock, beginning in February 2024, were ***not*** pursuant to Rule 10b5-1 trading plans. This supports an inference that Waltz was aware of negative, time-sensitive material non-public information about Atkore's financial condition, and in such a hurry to unload his Atkore stock that (contrary to his prior practice) he sold tens of millions of dollars of Atkore stock into the open market without taking the time to enter into a Rule 10b5-1 plan.

538.    As alleged above, OPIS reports show that Atkore's non-competitive price-setting behavior faced certain specific, undisclosed challenges in February 2024. At that very time, Waltz sold over *43,000* of his shares in a single transaction on February 26, 2024 (without a Rule 10b5-1 trading plan), reaping nearly *$7 million* in proceeds. As the conspiracy continued to face complications, and Atkore and its competitors failed to achieve a price increase for March 2024, Waltz sold another *50,000* of his shares on March 4, 2024 (again without a Rule 10b5-1 trading plan), reaping over *$8.6 million* in proceeds. Waltz's February 26 and March 4, 2024 sales came soon before the Class Period high price for Atkore stock—$194.98, reached on April 1, 2024—which was the *highest-ever* Atkore stock price to date. These sales also came just over two months before the truth about Atkore's artificially inflated financials was partially revealed to the market via the May 7, 2024 corrective disclosure that lowered Atkore's fiscal 2024 EBITDA guidance from a range of $900-$950 million to a range of $850-$900 million, which drove Atkore's stock price down by over 12.5%.

539.    On November 26 and 27, 2024, days after Waltz made the November 21, 2024 false and misleading statements to investors set forth above (including that "pricing could stabilize and potentially improve with the clarity on the allowable import population," which contributed to a cumulative 12% increase in Atkore's stock price), Waltz sold 120,098 shares of his Atkore stock at inflated prices in two separate transactions (neither of which was made under a Rule 10b5-1 trading plan), reaping a total of nearly *$11.3 million* in insider proceeds. These sales came less than three months before the truth about Atkore's artificially inflated financials was partially revealed to the market via the February 4 and February 18, 2024 corrective disclosures that drove Atkore's stock price down a cumulative 22.76%.

540.     Defendant Waltz benefited during the Class Period from exercising Atkore stock options with exceedingly low exercise prices and selling the resulting stock at artificially inflated prices. For example, on February 1, 2023, Waltz exercised options to purchase 30,000 Atkore shares at an exercise price of only $9.12 per share and immediately sold those shares in the open market for $140.26 per share, netting ***$3,934,275*** in profits. Similarly, on December 14, 2023, Waltz exercised options to purchase 79,600 Atkore shares at an exercise price of only $9.12 per share and immediately sold those shares in the open market for $150.75 per share, netting $***11,273,389*** in profits. On March 4, 2024, Waltz exercised options to purchase 50,000 Atkore shares at exercise prices between $21.45 and $25.91 and immediately sold those shares in the open market for $173.85 per share, netting ***$7,568,046*** in profits.

541.     **Defendant Johnson.** During the Class Period, Defendant Johnson sold over 22,700 shares of Atkore common stock for proceeds of approximately $3.7 million. Through these sales, which were unusual in both timing and amount (including their difference from Johnson's stock sales during the Control Period), Johnson avoided losses of $2,412,996.[25] Each of these sales comprised a significant percentage of the Atkore common stock Johnson held at the time of the sale.

542.     Defendant Johnson's insider sales during the Class Period are set forth below:

---

[25] The "losses avoided" number is the amount by which the actual proceeds of these sales exceeded the hypothetical proceeds from sales of the same amount of Atkore stock at the August 5, 2025 closing price of $56.39, after the corrective disclosures alleged herein removed artificial inflation from the stock price.

| Defendant Johnson's Class Period Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| Date | Shares Sold | Price | Proceeds | Profits | Losses Avoided | Percent of Holdings Sold** |
| 3/9/2023[26] | 10,000 | $149.79 | $1,497,877 | N/A* | $933,977 | 24.9% |
| 3/4/2024 | 12,701 | $172.84 | $2,195,228 | N/A* | $1,479,019 | 28.1% |
| Totals | 22,701 | | $3,693,105 | | $2,412,996 | |
| *The purchase prices for shares sold in this transaction are not listed in the corresponding Form 4. **Shares sold as a percentage of holdings of Atkore common stock at time of sale. | | | | | | |

543.    By comparison, during the Control Period, Defendant Johnson made only a single sale of 15,500 shares for proceeds of $1.83 million. Thus, via his Class Period stock sales, Johnson sold over 46% more shares, and received *over twice* as much in proceeds, as he did through his Control Period sales.

544.    Defendant Johnson's Class Period stock sales were suspiciously timed to take advantage of the market's ignorance of Atkore's anti-competitive PVC Pipe pricing and PVC Pipe price-fixing conspiracy, which artificially inflated Atkore's performance and stock price. For example, Johnson's March 9, 2023 sale, at a price of $149.79, was just four trading days after the Class Period high price for Atkore stock up to that point—$154.86, reached on March 3, 2023.

545.    Further, as OPIS reports show, the price-fixing conspiracy was facing challenges in February 2024 and failed to achieve a price increase for March 2024. As this was happening, Defendant Johnson seized on the opportunity to unload over *12,700* of his shares in an open market

---

[26] Defendant Johnson made his March 9, 2023 stock sale pursuant to a Rule 10b5-1 trading plan adopted on February 6, 2023, by which time he was already privy to material nonpublic information about the effects of Atkore's anti-competitive price-setting scheme on the Company's financial performance.

sale on March 4, 2024, reaping nearly **$2.2 million** in proceeds. This sale came soon before the Class Period high price for Atkore stock—$194.98, reached on April 1, 2024—which also represents the **highest-ever** Atkore stock price to date. This sale also came just over two months before the truth about Atkore's artificially-inflated financials was partially revealed via the May 7, 2024 corrective disclosure that drove Atkore's stock price down over 12.5%.

546.    During the Class Period, as indicated by the footnote to Johnson's chart above, he executed his first Class Period sale (on March 9, 2023) via a Rule 10b5-1 trading plan. However, Johnson then suspiciously changed his stock-selling approach during the Class Period and made his remaining Class Period Atkore stock sales—in March 2024—**not** pursuant to a Rule 10b5-1 trading plan. This supports that Johnson was aware of negative and time-sensitive material, non-public information about Atkore's financial condition, and in such a hurry to unload his Atkore stock that (contrary to his prior practice) he sold millions of dollars of Atkore stock into the open market without taking the time to enter into a Rule 10b5-1 plan.

547.    All of Johnson's Class Period acquisitions of Atkore stock involved acquiring shares of stock through Restricted Stock Units and Performance Stock Units, for which Johnson did not pay any of his own cash. For example, on November 11, 2022, Johnson acquired 3,320 Atkore shares as Restricted Stock Units, for which he paid $0. On November 21, 2022, Johnson acquired 14,239 Atkore shares as Performance Stock Units, for which he paid $0. On November 13, 2023, Johnson acquired 4,749 Atkore shares as Restricted Stock Units, for which he paid $0.

548.    **Defendant Pregenzer.** During the Class Period, Defendant Pregenzer sold over 15,300 shares of Atkore common stock for proceeds of approximately $2.5 million. Through these sales, which were unusual in both timing and amount (including their difference from Pregenzer's stock sales during the Control Period), Pregenzer profited by **at least** $283,528 and avoided losses

of $1,590,927.[27] Each of these sales comprised a significant percentage of the Atkore common stock Pregenzer held at the time of the sale.

549.    Defendant Pregenzer's insider sales during the Class Period are set forth below:

| Defendant Pregenzer's Class Period Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Shares Sold** | **Price** | **Proceeds** | **Profits** | **Losses Avoided** | **Percent of Holdings Sold**\*\* |
| 3/1/2023 | 4,754 | $150.00 | $713,100 | N/A\* | $445,022 | 15.3% |
| 2/26/2024 | 6,548 | $158.49 | $1,037,824 | N/A\* | $668,582 | 17.7% |
| 3/4/2024 | 4,044 | $174.42 | $705,364 | $283,528 | $477,323 | 11.7% |
| **Totals** | **15,346** | | **$2,456,288** | **≥$283,528** | **$1,590,927** | |
| *The purchase prices for shares sold in this transaction are not listed in the corresponding Form 4. **Shares sold as a percentage of holdings of Atkore common stock at time of sale. | | | | | | |

550.    By comparison, during the Control Period, Defendant Pregenzer sold only approximately 2,800 shares of Atkore stock for proceeds of approximately $318,000. Thus, via his Class Period stock sales, Pregenzer sold over five times more shares and received ***nearly eight times*** as much in proceeds as he did through his Control Period sales.

551.    Defendant Pregenzer's sales during the Class Period were suspiciously timed to take advantage of the market's ignorance of Atkore's anti-competitive PVC Pipe pricing and the PVC price-fixing conspiracy, which artificially inflated Atkore's performance. For example, Pregenzer's March 1, 2023 sale, at a price of $150.00, was made just two trading days before the

---

[27] The "losses avoided" number is the amount by which the actual proceeds of these sales exceeded the hypothetical proceeds from sales of the same amount of Atkore stock at the August 5, 2025 closing price of $56.39, after the corrective disclosures alleged herein removed artificial inflation from the stock price.

Class Period high price for Atkore stock through March 2023—$154.86, reached on March 3, 2023.

552. Further, as OPIS reports show, the conspiracy was starting to unravel in February 2024, and Defendant Pregenzer sold over ***6,500*** of his shares in a single transaction on February 26, 2024, reaping over ***$1 million*** in proceeds. As the conspiracy continued to deteriorate and Atkore and its competitors failed to achieve a price increase for March 2024, Defendant Pregenzer reaped over ***$700,000*** in proceeds by selling over ***4,000*** of his shares on March 4, 2024. This was the very first day he could sell these shares, which he had acquired the same day through the exercise of options that had become exercisable the same day.

553. These February 26 and March 4, 2024 sales came soon before the Class Period high price for Atkore stock—$194.98, reached on April 1, 2024—which also represents the ***highest-ever*** Atkore stock price to date. These sales also came just over two months before the truth about Atkore's artificially inflated financials was partially revealed via the May 7, 2024 corrective disclosure that drove Atkore's stock price down over 12.5%.

554. During the Class Period, Pregenzer made ***none*** of his sales pursuant to a Rule 10b5-1 trading plan. This supports that Pregenzer was aware of negative and time-sensitive material, non-public information about Atkore's financial condition, and in such a hurry to unload his Atkore stock that he sold millions of dollars of Atkore stock into the open market without taking the time to enter into a Rule 10b5-1 plan

555. Defendant Pregenzer also benefited during the Class Period by exercising Atkore stock options with comparatively low exercise prices and selling the resulting stock at artificially inflated prices. For example, on March 4, 2024, Pregenzer exercised options to purchase a block of 2,503 Atkore shares for $105.94 per share and an additional block of 1,541 Atkore shares for

$101.66 per share. He immediately sold all 4,044 of these shares for $174.42 per share, netting **$283,528** in profit.

556. All of Pregenzer's remaining Class Period acquisitions of Atkore stock involved acquiring shares through Restricted Stock Units and Performance Stock Units, for which Pregenzer did not pay any of his own cash. For example, on November 11, 2022, Pregenzer acquired 2,459 Atkore shares as Restricted Stock Units for which he paid $0 per share. Similarly on November 21, 2022, Pregenzer acquired 9,858 shares of Atkore shares as Performance Stock Units for which he paid $0 per share. Further, on November 17, 2023, Pregenzer acquired 18,118 Atkore shares as Performance Stock Units for which he paid $0 per share. On November 16, 2024, Pregenzer acquired 4,462 Atkore shares as Performance Stock units for which he paid $0 per share. On November 18, 2024, Pregenzer acquired 6,369 Atkore shares as Restricted Stock Units for which he paid $0 per share.

557. As demonstrated by the chart below, these Defendants' stock sales (represented by the red, black and gray bars at the bottom of the price chart) benefited from Atkore's artificially inflated and record high stock prices during the Class Period and closely preceded periods of steep decline in Atkore's stock price:



558. **Defendant Deitzer.** Prior to becoming CFO in August 2024 (i.e., after three corrective disclosures had already entered the market), Defendant Deitzer did not publicly report his Atkore stock holdings, and there is no way for Lead Plaintiff to ascertain, absent discovery, whether and when Mr. Deitzer may have sold shares of Atkore stock prior to August 2024. His Form 3 Initial Statement of Beneficial Ownership of Securities, filed with the SEC and dated August 9, 2024, disclosed that, as of August 2024, Deitzer only held approximately 4,691 shares of Atkore common stock and vested and unvested restricted stock units.

559. Defendant Deitzer did not have any reported cash purchases of Atkore stock during the Class Period. All of Deitzer's reported Class Period acquisitions of Atkore stock involved

acquiring shares through Restricted Stock Units and Performance Stock Units, for which he did not pay any of his own cash. For example, on November 16, 2024, Deitzer acquired 953 Atkore shares as Performance Stock Units, which he paid $0 to acquire. On November 18, 2024, Deitzer acquired 5,459 Atkore shares as Restricted Stock Units.

> **D.** **The Departures of Defendants Johnson and Waltz, and Significant PVC Pipe Personnel, Were Suspiciously Timed**

560. Defendant Johnson, Atkore's former CFO and CAO, announced his resignation on July 23, 2024—after the first alleged corrective disclosure on May 7, 2024 (when Atkore lowered its fiscal 2024 EBITDA guidance from a range of $900-$950 million to a range of $850-$900 million, which drove Atkore's stock price down by over 12.5%), and just hours before ManBear released the ManBear Report exposing Atkore's anti-competitive PVC Pipe pricing and participation in the PVC pipe price-fixing scheme. His resignation was effective August 9, 2024, at which time Defendant Deitzer became the new Atkore CFO.

561. Further, whereas Defendant Johnson served as both CFO and CAO during his tenure with the Company, Atkore separated the two roles upon his departure. Defendant Deitzer stepped into the CFO role and James Alvey, the Company's Corporate Controller and a former Ernst & Young auditor, took on the additional responsibilities of CAO. This disaggregation of executive responsibility for finances and accounting, on top of Johnson's already suspicious departure, further supports an inference of Johnson's scienter.

562. Defendant Waltz announced his resignation as CEO on the morning of August 5, 2025, the day the Company released its earnings for the third quarter of 2025 and announced a $50 million cut to projected adjusted EBITDA for 2026 due to continuing declines in PVC pricing. These revelations caused Atkore's stock to drop by over 26% in a single day (Atkore's largest one-day percentage decline during the Class Period) and caused concerned securities analysts to

sharply cut their price targets for Atkore stock. Defendant Waltz's "unexpected" resignation was suspiciously timed and supports an inference of scienter.

563.    Other important Atkore personnel either departed or announced their departures from Atkore around the same time as Johnson and Waltz. Jeff Sherman, former VP/GM of Plastic Pipe and Conduit at Atkore, left Atkore at around the same time as Johnson, in July or August of 2024. Sherman's tenure at Atkore is currently missing from his LinkedIn profile, creating a gap between his work as President and Co-Owner of Ridgeline Pipe Manufacturing (which Atkore acquired in October 2013) and his current employer (where he started in November 2024). Serge Boutros, who had served as President of Atkore's Plastics business unit since May 2024, also left Atkore at around the same time as Defendant Waltz in August 2025.

**E.    Defendants Waltz, Johnson, and Deitzer Reaped Significant Incentive Compensation from Artificially Inflated PVC Prices and Atkore's Artificially Inflated Stock Price**

564.    As top executives of Atkore, Defendants Waltz, Johnson, Pregenzer and Deitzer were eligible for significant cash and stock-based incentive compensation. These executives' performance-based bonuses were 80% dependent upon Atkore meeting specific EBITDA benchmarks. Thus, they had a powerful incentive to set and maintain artificially high prices for PVC Pipe, in order to increase the Company's EBITDA and trigger lucrative payouts to themselves. The existence of this financial incentive supports an inference of scienter—as does the actual annual total compensation of the Individual Defendants, which was far higher during the Class Period than years prior.

565.    Throughout the Class Period, the compensation of the Individual Defendants was explicitly "tied to" Atkore's "performance during the year" on metrics including adjusted

EBITDA.[28] Atkore's artificially inflated PVC Pipe prices during the Class Period in turn artificially inflated these metrics, which far exceeded even the Company's projected "maximum" annual goals. The Individual Defendants consequently reaped millions of dollars in excess total compensation relative to their total compensation in years before the Class Period.

566.    For example, in 2022, Defendant Waltz had a $1 million base salary. But because Atkore's 2022 adjusted EBIDTA of over $1.3 billion exceeded even the "maximum" goal of approximately $980 million, Waltz's total compensation for the year was over $7.4 million. By contrast, in 2020, Waltz's total compensation was $3.4 million. Notably, the portion of Waltz's cash compensation that came from Atkore's "incentive plan" was approximately $730,000 in 2020, but skyrocketed to over $2.6 million in 2022—a *more than threefold* increase.

567.    Defendant Johnson similarly reaped significant financial gains from the Company's price-fixing activity. Between 2020 and 2022, Johnson's total compensation rose by 67%, increasing from approximately $1.5 million to over $2.5 million. Notably, the portion of Johnson's cash compensation that came from Atkore's "incentive plan" was approximately $273,000 in 2020 and rose to nearly $873,000 in 2022—again, a *more than threefold* increase.

568.    Defendant Pregenzer reaped similar significant financial gains from the Company's price-fixing activity. Pregenzer's total compensation in 2020 was just over $1 million, compared to a total compensation of over $1.9 million in 2022. Notably, the portion of Pregenzer's cash compensation that came from Atkore's "incentive plan" rose from approximately $253,000 in 2020 to nearly $742,000 in 2022—a *nearly threefold* increase.

569.    The Company's 2022 Proxy Statement stated that the "significant increase in Adjusted EBITDA" that rewarded Defendants Waltz, Johnson and Pregenzer with these inflated

---

[28] 2022 proxy at 23-45.

compensation packages "is ***primarily attributed to a continued increase in net sales and pricing of PVC products***."

570.    In 2022, Defendants Waltz, Johnson and Pregenzer received a payout of 200% of the target award under the part of the Company's long-term incentive plan that rewarded "net income performance." According to Atkore's 2022 Proxy Statement, this "maximum achievement and payout of Adjusted Net Income versus targeted levels is ***directly attributed*** to the increase in net sales which were mostly ***driven by the plastic pipe and conduit category*** within the Electrical business unit"—which encompassed the Company's PVC Pipe business.

571.    Crucially, in 2022, Defendants Waltz, Johnson and Pregenzer received 150% of the target award payout under the part of Atkore's long-term incentive plan that rewarded the performance of Atkore's stock price over the three-year period 2020 to 2022. Along with the net income performance described above, the performance of Atkore's stock over that period— artificially inflated by Defendants' false statements concealing Atkore's anti-competitive PVC Pipe pricing and PVC Pipe price-fixing collusion propping up PVC pipe prices—thus enabled Waltz, Johnson and Pregenzer to receive, respectively, over 62,000 shares, over 14,000 shares, and over 11,000 shares of Atkore stock. At market close on the date of publication of Atkore's 2022 Proxy Statement, Waltz's share award was worth over $7.8 million, Johnson's was worth over $1.7 million, and Pregenzer's was worth over $1.4 million.

572.    Despite noticeably worse Atkore EBITDA performance in 2023 and 2024, Defendants Waltz, Johnson and Pregenzer reaped similar share awards in those years due to the cumulative performance of Atkore's stock price over the preceding three-year period. In 2023, Waltz, Johnson and Pregenzer received, respectively, nearly 88,000 shares, nearly 21,000 shares, and over 18,000 shares of Atkore common stock. At market close on the date of publication of

Atkore's 2023 Proxy Statement, Waltz's share award was worth over $13.7 million, Johnson's was worth over $3.2 million, and Pregenzer's was worth over $2.8 million.

573. In 2024, Defendants Waltz, Pregenzer and Deitzer (who took Defendant Johnson's place as CFO effective August 9, 2024) received, respectively, nearly 23,000 shares, nearly 4,500 shares, and nearly 1,000 shares of Atkore common stock. At market close on the date of publication of Atkore's 2024 Proxy Statement, Waltz's share award was worth nearly $2 million, Pregenzer's was worth nearly $379,000, and Deitzer's was worth over $80,000.

574. This significant financial gain was artificially inflated compared to the compensation that Defendants would have received absent the artificial inflation in Atkore's stock price throughout the Class Period, which was a **_direct_** result of Defendants' false and misleading statements and omissions. Defendants' incentive compensation during the Class Period thus supports a strong inference of scienter on the part of Defendants Waltz, Johnson, Pregenzer and Deitzer.

## F. Defendants Were Confronted with Direct Evidence of Price-Fixing Via OPIS No Later Than the July 24, 2024 ManBear Report

575. Defendants were placed on notice of Atkore's alleged PVC Pipe price-fixing conspiracy with its competitors—or were, at the very least, extremely reckless in not knowing about it—by no later than July 24, 2024, upon release of the ManBear Report. The Report contained extensive direct evidence of this collusion via quotes and screenshots from over 20 OPIS reports, dated between January 20, 2022 and July 19, 2024.

576. The quotes, screenshots and the ManBear Report's analysis demonstrated PVC Pipe converters' mutual communication of forward-pricing goals and intentions for PVC Pipe pricing. For example, the ManBear Report included a screenshot of OPIS's June 21, 2024 report that "converters conceded **_they need to figure out how to push prices higher_**," that "**_[t]he_**

*consensus this week was for a single price increase* . . . [t]hen, if that works, do it again and again until it stops working," and that "*[c]onduit converters have been successful with this strategy in the past*." The ManBear Report also included a screenshot of the next week's OPIS report, dated June 28, 2024, which stated that, since the prior week's issue, "[c]onverters" including "Atkore companies" had "start[ed] a price increase effort," increasing PVC Pipe prices with nearly simultaneous timing.

577.     The ManBear Report also highlighted the FTC's definition of "[i]llegal price fixing," as well as FTC language cautioning that "exchanging price or other sensitive business data among competitors" through an "industry group . . . can raise antitrust concerns if it encourages more uniform prices than otherwise would exist." This language describes *precisely* what Atkore and its supposed competitors were doing via OPIS.

578.     Upon publication of the ManBear Report on July 24, 2024, Defendants either knew of or were reckless in not knowing of its contents. During Atkore's August 6, 2024 earnings call for the second quarter of 2024, Waltz acknowledged that he in fact knew about the ManBear Report. When asked by a securities analyst to address the ManBear Report and its accusations, Waltz responded, "I'm going to claim that report is unsubstantiated from the conclusions it tries to make." No later than August 6, 2024, Waltz admitted publicly he knew of the ManBear Report's contents well enough to characterize "the conclusions it tries to make" as "unsubstantiated." If any Individual Defendant claims to have *not* known the Report's contents after August 6, 2024, that supposed lack of knowledge was severely reckless.

### G.     Atkore Is Currently Facing a Department of Justice Investigation and Multiple Civil Antitrust Lawsuits

579.     The Company is currently both the target of an investigation by the Antitrust Division of the U.S. Department of Justice and a defendant in several civil antitrust class action

lawsuits brought on behalf of market participants who overpaid for PVC Pipe as result of the alleged price-fixing by Atkore and its co-conspirators. Both the DOJ's investigation and these civil lawsuits further support an inference of scienter.

580.     Beginning on August 23, 2024, Atkore was named in a series of antitrust class action suits alleging that Atkore and other U.S.-based PVC Pipe manufacturers conspired to artificially inflate the price of PVC Pipes by exchanging competitively sensitive business information, including information regarding future PVC Pipe pricing and sales through OPIS. *See, e.g.*, *In re PVC Pipe Antitrust Litig.*, No. 1:24-cv-07639 (N.D. Ill. Aug. 23, 2024).

581.     Further, on February 13, 2025, Atkore received a grand jury subpoena from the DOJ's Antitrust Division directing it to produce documents related to its PVC Pipe pricing. That subpoena indicates that the DOJ is considering pursuing criminal charges against Atkore, and follows a similar August 24, 2024 subpoena from the DOJ to Otter Tail, an Atkore competitor that the ManBear Report identified as a co-conspirator in the PVC pipe price-fixing.

582.     In addition, the timing of Atkore's receipt of a subpoena after the DOJ subpoenaed Otter Tail strongly indicates that Otter Tail's information and documents provided in response to the subpoena further indicated to the DOJ that Atkore was involved in price-fixing, such as those detailed in the civil antitrust referenced complaints.

## H.     OPIS Abruptly Ceased Publication of the *PetroChem Wire* Report After It Received a DOJ Subpoena, and OPIS Has Settled with Antitrust Plaintiffs

583.     On December 13, 2024, less than four months after the price-fixing allegations first came to light, OPIS abruptly ended publication of the *PetroChem Wire* report, the conduit through which Atkore and its co-conspirators perpetrated their scheme to fix PVC Pipe prices.

584.     Just a month later, OPIS's parent company, News Corp., also received a grand jury subpoena from the DOJ demanding that OPIS produce "documents related to the pricing of PVC

Pipe and the publication of the PVC and Pipe Weekly Report." The timing and circumstances of the decision to end this publication are highly suspicious, particularly considering the DOJ's investigation, and imply that OPIS saw potential liability if it continued to publish the *PetroChem Wire* report.

585.    As alleged further above, OPIS also quickly reached a $6 million settlement with the civil plaintiffs who named OPIS (along with Atkore and other alleged co-conspirators) in their antitrust class action lawsuits alleging price-fixing of PVC Pipe filed in August of 2024. OPIS's decision to quickly settle the antitrust claims against it just nine months later (in May of 2025) supports an inference that OPIS understood it faced potential antitrust liability in continuing to defend the suit. As also further alleged above, as part of the settlement, OPIS agreed to cooperate with the civil antitrust plaintiffs and provide them with documents and testimony. On August 18, 2025, the civil antitrust plaintiffs incorporated numerous pages of information from OPIS in their amended complaints, filed under seal and in redacted form in this Court.

### I.    Atkore's Core Operations Were the Subject of Defendants' Material Misrepresentations and Omissions

586.    Defendants' false and misleading statements and omissions concerned Atkore's core operations, further bolstering a strong inference of scienter. The false and misleading statements and omissions alleged herein concern topics including: (i) Atkore's purportedly sustainable margins, revenues, and profits in its PVC business; (ii) the sources of its financial performance, generally and as to quarterly, quarter-over-quarter, and year-over-year results, particularly as to PVC Pipe; (iii) the purported competitiveness of the PVC Pipe industry, especially as to pricing, and the Company's purported competitive advantages; and (iv) the reasons for poor financial performance during certain quarters.

587.     Defendants' statements and omissions concerned Atkore's financial performance and market position, specifically with regard to its Electrical segment and PVC Pipe business. That Electrical segment comprised the vast majority of Atkore's business. In fiscal year 2023, Electrical accounted for 76% of sales and nearly all—91%—of EBITDA, and similar predominance continued in fiscal year 2024. Further, PVC Pipe was among Atkore's most important products. sales of plastic pipe, conduit, and fittings alone accounted for a significant portion of the Company's sales, representing 37% of total sales for fiscal year 2023.

588.     Indeed, as late as the Company's May 7, 2025 earnings call for the second quarter of 2025, an analyst asked Defendant Waltz about the "longer term" importance of PVC Pipe to Atkore's "overall business," and Waltz reiterated that it was "a key part of our business."

589.     Further, product pricing writ large was a core concern of Defendants and the Company during the Class Period. FE-1 explained that under the Company's "Atkore Business System," specific strategic objectives were defined, overseen by an executive sponsor through a three-year timeline, and ultimately instituted as part of the regular business process. Because there was little difference between Atkore's and its supposed competitors' product offerings, price was *the* critical factor in Atkore's business, and was therefore the subject of the Company's "pricing excellence" objective—one of the Atkore Business System's founding strategic objectives. Beginning in 2017 or 2018, FE-1 himself served as executive sponsor for pricing excellence, which made the "spread" for each Atkore product—i.e., the difference between manufacturing cost and sale price—the key metric in measuring pricing performance. Underscoring their central importance, the Company measured the performance of its Presidents, General Managers, and inside sales teams based on spreads.

590. Thus, by the time the Class Period began, intense and constant focus on product spreads was central to the Company's regular operations. As described above, those operations included a constant flow of information regarding PVC Pipe pricing between and among the PVC inside sales team, former GM of PVC Jeff Sherman, and Defendants Waltz, Johnson, Deitzer and Pregenzer.

### J. The Speaking Defendants Spoke Frequently and with Familiarity on the Topics of Defendants' Misrepresentations and Omissions

591. The Speaking Defendants' false and misleading statements and omissions concerned Atkore's pricing practices, a topic on which Defendants spoke frequently and with great claimed familiarity. This bolsters a strong inference of their scienter. During the Class Period, Defendants frequently spoke about Atkore's purportedly sustainable margins and profits, and about the purported competitiveness of the PVC Pipe industry, especially as to pricing, and the Company's purported competitive advantages therein.

592. By virtue of their positions within Atkore, the Speaking Defendants had extensive insight into Atkore's crucially important Electrical segment and PVC Pipe business. Defendant Waltz had ultimate responsibility for decisions crucial to Atkore's operations and, according to Atkore's 2022 Proxy Statement, Waltz had "intimate knowledge of the Company's day-to-day operations as President and Chief Executive Officer." Both Defendant Johnson and Defendant Deitzer were also similarly involved in pricing decisions in their respective tenures as CFO.

593. As CEO, Defendant Waltz led Atkore's earnings calls each quarter. Defendants Johnson and Deitzer, during their respective tenures as CFO, elaborated on the Company's financial results in detail on those calls. In their capacities communicating the Company's performance to investors and analysts, the Speaking Defendants were responsible for the accuracy and completeness of their statements. Indeed, Defendant Waltz, and Defendants Johnson and

Deitzer during their respective tenures as CFO, certified that they had reviewed those very same financial results, as included in the Company's quarterly and annual SEC filings on Forms 10-Q and 10-K, and affirmed that the Company's statement of those results were complete and accurate.

594. The Speaking Defendants also made certain of their statements at industry conferences, where Defendants regularly addressed market analysts and investors regarding Atkore's product pricing, financial results and outlook, and competitive position within the market. Speaking in these settings, and on these topics, required the Speaking Defendants to assess and understand the veracity of their statements and indicated to the market that their statements carried official authority.

595. Defendant Waltz demonstrated his close knowledge of Atkore's pricing dynamics, and PVC Pipe pricing in particular, on multiple occasions:

- On the Company's August 6, 2024 earnings call for the fiscal third quarter of 2024, Waltz was asked about "the noise we're hearing about pricing in PVC," and responded that he was "proud of our internal pricing mechanisms," which included a "weekly call, scatter diagrams, [and] apps that tell us pricing."

- On the Company's February 4, 2025 earnings call for the fiscal first quarter of 2025, Waltz was asked about "this quarter's revision," and responded:

    I think it's pricing. . . . It's hard to say to go, well, hold it. ***Who was the one that dropped their price or now that somebody dropped their price? Even a well-known, recognized competitor of ours***, call it a Tier 1 person has been around for a century or something[,] that PVC hasn't been along but you get it. They go, ***hey, now they're matching or now they think that's the market price.***

- During his February 18, 2025 presentation to Citi's Global Industrial Tech and Mobility Conference, Waltz was asked by a Citigroup analyst to talk about "what differentiates Atkore," and responded:

    [T]here is absolutely a sustainable competitive advantage with Atkore. . . . But what may have got lost is to go, if we are, pick whatever number, 3%, 5%, 7% higher than our competition, if you're making -- selling something for $700 and you say 5%, we can sell for $735. But if the market pricing drops from $700 to $300, we cannot still be selling at $735. Can we be selling at $315 versus $300? The answer is yes. And the only thing I'd say even with

> commodities, like again, is the service breadth of our products. But we do have a 10% plus product vitality that I don't think anybody in our industry for our type of products have. So again, that does help with both pricing differential, growth preference and so forth.

596.    Defendant Johnson demonstrated his knowledge of and involvement in PVC pricing decisions on the following occasions:

- On June 14, 2023, speaking the Wells Fargo Industrials Conference, Johnson stated that he was involved in the routine meetings with CEO Waltz where Atkore's executive leadership discussed "the dynamics of pricing and what [Atkore was] going to do the next week."

- On the Company's August 6, 2024 earnings call for the fiscal third quarter of 2024, Johnson was asked by a CJS Securities analyst whether "PVC pricing still represents . . . the biggest pricing risk moving forward." Johnson replied, "we don't talk enough about the demand aspect of pricing. If we had that type of demand [as during COVID] right now, I don't think we'd be talking about pricing like we're talking about today. So I think in that regard, the reason why we would say PVC for next year is probably just more uncertainty around the PVC market for next year as it goes in and affects pricing."

597.    After Defendant Deitzer took over as Atkore CFO, he too demonstrated his knowledge of and involvement in PVC pricing:

- On the Company's November 21, 2024 earnings call for the fiscal third quarter of 2024, Deitzer discussed the "price normalization, primarily in our PVC business," that "continued through FY 2024," and forecasted that "pricing for our PVC conduit continues to be challenged." Asked by a Keybanc analyst about the "$70 million more pricing pressure than previously expected," Deitzer drew on his knowledge of the Company's internal PVC pricing analysis in responding that "*we* see potential for further degradation than initially anticipated on the PVC electrical conduit side."

## VIII.  ADDITIONAL LOSS CAUSATION ALLEGATIONS

598.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Lead Plaintiff and the Class.

599.    As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Atkore's common stock and operated as a fraud or deceit on the

Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Atkore's stock fell precipitously, as the prior artificial inflation came out of the price.

600.   As the truth was revealed to the public, piece by piece, the artificial inflation in Atkore's stock price was removed on May 7, 2024; July 24, 2024; August 6, 2024; November 8, 2024; February 4, 2025; February 18, 2025; and August 5, 2025. Revelations on these days, described in greater detail above (¶¶251-301), revealed on a piecemeal basis the true nature and extent of Defendants' misrepresentations concerning, among other things: (i) Atkore's purportedly sustainable margins and profits; (ii) the purported competitiveness of the PVC pipe industry, especially as to pricing; and (iii) the Company's purported competitive advantages in the PVC pipe industry, especially as to pricing.

601.   As illustrated by the chart below, each of these loss-causing disclosures was statistically significant, occurring against a backdrop of little to no movement in the wider stock market:

| Date of Corrective Disclosure | Corrective Disclosure | Atkore Stock Price Change | DJI / S&P 500 / Nasdaq Price Change |
|---|---|---|---|
| **May 7, 2024** | ATKR 2Q24 earnings | -$22.06<br>-12.51% | DJI: **+0.1%**<br>S&P 500: **+0.1%**<br>Nasdaq: **-0.1%** |
| **July 24, 2024** | ManBear Report released; Defendant Johnson's departure announced | -$12.37<br>-8.53% | DJI: **-1.25%**<br>S&P 500: **-2.31%**<br>Nasdaq: **-3.64%** |
| **August 6, 2024** | ATKR 3Q24 earnings | -$17.41<br>-14.70% | DJI: **+0.8%**<br>S&P 500: **+1%**<br>Nasdaq: **+1%** |
| **November 8, 2024** | Otter Tail announces DOJ subpoena; RBC holds call with law professor | -$7.39<br>-7.20% | DJI: **+0.59%**<br>S&P 500: **+0.38%**<br>Nasdaq: **+0.09%** |
| **February 4, 2025** | ATKR 1Q25 earnings | -$15.59 | DJI: **+0.3%** |

| Date of Corrective Disclosure | Corrective Disclosure | Atkore Stock Price Change | DJI / S&P 500 / Nasdaq Price Change |
|---|---|---|---|
| | | -19.56% | S&P 500: **0.7%**<br>Nasdaq: **+1.4%** |
| **February 18, 2025** | First trading day after ATKR discloses DOJ subpoena | -$2.32<br>-3.20% | DJI: **+0.2%**<br>S&P 500: **+0.24%**<br>Nasdaq: **+0.07%** |
| **August 5, 2025** | ATKR 3Q25 earnings; Defendant Waltz's departure announced | -$20.16<br>-26.34% | DJI: **-2.6%**<br>S&P 500: **-0.5%**<br>Nasdaq: **-0.7%** |

602. None of these disclosures was sufficient on its own to fully remove the artificial inflation from Atkore's stock price because each of them only partially revealed the facts that Defendants had concealed from investors. The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Atkore's purportedly sustainable margins and profits, the purported competitiveness of the PVC pipe industry, especially as to pricing, and the Company's purported competitive advantages in the PVC pipe industry, especially as to pricing. These misrepresentations and omissions inflated and maintained the price of Atkore's publicly traded shares at levels that were artificially inflated, inducing members of the Class to continue purchasing Atkore's stock even after the truth began to partially enter the market.

603. Each corrective disclosure alleged herein, and these disclosures taken in the aggregate, caused Atkore's stock price to drop, and directly and proximately caused Lead Plaintiff and the Class to suffer economic loss on shares they had bought at artificially-inflated prices.

## IX.    CLASS ACTION ALLEGATIONS

604. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Atkore common stock between August 2, 2022 and August 4, 2025, inclusive, and

who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

605.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Atkore actively traded on the NYSE under the symbol "ATKR." Millions of Atkore shares were traded publicly during the Class Period on the NYSE. In 2025, the Company had more than 34 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Atkore or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

606.    Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

607.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

608.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

1.      whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

2.      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

3.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented and omitted material facts about the business, operations, and prospects of Atkore;

4.      whether the market price of Atkore common stock during the Class Period was artificially inflated due to the material misrepresentations and omissions complained of herein; and

5.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

609.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

610.    As a result of their purchases of Atkore's common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

611.    To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Atkore who knew that the statement was false when made.

## XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

612.    The market for Atkore common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Atkore common stock traded at artificially inflated and/or maintained prices during the Class Period. Lead Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Atkore common stock and market information relating to Atkore and have been damaged thereby.

613.    At all times relevant, the market for Atkore common stock was an efficient market for the following reasons, among others:

1.    Atkore was listed and actively traded on the NYSE, a highly efficient and automated market;

2.    As a regulated issuer, Atkore filed periodic public reports with the SEC and/or the NYSE;

3.    Atkore regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, earnings calls, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

4.     Atkore was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

614.     As a result of the foregoing, the market for Atkore common stock promptly digested current information regarding Atkore from publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Atkore common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

615.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XII.   COUNTS AGAINST DEFENDANTS

### COUNT I

#### For Violations of Section 10(b) of the Exchange Act and
#### Rule 10b-5 Against All Defendants

616.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

617.   This Count is asserted on behalf of all members of the Class against Defendant Atkore and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

618.   Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Atkore's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Atkore common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each Defendant took the actions set forth herein.

#### Atkore and the Speaking Defendants Made Misrepresentations
#### and Omissions in Violation of Rule 10b-5(b)

619.   Defendant Atkore and the Speaking Defendants Waltz, Johnson and Deitzer violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b), in that they made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to maintain artificially high market prices for Atkore common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All such Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

215

620. Defendant Atkore and the Speaking Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Atkore's business, operations, and prospects, as specified herein. Defendant Atkore and the Speaking Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Atkore's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Atkore and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

621. Each of the Speaking Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Speaking Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Speaking Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Speaking Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Speaking Defendants was aware of the

Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

622.     The Speaking Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Speaking Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Atkore's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Speaking Defendants' misstatements of the Company's business, operations, and prospects, Speaking Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

623.     Defendant Atkore's liability arises from the liability of the Speaking Defendants as set forth above, as well as from Atkore's itself making the alleged false and misleading statements and omissions alleged herein.

624.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Atkore common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Speaking Defendants or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Speaking Defendants, but not disclosed in public statements by such Defendants, Lead Plaintiff and the other members of the Class purchased

Atkore common stock during the Class Period at artificially inflated prices and were damaged thereby.

625.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Atkore was experiencing, which were not disclosed by Speaking Defendants, Lead Plaintiff and other members of the Class would not have purchased Atkore common stock, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

626.    By virtue of the foregoing, Atkore and the Speaking Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

627.    As a direct and proximate result of Atkore and the Speaking Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**Atkore and the Individual Defendants Engaged in a Scheme to Defraud
Investors in Violation of Rules 10b-5(a) and (c)**

628.    Atkore and the Individual Defendants Waltz, Johnson, Deitzer and Pregenzer violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5, in that they (i) employed devices, schemes, and artifices to defraud and (ii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Atkore common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All such Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

629.    Defendants, individually and in concert, employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period. As part of their scheme to defraud investors in Atkore common stock in violation of Rule 10b-5(a) and (c), Defendants engaged in anti-competitive PVC Pipe pricing and colluded with supposed competitors in the PVC pipe industry to fix PVC pipe prices as artificially high levels, which artificially inflated Atkore's financial results, artificially inflated Atkore's stock price, and Defendants sold shares of Atkore stock at the artificially-inflated prices.

630.    As a result of the devices, schemes, and artifices to defraud as set forth above, the market price of Atkore common stock was artificially inflated, and Atkore's financial results appeared sustainably high, when in fact they were based on Defendants' anti-competitive PVC Pipe pricing and were therefore artificial and unsustainable. As a result, Lead Plaintiff and the other members of the Class purchased Atkore common stock during the Class Period at artificially inflated prices and were damaged thereby.

631.    At the time Defendants engaged in said devices, schemes, and artifices to defraud, Lead Plaintiff and other members of the Class were ignorant of their existence. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the price manipulation from which Atkore was benefitting, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased Atkore common stock, or, if

they had purchased such shares during the Class Period, they would not have done so at the artificially-inflated prices that they paid.

632.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

633.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

634.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

635.    The Individual Defendants Waltz, Johnson, Deitzer and Pregenzer acted as controlling persons of Atkore within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including (i) the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, and (ii) the decisions and acts comprising the scheme alleged herein under § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

636. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

637. As set forth above, the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

638. WHEREFORE, Lead Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

1. Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2. Awarding Lead Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

3. Awarding Lead Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

4. Awarding such other and further relief as this Court deems appropriate.

## XIV.  JURY DEMAND

639.    Lead Plaintiff demands a trial by jury.


Dated: August 22, 2025                           Respectfully submitted,


By: */s/ Adam Wierzbowski*

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice* pending)
Adam Wierzbowski (admitted *pro hac vice*)
Alexander Noble (admitted *pro hac vice*)
Matthew S. Goldstein (admitted *pro hac vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
Adam@blbglaw.com
Alexander.Noble@blbglaw.com
Matthew.Goldstein@blbglaw.com


**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
Avi Josefson (Bar No. 6272453)
875 North Michigan Avenue, Suite 3100
Chicago, IL 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
Avi@blbglaw.com


*Lead Counsel for Lead Plaintiff Nykredit Portefølje*
*Administration A/S*