# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| IN RE ATKORE, INC. SECURITIES LITIGATION | Case No. 1:25-cv-01851<br><br>Honorable John J. Tharp Jr. |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## <u>TO DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

    I.       Defendants Had Direct Control Over Atkore's PVC Pipe Pricing ......................... 2

    II.     Atkore's High PVC Pipe Prices Garnered Record Margins and Profits ................. 3

    III.    Atkore Told Investors the PVC Pipe Market Was Competitive, Its High
              PVC Pipe Prices Were Due to Unique Business Strengths, and Its Profits
              Were Sustainable ................................................................................................... 3

    IV.    Atkore Used OPIS to Anti-Competitively and Unsustainably Boost PVC
              Pipe Pricing ........................................................................................................... 4

            A.     Atkore Used OPIS as an Intermediary to Fix Prices .................................. 4

            B.     Atkore's Price-Fixing Scheme Was in Effect by the Start of the
                 Class Period .............................................................................................. 4

            C.     "Plus Factors" Confirm the Anti-Competitive Pricing Scheme ................. 5

    V.     Defendants Internally Witnessed the Scheme's Collapse and Capitalized
              through Insider Trading and Bonuses Before the Truth Was Revealed ................. 6

    VI.    The Truth Gradually Emerged as Defendants Continued to Mislead
              Investors ................................................................................................................ 7

    VII.   OPIS Settled Private Civil Antitrust Claims and Produced Dozens of
              Communications Concerning Pricing Agreements Involving Atkore .................... 8

    VIII.  Post-Class Period Events Yield Further Evidence of the Price-Fixing
              Scheme ................................................................................................................... 9

ARGUMENT ........................................................................................................................... 9

    I.       THE COMPLAINT ADEQUATELY PLEADS A 10b-5(b) CLAIM ................... 9

            A.     The Complaint Is Not a "Puzzle Pleading" ............................................... 9

            B.     The Complaint Pleads Material Misstatements and Omissions ................ 11

            C.     The Complaint Pleads a Strong Inference of Scienter for Each
                 Defendant ................................................................................................. 25

            D.     The Complaint Adequately Alleges Loss Causation ............................... 35

II. THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY.......... 38

III. THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON CLAIMS ...................................................................................................... 40

CONCLUSION........................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adient PLC Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. April 2, 2020) ...........................................................................31

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ..........................................................................30, 35, 38

*Alizadeh v. Tellabs, Inc.*,
2014 WL 2726676 (N.D. Ill. June 16, 2014) ........................................................................10

*Allison v. Oak Street Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ...................................................................28, 37

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) ................................................................................................35

*Anderson v. Abbott Lab'ys*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ...................................................................................21

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Ruth*,
99 F.4th 928 (7th Cir. 2024) ................................................................................................28

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ................................................................................................29

*Asher v. Baxter Int'l, Inc.*,
377 F.3d 727 (7th Cir. Sept. 3, 2004) .......................................................................24, 36, 37

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ........................................................................26

*In re Bally Total Fitness Sec. Litig.*,
2006 WL 3714708 (N.D. Ill. July 12, 2006).........................................................................27

*In re Bally Total Fitness Sec. Litig.*,
2007 WL 551574 (N.D. Ill. Feb. 20, 2007) .........................................................................35

*Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan.12, 2021).......................................................................27, 31

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)........................................................................37

*In re Boeing Co. Aircraft Sec. Litig.*,
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ........................................................11, 31, 35, 38

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ...............................................................................................37

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)...........................................................................36, 37, 39

*Cai v. Visa Inc.*,
  2025 WL 4091993 (N.D. Cal. Dec. 10, 2025).........................................................................37

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009)....................................................................................35

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997) ...............................................................................................35

*Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ...........................................................................19

*Catogas v. Cyberonics, Inc.*,
  292 F. App'x 311 (5th Cir. 2008) ..........................................................................................37

*Chandler v. Ulta Beauty, Inc.*,
  2022 WL 952441 (N.D. Cal. Mar. 30, 2022)..........................................................................29

*Chew v. Moneygram Int'l, Inc.*,
  2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .....................................................................27, 32

*Chow v. Archer-Daniels-Midland*,
  2025 WL 790854 (N.D. Ill. Mar. 12, 2025)................................................................... *passim*

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...............................................................................................30

*City of Livonia Emps' Ret. Sys. & Loc. 295/Loc. 851, IBT Emp. Grp. Welfare
  Fund v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ...........................................................................................31, 33

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp. Inc.*,
  2013 WL 1100819 (W.D. La. Mar. 15, 2013) .........................................................................20

*City of Roseville Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010).................................................................................20, 27

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ............................................................................27

*College Ret. Equities Fund v. Boeing Co.*,
  2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ...........................................................33

*Davis v. SPSS, Inc.*,
  431 F. Supp. 2d 823 (N.D. Ill. 2006) .....................................................................35

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) ....................................................................36

*Desai v. Gen. Growth Props., Inc.*,
  654 F. Supp. 2d 836 (N.D. Ill. 2009) .....................................................................24

*In re Downey Sec. Litig.*,
  2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ..........................................................30

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023).....................................................................21

*Eden Alpha CI LLP v. Polished.com Inc.*,
  763 F. Supp. 3d 270 (E.D.N.Y. 2025) ....................................................................39

*Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)...................................................................................29

*Espy v. J2 Glob., Inc.*,
  99 F.4th 527 (9th Cir. 2024) ..................................................................................27

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ......................................................15, 23, 36

*Fogel v. Vega*,
  759 F. App'x 18 (2d Cir. 2018) ..............................................................................21

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................20

*Grigsby v. BofI Holding, Inc.*,
  979 F.3d 1198,1206 (9th Cir. 2020) .......................................................................37

*In re Guidant Corp. Sec. Litig.*,
  536 F. Supp. 2d 913 (S.D. Ind. 2008)....................................................................29

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ...................................................................................12

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015)..................................................................................24

v

*Harrington v. Tetraphase Pharms. Inc.*,
    2017 WL 1946305 (D. Mass. May 9, 2017) ...................................................................30

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third
    Bancorp*,
    2022 WL 1642221 (N.D. Ill. May 24, 2011) ......................................................27, 29, 31, 38

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ...............................................................20

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .......................................................................................31

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) .......................................................................................33

*Holwill v. Abbvie Inc.*,
    2025 WL 1908156 (N.D. Ill. July 10, 2025)....................................................20, 33, 34

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) .......................................................................................27

*In re Integra Lifesciences Holdings Corp. Sec. Litig.*,
    2025 WL 1798386 (D.N.J. June 30, 2025)....................................................................27

*In re iRobot Corp. Sec. Litig.*,
    527 F. Supp. 3d 124 (D. Mass. 2021) .........................................................................30

*Jastram v. NextEra Energy, Inc.*,
    161 F.4th 693 (11th Cir. 2025) ....................................................................................36

*Joyce v. Amazon.com, Inc.*,
    2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ..........................................................27

*Kaufman v. Motorola, Inc.*,
    1999 WL 688780 (N.D. Ill. Apr. 16, 1999) .................................................................25

*In re KBC Asset Mgmt. N.V.*,
    572 F. App'x 356 (6th Cir. 2014) ................................................................................37

*KBC Asset Mgmt. NV v. Discover Fin. Servs.*,
    2025 WL 976120 (N.D. Ill. Mar. 31, 2025)................................................................21

*Knurr v. Orbital ATK Inc.*,
    294 F. Supp. 3d 498 (E.D. Va. Mar. 2, 2018)..............................................................32

*La. Mun. Pol. Emps.' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
    No. 11-cv-00289 (D. Vt.)..............................................................................................29

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ...................................................................................27

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ....................................................................................37

*Lorenzo v. SEC*,
  587 U.S. 71 (2019)......................................................................................................39

*In re Lottery.com, Inc. Sec. Litig.*,
  715 F. Supp. 3d 506 (S.D.N.Y. 2024)........................................................................31

*Macovski v. Groupon, Inc.*,
  2021 WL 1676275 (N.D. Ill. Apr. 28, 2021) .............................................................10

*Macovski v. Groupon, Inc.*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021) ..............................................................23, 36, 38

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)....................................................................................................11

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................................ *passim*

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017).........................................................................39

*Menkes v. Stolt–Nielsen*,
  2006 WL 1699603 (D. Conn. June 19, 2006)..............................................................16

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .....................................................................................21

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...................................................................................38

*In re Micron Techs., Inc. Sec. Litig.*,
  2007 WL 576468 (D. Idaho Feb. 21, 2007).................................................................16

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ...........................................................................23

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .............................................................15

*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v. Impax
  Lab'ys, Inc.*,
  843 F. App'x 27 (9th Cir. 2021) ...................................................................................36

vii

*In re Nature's Sunshine Prods. Sec. Litig.*,
  486 F. Supp. 2d 1301 (D. Utah 2007)................................................................25

*In re NeoPharm, Inc. Sec. Litig.*,
  705 F. Supp. 2d 946 (N.D. Ill. 2010) ...............................................................38

*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022) ................................................................................39

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ..........................................................................30

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................23

*Ont., Ltd. v. Zurich Capital Mkts.*,
  249 F. Supp. 2d 974 (N.D. Ill. 2003) ...............................................................40

*Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)...............................................14, 36, 37

*Panasuk v. Steel Dynamics, Inc.*,
  2009 WL 5176193 (N.D. Ind. Dec. 21, 2009) .................................................24

*In re Par Pharm., Inc. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990) ...................................................................20

*Pelletier v. Endo Int'l PLC*,
  439 F. Supp. 3d 450 (E.D. Pa. 2020) ...............................................................14

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ............................................................................28

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
  690 F. Supp. 3d 862 (N.D. Ill. 2023) ................................................27, 28, 30

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ...........................................................................39, 40

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings*,
  679 F.3d 952 (7th Cir. 2012) ............................................................................27

*Plumbers & Pipefitters Loc.Union No. 630 Pension-Annuity Tr. Fund v.
  Allscripts-Mysis Healthcare Sols., Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011) ...............................................................33

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ............................................................................36

*Pugh v. Tribune Co.,*
    521 F.3d 686 (7th Cir. 2008) ..................................................................................................39

*Rahman v. Kid Brands, Inc.,*
    736 F.3d 237 (3d Cir. 2013)....................................................................................................35

*Rensin, Tr. of Rensin Joint Tr. v. U.S. Cellular Corp.,*
    755 F. Supp. 3d 1048 (N.D. Ill. 2024) ...................................................................................21

*Ret. Plan v. Fleetcor Techs., Inc.,*
    2018 WL 4293143 (N.D. Ga. May 15, 2018).........................................................................12

*Ret. Sys. v. Anixter Int'l, Inc.,*
    2012 WL 1068761 (N.D. Ill. Mar. 29, 2012).........................................................................29

*Ross v. Career Educ. Corp.,*
    2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)..........................................................................21

*Roth v. OfficeMax, Inc.,*
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ...............................................................................27, 33

*San Antonio Fire & Police Pension Fund v. Syneos Health, Inc.,*
    75 F.4th 232 (4th Cir. 2023) ..................................................................................................30

*Schleicher v. Wendt,*
    618 F.3d 679 (7th Cir. 2010) ..................................................................................................38

*SEC v. Rio Tinto plc,*
    41 F.4th 47 (2d Cir. 2022) ......................................................................................................39

*SEC v. Winemaster,*
    529 F. Supp. 3d 880 (N.D. Ill. 2021) ..........................................................................10, 39, 40

*Selbst v. McDonald's Corp.,*
    2005 WL 2319936 (N.D. Ill. Sep. 21, 2005) .........................................................................24

*Silverman v. Motorola, Inc.,*
    772 F. Supp. 2d 923 (N.D. Ill. 2011) .....................................................................................29

*Silverman v. Motorola, Inc.,*
    798 F. Supp. 2d 954 (N.D. Ill. 2011) .....................................................................................38

*In re Skechers USA, Inc. Sec. Litig.,*
    444 F. Supp. 3d 498 (S.D.N.Y. 2020).....................................................................................28

*Smykla v. Molinaroli,*
    85 F.4th 1228 (7th Cir. 2023) .................................................................................................10

*Societe Generale v. Caterpillar, Inc.*,
  2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) .................................................................21

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
  2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000).................................................................15

*Speakes v. Taro Pharm. Indus., Ltd.*,
  2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).......................................................11, 12, 13, 20

*In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) .................................................................10, 27

*In re St. Paul Travelers Sec. Litig. II*,
  2006 WL 2735221 (D. Minn. Sept. 25, 2006).................................................................20

*Starr v. !Hey, Inc.*,
  2003 WL 21212596 (N.D. Ill. May 23, 2003) .................................................................40

*Stoneridge Inv. Partners, LLC v. Sci-Atlanta*,
  552 U.S. 148 (2008).................................................................39

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) .................................................................24

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).................................................................9, 25

*In re Teva Sec. Litig.*,
  671 F. Supp. 3d 147 (D. Conn. 2023).................................................................13, 36, 37

*Thomas v. Shiloh Indus., Inc.*,
  2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018).................................................................33

*Toft v. Harbor Diversified, Inc.*,
  2025 WL 357776 (E.D. Wis. Jan. 31, 2025).................................................................33

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) .................................................................37

*In re Tupperware Brands Corp. Sec. Litig.*,
  2021 WL 247870 (M.D. Fla. Jan. 25, 2021).................................................................39

*U.S. v. Filer*,
  762 F. Supp. 3d 730 (N.D. Ill. 2025) .................................................................31

x

*United Food & Com. Workers Int'l Union Loc. 464A v. Pilgrim's Pride Corp.*,
2022 WL 684169 (D. Colo. Mar. 8, 2022) ...........................................................21

*Utesch v. Lannett Co., Inc.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019) ...................................................................15

*Vallabhaneni v. Endocyte, Inc.*,
2016 WL 51260 (S.D. Ind. Jan. 4, 2016)..............................................................35

*Valspar Corp. v. E.I. Du Pont de Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017)..................................................................................33

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ....................................................................24

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ....................................................................11

*In re Walgreens Boots All. Sec. Litig.*,
2026 WL 25948 (N.D. Ill. Jan. 5, 2026) ..................................................................9

*Woolgar v. Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)....................................................................30

**Statutes and Rules**

Securities Exchange Act of 1934:

§ 21D(b)(1), 15 U.S.C. §78u-4(b)................................................................10, 25

Fed. R. Civ. P.:

Rule 8 ....................................................................................................................35

Rule 9(b) ...........................................................................................................9, 37

Rule 12(b)(6)...........................................................................................................9

PSLRA .........................................................................................................9, 23, 25, 34

xi

**GLOSSARY**[1]

| Term | Definition |
|---|---|
| Antitrust Actions, Antitrust Claims, and Antitrust Docket | Civil antitrust suits pending in this Court alleging violations of the Sherman Antitrust Act and state law analogues, under docket number 1:24-cv-07639 (N.D. Ill.) |
| Atkore or the Company | Defendant Atkore Inc. |
| BCC List | Email distribution list maintained by OPIS editor Donna Todd that included PVC Pipe manufacturers' employees, used to circulate forward-looking price sheets on weekly basis |
| Class Period | February 19, 2021 through August 4, 2025 inclusive |
| Complaint and ¶__ | Plaintiff's First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 72 (public redacted version), ECF No. 73 (sealed version) |
| D.Br. and D.App'x | Defendants' Motion to Dismiss, ECF No. 83 and Appendices submitted by Defendants |
| Deitzer | Defendant John M. Deitzer |
| Decl. and Ex. | Declaration of Adam Wierzbowski and Exhibits thereto |
| Defendants | Defendants Atkore, Defendants Waltz, Johnson, Deitzer, and Pregenzer |
| DOJ | U.S. Department of Justice Antitrust Division |
| Electrical Segment | Business unit of Atkore in which PVC Pipe was sold |
| EBITDA | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| Exchange Act | Securities Exchange Act of 1934 |
| FE | Former employees cited in Complaint |
| FY | Fiscal Year |
| Individual Defendants | Defendants Waltz, Johnson, Deitzer, and Pregenzer |
| Johnson | Defendant David P. Johnson |
| ManBear Report | Report entitled "Pipe Price Fixing" published by market research firm ManBear on July 24, 2024 |
| OPIS | Oil Price Information Service, LLC |
| Plaintiff | Lead Plaintiff Nykredit Portefølje Administration A/S |
| *Petrochem Wire* report | Weekly report on PVC Pipe pricing and sales, issued by OPIS and authored by senior OPIS editor Donna Todd |
| Pregenzer | Defendant John W. Pregenzer |
| PSLRA | Private Securities Litigation Reform Act of 1995 (PSLRA) |
| PVC | PolyVinyl Chloride, synthetic plastic polymer used in PVC Pipe |
| PVC Pipe | PVC pipe products, including municipal pipe, plumbing pipe, and electrical conduit pipe and fittings |
| SEC | U.S. Securities and Exchange Commission |
| Sherman | Jeff Sherman, Atkore's former Vice President and General |

---

[1] Unless otherwise indicated or defined herein, capitalized terms have the same meaning as in the Complaint and all emphasis in quotations is added.

| Term | Definition |
|---|---|
|  | Manager of PVC Pipe |
| Speaking Defendants | Atkore, Waltz, Deitzer, and Johnson |
| SOX Certifications | Sarbanes-Oxley Act Certifications challenged in Complaint |
| Todd | Senior OPIS editor who authored weekly *Petrochem Wire* report |
| TSR | Total shareholder return |
| Waltz | Defendant William ("Bill") E. Waltz |
| Westlake | Westlake Corporation and Westlake Pipe & Fittings Corporation |

## INTRODUCTION

During the Class Period, Atkore entered into undisclosed agreements with its competitors to fix the prices of PVC Pipe. Defendants did so through the OPIS industry information firm, which immediately settled the Antitrust Claims against it for $6 million and production of its price-fixing communications with Atkore and others in the Antitrust Actions. Yet Defendants told investors the opposite—that Atkore did not speak to competitors, that the market was "competitive," that its prices, record revenues and margins were the result of its "truly unique, sustainable, competitive advantages on pricing that no one else has." These claims to investors were literally false—not merely misstatements by omission—such as Defendant Waltz's false claims that Atkore and its supposed competitors independently "pric[ed] their products" "to maximize *their own profit*." As Individual Defendants artificially inflated Atkore's revenues and stock price, they sold tens of millions of dollars of personally-held Atkore stock.

Defendants try to sidestep the scores of Atkore's price-fixing communications pled in the Complaint. Plaintiff's claims do not require Atkore to *admit* that its coordinated price increases with competitors "br[oke] the law" (D.Br.1)—though Atkore's communications quoted throughout the Complaint demonstrate that it certainly did. The claims here are securities fraud claims, judged by the nature of Defendants' misstatements to investors. The Complaint amply pleads that Defendants knowingly or recklessly told investors that Atkore's PVC Pipe markets and pricing were competitive, when in truth they were not. In stark contrast to Atkore's repeated claims that its record-breaking profits were sustainable results of its competitive market behavior, they were based on Atkore's non-competitive, unsustainable pricing scheme. This was securities fraud.

Defendants' assertion that the Speaking Defendants had no knowledge of pricing communications with competitors is not plausible. Before the practices came under public scrutiny, CEO Waltz and CFO Johnson publicly *admitted* they led the weekly meeting to set

Atkore's PVC Pipe pricing, in which Atkore matched competitors' prices **to the penny** (*e.g.*, ¶¶321, 735-42). These facts and many others show the Speaking Defendants' knowledge or reckless disregard of Atkore's true anti-competitive pricing practices.

Defendants claim only "lower-level employees" were potentially involved in the price-fixing. Not so. The list of Atkore executives involved includes Defendants Waltz (former CEO), Johnson (former CFO) and Pregenzer (COO and President of Electrical); ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. This was no "rogue operation."

The truth about Atkore's unsustainable, anti-competitive pricing practices and the full extent to which they drove Atkore's financial success emerged through a series of partial disclosures. These disclosures included not only the ManBear Report alleging Atkore's price collusion, but also DOJ subpoenas on Atkore and its competitor Otter Tail, and revelations of the full, negative financial impact of Atkore's price-fixing and Waltz's unexpected departure as CEO. Atkore stock price fell sharply with each disclosure, with the total financial impact of the fraud emerging only after several quarters of disappointing financial results as the scheme unwound.

**STATEMENT OF FACTS**

**I.      Defendants Had Direct Control Over Atkore's PVC Pipe Pricing**

Before and during the Class Period, Defendants controlled Atkore's PVC Pipe pricing. Before Waltz became CEO, was Atkore's President of Electrical from 2013 to 2018, overseeing PVC Pipe sales. ¶86. Waltz and Johnson became CEO and CFO respectively in 2018 and executed Atkore's "pricing excellence" initiative to increase prices on PVC Pipe. ¶¶87, 830. Every Friday, Waltz and Johnson "le[d] a meeting" with Atkore's senior executive leadership, including Pregenzer and Deitzer, to "decid[e] on what the pricing is going to look like literally for the next week." ¶¶88-90; 735. These meetings continued through the Class Period (¶¶736-41) and occurred

2

the same day OPIS sent the *PetroChem Wire* report, used by Atkore and its competitors to increase the following week's prices. ¶¶737-38. Each week, Atkore and its competitors sent their forward-looking price sheets to OPIS editor Donna Todd, who collected and re-circulated them via her "BCC List," which included Atkore executives ██████████████████████████, and others. ¶¶167-68. Atkore and its competitors used OPIS to agree on prices and enforce their conspiracy.

## II. Atkore's High PVC Pipe Prices Garnered Record Margins and Profits

PVC Pipe, Atkore's most important product, comprised nearly 40% of Atkore's total sales in fiscal 2023. ¶59. PVC Pipe sales drove the success of Atkore's Electrical Segment, which contributed over 75% of Atkore's total sales and *90% of Atkore's profits* in fiscal 2023. ¶58. Before the Class Period, PVC Pipe prices were relatively constant and closely tracked input costs. ¶70. During the Class Period, PVC Pipe price increases far outpaced any increases in input costs (¶329), including its primary ingredient PVC resin accounting for roughly 70% of production costs. ¶¶71, 208. PVC Pipe prices continued to increase, even as input costs normalized and *decreased*. ¶335. As Todd privately observed during the Class Period, "pipe prices and resin prices decoupled for a while now, so resin prices won't dictate pipe prices." ¶208. This divergence shrunk in 2024 and 2025 as Atkore's price-fixing scheme became the subject of public scrutiny. ¶344.

Atkore's stock price rose as PVC Pipe prices increased. From 2019 to April 2024, Atkore's stock skyrocketed from *$19.30 per share* to a high of *$187.12 per share*—a nearly *ninefold* increase. Given the critical role of PVC Pipe pricing in driving Atkore's success, investors, and analysts focused intently on pricing during the Class Period. ¶80.

## III. Atkore Told Investors the PVC Pipe Market Was Competitive, Its High PVC Pipe Prices Were Due to Unique Business Strengths, and Its Profits Were Sustainable

Analysts repeatedly questioned Atkore about how it was able to garner record margins and profits from high PVC Pipe prices. Defendants responded that Atkore operated in a "competitive"

market (*e.g.*, ¶494) governed by "supply and demand" (*e.g.*, ¶487), and denied Atkore ever spoke to its competitors about pipe supply and pricing. *E.g.*, ¶493. When pressed about the source of Atkore's high prices and margins, Defendants told analysts and investors that its high pricing was due to its unique business model, that pricing and margins were sustainable (*e.g.*, ¶¶596-623, 707-13) and projected future earnings growth due to supposed competitive advantages. *E.g.*, ¶¶81-83.

## IV. Atkore Used OPIS to Anti-Competitively and Unsustainably Boost PVC Pipe Pricing

### A. Atkore Used OPIS as an Intermediary to Fix Prices

OPIS is a subscription news service to which only a limited group of subscribers, including Atkore and its supposed competitors, had access. ¶¶112, 120. Each week, senior OPIS editor Todd collected PVC Pipe pricing information from Atkore and its competitors and issued a report, the *PVC & Pipe Weekly*. ¶122. In addition, Atkore and its competitors used their communications with Todd to exchange competitively sensitive, forward-looking PVC Pipe price information and reach agreements on inflated prices. ¶¶151-52. As early as ███████████████████████████████ ████████████████████████████████████████████████. ¶155.

### B. Atkore's Price-Fixing Scheme Was in Effect by the Start of the Class Period

By the start of the Class Period in February 2021, Atkore and its competitors actively fixed PVC Pipe prices under set agreements, using OPIS as an intermediary[1] to exchange competitively-sensitive, forward-looking price information. ¶162. Atkore actively ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[1] Antitrust law prohibits "***information-sharing programs*** ... ***as a disguised means of fixing prices***." ¶133. OPIS, one such "information-sharing platform," settled the Antitrust Claims for $6 million. ¶144.



. ¶163.

Atkore

¶177.

*Id.*

" *Id.*

¶168.

*Id.*

Atkore

¶169.

¶169.

*Id.*

*Id.*

*Id*. Dozens of similar examples are detailed in the Complaint. ¶¶162-205 (2021); ¶¶206-31 (2022); ¶¶232-85 (2023); ¶¶287-320 (2024).

## C.    "Plus Factors" Confirm the Anti-Competitive Pricing Scheme

Several plus factors—economic actions and outcomes that support the existence of price-fixing activity—confirm Atkore and its supposed competitors agreed to fix PVC Pipe prices. First, Atkore's adherence to the price-fixing scheme was contrary to its independent self-interest,

including to expand market share through volume, unless part of a collective plan. ¶¶325-28. Second, market data shows a decoupling of the historic lock-step relationship between input costs and PVC Pipe prices aligning with the price-fixing scheme. ¶¶329-49. Third, Atkore's pricing actions, including explicit calls for competitors to coordinate, lack any plausible, legitimate business rationale absent price-fixing. ¶¶350-53. Fourth, Atkore utilized and created numerous opportunities for direct, regular communication with its competitors. ¶¶354-65.

## V. Defendants Internally Witnessed the Scheme's Collapse and Capitalized through Insider Trading and Bonuses Before the Truth Was Revealed

Atkore's price-fixing scheme was unsustainable and by early 2024, Defendants privately learned it started to unravel. ¶298. I ███████████████████████████████████████ ███████████████████████████████████████ ¶¶293-96. On February 23, 2024, OPIS privately reported to Atkore and the group that "if competitors go out next week and try to lock up a bunch of volume ... they won't be able to raise prices at all." ¶298. The next trading day, Waltz and Pregenzer sold about **50,000 shares** of Atkore stock for **$10 million**. ¶¶771, 785.

As the scheme unraveled further, Defendants unloaded more shares at fraud-inflated prices. In March 2024, Atkore and its competitors failed to achieve a price increase. ¶771. On March 4, 2024—the Monday Todd circulated the price sheets reflecting the scheme's failure—Pregenzer, Waltz and Johnson all made massive **_unplanned_** open market sales, dumping nearly **70,000** shares for **$12 million**. ¶367. Armed with non-public information that the price-fixing scheme was collapsing, Defendants unloaded their shares near Atkore's Class Period high stock price. ¶367. Atkore began disclosing the negative financial impact of that failure barely two months later. *Id*.

Atkore's executive compensation programs also incentivized Defendants to deceive investors. ¶797. For example, Defendants received cash bonuses that were 80% dependent on meeting EBITDA benchmarks, met due to "a continued increase in net sales and pricing of PVC

6

products." ¶¶802-03. Defendants also received bonuses tied to the performance of Atkore's stock price over a three-year period, incentivizing them to boost the share price. ¶¶797–98. As a result of Defendants' deception of investors, their payouts rose dramatically during the Class Period. *See* ¶¶799–800 (threefold increase in Waltz's bonuses); ¶¶800 (Johnson's bonuses), 801 (Pregenzer's bonuses). Defendants' fraud also netted them lucrative share awards, as it enabled Atkore to meet and greatly exceed net income and TSR targets. ¶¶803, 805 (Waltz, Johnson and Pregenzer received awards worth approx. $7.8 million, $1.7 million, and $1.4 million, respectively). These award amounts plummeted as the scheme unraveled and the corrective disclosures began. ¶807.

## VI. The Truth Gradually Emerged as Defendants Continued to Mislead Investors

The truth emerged through a series of partial disclosures. On May 7, 2024, Atkore lowered its 2024 EBITDA[2] guidance from a range of $900 to $950 million to $850 to $900 million. ¶370. In response, Atkore's stock price fell by 12.5%. ¶375. Analysts were shocked by this "unexpected F2024 guidance cut" (¶374) after years of consistently positive earnings. ¶371. The next day, Johnson admitted this was caused by Atkore's inability to maintain high PVC Pipe prices. ¶374.

In July 2024, the market began to learn *why* Atkore's margins on PVC Pipe were shrinking. After market close on July 23, 2024, Atkore announced that Johnson, who was CFO during the price-fixing, abruptly resigned. ¶376. The next day, July 24, 2024, the ManBear Report[3] revealed instances of Atkore's anti-competitive pricing (¶377) and Atkore's stock price fell 8.5%. ¶384.

On August 6, 2024, Atkore reported 3Q financial results—the first full quarter after Atkore's price-fixing scheme began to collapse. ¶385. Reflecting Atkore's inability to maintain non-competitively high-prices, Atkore's Electrical Segment sales fell by nearly 15% (¶386) and

---

[2] Atkore stated in its SEC filings EBITDA was Atkore's "primary measure of profit and loss." ¶370.
[3] ManBear's prior three investigations led to "meaningful market changes, fines, [and] executive indictments," including exposure of price-fixing in the chicken industry followed by multiple DOJ indictments, and one participant pleading guilty and paying a $107 million fine. ¶377. *Id*.

the Company slashed its FY2024 and FY2025 earnings projections, which Atkore just lowered one quarter earlier. ¶385 (reducing, *e.g.*, FY2024 EBITDA projections from $850-$900 million to $772-$782 million). Atkore admitted its declining performance was due to falling PVC Pipe prices. ¶387. The news "surprised" and "disappointed" analysts (¶390), particularly Atkore's "sever[e]" guidance cut, which was nearly *30%* below expectations (¶¶390-91). On this news, Atkore's stock price fell nearly 15%. ¶392. But Waltz denied the ManBear Report's allegations as "unsubstantiated" (¶389) and blamed the "softer" pricing on "slower end markets." ¶387.

On November 7, 2024, Atkore's competitor Otter Tail (whom ManBear identified as a co-participant in Atkore's price-fixing) revealed it had received a DOJ grand jury subpoena. ¶393. On November 8, 2024, RBC held an investor call to discuss the implications of the DOJ's Otter Tail subpoena, which RBC called a "notable development" for Atkore, given civil antitrust actions were already filed against Atkore. ¶394. On this news, Atkore's stock price fell 7.2%.

On February 4, 2025, Atkore reported 1Q2025 financial results. Contrary to prior assurances, Atkore surprised investors with net sales down 17% year-over-year and a further *$100 million* guidance cut—with *$75 million* due to falling PVC Pipe prices. ¶¶397, 405. Underscoring the hastening collapse of the scheme, Pregenzer admitted PVC Pipe price declines underwent "significant acceleration." ¶405. On this news, Atkore's stock price fell nearly 20%. ¶408.

On February 14, 2025, Atkore revealed it received a DOJ grand jury subpoena requiring production of documents related to PVC Pipe price-fixing. ¶409. On this news, Atkore's stock price fell 3.2%. ¶410. And, on August 5, 2025, Atkore announced the surprise resignation of CEO Waltz, and revealed Atkore's margins worsened due to falling PVC prices and cut 2026 guidance by an additional $50 million. ¶412. On this news, Atkore's stock price fell over 26%. ¶420.

**VII.     OPIS Settled Private Civil Antitrust Claims and Produced Dozens of Communications Concerning Pricing Agreements Involving Atkore**

In August 2024, private civil Antitrust Actions named OPIS as a defendant. ¶142. Around the same time, OPIS received a DOJ grand jury subpoena and investigative demands from states. ¶143. On December 13, 2024, after nearly 20 years, OPIS placed Todd on indefinite leave and abruptly stopped *Petrochem Wire*. ¶¶817, 820. On May 5, 2025, OPIS settled antitrust claims for $6 million and agreed to produce documents, including OPIS's text and email communications with Atkore and its competitors, many of which Plaintiff cited in its Complaint. *See* ¶¶151-316.

## VIII. Post-Class Period Events Yield Further Evidence of the Price-Fixing Scheme

On October 7, 2025, the DOJ intervened in the private Antitrust Actions against Atkore while it determines whether to pursue charges for "price fixing, bid rigging, and market allocation." ¶815 n.37. In March 2026, the court granted the plaintiffs' motion for cell phone discovery (Ex.A), which references an Atkore "executive" directly communicating with competitor s Westlake and IPEX. In April 2026, the court approved Atkore competitor Westlake's settlement of Antitrust Claims for $67 million (Ex.B), of which the Court may take judicial notice.

<u>**ARGUMENT**</u>

## I. THE COMPLAINT ADEQUATELY PLEADS A 10b-5(b) CLAIM

On a Rule 12(b)(6) motion to dismiss, courts must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Plaintiffs' Complaint pleads violations of Section 10(b) and Rule 10b-5 because it alleges "(i) a material misrepresentation or omission by the defendant; (ii) scienter, (iii) a connection between the misrepresentation or omission and the purchase or sale of a security, (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation." *In re Walgreens Boots All. Sec. Litig.*, 2026 WL 25948, at *7 (N.D. Ill. Jan. 5, 2026).

### A. The Complaint Is Not a "Puzzle Pleading"

The Complaint pleads a clear case of misconduct. It satisfies Rule 9(b) and the PSLRA by

identifying (i) the false statements chronologically; (ii) who made each of them, where, and when; and (iii) the specific, detailed falsity reasons for each. 15 U.S.C. § 78u-4(b)(1). Defendants' Motion and seven appendices grouping the misstatements confirm they can "fairly respond" to the Complaint; it is not a "puzzle pleading." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1011-12 (N.D. Ill. 2004); *SEC v. Winemaster*, 529 F. Supp. 3d 880, 907 (N.D. Ill. 2021) (not puzzle pleading if court has "no difficulty" identifying false statements and underlying misconduct).

Plaintiff was not required to bold and italicize the misstatements. D.Br.8-9. Unlike Defendants' cases, the Complaint does not use improper block-quoting.[4] The alleged false statements are between one to five lines of text (D.App'x.3, 5, 7), except for the SOX Certifications (¶¶446-47) whose falsity Plaintiff explains (¶448). Bold and italics are not legally required or "very helpful").[5] Yet the Complaint does bold and italicize certain statements (¶¶81-83)—including claims that Atkore had "***truly unique, sustainable, competitive advantages on pricing that no one else has***." ¶81 (emphases in Complaint). Plaintiff otherwise isolates and quotes the specific phrases that are false and misleading, for specific reasons. *See, e.g.*, ¶427 (specifying phrases about "price," "costs," "customers," and reasons for falsity); ¶428 (specifying phrases falsely attributing profits to legitimate causes, and reasons for falsity). *See also* ¶¶434-35; ¶¶466-67 (using this approach).[6]

Defendants complain that many misstatements were allegedly false and misleading for the same reasons. D.Br.9. But that is largely because Defendants continuously misrepresented the same facts. In any event, the Complaint specifies "the reason ***or reasons***" for falsity. 15 U.S.C. §

---

[4] *Alizadeh v. Tellabs, Inc.*, 2014 WL 2726676, at *4 (N.D. Ill. June 16, 2014) (block-quote of "more than five-single spaced pages"); *Smykla v. Molinaroli*, 85 F.4th 1228, 1235 (7th Cir. 2023) (plaintiff's block-quotes did not even "explain why those block quotes … are misleading").

[5] *Macovski v. Groupon, Inc.*, 2021 WL 1676275, at *6 (N.D. Ill. Apr. 28, 2021); *Alizadeh*, 2014 WL 2726676, at *4 (using bold and italics "***does nothing*** to clarify Plaintiffs' assertions of false statements").

[6] Rather than clarifying the challenged statements, Defendants' appendices added text that is not in the Complaint, without specifying what they added. Plaintiff's ¶425 quoted 12 lines of text as false and misleading; Defendants' entry is 22 lines. Plaintiff's ¶589 is nine lines; Defendants' is 21 lines in App'x 3.

10

78u-4(b)(1); *e.g.*, ¶440 (alleging that Atkore attributing financial results to "increased average selling prices" "misstated and failed to disclose that the source of Atkore's outsized revenues, margins and profits was Atkore's undisclosed anti-competitive PVC Pipe pricing behavior").

Defendants misconstrue Plaintiff's allegations concerning Atkore's reported financial metrics. D.Br.9. Atkore's metrics were materially misleading because Defendants attributed them to legitimate business features, instead of the actual undisclosed pricing misconduct. ¶439. The Complaint spells out why this was materially misleading. ¶¶438-447; *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *7 (S.D.N.Y. Sept. 24, 2018) (defendants "place[d] the source of the revenue at issue so as to require further disclosure regarding the price-fixing conspiracy").

## B.    The Complaint Pleads Material Misstatements and Omissions.

Falsity is adequately pled if "the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 638 (N.D. Ill. 2020). Defendants assert the Complaint "does not claim any of [the statements] were literally false." D.Br.10. To the contrary, Plaintiff alleges scores of the statements were literally false. *E.g.*, ¶703 (claim Atkore did not "talk to our competition" "materially *false* and misleading because Atkore did 'talk' to its competitors"); ¶81 ("host of public *false* statements"); ¶82 (statements "repeatedly assured investors *falsely* that they were fiercely competing ... and denied that Atkore communicated with its competitors").

This is not a pure "omission" case, as Atkore asserts. D.Br.7. A pure omission is where the company does *not* speak on a particular topic at all. Here, Defendants spoke about a supposed lack of communication with competitors, PVC Pipe pricing, and the sources of Atkore's profits. Rule 10b-5(b) "prohibits omitting material facts necessary to make the 'statements made ... not misleading'" and statements that omit material information are actionable as "half-truths, not pure omissions." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024); *In*

11

*re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at \*17 (N.D. Ill. Aug. 23, 2022) (Tharp, J.).

Defendants also wrongly assert that the undisclosed conduct must itself be illegal. D.Br.20. It is enough that Defendants made false or misleading statements about the material undisclosed fact that Atkore coordinated supra-competitive price increases with its competitors. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136-37 (2d Cir. 2021) (Section 10(b) "does not depend on whether the alleged ... practices themselves were fraudulent or otherwise illegal"); *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.,* 2018 WL 4293143, at \*7-8 (N.D. Ga. May 15, 2018) (rejecting proposition that underlying practices "must violate a statute, regulation, or standard in order to be actionable"). In any event, the Complaint is replete with direct and strong circumstantial evidence (¶¶325-65) of the alleged price-fixing. *Speakes*, 2018 WL 4572987, at \*4.

**1.     Atkore Spoke to Competitors; ManBear Was Not "Unsubstantiated"**

In response to analyst questions about Atkore's PVC Pipe pricing and product supply (which impacts pricing),[7] Defendants denied Atkore communicated with competitors. For example, in 2021, when asked about "competitive moats" around Atkore, Waltz said, "I'm not talking to my competition, but there are so many moats." ¶493. In May 2022, Waltz reiterated, "we do have competitors out there and it's a competitive market." ¶524. When asked if competitors were increasing PVC Pipe manufacturing, Waltz flatly said, "Again, my competitors and I don't talk." ¶537. In November 2022, Waltz stated that Atkore priced independently from competitor Westlake: "they're effective pricing their products, trying to maximize their own profit." ¶543. In truth, Atkore coordinated pricing with Westlake through OPIS, including at that time. ¶¶221-22, 236 (Atkore/Westlake coordination from August 2022 through January 2023).

These statements denying that Atkore communicated with its competitors were materially

---

[7] Defendants assert that the "supply of products" has "no bearing on the alleged price-fixing scheme" (D.Br.12), but Atkore told investors: "on pricing, the biggest thing is ***supply***, demand and service." ¶544.

false and misleading when made. In reality, Atkore and its competitors *did talk*, including through OPIS, which allowed Atkore to engage in anti-competitive PVC Pipe pricing. ¶703; *supra* Facts §IV. This contrast between Defendants' public statements and its private communications through OPIS supports a claim for securities fraud. *Speakes*, 2018 WL 4572987, at *2, 6 (sustaining misstatements by executives who had "authority to, and did, cause pricing changes").

Defendants deceived investors after the ManBear Report was published. When asked about the price-fixing allegations, Waltz implicitly denied its claims and reassured investors, "I am so proud of our internal pricing mechanisms, weekly calls, scatter diagrams, apps that tell us pricing that we drive our business and I'm going to claim that report is unsubstantiated from the conclusions it tries to make." ¶681; *see also* ¶678 (Waltz to analyst: "I can't control obviously what our competitors do … or listen to somebody else saying here's the price you need and reacting to that"). In reality, Atkore coordinated pricing as ManBear alleged and "controlled" competitors by enforcing the price-fixing agreement. ¶169. These statements are actionable. *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 210 (D. Conn. 2023) (sustaining misstatement that defendant "did not find any evidence [of] structured collusion or price fixing").

### 2. Atkore Did Not Operate in a Competitive Environment

Defendants repeatedly claimed Atkore priced its PVC Pipe in a "competitive" market based on supply and demand. For example, on March 2, 2021, Johnson claimed that Atkore had "good competitors," "everyone keeps each other on their toes" (¶431) and Atkore's "pricing is dynamic" and based on "the competitive nature in that region." ¶432. On August 3, 2021, an analyst asked about "price elasticity" and if "price is not a barrier," because it seemed "the market will take as much as you can deliver." ¶465. Waltz responded it was "an average thing for a competitor" to tell customers that the competitor would "charge 3% or 4% less" than Atkore. *Id*.

Defendants made numerous similar statements throughout the Class Period. Contrary to

13

Defendants' claim (D.Br.12), their statements went far beyond "mentioning" competitors. In December 2021, Waltz rhetorically asked investors, "Do we have to be competitive?" and answered, "Absolutely" (¶494). In February 2024, Waltz stated Atkore's pricing was "on track," "we've put in one or two price increases," and "we're still optimistic going forward on these attempting to push the prices in the industry up." ¶645. He stated Atkore's "profit and pricing" was determined by "just general industry volume," (¶646), there was "nothing of significance" going on in "the competitive landscape" (¶647), and Johnson added "the competitive landscape is fairly stable year-over-year." *Id*. On February 20, 2024, when analysts asked how Atkore was "achieving sustainable … margins post-pandemic," Waltz responded, "the industry has gotten more consolidated, great competitors out there.... We're all competing really now, which I think is effectively on value." ¶650; *see also* ¶653 (Waltz: "we do have good competitors"; our competitors are out leading price increases"; "we lead more … but we're not the only ones"; "we are holding and/or increasing price … as the underlying commodities dropping"; "even if … we didn't expect a competitor to drop price, we had to match."). Atkore's Form 10-K said of the civil antitrust suits: "The Company believes there are defenses, both factual and legal…." ¶696.[8]

Defendants' claims that Atkore operated in a competitive market were false. Courts sustain claims where, as here, Defendants "purported to inform investors about the competitive environment, the sources of revenue, or the basis of their pricing decisions, but ***obscured or omitted material information about the same topics***" (*i.e.*, Atkore's pricing scheme). *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 466 (E.D. Pa. 2020); *see Ontario Tchrs.' Pension Plan Bd.*

---

[8] *See also, e.g.*, ¶526 (5/3/022: an analyst asked, "are you seeing any changing competitive dynamics around pricing from smaller suppliers specifically?" and Johnson said, "everyone is really struggling with higher input costs …"); ¶611 (Johnson, 6/14/2023: pricing actions by Atkore's "great competitors" would lead to Atkore "giving back" profits); ¶612 (Johnson, 6/14/2023: Atkore had "probably a little bit better pricing environment than what we thought" and "g[ave] back less than we had intended or … thought").

*v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 158 (D. Conn. 2019) (misleading to tout "fierce" competition when defendant priced "in tandem" with competitors); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 599 (N.D. Cal. 2019) (misleading to tout market as "competitive" with "widespread price fixing"); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 418 (E.D. Pa. 2019) (misleading to state "[w]e face strong competition" with market "riddled with anticompetitive conduct"); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *7 (S.D.N.Y. Mar. 28, 2018) (misleading to claim market was "very competitive" given anti-competitive conduct); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (company stated it competed but failed to disclose anticompetitive agreement).

Plaintiff alleges numerous facts showing the PVC Pipe market was anti-competitive, including that: (i) numerous "plus factors" supporting collusion (¶¶322-65), (ii) PVC Pipe prices spiked while input costs remained constant or fell (¶¶341-44); (iii) analysts' intense focus on Atkore's pricing, supply and Defendants' supposed explanations for sharp price increases (¶¶487-89); (iv) DOJ's ongoing investigations of Atkore and Otter Tail (¶¶393-95, 815-16); (v) OPIS (¶¶142-45) and Atkore competitor Westlake's settlements of the Antitrust Claims (Ex. B); (vi) Atkore and its supposed competitors agreed to raise and set prices to the penny (¶321); (vii) Atkore discussed ███████████████████████████████ (¶¶152-83); and (viii) emerging evidence of direct phone communications between Atkore and its competitors (Ex. A).

Defendants also made repeated specific claims that the competitive forces of supply and demand governed Atkore's PVC Pipe pricing. For example, on November 9, 2022, Waltz asserted that "on pricing, the biggest thing is supply, demand and service." ¶544. Similarly, on November 18, 2022, Waltz claimed that, on pricing, "it's more a supply, demand than it really is the underlying commodities." ¶562. On May 9, 2023, Waltz claimed "the biggest thing that controls

15

our profit is just supply/demand in the market." ¶603. Likewise, on February 1, 2023, Waltz claimed he was "cautiously optimistic for growth" on "demand in PVC" (¶582)[9] and that "the things that drive our ability to price are supply/demand competition." ¶584. On August 6, 2024, Waltz also stated "supply demand constraints … drive[] our business." ¶682.[10] These statements were materially false and misleading because they claimed competitive supply and demand forces governed Atkore's PVC Pipe pricing when, in truth, it was anti-competitive agreements. *See In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468, at *7 (D. Idaho Feb. 21, 2007) (sustaining misstatements that pricing was due to market factors, when in fact due to price-fixing scheme).

Defendants' claims about Atkore's "dynamic" pricing were also false and misleading. On November 11, 2021, Waltz stated Atkore had "the ability to put price increases through virtually instantaneously." ¶476. On June 14, 2023, Johnson was asked "about how dynamic the pricing is," and he responded "we literally price on a day-to-day basis by product line, by region, by customer." ¶610. Johnson claimed "we pretty much know ahead of time if prices are going up or down, are able to react to that," and "the only time where you might get upside down there is if it's a supply-demand situation…. And I think our competition does very similar things." *Id.*[11] In truth, Atkore's was set in advance with competitors through OPIS. ¶427; *Menkes v. Stolt–Nielsen*, 2006 WL 1699603, at *8 (D. Conn. June 19, 2006) (statements that business achieved success in a

---

[9] Defendants assert Waltz meant **metal** electrical volumes. D.Br.13n.5. But Waltz was addressing a question about "PVC" first, and "almost" back to answering the analyst's "first question" about metal. D.Ex.40 at 7.
[10] *See also* ¶451 (7/13/2021: analysts asked "how pricing works at Atkore," and Johnson responded Atkore looked at "commodities," "freight and labor," "input cost"); ¶487 (11/18/2021, when asked about "sustainability of price," Waltz claimed Atkore was "in a higher price environment with supply and demand constraints"); ¶562 (Johnson, 11/18/2022: Atkore's FY2023 projections supported by "market demand environment"); ¶¶568-70 (Waltz, 11/30/2022: "supply-demand imbalance" was "biggest factor" driving Atkore pricing; an "art" to Atkore "hold[ing] pricing" high even when input costs decreased); ¶588 (Johnson, 2/21/2023: "PVC is very much in balance supply and demand … Q1 actuals and our Q2 guide were pretty similar in nature … embedded in that is a stabilization of pricing over that period of time").
[11] *See also, e.g.,* ¶591 (Johnson, 2/1/2023: "our pricing is very dynamic … we can be very … agile when it comes to any changes in input costs").

16

competitive environment were false where complaint alleged anticompetitive activity).[12]

Defendants assert their descriptions of market conditions were accurate because there were supply chain disruptions during COVID and competition from imports. D.Br.13-14. These factual assertions cannot be resolved on a motion to dismiss, and any role played by COVID or imports does not undermine that, irrespective of any such dynamics, Atkore still found it necessary to agree with its supposed competitors on setting and raising PVC Pipe prices during the Class Period.[13]

### 3. Defendants Misrepresented the Sources of Atkore's Profits

Defendants falsely attributed Atkore's record profits and margins to factors other than anti-competitive pricing. For example, on February 17, 2021, Waltz claimed Atkore "had a record number of profits" due to "new product development, bringing value to the customer, automation, digitization…" ¶¶422; 425 (Waltz touting Atkore's "manufacturing capability," being "automated where other people aren't," "honest communication with our customers" and the ability to deliver in "one to two weeks time."). Defendants repeatedly attributed Atkore's success to factors such as Atkore's "Business System." *E.g.*, ¶439 (Waltz, 4/29/2021: citing "Atkore Business System, including particular focus on commercial and operational execution"); ¶444 (Waltz, 4/29/2021: citing "sustained efficiency" of "Atkore Business System").[14] Defendants also cited Atkore's

---

[12] Defendants also said Atkore was focused on increasing volume, or that volume was not impacted by its pricing, when Atkore's non-competitive pricing constrained volume. *See, e.g.*, ¶536 (on August 2, 2022, an analyst asked, "[a]s volume declines, how price is tied to that and is it different for PVC than … other areas?" Waltz responded, "we want to maximize both price and volume"); ¶593 (on February 21, 2023, when asked if Atkore's earnings would be impacted by a decline in sales volumes, Johnson replied, "we just don't see [sales volume declines].... In most cases we have two or three competitors by price.").

[13] Defendants continued to mislead investors after disclosure of the ManBear Report. D.Br.14n.6. As addressed below, this premature "truth on the market" defense fails. *Infra* at 36. Moreover, Waltz denied the report's allegations (¶681) and the market did not learn the full extent of Atkore's reliance on price-fixing to drive profits until it was revealed through subsequent corrective disclosures. *See* ¶¶370-420.

[14] *See also, e.g.*, ¶¶484-85 (Waltz, 11/18/2021: Atkore's financial performance due "to increased average selling prices" and "resilience of our business model"); ¶489 (Johnson, 11/18/2021: attributed $186 million of higher average selling prices to "Atkore business systems," including "delivery service, new products"); ¶500 (Waltz, 1/31/2022: claimed "[t]he commitment of our team and our focus on executing the Atkore

purported customer service and reliability to explain the price increases. ¶445 (Johnson, 4/29/2021: crediting "increased prices" to "just delivery and being able to service our customers and being able to get the price for the value that we're offering to market at this point in time").[15]

Defendants also reassured investors Atkore's prices would not fall (or "normalize") by likening Atkore's one-stop shopping business model to Amazon. *E.g.*, ¶¶475, 476 (Waltz responding to question about price normalization by claiming Atkore had higher margins because of its "value proposition," its "one stop shop," "the one order delivery invoice," and "[Atkore's] expertise"); ¶540 (Waltz claimed Atkore's "success" was due to "the Atkore business system" and the Company's "one order, one delivery, one invoice" sales model, which he compared to Amazon's).[16] Similarly, on November 30 2022, Waltz told investors Atkore enjoyed a "price

Business System drove margin expansion"); ¶516 (Waltz, 5/3/2022: attributed Atkore's growing profitability to "our team's dedication to serving our customers and the resilience of the Atkore Business System, which continues to successfully guide our operations through pricing volatility"); ¶532 (Waltz, 8/2/2022: attributed "year-over-year earnings growth and margin expansion" to "the strength of the Atkore Business System and our industry-leading solutions…"); ¶¶551-54, 557 (on November 18, 2022, Waltz attributed Atkore's financial success to "our strategic initiatives to expand our portfolio and deliver differentiated value to our customers" and "the resilience of our business model" (¶551), and Defendants attributed the financial success to "higher average selling prices," "our Atkore business system" (¶¶552-54), "elevated prices" and "our foundational Atkore Business System" (¶557)); ¶¶580, 584 (on February 1, 2023, Waltz attributed Atkore's ability to keep prices high despite falling input costs to the "resiliency of our Atkore Business System model" (¶580), its "value proposition," and "ability to co-load in one order, one delivery, one invoice, our electronics, our customer service" (¶584)); ¶618 (Waltz, 8/8/2023: attributed Atkore's "solid results in the third quarter" to "the strength and stability of our business model").

[15] *See also, e.g.*, ¶452 (Johnson, 7/13/2021: the driver of excess margin in PVC conduit was Atkore's "strategy around holding our on-time performance," and "our lead time," which "led to some very substantial price increases"); ¶457 (8/3/2021: Waltz attributed Atkore's "record earnings" and expanded margins to "strong demand and outstanding execution amidst industry supply constraints" as well as "Atkore's focus on delivering for our customers"); ¶465 (Waltz, 8/3/2021: "if you have the material, you have a good say-do ratio, you're honest with your customers, they are ... willing to pay more"); ¶469 (9/9/2021: when asked how Atkore created the "pricing power," Waltz claimed "our team has been able to service the customer really well,' and what "customers care about most" is "getting their product on time" and "[t]hey're willing to pay a price premium for that"); ¶629 (Waltz, 11/17/2023: attributed "solid results" to "strategic initiatives" that "deliver differentiated value to our customers").

[16] *See also, e.g.*, ¶493 (Waltz, 12/2/2021: Atkore was "able to drive price and profits" because "we truly are the one-stop-shop across all these products"); ¶523 (Waltz, 5/3/2022: attributed Atkore's pricing to "still the value package of confidence in delivery" and "the other things Atkore really does well with one order, one delivery, one invoice, our reputation and so forth"); ¶576 (Waltz, 2/1/2023: attributed Atkore's financial

premium" because of (i) Atkore's managing "supply-demand imbalance" through "shipping quickly" and "manag[ing] our backlog" (¶¶567-68); (ii) the "convenience" of the Company's Amazon-like "one order, one delivery, one invoice" sales model allowing customers "to bundle products together," which he called a "truly unique, sustainable, competitive advantages on pricing that no one else has" (¶569); and (iii) Atkore's ability to manage "input costs" to "get more price than cost" and relationships "with every major distributor out there" (¶570).

These claims misled analysts and investors. By February 18, 2025, after several quarters of negative results, an analyst expressed that he thought Atkore's much-touted "one order, one delivery, one invoice" model "was going to protect you from … competitors." ¶713. In response, Waltz stated, "some of our ... largest customers out there have never bought a single imported product, and they're loyal to us"; they are the "same as Atkore, they don't have to be the same price, nor do they want to be at the same price as the person with three shops and so forth." *Id*.

Defendants' attributing Atkore's high prices and profit margins to Atkore's supposed commercial advantages were materially false and misleading. In truth, the source of Atkore's inflated revenues, margins and profits was Atkore's anti-competitive pricing. ¶428. *See Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*, 2018 WL 1071442, at *4 (N.D. Ill. Feb. 27, 2018) (defendants touting "frequency trends were … favorable" imposed duty to disclose

---

success to how "we leverage our diversified approach and broad portfolio of leading solutions to capture opportunities for growth"); ¶589 (2/21/2023: when asked "how Atkore is able to record $1 billion of price versus cost and related EBITDA," Waltz responded, "underlying Atkore is what we call the Atkore Business System.… We truly have a system from how we recruit people to how we price … that's [what is] paying fruition." Waltz continued, "Atkore has the competitive, sustainable advantage of one order, one delivery, one invoice as we continue to do that.... we could get you pay a premium for that … those things are the primary drivers"); ¶634 (Waltz, 11/17/2023: "really the stuff that we presented in November a year ago [the November 2022 "waterfall" projection] is playing out other than slightly better … because of our service, our Regional Service Centers, the ability for one order, one delivery, one invoice"); ¶644 (Waltz, 2/1/2024: "we're a price leader because we have that one order, one delivery, one invoice and we have the ability to bring more value than many of our competitors to the industry"); ¶710 (Deizter, 2/18/2025: it took "decade to build [PVC] business ... to build that network of facilities, integrate them, and … operational footprint to then start to move into an edge-out strategy").

"reduction in underwriting standards" that drove trends); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at \*6 (N.D. Cal. Feb. 27, 2018) (defendants' attributing account growth to "cross-selling" actionable where they failed to disclose millions of fake accounts); *Speakes*, 2018 WL 4572987, at \*7 (finding actionable Taro's claims that sales revenue increased "primarily due to price adjustments during the year and increased market share of select products" and "the prudent lifecycle management support product portfolio"); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp. Inc.*, 2013 WL 1100819, at \*3 (W.D. La. Mar. 15, 2013) (sustaining claims concerning LHC's statements that its revenues were due to "organic growth," rather than Medicare abuse); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013) (once Gentiva put cause of financial success at issue, it was "obligated to disclose information concerning the source of its success"); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010) (attributed success to business practices, failing to disclose price-fixing drove revenue); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (claims sustained based on undisclosed drug approval scheme where defendants claimed success was due to their expertise).

Misstating the law, Defendants assert Atkore had no duty to accuse itself of wrongdoing. D.Br.10. The principle they cite from *Holwill v. AbbVie Inc.* is inapplicable to the literally false statements alleged here. 2025 WL 1908156, at \*11-12 (N.D. Ill. July 10, 2025) (Tharp, J.). Plus, "the failure to disclose uncharged criminal conduct may be actionable where the failure to do so would make other disclosures materially misleading." *Speakes*, 2018 WL 4572987, at \*4; *accord Holwill*, 2025 WL 1908156, at \*10 (same). Defendants repeatedly "put[] the topic of the cause of [Atkore's] financial success at issue," requiring them to disclose their coordination of pricing with competitors to avoid their statements being materially misleading. *Gentiva*, 932 F. Supp. 2d at 368; *In re St. Paul Travelers Sec. Litig. II*, 2006 WL 2735221, at \*4 (D. Minn. Sept. 25, 2006)

20

(statements about revenue required disclosure of bid-rigging). Defendants' cases are inapposite.[17]

Defendants also broadly assert the Complaint claims "these statements are misleading because they did not also attribute Atkore's financial results to the alleged price fixing." D.Br.13. Not so. The statements attribute financial results to specific causes and thus gave rise to a duty to disclose the actual cause. Plaintiff has not alleged merely "accurately-reported financial statements" (*id.*) as misleading but specific statements attributing those results to specific causes.[18]

Defendants also argue that several of these statements are vague optimistic corporate statements. D.Br.16-17. They miss that these are the supposed competitive advantages to which Defendants pointed for the basis of Atkore's pricing, margins and profits, including in direct response to analyst inquiries, which support their materiality. *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (concern among analysts supports materiality). Also, Defendants' argument that some of these claims represent their "opinions" about Atkore's strong market position (D.Br.17-18) ignores they are statements of purported fact concerning sources of profits, and Defendants' failure to disclose that the true cause of Atkore's success was Atkore's anti-competitive pricing is a material omission. *Rensin, Tr. of Rensin Joint Tr. v. U.S. Cellular Corp.*, 755 F. Supp. 3d 1048, 1061-63 (N.D. Ill. 2024) ("opinion statements" actionable as "material omission" under *Omnicare* where defendant "omitted material facts").

### 4. Atkore's Profits and Margins Were Not Sustainable

---

[17] *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 172 (S.D.N.Y. 2023) (defendants did not claim "some legitimate competitive advantage," unlike here); *Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 901 (N.D. Ill. 2001) (no facts suggested defendant's "opinion about its own compliance" were untrue); *Societe Generale v. Caterpillar, Inc.*, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) (similar); *United Food & Com. Workers Int'l Union Loc. 464A v. Pilgrim's Pride Corp.*, 2022 WL 684169, at *5 (D. Colo. Mar. 8, 2022) (no ruling on statement that market was "highly competitive"); *KBC Asset Mgmt. NV v. Discover Fin. Servs.*, 2025 WL 976120, at *17 (N.D. Ill. Mar. 31, 2025) (no present fact statements were misleading); *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (same).
[18] Defendants' unreported authority *Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018) is inapposite. It concerned only "[a]ccurately reported financial statements" and not the claimed reasons therefor. *Id.*

21

Defendants repeatedly claimed Atkore's profits and margins were sustainable. On February 17, 2021, asked whether Atkore could sustainably "pass through costs," Waltz claimed Atkore would "make money … on the way up or down … we're selling the value of the bundled package of innovative product," touting Atkore's knack for "holding the price up as our costs go down." ¶426. On November 11, 2021, Waltz stated, on pricing, "we perform well no matter what ... I would expect that to continue going forward." ¶476. On November 9, 2022, when asked if Atkore could hold on to high pricing if there were deflation, Waltz responded Atkore "absolutely can hold on to it" and "we will hold on to a lot of the profit we will get back some." ¶544.

In November 2022, Waltz and Atkore claimed that, of the benefit Atkore had driven in pricing and profitability, "approximately 40% of that benefit [$400 million] is sustainable going forward" and price "normalization will, by and large, be behind us this year" and "our pricing power will even be that more robust." ¶¶558-62. On February 21, 2023, when analysts questioned Defendants about Atkore's November 2022 claim, Johnson stated "it was "actually a little too conservative" as "pricing is a little stronger than what we had thought." ¶590. On May 9, 2023, an analyst asked how Atkore planned to maintain high PVC prices given declining input costs, and Waltz responded, "our pricing is not down 50% ... we are doing better than expected," referred back to its November 2022 claim of retaining 40% in pricing, and stated: "we're as comfortable today as … when we put the plan together … we are on track." ¶604. Also on February 20, 2024, an analyst asked, "Why wouldn't you change your guidance other than maybe you're worried about more price normalization," and Johnson responded, "I don't think we're worried about that." ¶654.[19] These statements were materially false and misleading when made. Atkore's pricing,

---

[19] *See also, e.g.*, ¶470 (Waltz, 9/9/2021: "we will be able to hold on to a lot more margin that we had in the past" because "we're a great supplier"; and "we'll be able to hold on to" "some of the price premium …"); ¶541 (Waltz, 11/9/2022: "the sustainability of our profit, it's because of the ability to add more things"; this

margins, and profits were not sustainable; they were the result of anti-competitive pricing behavior that, once revealed, would sink Atkore's profits.

Defendants' financial guidance and claims Atkore was on track to hit it (*e.g.*, ¶¶422-24, 441-43, 459-64, 470, 483, 487-88, 502-04, 510, 518-22, 524, 534-35, 537, 544, 550, 555, 558-63, 577-83, 588, 590, 592, 599-604, 612, 618-21, 630-34, 640-42, 644-45, 652, 654, 660-61, 663-64, 669, 675, 677-80, 683, 690-91, 693, 695, 702, 704, 719-20, 726) were false and misleading because they contained embedded false facts, omitted material facts, put profit sources at issue without disclosing the collusion, and the guidance was not achievable absent price-fixing. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185, 189 (2015); *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 483-84 (N.D. Ill. 2021) (guidance misleading when "not achievable" given contrary knowledge); *McKesson*, 411 F. Supp. 3d at 600 (guidance false where it put source of profits from collusion at issue by attributing revenue to "drug ... price increases").

Defendants' guidance and statements that profits were "sustainable going forward" are not protected by the PSLRA safe harbor. D.Br.15. They included assertions of present fact, including Atkore's supposed ability to sell "the value of the bundled package of innovative product" (¶426) and Atkore being "really good [at] ... holding the price up as our costs go down" (*¶id.*) and "I don't think there's any concern there" around potential price normalization (¶605). Such "statements of past or present facts are not covered by the safe harbor provision—even when they are inextricably tied with forward-looking statements." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 965

---

is "like Amazon.... It's the same logistical thing"); ¶633 (Johnson, 11/17/2023: "the sustainable pricing increases that we discussed are still holding"); ¶646 (Waltz, 2/1/2024: on profit and pricing, "the one order, one delivery, one invoice that just is a competitive, sustainable advantage"); ¶652 (2/20/2024, when analysts asked "how do you get so precise" about the claim of retaining 40% in pricing, Johnson responded "sequentially our pricing is firming"; "we're in the ballpark of … our original expectations"); ¶663 (5/7/2024: when asked about statement that if certain things did not pan out, pricing could be impacted, Waltz said, "right now things are playing out as expected ... there's no foreshadowing").

(N.D. Cal. 2014); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1334-35 (7th Cir. 1995) (statement engines "were making progress toward their targets" was "historical statement," not forward-looking). Also, Speaking Defendants had actual knowledge of the non-sustainability of Atkore's anti-competitive pricing, given their personal oversight of weekly pricing meetings, and Waltz and Pregenzer's sales on February 26, 2024 of nearly ***50,000 shares*** of Atkore stock when clear signs indicated the conspiracy was weakening. ¶¶771, 785; *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *18, 20 (N.D. Ill. Sep. 21, 2005) ("actual knowledge" where "defendants were high level managers who had access to reports" contradicting "predictions being made in public").

Defendants' statements were not accompanied by meaningful cautionary language. The language Defendants cite, like Atkore's generic provision that it might not "maintain established price levels" (D.Br.16) was neither "cautionary" nor "meaningful." Atkore failed to disclose substantial, known, contrary present facts, including its anti-competitive pricing scheme and that it did not support "sustainable" margins. *See, e.g.*, *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 949 (N.D. Ill. 2015) (Safe Harbor inapplicable where defendants "represent[] a risk that already has materialized … as a risk that ***could*** develop in the future"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (similar). The adequacy of Atkore's cautionary language is a fact-specific question inappropriate for resolution "before plaintiffs have access to discovery." *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. Sept. 3, 2004).[20]

### 5. Defendants Made False and Misleading SOX Certifications

Johnson and Waltz also certified that Atkore's SEC filings did not contain any omissions or false statements of material fact, while knowingly concealing Atkore's anti-competitive pricing.

---

[20] Defendants' cases are inapposite. *See Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 846 (N.D. Ill. 2009) (voluminous, detailed language warning about relevant risks); *Panasuk v. Steel Dynamics, Inc.*, 2009 WL 5176193, at *9 (N.D. Ind. Dec. 21, 2009) (specific, present-tense warnings of materialized risks).

*E.g.*, ¶446. This omission rendered Defendants' statements in SEC filings (including the SOX Certifications) materially false and misleading. *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1307 (D. Utah 2007) (holding that, because plaintiffs alleged a defendant was aware of and involved in fraud concerning a defendant company, "a reasonable person would believe that [his] statements in the … SOX certifications were false or misleading").[21]

### 6. Defendants Omitted Material Adverse Facts

Each of Defendants' affirmative statements above about Atkore's pricing, supposed competitive environment and advantages, triggered a duty to disclose material, undisclosed facts concerning those statements, in order to render them not materially misleading. *Kaufman v. Motorola, Inc.*, 1999 WL 688780, at *6 (N.D. Ill. Apr. 16, 1999). This included that Atkore:

- used OPIS to share forward-looking pricing with competitors (¶¶86-150) and enforce agreements to increase and stabilize PVC Pipe prices (¶¶151-321);

- coordinated price increases over 20-30% above market levels (¶347) that were the source of Atkore's outsized revenues, margins and profits (¶¶558-59);

- could not sustain the price increases in non-manipulated market conditions, subjecting Atkore to losses when its practices were publicly exposed (¶¶369-420);

- knew by early 2024 that the price-fixing scheme was unraveling (¶¶297-310), including because of imports not subject to the scheme (¶845), and over-accumulation of inventory, which posed a threat to Atkore's profitability (¶¶325-28). *See also* ¶429.

### C. The Complaint Pleads a Strong Inference of Scienter for Each Defendant

The PSLRA requires Plaintiff to plead "facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A)—*i.e.*, that Defendants knew or recklessly disregarded their statements were false. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). The inference must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiff's allegations must be assessed "holistically," *id.* at 322,

---

[21] Plaintiff does not claim Defendants are liable for the analysts' statements. D.App'x.5 ¶¶556, 564, 585.

326, and "need not plead a 'smoking gun'—they can build a case from multiple threads." *Makor*, 513 F.3d at 710. Contrary to Defendants' arguments (D.Br.20-34), a strong inference may thus be drawn from circumstantial facts taken together, even if none alone would suffice. *Id.* at 709; *see Azar v. Grubhub, Inc.*, 2021 WL 4077327, at \*6 (N.D. Ill. Sept. 7, 2021) ("The inferential significance of any single allegation can be determined only by reference to all other allegations.").

### 1.     Plaintiff's Holistic Allegations Raise a Strong Inference of Scienter

The Complaint raises a strong inference of each Defendant's scienter through facts including the Speaking Defendants' control over Atkore's prices, Pregenzer and Sherman's participation in price-fixing communications, Defendants' "motive" and "public statements," the "core nature" of PVC to Atkore, "suspicious departures," and "government investigations." *Chow v. Archer-Daniels-Midland*, 2025 WL 790854, at \*4 (N.D. Ill. Mar. 12, 2025).

***The Speaking Defendants Controlled PVC Pricing.*** Defendants Waltz and Johnson, who controlled Atkore's internal "pricing excellence" initiative (¶¶87, 830), told investors they received "weekly" pricing data and met every Friday to "talk[] about the dynamics of [PVC] pricing" and "***decide[] on what the pricing is going to look like literally for the next week***." ¶¶735-41.[22] The Friday meetings coincided with OPIS's weekly issuance of *PVC & Pipe Weekly* and pricing data, through which Atkore and competitors communicated pricing agreements, to its limited subscriber base. ¶¶737-38. The Speaking Defendants, who also received pricing information from those ***actively participating in*** price-fixing communications through OPIS (*see infra* at 27-28), set PVC prices that regularly matched competitors' prices ***to the penny.*** *E.g.*, ¶¶321, 735-42. The inference that the Speaking Defendants decided Atkore's prices knowing they matched the prices Atkore and its supposed competitors already agreed upon is more compelling

---

[22] Waltz and Pregenzer also attended annual and all-hands meetings about pricing (¶¶76-78), and after Deitzer became CFO, he demonstrated his knowledge of "pricing" in Atkore's "PVC business." ¶832.

than any contrary inference, *i.e.*, that time and again, the Speaking Defendants coincidentally set prices exactly as Atkore's price-fixing agreements with its supposed competitors dictated.[23]

***PVC Pricing Data Flowed Continuously Among Sherman, Pregenzer and the Speaking Defendants.*** Atkore's GM of PVC, Jeff Sherman, who formulated price changes and generated price sheets (¶¶839-40), ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ¶254. Sherman also communicated pricing decisions to Pregenzer near-daily and each month gave Pregenzer a comprehensive update on Atkore's PVC business. ¶¶106-09, 747-48, 845-46. Pregenzer knew of Atkore's pricing agreements with competitors; ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ ¶¶138-39, 163-68, 749.

---

[23] Contrary to Defendants' assertions (D.Br.25), Plaintiff's allegations go far beyond corporate roles and meeting attendance, making it "unlikely that the then-CEO and CFO…would ***not*** have known about" Atkore's price-fixing. *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 895 (N.D. Ill. 2023); *see Chow*, 2025 WL 790854, at *4. Defendants' cases (D.Br.24-26) are inapposite. Unlike this case, many lacked allegations that defendants knew or had access to facts contradicting their statements. *See Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings*, 679 F.3d 952, 955 (7th Cir. 2012); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 540 (5th Cir. 2008); *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *19 (N.D. Ill. Sept. 30, 2024); *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 539 (9th Cir. 2024); *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *22 (N.D. Ill. May 24, 2011); *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *13 (W.D. Wash. Dec. 4, 2023); *Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *12 (N.D. Ill. Jan.12, 2021); *In re Integra Lifesciences Holdings Corp. Sec. Litig.*, 2025 WL 1798386, at *13-20 (D.N.J. June 30, 2025); *City of Roseville*, 713 F. Supp. 2d at 401. Unlike Defendants here, the *In re Level 3 Commc'ns, Inc. Sec. Litig.* defendants offered a more compelling nonculpable inference. 667 F.3d 1331, 1345 (10th Cir. 2012). *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *26 (N.D. Ill. Feb. 13, 2013) found scienter based on defendants' participation in meetings specifically addressing the subjects of the fraud and thus favors Plaintiff. And the Complaint does not speculate Defendants "must have known" (D.Br.31-32)—it relies on their admission that ***they decided Atkore's prices***. *See In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *10 (N.D. Ill. July 12, 2006); *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 798-99 (N.D. Ill. 2007).

Pregenzer, armed with pricing data from Sherman ████████, reported comprehensively on pricing to Waltz, Johnson, and Deitzer at monthly executive meetings in Chicago. ¶¶840-43. The meetings covered PVC Pipe pricing and spreads—the very metrics artificially inflated by the scheme—for up to four hours, with Waltz and Johnson doing a "deep dive." ¶¶98-101, 843-44. This pricing data communication from Sherman to Pregenzer and the Speaking Defendants— supports scienter. *See, e.g.*, *Phoenix*, 690 F. Supp. 3d at 892, 894-95 (executives "received materials explicitly documenting the problem").

***Suspicious Stock Sales.*** During the Class Period, Defendants Waltz, Johnson, and Pregenzer collectively sold over 486,000 shares of Atkore stock for over ***$62.5 million*** in total proceeds and over $23 million in profit. ¶756. By contrast, during the prior 1,627-day control period, Johnson and Pregenzer made no sales, and during the Class Period, Waltz sold over ***four times*** as many shares (for over ***13 times as much*** in proceeds) as during the control period. ¶¶766, 776, 783. Contrary to Defendants' assertion that their Class Period sales "were not timed to take advantage of the alleged fraud" (D.Br.27), the sales were suspiciously timed. For example, immediately after OPIS privately advised on February 23, 2024 that co-conspirators "won't be able to raise prices at all"—and Atkore's stock price was near its Class Period high—Defendants began selling, and sold approx. 117,000 shares for $19.6 million in sales between February 26 and March 4, 2024, ***not*** pursuant to a Rule 10b5-1 plan. ¶¶770, 779, 787.[24]

---

[24] Defendants' incentive compensation (*supra* Facts §V) further supports a strong inference of scienter. ¶¶797-808. *See Allison v. Oak Street Health, Inc.*, 2023 WL 1928119, at *9 (N.D. Ill. Feb. 10, 2023). Defendants assert that performance-based compensation is "typical of nearly every corporation." D.Br.30-31. But Atkore's price-fixing inflated the very metrics driving Defendants' compensation—metrics Atkore attributed to "pricing of PVC products." ¶¶797-808; *see Chow*, 2025 WL 790854, at *5 ("nothing generic" where compensation linked to performance of segment bolstered by fraud). Defendants' cases are either inapposite or cut in Plaintiff's favor. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018) (no compensation allegations); *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Ruth*, 99 F.4th 928, 953 (7th Cir. 2024) (crediting incentive compensation); *In re Skechers USA,*

Defendants' contrary assertions fail. ***First***, Defendants assert that "several trades were pursuant to Rule 10b5-1 plans" (D.Br.28), but the sales in early 2024 (***immediately after*** the private revelation that competitors failed to agree to another price increase) were not. ¶¶770, 779, 787. Defendants' trading plans also "provide[] no defense to scienter allegations" because they were adopted during the Class Period, after the scheme began (¶¶765nn.30-31, 775n.33, 782n.35),[25] and Plaintiff "sufficiently alleges that the purpose of the plan[s] was to take advantage of an inflated stock price." *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).[26] Further, Defendants' authorities do not involve suspicious sales on the "very first day" that options became exercisable, just days after Defendants privately learned negative information. ¶785.[27] ***Second***, Defendants assert Johnson's and Waltz's sales were innocent because they were "on their way out the door." D.Br.28-29. But their departures were unexpected (¶¶376, 415-16) and long after the sales: Waltz left in August 2025, nine months after he sold in November 2024; and Johnson left in July 2024, four months after he sold in March 2024. ***Third***, Defendants' retaining some stock also does not undermine scienter because Atkore's policy required Waltz, Johnson and Pregenzer to retain stock amounts tied to their salary (¶759) and "none of these Defendants could have sold their full holdings of Atkore stock." ¶760; *Makor*, 513 F.3d at 710.

***Departures by Defendants and Other Key Personnel.*** The suspicious departures of key

---

Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 527 (S.D.N.Y. 2020) (incentive compensation less than base pay); *Fifth Third*, 2022 WL 1642221, at *23 (no allegations tying compensation to fraud).

[25] *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012) and *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) are thus inapposite.

[26] Contrary to Defendants' argument (D.Br.28n.14), Plaintiff need not allege, verbatim, a plan's "purpose." Defendants cite *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 n.4 (2d Cir. 2022), which quotes *Blanford*, 794 F.3d at 309, but the *Blanford* complaint—which defeated a trading plan defense—alleged defendants entered plans during the class period and "[a]s a result" could "cash in on" an "artificially inflated stock price." Compl. ¶¶83-84, ECF No. 71, *La. Mun. Pol. Emps.' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 11-cv-00289 (D. Vt.).

[27] *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *29 (N.D. Cal. Mar. 30, 2022); *Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 936 (N.D. Ill. 2011).

personnel further "cement the strong inference" of scienter. *Chow*, 2025 WL 790854, at *4; *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (resignations "reinforce" scienter). Johnson unexpectedly announced his departure on July 23, 2024, after Atkore reduced guidance on May 7, 2024, and **the day before** the ManBear Report. His responsibilities were then separated, with Deitzer taking over as CFO and a former auditor taking over accounting. ¶794. Sherman then left Atkore in August 2024, shortly after the ManBear Report. ¶107. Waltz announced his unexpected retirement on August 5, 2025 as part of a negative earnings announcement (¶795) and before Atkore had a replacement (D.Ex.63). Defendants assert their departures are not suspicious (D.Br.29-30), but this is a fact question, and they were the kind of departures the *Phoenix* court (cited by Atkore) found supported scienter. 690 F. Supp. 3d at 894-95 ("sudden" departure of CEO "close to [corrective] disclosures").[28]

**The ManBear Report, DOJ Investigations, and OPIS Settlement.** Defendants knew of the ManBear Report's price-fixing evidence by August 6, 2024, when Waltz called the Report "unsubstantiated." ¶¶809-12. The Report contained screenshots from over 20 OPIS reports from January 2022-July 2024, and highlighted FTC guidance cautioning against sharing pricing through industry groups. ¶¶809, 811. Defendants—who set the prices the Report discussed—made their misstatements after that date at least recklessly as to their falsity. Atkore and Otter Tail are also targets of an ongoing criminal investigation by the DOJ's Antitrust Division (¶815), which

---

[28] Defendants' other cases are inapt, as they did not involve consecutive suspicious departures of a CEO, CFO, and key scheme participants (here, Sherman left in July/August of 2024; Melissa Kidd (SVP of Sales) left in July 2025; and Serge Boutros (President of Plastics business unit) left around the same time as Waltz in August 2025 (¶796)). *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020); *In re Downey Sec. Litig.*, 2009 WL 736802, at *11 (C.D. Cal. Mar. 18, 2009); *Harrington v. Tetraphase Pharms. Inc.*, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017); *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 140 (D. Mass. 2021); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062-63 (9th Cir. 2014); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017); *San Antonio Fire & Police Pension Fund v. Syneos Health, Inc.*, 75 F.4th 232, 244 (4th Cir. 2023).

"cement[s] the strong inference" of scienter. *Chow*, 2025 WL 790854, at *4. After civil antitrust plaintiffs filed suit against OPIS and PVC Pipe makers (including Atkore), OPIS abruptly ceased publication of *PVC & Pipe Weekly* and quickly reached a $6 million settlement (¶¶817-19), and Westlake settled antitrust claims against it for $67 million.[29]

*Core Operations.* As PVC Pipe is a central product for Atkore and significantly drove Atkore's revenues (*supra* Facts § II), the core operations doctrine further supports Defendants' scienter. *See Makor*, 513 F.3d at 709 (scienter inference "more likely" than "its opposite" in part because fraud concerned company's "most important products"). Defendants assert (D.Br.26) that allegations of a core operation are insufficient to show scienter. But unlike in Defendants' cases, Plaintiff alleges specifics beyond just core operations,[30] *e.g.*, that PVC Pipe was a critical product for which the CEO and CFO admitted they closely tracked and set prices every Friday. ¶22.

*Atkore's Corporate Scienter.* Atkore's scienter is properly founded on "the state of mind of the individual corporate official or officials who make or issue the statement or ... who furnish information or language for inclusion therein." *Makor*, 513 F.3d at 708. The Speaking Defendants' scienter is attributable to Atkore because they made the statements. Sherman and Pregenzer were directly involved in the anti-competitive communications (¶¶752-55) and their scienter is imputed to Atkore because they "furnished" information to the Speaking Defendants "for inclusion" in their

---

[29] Contrary to Defendants' assertions that the ManBear Report, antitrust lawsuits, and DOJ subpoena revealed mere "accusations" (D.Br.32), ManBear screenshotted non-public OPIS reports reflecting anti-competitive communications. ¶¶681, 809-12. The Speaking Defendants—who set PVC prices every week—could not have read these screenshots without recognizing their anti-competitive nature. *See City of Livonia Emps' Ret. Sys. & Loc. 295/Loc. 851, IBT Emp. Grp. Welfare Fund v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013). Defendants' cases are inapposite. Unlike in *Fifth Third Bancorp*, 2022 WL 1642221, at *22, the ManBear Report (and not only the DOJ subpoena) supports scienter. Contrary to *U.S. v. Filer*, 762 F. Supp. 3d 730, 758 (N.D. Ill. 2025), scienter is also supported by OPIS (and Westlake) promptly settling the antitrust claims. *Helwig v. Vencor, Inc*., 251 F.3d 540, 552 (6th Cir. 2001).

[30] *See Boeing*, 2022 WL 3595058, at *11; *In re Adient PLC Sec. Litig.*, 2020 WL 1644018, at *29 (S.D.N.Y. April 2, 2020); *Baxter*, 2021 WL 100457, at *13; *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 557 (S.D.N.Y. 2024).

31

pricing statements. ¶¶835-41, 852-53. For example, on the February 17, 2021 earnings call that Plaintiff alleges included false statements, Waltz said, "we literally had our presidents [*e.g.*, Pregenzer] and our general managers [*e.g.*, Sherman] [provide the] assumptions" underlying Atkore's earnings projections and related claims concerning Atkore's performance. ¶836. Similarly during a July 13, 2021 conference, Johnson said he and Waltz met weekly with "the major sales leaders and business leaders" to discuss "pricing strategy and what we're seeing in the marketplace"—the very topics of Defendants' false statements. *Id.*; *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 516 (E.D. Va. Mar. 2, 2018). Sherman also provided pricing information to Pregenzer for his presentations to Waltz and Johnson, which informed their statements. ¶¶840-42.

Defendants assert corporate scienter cannot be imputed because (i) no data "furnished" was false; (ii) no employee furnished information for the challenged statements; (iii) Sherman is not "sufficiently senior"; and (iv) Pregenzer "knew of [no] illegality." D.Br.33-35. Each contention fails for the reasons discussed above and the following additional reasons.[31] *First*, the misleading omission alleged in the Complaint is that Atkore's financial results and "pricing strategy" was based on an anti-competitive scheme to which not only the Speaking Defendants, but also Pregenzer and Sherman, were privy and central, and Pregenzer and Sherman presented pricing information from the anti-competitive scheme to Waltz and Johnson. *See* ¶¶428-29, 875-83. *Second*, Sherman is sufficiently senior for his scienter to matter, as Waltz relied on executives at his level (¶836) and, as GM of PVC, Sherman "was in the middle of everything" (¶107), reported directly to Pregenzer, and provided pricing information for Pregenzer's presentations. ¶¶743, 840-

---

[31] Defendants also argue that corporate scienter may not be "collective" (D.Br.32), citing *Hill v. Tribune Co.*, 2006 WL 2861016, at *12 (N.D. Ill. Sept. 29, 2006), and *Chew*, 2024 WL 4346522, at *23. But those cases are inapposite because the Complaint alleges scienter for specific, identifiable individuals.

42.[32] *Finally*, Defendants assert Pregenzer "knew of [no] illegality" (D.Br.34-35), but Pregenzer ████████████████████████████████████████████ (¶¶124, 166, 168), supporting an inference of knowledge or recklessness. *City of Livonia*, 711 F.3d at 756.

### 2. Defendants' Remaining Scienter Arguments Should Be Rejected

The Court should reject Defendants' attempts to "pick apart Plaintiff['s] allegations … in isolation." *Chow*, 2025 WL 790854, at *4; D.Br.24-32. Plaintiff's allegations stand up to each scienter challenge, and Defendants offer no alternative, nonculpable explanation.

### a. Defendants' "Double Scienter Hurdle" Is Not the Law

Defendants argue Plaintiff must clear a "double scienter hurdle" by alleging each Speaking Defendant both (i) knew of the lower-level employees' communications with OPIS and (ii) knew those communications violated the antitrust laws. D.Br.20-21. The law does not require this.[33]

Defendants assert the mistaken premise that Plaintiff needed to plead that the Speaking Defendants knew of the communications with OPIS *and* that they violated the antitrust laws. D.Br.20. But the test is whether Defendants knew or recklessly disregarded that *their statements to investors* were false or misleading. *Makor*, 513 F.3d at 704. The Complaint alleges the Speaking Defendants—who set Atkore's prices to match competitors' *to the penny* as they received pricing

---

[32] *Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *5 (S.D.N.Y. Sept. 19, 2018), *College Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, at *17 (N.D. Ill. Sept. 18, 2023), and *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Mysis Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 884 (N.D. Ill. 2011) are distinguishable because they did not involve employees with Sherman's direct connection to the underlying fraud. *E.g.* ¶¶747-49, 839-52. For the same reason, Sherman's resignation is relevant to scienter. *Cf.* D.Br.29. As a suspicious departure, Sherman's scienter may be imputed to Atkore, and unlike the departing employees in *OfficeMax, Inc.*, 527 F. Supp. 2d at 803 n.14, Sherman implemented the price-fixing and was the source of PVC pricing information for Defendants. ¶¶107, 839-42, 850.

[33] Defendants' cases are inapposite. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) (allegedly false regulatory reports at a foreign subsidiary, not as here, defendants personally setting prices central to fraud); *Holwill*, 2025 WL 1908156 (conduct not per se wrongdoing, unlike price-fixing); *Toft v. Harbor Diversified, Inc.*, 2025 WL 357776 (E.D. Wis. Jan. 31, 2025) (same); *Valspar Corp. v. E.I. Du Pont de Nemours & Co.*, 873 F.3d 185, 199 (3d Cir. 2017) (antitrust case with "no evidence" of "discussion of prices" or "agreement").

information from Pregenzer (who was privy to OPIS communications) and Sherman (who was an active participant)—knew or at minimum recklessly disregarded facts rendering their statements false.[34] Plaintiff also clears Defendants' hurdles: competitors agreeing to adopt identical prices via an intermediary is "so obviously illegal that anyone familiar with it would presumably recognize as much." *Holwill*, 2025 WL 1908156, at *15; *Chow*, 2025 WL 790854, at *4. Knowing Atkore's conduct was improper, Waltz repeatedly denied talking to his competitors (as if doing so would have been problematic (¶¶493, 524, 537)), and Atkore took steps to keep such communications secret, including ██████████████████████████████ ██████████████████████████████████████████████████ ¶190.

### b. Defendants' Challenges to the Former Employees Fail

Defendants argue the Court should "steeply discount" the FE allegations. D.Br.22-24. It should not. Here, the FE accounts are strengthened by "numerous" such witnesses, firsthand knowledge, and corroboration. *Makor*, 513 F.3d at 712. The Complaint describes each FE by title and tenure, and Atkore's communications produced by OPIS corroborate their accounts. The PSLRA does not require the FEs to attest that Defendants' conduct was illegal. They reported facts regarding what Defendants knew and when. Considered holistically with the Complaint's other allegations, the FEs contribute to falsity and a strong inference of fraudulent intent. *Id.* at 711-12.

Defendants ask the Court to disregard FE-1's accounts of Atkore's strategic emphasis on pricing and business review meetings because he "left Atkore before the Class Period." D.Br.23. But Waltz and Johnson admitted their involvement in pricing throughout the Class Period, and the other FEs confirm the practices reported by FE-1—including monthly meetings, spread tracking,

---

[34] The law does not require "smoking gun" evidence, such as Speaking Defendants being told point-blank Atkore was violating antitrust laws. D.Br.21. Contrary to Defendants' claims (D.Br.20 n.8), Pregenzer's and Sherman's scienter is relevant; and Speaking Defendants' scienter can be inferred based on information from Pregenzer and Sherman. *Supra* Argument § I.C.1 (corporate scienter analysis).

and information flow to Defendants—continued during the Class Period. ¶¶76-78 (FE-2), 102 (FE-3), 106-09 (FE-4). FE-1 also reported to Waltz and interacted with Waltz and Johnson daily (¶¶98-101), unlike the FE in *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323 (S.D.N.Y. 2009).

Defendants also argue FE-2, FE-3, and FE-4 were not "involved in pricing." D.Br.24. But they had firsthand insight into Defendants' knowledge of pricing information. *See, e.g.*, ¶¶109, 845 (FE-3 attended vast majority of monthly PVC meetings, confirmed monthly meetings between Sherman and Pregenzer, and heard Sherman discussing pricing); ¶¶76-78 (FE-2 attended meetings with Waltz and Pregenzer about PVC pricing). Here, each FE offers concrete, firsthand facts connecting Speaking Defendants to PVC pricing. *See, e.g.*, ¶¶75, 91, 98-101, 106, 136, 745. Defendants incorrectly argue (D.Br.23) scienter cannot be founded on facts from AW-1, who corroborated the scheme's mechanics and Todd's communications with PVC manufacturers, and is not offered to show Defendants' state of mind. ¶¶136-40. Finally, in Defendants' cases, unlike here, vague FE accounts did not connect the defendants to matters key to the alleged fraud.[35]

### D. The Complaint Adequately Alleges Loss Causation

Loss causation requires only that plaintiff plead defendant "is at least one plausible cause of the economic loss." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011). It "ought not place unrealistic burdens" at the "pleading stage. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997). Rule 8 applies, requiring "some indication of the loss and the causal connection that the plaintiff has in mind." *Boeing*, 2022 WL 3595058, at *28.

The Complaint plausibly alleges "a series of partial disclosures," *Akorn*, 240 F. Supp. 3d at 822, each followed by a "statistically significant" stock price decline. ¶¶854-59. ManBear's

---

[35] *See Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *8-10 (S.D. Ind. Jan. 4, 2016); *In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, at *6-11 (N.D. Ill. Feb. 20, 2007); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013); *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill. 2006).

accusation of price fixing (June 24, 2024, ¶¶376-84) and the DOJ subpoenas (Nov. 7, 2024, ¶¶393-96, and Feb. 14, 2025, ¶¶409-11) caused investors increasingly to suspect price fixing. Atkore did fix prices as alleged and investigated, ¶¶110-365, and that true suspicion was corrective. Atkore's results and guidance (on May 7, 2024 (¶¶370-75), August 6, 2024 (¶¶385-92), February 4, 2024 (¶¶397-408), and August 5, 2025 (¶¶412-20)) are corrective too because they revealed Atkore's inflated pricing and margins were not sustainable and were causally related to the unraveling of the scheme.[36] Prior to May 7, 2024, "cracks" "began to emerge," with the cartel "breaking ranks," ¶¶23, 27; *see* ¶¶295-308. PVC prices remained supra-competitive but declined through the final corrective disclosure. ¶¶329-49. Investigations and disappointing earnings and guidance suffice to plead loss causation for statements that misleadingly omit price fixing.[37]

Defendants *concede* loss causation is "properly alleged" as to June 24, 2024 but attack the remaining disclosures. These arguments fail. ***First***, Defendants' argument that the ManBear Report revealed the "full truth" is a premature "truth-on-the-market" defense "not [available] at the pleading stage." *Asher*, 377 F.3d at 734. Defendants cannot circumvent this by styling it as a loss causation argument. *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 489 (N.D. Ill. 2021).

---

[36] Loss causation is also alleged because Waltz unexpectedly retired on August 5, 2025 (the suspiciousness is supported by Waltz's role in setting prices, Johnson's departure the day before the ManBear Report, and Sherman's departure shortly after the ManBear Report. *Jastram v. NextEra Energy, Inc.*, 161 F.4th 693, 711-12 (11th Cir. 2025) (loss causation alleged as to CEO retirement during corruption scandal); *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (executive departures, taken with short seller report, government investigation, and disappointing earnings, "collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation").

[37] *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v. Impax Lab'ys, Inc.*, 843 F. App'x 27, 31 (9th Cir. 2021) (earnings misses support "loss causation on their price-fixing theory"); *Teva*, 671 F. Supp. 3d at 195-98 (corrective disclosures of investigations, earnings miss, and impairment); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 293 (E.D.N.Y. 2023) (corrective disclosures that "projected sales, earnings and margins fell" as price-fixing waned); *Evanston Police*, 411 F. Supp. 3d at 603-04 ("announcements of disappointing financial results or projections" revealed misrepresentations concerning price fixing); *Ontario Tchrs.'*, 432 F. Supp. 3d at 172-74 (corrective disclosures of "government investigation," "bad press," and antitrust lawsuit); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164-65 (S.D.N.Y. 2008) ("*BMS*") (corrective disclosure of government antitrust investigation).

The ManBear Report did not fully eliminate the inflation in Atkore's stock price or reveal the true source and non-sustainability of Atkore's margins. The Report was also gradually corroborated by the DOJ subpoenas, Atkore's earnings and guidance, and executive departures. *Teva*, 671 F. Supp. at 195-98 (price fixing not fully disclosed by "lawsuit and bad press," and later disclosures of investigations and earnings corrective as well). Defendants also ignore: statistically significant stock price declines on the six other days, *Asher*, 377 F.3d at 734; Defendants' denial of the report as a "unsubstantiated" (¶684; D.Br.19); and their misstatements after the ManBear Report, ¶¶671-729. ManBear made "contestable allegations of wrongdoing," which subsequent disclosures made "more credible ... and thus more likely to be acted upon as truth." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791, 795 (9th Cir. 2020).[38]

***Second***, each DOJ subpoena revealed "something ***new***." D.Br.35.[39] Defendants do not argue the subpoenas were known earlier, only that ManBear identified a "***risk*** of a regulatory investigation." D.Br.36. But Plaintiff is only required "to describe how the falsity of the defendant's misstatement was revealed …, not to describe all the ways in which it was ***not*** revealed." *Grigsby*, 979 F.3d at 1206.[40] Even if a risk is already known to the market, "new

---

[38] Defendants' cases are inapposite. *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007) (misstatements were about 1997 audit; corrective disclosures concerned 1998 audit); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) (misstatements about improper recruiting practices unrelated to any corrective disclosures). *DeVry* held an investigation by a Senate committee was not corrective because the committee had no "authority to sanction." 2012 WL 1030474, at *17. The DOJ, which is investigating Atkore and Otter Tail, does.

[39] *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198,1206 (9th Cir. 2020) (disclosure of SEC investigation corrective); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016) (investigation corrective); *Oak St. Health,* 2023 WL 1928119, at *11 (investigation part of "series of partial corrective disclosures"); *Teva*, 671 F. Supp. 3d at 195 (antitrust investigation and complaint); *Ontario Tchrs.'*, 432 F. Supp. 3d at 172-74 (same); *Bristol Myers Squibb*, 586 F. Supp. 2d at 164-65 (similar); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287-88 (S.D.N.Y. 2008) (similar, collecting cases).

[40] Defendants' cases are inapposite. *Cai v. Visa Inc.*, 2025 WL 4091993, at *5 (N.D. Cal. Dec. 10, 2025) (applying Rule 9(b); dismissing where plaintiff failed to "connect" disclosure to theory of fraud); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311 (5th Cir. 2008) (NASDAQ notice of stock subject to delisting for late SEC filing revealed nothing about stock-option accounting); *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014) (defendant sanctioned in 2010; unsealed affidavits in 2012 gave no "new" information).

information *as to the extent*" is corrective. *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 982-83 (N.D. Ill. 2011); *In re NeoPharm, Inc. Sec. Litig.*, 705 F. Supp. 2d 946, 969-70 (N.D. Ill. 2010) (loss causation pled where "extent of the problems" not known). Defendants' cited cases (D.Br.36-37) are inapplicable because here, none of the corrective disclosures was "gleaned entirely from" previously public information. *Meyer v. Greene,* 710 F.3d 1189, 1198 (11th Cir. 2013). The DOJ knew non-public facts when issuing subpoenas, as did Atkore when cutting guidance. The ManBear Report, which Defendants do not challenge, was based on non-public OPIS reports.

*Third*, Defendants argue Atkore's earnings news did not relate to price-fixing. D.Br.37. But the disappointing results and guidance reductions were *caused* by the collapsing price-fixing. ¶¶23, 27, 295-308, 329-49. Defendants admitted these results were driven primarily by PVC pricing and competition. ¶¶370, 372-374, 386-91, 399-407, 412-19. These admissions and "analyst statements" plead loss causation. *Boeing*, 2022 WL 3595058, at *29. There is no further requirement Defendants admit the falsity of their statements. *Id.* at *28 (corrective disclosures need not "mirror image" misstatements). Guidance reductions comprise loss causation if "significant aspects of the still-concealed fraud" provided the catalyst for the miss. *Silverman*, 798 F. Supp. 2d at 980-81; *Macovski*, 553 F. Supp. 3d at 489 (for statements misleading by omission, a "later disclosure that revealed the whole truth" is corrective).[41] Defendants' argument that the disclosures related to "*future*" periods "after" the "scheme ended" (D.Br.37) fails because they revealed something about the past and were causally related to the misstatements. Defendants' assertion the scheme "ended" in "mid-2024" (*id.*) is a disputed extrinsic fact.[42]

## II.     THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY

---

[41] *Dell* (D.Br. 38) applies special rules for the so-called materialization-of-the-risk; the Seventh Circuit has rejected such special rules. *Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010).

[42] Defendants' charge of cherry-picking specific financial news (D.Br.38) is wrong, and "Plaintiffs need not … link each explanation" to an immediate stock price drop." *Akorn*, 240 F. Supp. 3d at 822.

38

Rule 10b-5(a) and (c) proscribe "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit." A scheme claim requires "acts that created a false appearance of fact." *Winemaster*, 529 F. Supp. 3d at 917. Scheme liability "capture[s] a wide range of conduct," including "conduct involving false or misleading statements," *Lorenzo v. SEC*, 587 U.S. 71, 79-81 (2019), rendering Atkore's assertion that scheme allegations must be "distinct" from misstatements (D.Br.39) "no longer tenable." *Winemaster*, 529 F. Supp. 3d at 918.[43] Here, the concealed price-fixing supports scheme liability. *BMS*, 586 F. Supp. 2d at 169-70 (defendant "secretly negotiated" anticompetitive agreement).

Defendants' scienter and loss causation challenges to the scheme claim fail for the reasons discussed above. The alleged scheme also involved "deceptive conduct" (D.Br.38), including misstatements, anti-competitive PVC pricing, collusion with supposed competitors, and stock sales at inflated prices (¶885), which was not "remote" from investors. D.Br.39-40.[44] Senior Atkore executives including Pregenzer orchestrated the price-fixing (¶¶733-42) and it drove margins, revenues, and profits, ¶¶821-25. *BMS*, 586 F. Supp. 2d at 170 (distinguishing *Stoneridge*). Defendants' cases involving low-level employees and isolated, foreign conduct do not apply.[45]

Nor does Plaintiff need to allege Defendants intended to affect securities markets. D.Br.39. Defendants quote the ***allegations*** in *Danske Bank*, not its holding that the scheme must have

---

[43] The PSLRA's requirement to specify each statement and reasons why it is misleading does not apply to scheme claims. *SEC v. Rio Tinto plc*, 41 F.4th 47, 55 (2d Cir. 2022). *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021), is not to the contrary.

[44] Conduct was "too remote" in *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, because defendants were third parties with no control over the issuer. 552 U.S. 148, 161 (2008). In *Pugh v. Tribune Co.*, the scheme "mastermind" worked at a subsidiary, was not an "executive officer of Tribune," did not act "in his Tribune capacity," and did not "intend[] to benefit Tribune." 521 F.3d 686, 696-98 (7th Cir. 2008).

[45] *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270 (E.D.N.Y. 2025) (frauds against individual customers); *In re Tupperware Brands Corp. Sec. Litig.*, 2021 WL 247870 (M.D. Fla. Jan. 25, 2021) (sales practices "implemented" by a non-defendant, low-level manager); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500 (S.D.N.Y. 2017) (bribery "years before" class period); *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95 (2d Cir. 2022) (payments to "investor relations" firm to repeat company statements).

occurred "in connection with the purchase or sale of a security." *Danske Bank,* 11 F.4th at 105. Plaintiff adequately alleges Defendants "knew or could have anticipated that" the scheme's results "would eventually reach investors," *Winemaster*, 529 F. Supp. 3d at 922, and Defendants' scheme intended to affect securities markets, such as through stock sales. ¶¶756-92.

**Lastly**, Defendants' assertion that "Pregenzer furnished objectively correct information" (D.Br.40) is a fact question and no defense. Pregenzer ███████████████████████ ████████████. *E.g.*, ¶124. That those prices were actually charged to customers is irrelevant. The undisclosed price fixing "injected inaccurate information into the marketplace" (D.Br.40): that Atkore's results reflected legitimate business practices, as opposed to price-fixing.

## III. THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON CLAIMS

The Individual Defendants are also liable under §20(a) for their control over the violations discussed above. Waltz, as CEO, had the "power to influence and control" Atkore's statements under §20(a). D.Br.40. Contrary to Defendants' suggestion, Plaintiff only asserts Johnson and Deitzer are liable under §20(a) during their tenures as CFO. *See* D.Br.40. And while Defendants assert Pregenzer "led only one of Atkore's [two] business segments," that segment accounted for over 75% of Atkore's revenue (¶76)—and **sold PVC Pipe**, to which the violations here relate. Pregenzer also provided the Speaking Defendants with the information they used to mislead investors (¶¶835-836) and thus had the requisite "ability to control the specific ... activity" underlying the § 10(b) violations. *Ont., Ltd. v. Zurich Capital Mkts.*, 249 F. Supp. 2d 974 (N.D. Ill. 2003). Defendants' authorities (D.Br.40), where the plaintiffs alleged it was "easy to imagine" control and pled "bare legal conclusions" do not apply. *Ont., Ltd.*, 249 F. Supp. 2d at 983-84; *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

40

Dated: April 24, 2026

Respectfully submitted,

By: */s/ Adam Wierzbowski*
**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
Salvatore J. Graziano (admitted *pro hac vice*)
Adam Wierzbowski (admitted *pro hac vice*)
Alexander Noble (admitted *pro hac vice*)
Shane D. Avidan (*pro hac vice* forthcoming)
Matthew S. Goldstein (admitted *pro hac vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
Adam@blbglaw.com
Alexander.Noble@blbglaw.com
Shane.Avidan@blbglaw.com
Matthew.Goldstein@blbglaw.com

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
Avi Josefson (Bar No. 6272453)
875 North Michigan Avenue, Suite 3100
Chicago, IL 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
Avi@blbglaw.com

*Lead Counsel for Lead Plaintiff Nykredit Portefølje Administration A/S*

41